## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**LAMARR MONSON,**

Plaintiff,

vs.

The **CITY OF DETROIT,** a Municipal Corporation
of the State of Michigan; the **DETROIT POLICE
DEPARTMENT; ISAIAH MCKINNON,** a former
Chief of Police of the Detroit Police Department;
**JOAN GHOUGOIAN,** a former Commander of the Detroit
Police Department, **BARBARA SIMON,** an Investigator
of the Detroit Police Department; **CHARLES BRAXTON,**
a police Sergeant of the Detroit Police Department;
**VINCENT CROCKETT,** a Police Officer of the Detroit
Police Department; and **JEROME WILSON,** a Police Officer
of the Detroit Police Department, jointly and severally,

Defendants.
                                                                           /
_____

**JOSEPH C. SMITH (P25480)**
**Joseph Conrad Smith, P.C.**
Attorney for Plaintiff
28411 Northwestern Hwy., Suite 960
Southfield, Michigan 48034
(313) 859-0229
jcsmith@josephconradsmith.com
                                                                           /
_____


## COMPLAINT AND DEMAND FOR TRIAL BY JURY

Plaintiff, **LAMARR MONSON,** (also hereinafter referred to as **"plaintiff"** or

**"Mr. Monson"**), through his attorney, **JOSEPH CONRAD SMITH, P.C.,** files this

Complaint against the above-referenced defendants, stating as follows:

Law Offices Of
Joseph Conrad Smith
8411 Northwestern Highway
Suite 960
Southfield, MI 48034
(313) 859-1000

## PARTIES

1.       At all times relevant herein, plaintiff, **LAMARR MONSON**, was, and is, a resident of the County of Wayne, State of Michigan.

2.       Defendant, **City of Detroit**, is a municipal corporation organized under the laws of the State of Michigan, and located in the County of Wayne, State of Michigan.  At all times relevant herein, the **City of Detroit** owned, operated and controlled the **Detroit Police Department.**

3.       Defendant, **Detroit Police Department ("the Department"),** is the law enforcement agency of the **City of Detroit.**

4.       At all times relevant herein, defendant, **Isaiah McKinnon ("McKinnon")**, was the Chief of Police of the **Detroit Police Department**.

5.       At all times relevant herein, defendant, **Joan Ghougoian ("Ghougoian")**, was employed by the **Detroit Police Department** as a Police Lieutenant and Commander of the **Department's** Homicide Section, located at 1300 Beaubien St. in the City of Detroit.

6.       At all times relevant herein, defendant, **Barbara Simon ("Simon")**, was employed by the **Detroit Police Department** as an Investigator assigned to the **Department's** Homicide Section, located at 1300 Beaubien St. in the City of Detroit.

Law Offices Of
Joseph Conrad Smith
3411 Northwestern Highway
Suite 960
Southfield, MI 48034
(313) 859-1000

2

7.      At all times relevant herein, defendant, **Charles Braxton ("Braxton")**, was employed by the **Detroit Police Department** as a police Sergeant assigned to the **Department's** Homicide Section, located at 1300 Beaubien St. in the City of Detroit.

8.      At all times relevant herein, **Vincent Crockett ("Crokett")**, was employed as a Police Officer by the **Detroit Police Department**.

9.      At all times relevant herein, **Jerome Wilson ("Wilson")**, was employed as a Police Officer by the **Detroit Police Department**.

## JURISDICTION AND VENUE

10.     The claims set forth in this Complaint arise out of deprivations of plaintiff's Constitutional rights guaranteed by the Fourth, Fifth, Sixth and Fourteenth Amendments of the United States Constitution.  The deprivations of plaintiff's Constitutional rights set forth herein were carried out under the color of state law, custom or usage, within the meaning of **42 USC §1983**.  Therefore, pursuant to **42 USC §1983, 28 USC §1331** and **28 USC §1343**, this Court has original jurisdiction to adjudicate plaintiff's causes of action as herein set forth.

11.     The events and omissions which form the basis of plaintiff's claims herein took place in the City of Detroit, County of Wayne.  Therefore, pursuant to **28 USC §1391(b),** venue is proper in the Eastern District of Michigan.

12.     The amount in controversy in this case exceeds $75,000.00.

Law Offices Of
Joseph Conrad Smith
8411 Northwestern Highway
Suite 960
Southfield, MI 48034
(313) 859-1000

3

## GENERAL AVERMENTS

13.     During the early morning hours of January 20, 1996, Christina Brown was brutally murdered.  This heinous crime took place in Apt. 7A of 2752 W. Boston in the City of Detroit.  **Lamarr Monson**, age 23, was arrested by defendants **Crockett** and **Wilson** without probable cause; detained and interrogated at Police Headquarters in violation of his Constitutional rights; denied access to an attorney; and coerced into signing a false "confession."

14.     **Mr. Monson** was told that if he signed an "information summary" prepared by defendant **Ghougoian,** in collaboration with defendant **Braxton,** he would be home within 24-hours.  After he signed the document prepared by these defendants, **Mr. Monson** was charged with First Degree Murder and held without bond.

15.     The sole evidence against **Mr. Monson** during his trial was the false "confession," which had been unlawfully coerced from him while he was illegally held by personnel of the **Detroit Police Department**.    On March 5, 1997, based solely on **Mr. Monson's** false "confession," a jury convicted **Mr. Monson** of second degree murder of Christina Brown.  After denial of his motion for a new trial, **Mr. Monson** was sentenced to 30-50 years in prison for a crime he did not commit.

16.     At the time of the events in this case, the apartment building located at 2752 W. Boston had sustained significant fire damage and most of the tenants had moved out.  Except

Law Offices Of
Joseph Conrad Smith
8411 Northwestern Highway
Suite 960
Southfield, MI 48034
(313) 859-1000

4

for 7 or 8 "tenants" who remained, the building was abandoned.  The building had no central heating and there was only makeshift electrical power.

17.    **Mr. Monson** met Christina Brown approximately two months before her untimely death.  In early January of 1996, **Mr. Monson** began using Apt. 7A of 2752 W. Boston.  Christina Brown, among others, would frequently "hang out" in Apt. 7A.  The few remaining "tenants" in the building knew **Mr. Monson** as "Marc Mason."   They knew Christina Brown as "Crystal."

18.    At 5 feet, 10 inches tall, Ms. Brown was slightly taller than **Mr. Monson**. Nearly every witness who testified during the murder trial, including the Medical Examiner who performed the autopsy, stated that Ms. Brown appeared to be at least 17 years of age.  One witness stated that she appeared to be 18, the age she claimed to be.  However, according to her mother, Christina Brown was a 12-year-old runaway.

19.    Several of the of the building "tenants" who gave statements to police following the murder of Christina Brown, claimed that they had purchased small ($10.00) quantities of marijuana or "crack" from "Marc" or "Crystal" in Apt. 7A.   No one actually "resided" in Apt.7A.  Christina Brown frequented the the apartment 3-4 days a week, occasionally spending the night there.  **Mr. Monson** lived with his parents at 2411 Highland in the City of Detroit.

20.    On the night before Christina Brown's murder, January 19, 1996, **Mr. Monson** left Christina in Apt. 7A at approximately 11:30 p.m.  He spent the night at the home of

Law Offices Of
Joseph Conrad Smith
8411 Northwestern Highway
Suite 960
Southfield, MI 48034
(313) 859-1000

5

Tawanna Crawford, the mother of his 6-year old daughter.  Ms. Crawford resided at 20737 Pierson Ct. in the City of Detroit.  **Mr. Monson** returned to 2752 W. Boston at approximately 2:00 p.m. the following afternoon.

21.     When **Mr. Monson** arrived at the apartment building, one of the "tenants" of the building, Linda Woods, was talking to a man that **Mr. Monson** recognized as the boyfriend Shellena Bentley, another "tenant" in the building.  Ms. Woods informed **Mr. Monson** that the door to Apt. 7A was open, but no one answered when she called out.  **Mr. Monson** proceeded to Apt. 7A, followed by Ms. Woods and the man to whom she had been talking.   When **Mr. Monson** went into the apartment, he discovered Christina Brown on the bathroom floor of the apartment.  She lifted her arms towards him, but was unable to speak.

22.     **Mr. Monson** could see that Christina Brown was severely injured.  Her head was swollen, and her face was covered with dried blood.  She had multiple cuts and lacerations on her hands, face and neck. There was blood on the bathroom floor, on all four walls of the bathroom and on the walls of the shower stall.   The bathroom window was shattered. **Mr. Monson** immediately went to the adjacent apartment, 6A, and began banging on the door.

23.     Apartment 6A was occupied by Kenneth Brown, his wife and two children. Mr. Brown would later testify that when **Mr. Monson** came to his door he was "hysterical," and pleaded with Mr. Brown to call EMS.  Mr. Brown, who had no telephone in his apartment, ran to a pay phone one block away and called EMS.  **Mr. Monson** drove to his sister's house

Law Offices Of
Joseph Conrad Smith
8411 Northwestern Highway
Suite 960
Southfield, MI 48034
(313) 859-1000

and called EMS himself.  When **Mr. Monson** returned to Apt. 7A, he placed a blanket on Christina Brown.  When she appeared to stop breathing he began chest compressions.

24.     Police officers **Vincent Crockett** and **Jerome Wilson** were the first responders to the crime scene.  They arrived at the building at approximately 2:10 p.m. on January 20, 1996.  **Mr. Monson** met the police officers at the front entrance of the apartment building and directed them to Apt 7A.  Linda Woods and Shellena Bentley's boyfriend were also present in the apartment.  The boyfriend identified himself to the police officers as "Raymond Lewis." He was actually Robert Lewis, using his brother's identity.

25.     Defendants **Crockett** and **Wilson** neither observed nor reported any suspected controlled substances or contraband of any kind.  Their investigation focused solely on the assault upon Christina Brown.    Although there was no probable cause to detain the three civilians who were present, defendant **Crockett** told them, "everyone is going to stay here." **Mr. Monson** and two other civilians complied with defendant **Crockett's** order.

26.     When EMS arrived, they transported Christina Brown to Henry Ford Hospital, where she was pronounced dead at 2:36 p.m. on January 20, 1996.  Based on what appeared to be multiple cuts, police personnel erroneously assumed that Christina Brown had been stabbed to death.  The actual cause of death was massive injuries to Christina Brown's skull and brain, a fact that would not be known until the Wayne County Medical Examiner issued his official report on February 1, 1996.

Law Offices Of
Joseph Conrad Smith
8411 Northwestern Highway
Suite 960
Southfield, MI 48034
(313) 859-1000

7

27.     After defendants **Crockett** and **Wilson** had interviewed **Mr. Monson** and the two other civilians, they ordered all three into their squad car.   Without probable cause to believe he had committed the assault upon Christina Brown, **Mr. Monson** was transported to the Homicide Section of Police Headquarters (1300 Beaubien St.) for "further interrogation." A second squad car which had arrived at the scene transported additional "tenants" of the apartment building to the Homicide Section of Police Headquarters for questioning.

28.     One "tenant" of 2752 W. Boston that the police did not interview on January 20, 1996, was Shellena Bentley.  Had they interviewed Ms. Bentley, she would have identified her boyfriend, Robert Lewis as the person who murdered Christina Brown.   Ms. Bentley also would have identified Robert Lewis' brother, Raymond, as the person who helped him dispose of the bloody clothing following the murder.

29.     At 4:00 p.m. on January 20, 1996, Paul Mark and Randy Richardson, the Detroit Police Department Evidence Technicians assigned to the case, arrived at 2752 W. Boston. According to Officer Mark's report, there were blood smears in the bathroom on all four walls, the door, doorframes, tub, sink, toilet, windowsill, shower curtain and the walls of the shower stall.

30.     Officer Mark's report also documented that the bathroom window was broken out, and there was blood on the outside of the window frame.  The bathroom floor was covered with blood, and there was also a kitchen-type knife with a wooden handle and a bent, 5 ½ blade, in the bathroom sink.  On the floor of the bedroom adjacent to the bathroom, there was a

Law Offices Of
Joseph Conrad Smith
3411 Northwestern Highway
Suite 960
Southfield, MI 48034
(313) 859-1000

bloody porcelain toilet tank top wrapped in a mattress cover.  The evidence technicians neither observed nor reported any suspected controlled substances or contraband of any kind.

31.     Officer Richardson dusted for prints, with positive results.   A print lift from the bathroom mirror was assigned Evidence Tag # 242489; print lifts from the shower walls in the bathroom were assigned Evidence Tag # 242490; and lifts from the porcelain toilet tank top found on the bedroom floor were assigned Evidence Tag #242491.

32.     At Police Headquarters, defendant **Barbara Simon** informed **Mr. Monson** of his Constitutional rights at 3:25 p.m.  She also gave him a Constitutional Rights Certificate of Notification, which he signed as "Marc Mason."   A hand-written notation on the Certificate states: "Lamarr Monson, AKA, Marc Mason, B/M/22, D.O.B. 1-31-72."   Defendant **Simon** signed the Certificate at 3:27 p.m.

33.     The Constitutional Rights Certificate of Notification that **Mr. Monson** signed indicated that he had the right to have a lawyer present before and during the time he answered any questions.  Upon signing the Certificate, **Mr. Monson** asked if he could call his parents to make arrangements for a lawyer.   He was told that he could make a phone call after he completed his statement.

34.     **Mr. Monson** also signed a Consent to Search Form.  In this form, **Mr. Monson** consented to have his vehicle searched without a search warrant.  He agreed that officers of the

Law Offices Of
Joseph Conrad Smith
8411 Northwestern Highway
Suite 960
Southfield, MI 48034
(313) 859-1000

9

**Detroit Police Department** could search his car for any "weapons, blood, clothes or any other evidence related to a homicide."

35.     Defendant **Simon** interrogated **Mr. Monson** for more than four hours, repeatedly challenging his account of events.   At some point during the interrogation, Defendant **Simon** told **Mr. Monson** that Christina Brown had died from her injuries, and that she was only 12-years-old.   This was the first time that **Mr. Monson** had any indication that Christina Brown had died or that she was not the age she claimed.

36.     **Mr. Monson** told defendant **Simon** that he had spent the night of January 20, 1996 with Tawanna Crawford, the mother of his 6-year-old daughter.    Defendant **Simon,** however, showed no interest in this information and made no attempt to corroborate **Mr. Monson's** claim.  Instead, defendant **Simon** made every effort to establish that an intimate relationship existed between **Mr. Monson** and Christina Brown.  Defendant **Simon** repeatedly challenged **Mr. Monson's** assertion that he had never been intimate with Christina Brown.

37.     Finally, at 7:45 p.m., defendant **Simon** wrote out a "statement."   She told **Mr. Monson** that when he signed the "statement" he could make his phone call.    The statement accurately set forth **Mr. Monson's** categorical denial of any involvement in the death of Christina Brown, as well as his explanation for giving a false name to police.  However, the statement misrepresented at least one fact, and completely omitted **Mr. Monson's** statement regarding his whereabouts on the night of the murder.

Law Offices Of
Joseph Conrad Smith
3411 Northwestern Highway
Suite 960
Southfield, MI 48034
(313) 859-1000

38. The statement signed by **Mr. Monson** included an "admission" that **Mr. Monson** had had sex with Christina Brown on one occasion. This was included in the statement even though **Mr. Monson** had explicitly denied having sex with Christina Brown. Additionally, although **Mr. Monson** told defendant **Simon** he had spent the previous night with Tawanna Crawford, defendant **Simon** omitted this critical information from his statement. **Mr. Monson** signed the statement in anticipation of recieving his telephone call and making arrangements for his release.

39. After obtaining **Mr. Monson's** signature on the statement, defendant **Simon** left Police Headquarters at approximately 8:00 p.m. However, **Mr. Monson** was not given access to a telephone. Instead, other investigators continued to interrogate **Mr. Monson** for an additional three hours. At approximately midnight, **Mr. Monson** was locked in a "holding cell" on the ninth floor of Police Headquarters. He did not sleep.

40. According to defendant **Simon**, the following day, she was assigned "Officer-in-Charge" of the case. She described her duties as overseeing the investigation, taking evidence to the crime lab for analysis, and preparing a report for the Prosecutor's Office.

41. At approximately 5:30 a.m. on January 21, 1996, **Mr. Monson** was removed from the 9th floor holding cell and taken to the office of the Homicide Commander, defendant **Ghougoian.** Defendant **Ghougoian** told **Mr. Monson:** "They want to charge you with First Degree Murder." Defendant **Ghougoian** pointed to a stack of papers on her desk and told

Law Offices Of
Joseph Conrad Smith
8411 Northwestern Highway
Suite 960
Southfield, MI 48034
(313) 859-1000

11

**Mr. Monson** that the evidence against him was overwhelming.  She also made reference to the fact that Christina Brown was only 12-years-old.

42.     Defendant **Ghougoian** assured **Mr. Monson** that she wanted to help him, but that she would need his help in order to do so.  She told **Mr. Monson** that if he would sign a second statement, establishing that he was acting in self-defense when Christina Brown was accidently stabbed, she could guarantee that he would be home within 24 hours.  Defendant **Ghougoian** told **Mr. Monson** this was his only way out.  Otherwise, she claimed he would be held in jail on a charge of First Degree Murder.

43.     As **Mr. Monson** pondered his situation, defendant **Ghougoian** questioned him about what he saw at the crime scene and how he thought the murder could have happened.  She suggested possible scenarios that could be used in a second statement, which she referred as an "information summary."  She insisted, however, that they needed to act quickly.   In reliance on defendant **Ghougoian's** promise that he would be home within 24 hours, **Mr. Monson** finally agreed to sign the "information summary" she proposed.

44.     Defendant **Ghougoian** stated that she would have one of her investigators prepare the "information summary" that would establish that **Mr. Monson** had acted in self-defense.  Shortly after 8:00 a.m., defendant **Braxton** came to defendant **Ghougoian's** office, and the two engaged in a discussion that **Mr. Monson** could not hear.  Defendant **Braxton** then took **Mr. Monson** to his office.

Law Offices Of
Joseph Conrad Smith
3411 Northwestern Highway
Suite 960
Southfield, MI 48034
(313) 859-1000

45.     Once again, **Mr. Monson** was read his Constitutional Rights.  When defendant **Braxton** advised **Mr. Monson** that he was entitled to have a lawyer present, **Mr. Monson** again asked if he could use the telephone.   Defendant **Braxton** responded: "We'll see." **Mr. Monson** was not given access to a telephone.

46.     As defendant **Braxton** began typing up the "summary," an exhausted **Lamarr Monson** laid his head down on defendant **Braxton's** desk.  **Mr. Monson** nodded yes or no to a few background questions.  For the most part, however, defendant **Braxton** typed the statement from an outline or notes written on a piece of paper.  As defendant **Braxton** typed, defendant **Ghougoian** came into the room several times.   She observed what defendant **Braxton** was typing and spoke to him in low tones that were not audible to **Mr. Monson.**  At one point, defendant **Ghougoian** came in with an evidence bag containing the bent knife retrieved from Apt 7A.

47.     **Mr. Monson** made no contribution to the "self-defense narrative," which purported to explain how Christina Brown was "accidently" stabbed.  The narrative was fabricated by defendant **Ghougoian** and defendant **Braxton.**   When the summary was completed, defendant **Braxton** showed **Mr. Monson** where to sign his name and where to place his initials.  **Mr. Monson** did not read the "information summary" but relied on the representation of defendant **Ghougoian** that once he signed the document he would be home within 24 hours.

Law Offices Of
Joseph Conrad Smith
8411 Northwestern Highway
Suite 960
Southfield, MI 48034
(313) 859-1000

13

48. After signing the "information summary," **Mr. Monson** was taken back to his holding cell. The following morning, defendant **Ghougoian** provided Chief of Police **Isaiah McKinnon** with an Inter-Office Memorandum entitled: SYNOPSIS REGARDING THE FATAL STABBING OF CHRISTINA BROWN, B/F/12, AT 2752 W. BOSTON, APARTMENT #A7, ON JANUARY 20, 1996

49. Defendant **Ghougoian's** Memorandum falsely represented that the Office of the Wayne County Medical Examiner had determined that the cause of Ms. Brown's death was multiple stab wounds. The Memorandum went on to state that Ms. Brown was selling marijuana and cocaine for **Mr. Monson**, and that he had at least one sexual encounter with her. The Memorandum stated, *"His assertion is that the stabbing occurred as a result of an argument which ensued because he had been with another woman."*

50. The Memorandum noted that the Wayne County Prosecutor's Office had recommended a charge of First Degree Murder against Mr. Monson. Defendant **Ghougoian** concluded the Memorandum by advising defendant **McKinnon** that the information contained in the Memorandum could "be released to the media per executive prerogative."

51. On the same day that defendant **Ghougoian** authored her Memorandum to defendant **McKinnon,** January 22, 1996, **Mr. Monson** was arraigned on a charge of First Degree Murder and ordered held without bond. After his arraignment, **Mr. Monson** was given access to a telephone for the first time.

Law Offices Of
Joseph Conrad Smith
3411 Northwestern Highway
Suite 960
Southfield, MI 48034
(313) 859-1000

14

52.     On the following day, January 23, 1996, an article appeared in the *Detroit Free Press,* pertaining to the "stabbing" murder of Christina Brown and the arrangement of **Lamarr Monson** for that murder.     According to the article, defendant **Ghougoian** stated that **Mr. Monson's** surprised and frantic behavior around the crime scene was a ruse. *"He tried to play this little thing of leaving and coming back and finding her."* Defendant **Ghougoian** went on to state that **Mr. Monson** later confessed to police.

53.     On January 24, 1996, defendant **Simon** requested the **Department's** crime lab to compare selected prints lifted from the crime scene with the prints of Christina Brown and **Lamarr Monson.** The print lifts selected by defendant **Simon** were the single print lifted from the bathroom mirror, and the multiple prints lifted from the bloody toilet tank top.  The request was submitted to Latent Print Examiner, Marcia M. Puckett.

54.     Ms. Puckett identified the single print taken for the bathroom mirror (Evidence Tag #242489) as belonging to **Mr. Monson.**   This finding was not incriminating because Mr. Munson was known to have frequented the apartment on a regular basis.  Of greater significance was the examination of the print lifts from the bloody toilet tank top (Evidence Tag #242491), which was the probable murder weapon. *None of the fingerprint lifts from the toilet tank top were attributable to **Mr. Monson.***

55.     One of the fingerprint lifts on the toilet tank top matched Christina Brown.  The other fingerprints were "unidentified."  There was also a palm-print that could not be compared to either Christina Brown or **Mr. Monson** because the examiner had no palm-prints from either

Law Offices Of
Joseph Conrad Smith
8411 Northwestern Highway
Suite 960
Southfield, MI 48034
(313) 859-1000

15

person for comparison.   Ms. Puckett's report was dated January 25, 1996.   The report specifically stated: "THERE IS STILL AN UNIDENTIFIED USABLE PRINT AND PALMPRINTS LEFT"

56.     Although the autopsy of Christina Brown was performed on January 21, 1996, the Wayne County Medical Examiner's Office did not issue its official report regarding the cause of death until February 1, 1996.   In its official report, the Wayne County Medical Examiner stated: *IT IS MY OPINION that death was caused by cranial cerebral injuries which were the result of a beating."*

57.     On February 2, 1996, a Preliminary Examination in **Mr. Monson's** case was held in 36th District Court, before the Hon. Jimmylee Gray. The first witness to testify at the Preliminary Examination was Jeff Harkey, M.D., the pathologist who performed the autopsy on Christina Brown. When asked the age of Christina Brown at the time of the autopsy, Dr. Harkey stated: *"She appeared older than her given age of 12 years. Most of us estimated her at around 17."*   Dr. Harkey went on to state that she was 5 feet 10 inches tall and weighed 115 pounds.

58.     Dr. Harkey described various external abrasions, scratches, lacerations and shallow "stab wounds" on the head, neck and arms of Christina Brown.   He also found evidence that she had been choked. Dr. Harkey described a 1 ½ inch cut running, up and down in front of the victim's left ear.   He stated that the fact that the ear itself was torn away from the skull, was consistent with the victim being hit with a heavy object.

Law Offices Of
Joseph Conrad Smith
8411 Northwestern Highway
Suite 960
Southfield, MI 48034
(313) 859-1000

16

59.     In his examination of the tissue between the skull and the scalp, Dr. Harkey found several hematomas (collections of congealed blood).  Dr. Harkey also found a fracture at the base of the skull, which began at the left temple and ran down and diagonally across the floor of the skull and then up to a point behind the right ear.  He felt these injuries were consistent with blunt force trauma from a heavy object.

60.     Dr. Harkey did not believe that the skull fracture could have been caused by pushing the victims head through a glass window.  He testified that the head injury was consistent with the victim being struck with a heavy object, ***such as the toilet tank top found at the crime scene***.  It was Dr. Harkey's opinion that the cause of death in this case was the extensive injuries to the brain and skull, caused by a blunt force trauma, consistent with something heavy being used on the head.

61.     Defendants **Simon** and **Braxton** also testified at the Preliminary Examination. They both testified, in essence, that the statements they took from **Mr. Monson** were voluntary and freely given.  They denied that any promises were made to **Mr. Monson.**  Both statements attributed to **Mr. Monson** were read into the record.  There was no testimony regarding the "unidentified" prints found on the toilet tank top.  Defendant **Ghougoian** did not testify at the Preliminary Examination or any other proceeding during the prosecution of **Mr. Monson.**

62.     When defendant **Simon** testified at **Mr. Monson's** Preliminary Examination, on February 2, 1996, she knew there were fingerprints on the probable murder weapon, which were not attributable to **Mr. Monson.**  Furthermore, despite having this knowledge for more

Law Offices Of
Joseph Conrad Smith
3411 Northwestern Highway
Suite 960
Southfield, MI 48034
(313) 859-1000

than a year before **Mr. Monson's** murder trial in March of 1997, defendant **Simon** made no effort to identify the person who left the prints. More significantly, this exculpatory fact was neither communicated to the Wayne County Prosecutor's Office, nor to **Mr. Monson's** attorney.

63.     The only evidence presented by the Prosecutor at the Preliminary Examination, which implicated **Mr. Monson** in the murder of Christina Brown, was the second statement **Mr. Monson** signed. Based on that signed statement, Judge Gray concluded that there was probable cause to believe the crime of First Degree Murder had been established. He also found that there was probable cause to believe that the defendant (**Mr. Monson**) had committed the offense.

64.     In May of 1996, **Mr. Monson's** attorney filed a motion to prevent the use of **Mr. Monson's** second statement on the grounds that it was not voluntarily and freely given. An evidentiary hearing on this issue was held before the Hon. Geraldine Bledsoe Ford on May 17, 1996. Only two witnesses testified at the evidentiary hearing, defendant **Braxton** and **Mr. Monson.** Again, defendant **Braxton,** testified, in essence, that **Mr. Monson's** second statement was voluntary and freely given. Defendant **Braxton** then read the entire second statement into the record.

65.     On cross-examination, defendant **Braxton** testified that defendant **Ghougoian** was the person who told him to take the statement from **Mr. Monson.** He also admitted that, "once or twice" she came in during his "interview" with **Mr. Monson.** Defendant **Braxton**

Law Offices Of
Joseph Conrad Smith
8411 Northwestern Highway
Suite 960
Southfield, MI 48034
(313) 859-1000

stated that he did not remember "interrogating" **Mr. Monson.** He claims he "just asked him what happened and wrote it down." In response to a question by the court, defendant **Braxton** stated that when he arrived at Police Headquarters, he was told that "**Mr. Monson** was ready to tell the truth about what happened yesterday."

66.     **Mr. Monson** testified that defendant **Ghougoian** told him that if he would sign another statement, he would be home within 24 hours. Otherwise, he would be charged with First Degree Murder. **Mr. Monson** also testified that defendant **Braxton** appeared to be typing the second statement from an outline. He stated that he was given an opportunity to read the statement that defendant **Braxton** typed, but he declined. Following the testimony of the two witnesses, the Court denied the motion to suppress the second statement, on the grounds that this was a question of fact for the jury.

67.     **Mr. Monson** was incarcerated for more than a year before his case was tried to a jury on March 3, 4, and 5th of 1997. Eleven witnesses were called during the three-day trial. However, the only evidence presented at trial, which connected **Mr. Monson** to the murder of Christina Brown, was the false "confession" that had been coerced from him by defendants **Ghougoian** and **Braxton** on January 21, 1996. Defendants **Simon** and **Braxton** both testified at the trial that the statements they took from **Mr. Monson** were voluntarily and freely made by him after he was advised of his Constitutional Rights.

68.     The fact that there were "unidentified" fingerprints on the bloody toilet tank top, which were not **Mr. Monson's,** was not communicated to **Mr. Monson's** attorney or

Law Offices Of
Joseph Conrad Smith
3411 Northwestern Highway
Suite 960
Southfield, MI 48034
(313) 859-1000

19

presented at trial. The fact that there were usable fingerprints found on the bloody smears in the shower stall, which apparently were never analyzed, was not communicated to **Mr. Monson's** attorney or presented at trial.

69. The fact that **Mr. Monson's** automobile was subjected to forensic testing, and that no weapon, blood or any other evidence of a homicide was found, was neither communicated to **Mr. Monson's** attorney nor presented at trial. Finally, the fact that a witness had contacted the defendant **Detroit Police Department** on two occasions and informed the **Department** that Robert Lewis had murdered Christina Brown, was never communicated to **Mr. Monson's** attorney or presented at trial.

70. In the absence of the exculpatory evidence that was known to the **Detroit Police Department,** the jury had only the "confession" that defendant **Ghougoian** had coerced from **Mr. Monson**. After three days of testimony, with no evidence of **Mr. Monson's** guilt beyond his coerced "confession," the jury convicted **Mr. Monson** of one count of second-degree murder. He was sentenced to 30-50 years imprisonment on March 21, 1997.

71. On appeal, **Mr. Monson** was represented by the State Appellate Defender Office. After his appeal was denied by the Michigan Court of Appeals, and the Michigan Supreme Court declined to review his case, **Mr. Monson** filed numerous *in pro per* pleadings in both State and federal courts. These efforts, however, were unavailing.

Law Offices Of
Joseph Conrad Smith
8411 Northwestern Highway
Suite 960
Southfield, MI 48034
(313) 859-1000

20

72.    Approximately three weeks after **Mr. Monson's** conviction, on March 27, 1997, Monica Childs, a veteran police investigator assigned to the Homicide Section, filed a lawsuit in the Wayne County Circuit Court against the **City of Detroit**, and **Joan Ghougoian**.  The lawsuit alleged that on August 20 and 21, 1996, **Ghougoian**, ordered Ms. Childs to take statements from two suspects in the shooting of an eleven-year-old boy.

73.    According to the complaint, **Ghougoian** had previously interrogated both suspects and had obtained confessions by promising the suspects that they could go home after confessing to their complicity in the murder.    The complaint further alleged that when Ms. Childs refused to testify that **Ghougoian** had *not* spoken to the two suspects, **Ghougoian** retaliated against Ms. Childs by transferring her out of the Homicide Section.

74.    Similar allegations were made in May of 1997, during a murder case pending before Judge Daphne Means Curtiss.  During an evidentiary hearing on a motion to suppress two "confessions," the defendants alleged their "confessions" were obtained after **Ghougoian** promised them they would be allowed to go home once their statements were signed.  Judge Curtiss ruled that the "confessions" obtained by **Ghougoian** were invalid because they were based on illegal promises **Ghougoian** made to the suspects.  Judge Curtiss also found that **Ghougoian** had lied by trying to shift responsibility for the illegal promise to another investigator.

75.    The two foregoing cases received extensive media coverage.  In the wake of these, as well as numerous similar complaints, the **Detroit Police Department** convened an

Law Offices Of
Joseph Conrad Smith
8411 Northwestern Highway
Suite 960
Southfield, MI 48034
(313) 859-1000

internal review board to investigate claims that defendant **Ghougoian** had routinely coerced confessions from suspects by promising their release. Defendant **Ghougoian** was transferred out of the Homicide Section before the internal investigation was completed, and she subsequently resigned from the **Detroit Police Department**.

76.     By March 2002, the Civil Rights Division of the United States Justice Department and the United States Attorney's Office for the Eastern District of Michigan had initiated a joint investigation into the policies and practices of the defendant **Detroit Police Department**. The Department's arrest and detention policies and practices were among the areas scrutinized. Following an extensive investigation, the Justice Department and the U.S. Attorneys Office made specific recommendations to facilitate the correction of unconstitutional practices.

77.     When the **Detroit Police Department** failed to adopt and/or implement the recommendations of the Justice Department, on June 12, 2003, the Justice Department filed suit against the **City of Detroit** and the **Detroit Police Department** in the United States District Court for the Eastern District of Michigan. Following the filing of the lawsuit, the parties entered into a Consent Judgment. The Consent Judgment provided, *inter alia*, that the **Detroit Police Department** would revise its arrest and detention policies in a manner that would prohibit and prevent unconstitutional practices.

78.     Further, the Consent Judgment prohibited the **Detroit Police Department** from conveying any individual to another location without probable cause to make an arrest or the

Law Offices Of
Joseph Conrad Smith
8411 Northwestern Highway
Suite 960
Southfield, MI 48034
(313) 859-1000

22

consent of the individual.   The Consent Judgment also prohibited the **Detroit Police Department** from detaining material witnesses without a court order.   Additionally, the **Department** was required to develop a policy ensuring that detainees would have reasonable access to attorneys, telephone calls and visitors.

79.     In early 2012, the Michigan Innocence Clinic ("the Clinic") at the University of Michigan Law School became involved in **Mr. Monson's** case.   On May 30, 2012, the Clinic filed a Freedom of Information Act request for the police documents pertaining to the murder of Christina Brown.   After more than 2 years, the request was denied.

80.     On July 8, 2012, after **Mr. Monson** had been incarcerated for more than 15 years, Shellena Bentley walked into a precinct station and requested to make a statement.   The statement pertained to the murder of Christina Brown.   According to Ms. Bentley, on the night of the murder, she and her boyfriend, Robert Lee Lewis, had decided to get high.   The boyfriend made several trips to the first floor apartment to purchase "drugs." After the last trip, Mr. Lewis returned to the apartment covered in blood.   He stated, "I had to kill that bitch. She scratched me."

81.     According to Ms. Bentley's statement, Mr. Lewis forced her to leave her apartment.   He took her to his mother's house, which was several blocks away.   He threatened to kill her and her children if she told anyone what had occurred.   Although Ms. Bentley feared for her life, shortly after the incident, she contacted the **Detroit Police Department** by

Law Offices Of
Joseph Conrad Smith
8411 Northwestern Highway
Suite 960
Southfield, MI 48034
(313) 859-1000

23

telephone on two occasions and told what she knew about the murder.  She came forward in person when she learned that Robert Lewis, and his brother Raymond, had moved out-of-state.

82.     Ms. Bentley also agreed to take a polygraph examination pertaining to the statement she had given to police.  The polygraph results did not indicate deception, and it was the opinion of the examiner that Ms. Bentley was being truthful regarding issues addressed.

83.     On November 6, 2014, the Clinic wrote to the Wayne County Prosecutor's Office of Conviction Integrity Unit ("CIU") and requested the CIU to arrange for the identification of the person who left the fingerprints on the toilet tank lid found at the scene of Christina Brown's murder.  The CIU rejected that request in a letter dated April 9, 2015.

84.     On August 31, 2015, after multiple requests to the Detroit Police Department and the Wayne County Prosecutor's Office, the Clinic finally received confirmation that the **Detroit Police Department** had matched a left thumb print on the toilet tank lid to Robert Lee Lewis, the same man implicated by Shellena Bentley.

85.     On September 27, 2016, pursuant to a court order, three items from the **Monson** case were submitted to the Michigan Department of State Police, Latent Print Unit.  The first item was the toilet tank top from the crime scene.  The second item contained known palm impressions of **Mr. Monson**.  The third item was a manila envelope containing the two fingerprint lifts from the toilet tank top, taken by the Detroit Police Department evidence technicians.

Law Offices Of
Joseph Conrad Smith
8411 Northwestern Highway
Suite 960
Southfield, MI 48034
(313) 859-1000

24

86.     The two fingerprint lifts taken from the crime scene by the evidence technicians were identified as the prints of Robert Lewis.  The examiner also identified seven (7) additional latent fingerprints from the toilet tank top.  They were all prints of Robert Lewis.  Five (5) of the prints were from the smooth finished top side of the toilet tank lid.  Two (2) of the prints were from the rough underside of the toilet tank lid.  No prints on the toilet tank lid were matched to **Lamarr Monson.**

87.     On January 30, 2017, the Honorable Shannon N. Walker granted **Mr. Monson's** motion for a new trial.  On August 25, 2017, the Wayne County Office of the Prosecuting Attorney issued a press release, indicating that the prosecutor's office would not retry the case against **Mr. Monson.**  Also, on August 25, 2017, Judge Walker entered an order dismissing the criminal case against **Lamarr Monson.**

## COUNT I

**(Liability of the City of Detroit, Isaiah McKinnon and the Detroit Police Department)**

88.     Plaintiff repeats the averments set forth in Paragraphs 1-87, by reference, as if fully set forth herein.

89.     On and before January 20, 1996, defendants, **City of Detroit, Isaiah McKinnon** and the **Detroit Police Department**, acting under color of state law, deprived **Mr. Monson** of his Constitutional rights guaranteed by the Fourth, Fifth, Sixth and Fourteenth Amendments of the United States Constitution in the following respects:

    (a)     **Defendants instituted and maintained written and/or de facto policies, which permitted or directed police**

Law Offices Of
Joseph Conrad Smith
8411 Northwestern Highway
Suite 960
Southfield, MI 48034
(313) 859-1000

25

officers to arrest persons such as Mr. Monson, without probable cause to believe that such persons had committed a crime;

(b)     Defendants instituted and maintained written and/or de facto policies, which permitted or directed police officers to transport persons such as Mr. Monson to the Homicide Section of Police Headquarters, without probable cause to believe that such persons had committed a crime and without their consent, for the purpose of conducting "further investigation;"

(c)     Defendants instituted and maintained written and/or de facto policies, which permitted the investigators of the Homicide Section, to detain and interrogate persons such as Mr. Monson, without probable cause to believe that such persons had committed a crime, without their consent and without judicial authority;

(d)     Defendants instituted and maintained written and/or de facto policies, which permitted the investigators of the Homicide Section, to lock in a "holding cell" persons such as Mr. Monson, without probable cause to believe that such persons had committed a crime and without their consent, for the purpose of obtaining evidence that would support a criminal prosecution;

(e)     Defendants instituted and maintained written and/or de facto policies, which permitted the investigators of the Homicide Section to deny detainees such as Mr. Monson access to a telephone for the purpose of contacting an attorney, or contacting family members who could contact an attorney on their behalf;

(f)     Defendants instituted and maintained de facto policies, which permitted the investigators of the Homicide Section, to withhold from the Prosecutor's Office exculpatory evidence that would call into question the guilt, or undermine the prosecution, of criminal defendants;

(g)     Defendants instituted and maintained de facto policies, which permitted Police Department personnel to ignore incoming telephone calls, identifying perpetrators of crimes in cases where another person had been charged with the crime;

Law Offices Of
Joseph Conrad Smith
'8411 Northwestern Highway
Suite 960
Southfield, MI 48034
(313) 859-1000

(h)     Defendants failed to train adequately all levels of police personnel regarding the procedures that must be followed in conjunction with the arrests, detention and interrogation of witnesses or suspects in order to achieve compliance with the Fourth, Fifth, Sixth and Fourteenth Amendments of the Constitution; further, defendants either knew, or should have known, that without such training, its law enforcement personnel were likely to violate the constitutional rights of persons such as Mr. Monson;

(i)     Defendants failed to train Police Department personnel how to document and utilize information from callers, identifying perpetrators of crimes in cases where another person had been charged with the crime; further, defendants either knew, or should have known, that without such training, its law enforcement personnel were unlikely to discover persons who had been wrongfully charged and prosecuted;

(j)     Defendants failed to perform routine audits of its law enforcement personnel to ensure that arrests, detentions, interrogations and collaborations with the Prosecutor's Office were were carried out in a manner that was constitutionally permissible or mandated; further, the defendants either knew, or should have known, that without such audits, its law enforcement personnel were likely to violate the constitutional rights of persons such as Mr. Monson.

90.     The foregoing acts and omissions constituted significant deprivations of well settled constitutional rights that were guaranteed to **Mr. Monson** under the Fourth, Fifth, Sixth and Fourteenth Amendments of the United States Constitution. Moreover, these deprivations resulted in the imprisonment of **Mr. Monson** for more than 20 years for a crime he did not commit.

Law Offices Of
Joseph Conrad Smith
8411 Northwestern Highway
Suite 960
Southfield, MI 48034
(313) 859-1000

27

## COUNT II

**(Liability of Defendants Vincent Crockett and Jerome Wilson)**

91.    Plaintiff repeats the averments set forth in Paragraphs 1-90, by reference, as if fully set forth herein.

92.    On January 20, 1996, defendants, **Vincent Crockett** and **Jerome Wilson**, acting under color of state law, deprived **Mr. Monson** of his Constitutional rights guaranteed by the Fourth, and Fourteenth Amendments of the United States Constitution in the following respects:

(a)    **During the course of investigating the assault upon Christina Brown in Apt. 7A of 2752 W. Boston, defendants detained Mr. Monson at the crime scene without probable cause to believe that he had committed the assault upon Christina Brown and without obtaining his consent;**

(b)    **After securing the crime scene at Apt. 7A of 2752 W. Boston, defendants transported Mr. Monson to Police Headquarters (1300 Beaubien St.) without probable cause to believe that he had committed the assault upon Christina Brown, without obtaining his consent and without judicial authority; and**

(c)    **Defendants transported Mr. Monson to Police Headquarters and placed him in custody in order to permit Homicide Section investigators to interrogate him and "develop" evidence which might constitute "probable cause" to support Mr. Monson's prosecution.**

93.    The foregoing acts and omissions constituted significant deprivations of well settled constitutional rights that were guaranteed to **Mr. Monson** under the Fourth, and Fourteenth Amendments of the United States Constitution.   Moreover, these deprivations resulted in the imprisonment of **Mr. Monson** for more than 20 years for a crime he did not commit

Law Offices Of
Joseph Conrad Smith
28411 Northwestern Highway
Suite 960
Southfield, MI 48034
(313) 859-1000

28

## COUNT III

### (Liability of Defendant Barbara Simon)

94.     Plaintiff repeats the averments set forth in Paragraphs 1-93, by reference, as if fully set forth herein.

95.     Defendant **Barbara Simon**, acting under color of state law, deprived **Mr. Monson** of his Constitutional rights guaranteed by the Fourth, Fifth, Sixth and Fourteenth Amendments of the United States Constitution in the following respects:

(a)     **When Mr. Monson was brought into Police Headquarters by defendants Crockett and Wilson on January 20, 1996, defendant Simon knew, or should have known, that Mr. Monson had been seized without probable cause to believe he had assaulted Christina Brown; without his consent; and without judicial authority; nevertheless, defendant Simon detained Mr. Monson in custody and interrogated him for more than four hours;**

(b)     **Defendant Simon wrote out a statement by hand that did not accurately reflect what she had been told by Mr. Monson; she included in the statement that Mr. Monson had been intimate with Christina Brown on one occasion, even though Mr. Monson stated he had never been intimate with Ms. Brown; further, she omitted from the statement the fact that Mr. Monson had accounted for his whereabouts on the night Ms. Brown was murdered; further she falsely represented to Mr. Monson that when he signed the statement he could make his requested phone call;**

(c)     **Defendant Simon denied Mr. Monson access to a telephone, even though she had told him he could use the telephone once he signed the statement she had prepared;**

(d)     **When defendant Simon left police headquarters on the night of January 20, 1996, she ordered Mr. Monson locked in a "holding cell" after other investigators had interrogated him; she gave this order even though she knew, or should have known, that there was no probable cause to believe Mr. Monson had fatally assaulted Christina Brown and that**

Law Offices Of
Joseph Conrad Smith
8411 Northwestern Highway
Suite 960
Southfield, MI 48034
(313) 859-1000

she had no judicial authority to lock Mr. Monson in a "holding cell;"

(e)    During her sworn testimony on February 2, 1996 (preliminary examination) and March 4, 1997 (jury trial) defendant Simon falsely testified that she used a "question and answer" format to obtain Mr. Monson's statement dated January 20, 1996; she did not disclose that she had inserted certain information with which Mr. Monson did not agree; nor did she disclose her omission of exculpatory information provided by Mr. Monson;

(f)    Defendant Simon failed to inform to the Prosecutor's Office that usable fingerprints, which did not match Mr. Monson's fingerprints, were found on the toilet tank top (the probable murder weapon); she failed to disclose this information to the Prosecutor's Office even though she knew, or should have known, that Mr. Monson and his attorney were entitled to be informed of this exculpatory evidence;

(g)    Defendant Simon failed to inform the Prosecutor's Office that she had made no effort to identify the person who left fingerprints on the toilet tank top, or the person who left fingerprints in the shower stall; she failed to disclose this information to the Prosecutor's Office even though she knew, or should have known, that Mr. Monson and his attorney were entitled to be informed of this potentially exculpatory evidence; and

(h)    Defendant Simon failed to inform the Prosecutor's Office that a forensic examination of Mr. Monson's automobile revealed no evidence of blood, weapons, or other evidence of a homicide; she failed to disclose this information to the Prosecutor's Office even though she knew, or should have known, that Mr. Monson and his attorney were entitled to be informed of this potentially exculpatory evidence.

96.    The foregoing acts and omissions constituted significant deprivations of well settled constitutional rights that were guaranteed to **Mr. Monson** under the Fourth, Fifth, Sixth and Fourteenth Amendments of the United States Constitution.  Moreover, these deprivations

Law Offices Of
Joseph Conrad Smith
8411 Northwestern Highway
Suite 960
Southfield, MI 48034
(313) 859-1000

resulted in the imprisonment of **Mr. Monson** for more than 20 years for a crime he did not commit.

## COUNT IV

### (Liability of Defendant Joan Ghougoian)

97.     Plaintiff repeats the averments set forth in Paragraphs 1-96, by reference, as if fully set forth herein.

98.     Defendant **Joan Ghougoian**, acting under color of state law, deprived **Mr. Monson** of his Constitutional rights guaranteed by the Fourth, Fifth, Sixth and Fourteenth Amendments of the United States Constitution in the following respects:

(a)     **When defendant Ghougoian met Mr. Monson on the morning of January 21, 1996, she knew, or should have known, that Mr. Monson had been seized without probable cause to believe he had assualted Christina Brown; that he had been brought to Police Headquarters without his consent and without judicial authority; that during eight hours of interrogation he had steadfastly denied any involvement in the fatal assault of Christina Brown; and that he had been locked in a holding cell overnight, even though there was no evidence implicating him in the fatal assault of Christina Brown; notwithstanding the foregoing, defendant Ghougoian continued Mr. Monson's unconstitutional detention and interrogation;**

(b)     **Defendant Ghougoian falsely represented to Mr. Monson that unless he signed a second statement he would be charged with First Degree Murder; defendant Ghougoian made this representation even though she knew, or should have known, there was no evidence implicating Mr. Monson in the murder of Christina Brown;**

(c)     **Claiming she wanted to help Mr. Monson, defendant Ghougoian falsely represented to Mr. Monson that his "only way out" was to sign a statement establishing he had acted in self-defense;**

Law Offices Of
Joseph Conrad Smith
8411 Northwestern Highway
Suite 960
Southfield, MI 48034
(313) 859-1000

(d)     Defendant Ghougoian falsely represented to Mr. Monson that if he signed a statement establishing that he had acted in self-defense, she could guarantee he would be home within 24 hours;

(e)     When Mr. Monson agreed to sign the proposed statement, in exchange for his release, defendant Ghougoian and her subordinate, defendant Braxton, fabricated a scenario, stating that Christina Brown was accidently stabbed in the neck as Mr. Monson attempted to ward off her attack; once Mr. Monson signed the "statement," it was turned over to the Prosecutor's Office under the guise that Mr. Monson had freely and voluntarily provided the content of the "statement;" the Prosecutor's Office then relied on the "statement" as the basis for Mr. Monson's arraignment on a charge of First Degree Murder.

99.     The foregoing acts and omissions constituted significant deprivations of well settled constitutional rights that were guaranteed to **Mr. Monson** under the Fourth, Fifth, Sixth and Fourteenth Amendments of the United States Constitution. Moreover, these deprivations resulted in the imprisonment of **Mr. Monson** for more than 20 years for a crime he did not commit.

## COUNT V

### (Liability of Defendant Charles Braxton)

100.     Plaintiff repeats the averments set forth in Paragraphs 1-99, by reference, as if fully set forth herein.

101.     Defendant **Charles Braxton**, acting under color of state law, deprived **Mr. Monson** of his Constitutional rights guaranteed by the Fifth, Sixth and Fourteenth Amendments of the United States Constitution in the following respects:

Law Offices Of
Joseph Conrad Smith
28411 Northwestern Highway
Suite 960
Southfield, MI 48034
(313) 859-1000

(a)     When defendant Braxton met Mr. Monson on the morning of January 21, 1996, he knew, or should have known, that Mr. Monson had been seized without probable cause to believe he had assaulted Christina Brown; that he had been brought to police headquarters without his consent and without judicial authority; that during eight hours of interrogation he had steadfastly denied any involvement in the fatal assault of Christina Brown; that Mr. Monson had been locked in a holding cell overnight, even though there was no evidence implicating him in the fatal assault of Christina Brown; notwithstanding the foregoing, defendant Braxton continued Mr. Monson's unconstitutional detention and interrogation;

(b)     Defendant Braxton denied Mr. Monson access to a telephone;

(c)     At the behest and direction of his superior, defendant Ghougoian, defendant Braxton typed out a statement that claimed Christina Brown had been accidentally stabbed as Mr. Monson attempted to ward off her attack; the details of the statement were fabricated by defendants Ghougoian and Braxton; when the statement was completed, defendant Braxton told Mr. Monson where to sign and initial the statement; defendant Braxton had Mr. Monson sign the document, even though he knew the substance of the statement had not been freely and voluntarily given by Mr. Monson;

(d)     During his sworn testimony on February 2, 1996 (preliminary examination), May 17, 1996 (Motion to Suppress) and March 4, 1997 (jury trial) defendant Braxton falsely testified that he used a "question and answer" format to obtain Mr. Monson's second statement, dated January 21, 1996; defendant Braxton also falsely testified that he merely wrote down what Mr. Monson told him; defendant Braxton failed to disclose that the "self-defense scenario" was actually fabricated by him and his superior, defendant Ghougoian; and

(e)     During Mr. Monson's jury trial, defendant Braxton falsely testified that when he arrived at work on January 21, 1996, he was informed that a person in one of the interview rooms wanted to speak with an investigator; defendant Braxton's testimony gave the false impression that Mr. Monson had initiated the contact with defendant Braxton, and that the statement he typed was freely and voluntarily provided to him by Mr. Monson; defendant Braxton made no mention of defendant Ghougoian, or the role she played in crafting the statement signed by Mr. Monson on January 21, 1996.

Law Offices Of
Joseph Conrad Smith
8411 Northwestern Highway
Suite 960
Southfield, MI 48034
(313) 859-1000

33

102.    The foregoing acts and omissions constituted significant deprivations of well settled constitutional rights that were guaranteed to **Mr. Monson** under the Fourth, Fifth, Sixth and Fourteenth Amendments of the United States Constitution.  Moreover, these deprivations resulted in the imprisonment of **Mr. Monson** for more than 20 years for a crime he did not commit.

## COUNT VI

### (Malicious Prosecution Prohibited by the Fourth Amendment)

103.    Plaintiff repeats the averments set forth in Paragraphs 1-102, by reference, as if fully set forth herein.

104.    Beginning with his arraignment on January 22, 1996, and culminating in his conviction on March 5, 1997, **Mr. Monson** was prosecuted for the murder of the Christina Brown.    Based upon their acts and omissions, as herein specified, defendants **Simon, Ghougoian** and **Baxton**, influenced and participated in the decision to prosecute **Mr. Monson** for the murder of Christina Brown.    They did so even though they knew, or should have known, there was a lack of probable cause for the criminal prosecution.

105.    As a consequence of the legal proceedings against him, **Mr. Monson** suffered a deprivation of liberty, apart from his initial seizure.  More specifically, he was held without bond for more than a year and, following a jury trial, he was convicted of second-degree murder and served more than 19 years in prison.

Law Offices Of
Joseph Conrad Smith
8411 Northwestern Highway
Suite 960
Southfield, MI 48034
(313) 859-1000

34

106.    For the reasons set forth above, on January 30, 2017, the Honorable Shannon N. Walker granted **Mr. Monson's** motion for a new trial.  On August 25, 2017, pursuant to motion by the Office of the Wayne County Prosecutor, Judge Walker entered an order dismissing the criminal case against **Lamarr Monson**.

107.    The foregoing acts and omissions constituted significant deprivations of well settled constitutional rights that were guaranteed to **Mr. Monson** under the Fourth, and Fourteenth Amendments of the United States Constitution.   Moreover, these deprivations resulted in the imprisonment of **Mr. Monson** for more than 20 years for a crime he did not commit.

## Count VII

**(Civil Conspiracy by Defendants Simon, Ghougoian and Braxton in Violation of the Due Process Clause of the Fifth Amendment)**

108.    Plaintiff repeats the averments set forth in Paragraphs 1-107, by reference, as if fully set forth herein.

109.    Between January 21, 1996 and February 2, 1996, defendants **Simon, Ghougoian** and **Braxton** agreed upon an illegal plan to secure the prosecution and conviction of **Mr. Monson**, in violation and disregard of his Constitutional right to Due Process of Law. Each co-conspirator shared in this conspiratorial objective and each committed one or more overt acts in furtherance of the conspiracy.  Those acts included the following:

(a)     **During her sworn testimony on February 2, 1996 (preliminary examination) and March 4, 1997 (jury trial) defendant Simon**

Law Offices Of
Joseph Conrad Smith
8411 Northwestern Highway
Suite 960
Southfield, MI 48034
(313) 859-1000

35

falsely testified that she used a "question and answer" format to obtain Mr. Monson's statement dated January 20, 1996;

(b)    Defendant Simon withheld from the Prosecutor's Office the fact that Mr. Monson had an explanation for his whereabouts at the time Christina Brown was fatally assaulted;

(c)    Defendant Simon withheld from the Prosecutor's Office the fact that usable fingerprints, which did not match Mr. Monson's fingerprints, were found on the toilet tank top (the probable murder weapon); she withheld this information from the Prosecutor's Office even though she knew, or should have known, that Mr. Monson and his attorney were entitled to be informed of this exculpatory evidence;

(d)    Defendant Simon withheld from the Prosecutor's Office the fact that she had made no effort to identify the person who left fingerprints on the toilet tank top, or the person who left fingerprints in the shower stall; she failed to disclose this information to the Prosecutor's Office even though she knew, or should have known, that Mr. Monson and his attorney were entitled to be informed of this potentially exculpatory evidence;

(e)    Defendant Simon withheld from the Prosecutor's Office the fact that a forensic examination of Mr. Monson's automobile revealed no evidence of blood, weapons, or other evidence of a homicide; she withheld this information from the Prosecutor's Office even though she knew, or should have known, that Mr. Monson and his attorney were entitled to be informed of this potentially exculpatory evidence;

(f)    When defendant Ghougoian met Mr. Monson on the morning of January 21, 1996, she knew, or should have known, that Mr. Monson had been seized without probable cause to believe he had assaulted Christina Brown; that he had been brought to Police Headquarters without his consent and without judicial authority; that during eight hours of interrogation he had steadfastly denied any involvement in the murder of Christina Brown; and that he had been locked in a holding cell overnight, even though there was no evidence implicating him in the fatal assault of Christina Brown; notwithstanding the foregoing, defendant Ghougoian continued Mr. Monson's unconstitutional detention and interrogation;

(g)    Defendant Ghougoian falsely represented to Mr. Monson that unless he signed a second statement he would be charged with

Law Offices Of
Joseph Conrad Smith
8411 Northwestern Highway
Suite 960
Southfield, MI 48034
(313) 859-1000

36

First Degree Murder; defendant Ghougoian made this representation even though she knew, or should have known, there was no evidence implicating Mr. Monson in the murder of Christina Brown;

(h)    Claiming she wanted to help Mr. Monson, defendant Ghougoian falsely represented to Mr. Monson that his "only way out" was to sign a statement establishing he had acted in self-defense;

(i)    Defendant Ghougoian falsely represented to Mr. Monson that if he signed a statement establishing that he acted in self-defense, she could guarantee he would be home within 24 hours;

(j)    When Mr. Monson agreed to sign the proposed statement, in exchange for his release, defendant Ghougoian and her subordinate, defendant Braxton, fabricated a scenario, stating that Christina Brown was accidentally stabbed in the neck as Mr. Monson attempted to ward off her attack; once Mr. Monson signed the "statement," it was turned over to the Prosecutor's Office under the guise that Mr. Monson had freely and voluntarily provided the content of the "statement;" the Prosecutor's Office then relied on the "statement" as the basis for Mr. Monson's arraignment on a charge of First Degree Murder.

(k)    When defendant Braxton met Mr. Monson on the morning of January 21, 1996, he knew, or should have known, that Mr. Monson had been seized without probable cause to believe he had assaulted Christina Brown; that he had been brought to police headquarters without his consent and without judicial authority; that during eight hours of interrogation he had steadfastly denied any involvement in the fatal assault of Christina Brown; that Mr. Monson had been locked in a holding cell overnight, even though there was no evidence implicating him in the fatal assault of Christina Brown; notwithstanding the foregoing, defendant Braxton continued Mr. Monson's unconstitutional detention and interrogation;

(l)    Defendant Braxton denied Mr. Monson access to a telephone;

(m)    At the behest and direction of his superior, defendant Ghougoian, defendant Braxton typed out a statement that claimed Christina Brown had been accidentally stabbed as Mr. Monson attempted to ward off her attack; the details of

Law Offices Of
Joseph Conrad Smith
8411 Northwestern Highway
Suite 960
Southfield, MI 48034
(313) 859-1000

37

Case 2:18-cv-10638-LJM-DRG   ECF No. 1, PageID.38   Filed 02/23/18   Page 38 of 39

the statement were fabricated by defendants Ghougoian and Braxton; when the statement was completed, defendant Braxton told Mr. Monson where to sign and initial the statement; defendant Braxton had Mr. Monson sign the document, even though he knew the substance of the statement had not been freely and voluntarily given by Mr. Monson;

(n)  During his sworn testimony on February 2, 1996 (preliminary examination), May 17, 1996 (Motion to Suppress) and March 4, 1997 (jury trial) defendant Braxton falsely testified that he used a "question and answer" format to obtain Mr. Monson's second statement, dated January 21, 1996; defendant Braxton also falsely testified that he merely wrote down what Mr. Monson told him; defendant Braxton failed to disclose that the "self-defense scenario" was actually fabricated by him and his superior, defendant Ghougoian; and

(o)  During Mr. Monson's jury trial, defendant Braxton falsely testified that when he arrived at work on January 21, 1996, he was informed that a person in one of the interview rooms wanted to speak with an investigator; defendant Braxton's testimony gave the false impression that Mr. Monson had initiated the contact with defendant Braxton, and that the statement he typed was freely and voluntarily provided to him by Mr. Monson; defendant Braxton made no mention of defendant Ghougoian, or the role she played in crafting the statement signed by Mr. Monson on January 21, 1996.

110.   The foregoing acts and omissions constituted significant deprivations of well settled constitutional rights that were guaranteed to **Mr. Monson** under the Fourth, and Fourteenth Amendments of the United States Constitution. Moreover, these deprivations resulted in the imprisonment of **Mr. Monson** for more than 20 years for a crime he did not commit.

Law Offices Of
Joseph Conrad Smith
8411 Northwestern Highway
Suite 960
Southfield, MI 48034
(313) 859-1000

## RELIEF SOUGHT

**WHEREFORE,** plaintiff respectfully requests an award of compensatory and punitive damages, together with interest, costs and attorney fees. The compensatory and punitive damages arising out of defendants' wrongful conduct exceeds the sum of **$75,000,000.00**.

Respectfully submitted,
**JOSEPH CONRAD SMITH, P.C.**


By: /s/
**JOSEPH C. SMITH (P25480)**
Attorney for Plaintiff
28411 Northwestern Hwy., Ste. 960
Southfield, Michigan 48034
(313) 859-0229
jcsmith@josephconradsmith.com


## DEMAND FOR TRIAL BY JURY

**NOW COMES** Plaintiff, **LAMARR MONSON**, through his attorney, **JOSEPH CONRAD SMITH, P.C.**, and hereby demands a trial by jury in the above-entitled cause.


Respectfully submitted,
**JOSEPH CONRAD SMITH, P.C.**


By: /s/
**JOSEPH C. SMITH (P25480)**
Attorney for Plaintiff
28411 Northwestern Hwy., Ste. 960
Southfield, Michigan 48034
(313) 859-0229
jcsmith@josephconradsmith.com

Dated: February 23, 2018

Law Offices Of
Joseph Conrad Smith
'8411 Northwestern Highway
Suite 960
Southfield, MI 48034
(313) 859-1000