UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LAMARR MONSON,

       Plaintiff,

v.

CITY OF DETROIT, *et al.*,

       Defendant.

Case No. 18-10638
Honorable Laurie J. Michelson
Magistrate Judge Stephanie Dawkins Davis

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS [30] AND DENYING PLAINTIFF'S MOTION FOR SANCTIONS [36]

In the course of investigating Christina Brown's 1996 murder, Detroit police officers arrested Lamarr Monson. After holding him overnight, they promised to release him and not to charge him so long as he signed a statement admitting he stabbed Brown in self-defense. Monson signed the statement. But the Detroit Police Department never released him. Instead, Monson was charged, and his statement was admitted against him at trial. And although Brown was killed by a blunt force trauma to the head, Monson's statement that he stabbed Brown helped to convince a jury he killed her. Monson was sentenced to a term of years in prison.

In 2012, after new evidence came to light, the Wayne County Prosecutor took another look at Monson's case. Although it took some time, eventually a state court dismissed his charges and, in 2017, he was released after 21 years in prison. The Wayne County Prosecutor declined to retry him.

Soon after, Monson sued Detroit, DPD, DPD's chief at the time of his arrest, and the officers personally involved in investigating Brown's murder. Now all Defendants move to dismiss. For various reasons, they say Monson's claims are not plausible. A few of Defendants'

arguments have merit, and a few do not. So, for the reasons that follow, the Court will grant in part and deny in part Defendants' motion to dismiss.

## I.

The following narrative is drawn entirely from the amended complaint's non-conclusory allegations, which, at this stage, are taken as true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).

## A.

In early January 1996, when Lamarr Monson was 23, he started hanging out at a dilapidated apartment building on Boston Street in Detroit. (ECF No. 17, PageID.347.) Damaged by fire, the building lacked heat and electricity, but still had some residents. (*Id.*) Monson frequented Apartment 7A but rarely stayed in the building overnight, preferring instead to spend his nights at his parent's house, or with the mother of his daughter. (*Id.* at PageID.348.)

Monson met Christina Brown in late 1995. (ECF No. 17, PageID.347.) Although Brown was a 12-year-old runaway at the time (*id.* at PageID.348), Monson believed she was 17 or 18 (*id.* at PageID.354). About three or four days a week, Brown hung out with Monson in Apartment 7A, and Brown occasionally spent the night in the building. (*Id.* at PageID.347–348.)

Monson and Brown interacted with some of the building's remaining residents. These residents knew them as Marc Mason and Crystal and occasionally bought small quantities of crack or marijuana from them. (ECF No. 17, PageID.347–348.) They remembered Crystal as a tall girl who looked to be about 17 or 18. (*Id.*)

## B.

Just before midnight on the evening of January 19, 1996, Monson left Apartment 7A. (ECF No. 17, PageID.348.) He spent the night at his daughter's mother's place. (*Id.*) Returning to the

building the next afternoon, Monson learned from another of the building's residents that the door to 7A was open, but nobody inside responded. (*Id.* at PageID.348–349.) When Monson entered 7A, he discovered Brown on the bathroom floor. (*Id.* at PageID.349.)

Brown was severely injured. She could lift her arms but could not speak. (*Id.* at PageID.349.) Her head was swollen, her face was covered in blood, and there were cuts all over her body. (*Id.*) Blood spattered the floor and walls of the bathroom. (*Id.*) And the bathroom's window was broken. (*Id.*)

Monson ran to the neighboring unit, occupied by Kenneth Brown. (ECF No. 17, PageID.349.) Hysterical, Monson pleaded with Kenneth to call 911. (*Id.*) But Kenneth did not have a phone, so he ran down the block to a payphone. (*Id.*) At the same time, Monson drove to his sister's house to call 911. (*Id.*)

After calling 911, Monson returned to the building. (ECF No. 17, PageID.349.) He placed a blanket on Christina and administered CPR when she stopped breathing. (*Id.*)

## C.

Around 2:10 pm, Detroit Police Officers Vincent Crockett and Jerome Wilson arrived. (ECF No. 17, PageID.350.) Monson met the officers and escorted them to Apartment 7A. (*Id.*) When Monson and the officers reached 7A, two other residents were also present. (*Id.*) One of them was Robert Lewis, who identified himself to police as Raymond Lewis. (*Id.*) Eventually, EMS arrived and transported Brown to a nearby hospital, where, at 2:36 pm on January 20, 1996, she was pronounced dead. (ECF No. 17, PageID.350.)

Based on visible cuts all over her body, the first responders believed Brown was stabbed to death. (*Id.*)

Back at the apartment building, Officers Crockett and Wilson told Monson, Lewis, and the other tenant not to leave. (*Id.*) Then the officers ordered all three into a squad car. (*Id.* at PageID.351.) Crockett and Wilson drove Monson, Lewis, and the other tenant to the homicide unit within police headquarters. (*Id.*)

## D.

At the homicide unit, a police investigator named Barbara Simon gave Monson two documents. One sought Monson's consent to search his vehicle for evidence. (ECF No. 17, PageID.353.) And the other was a form titled "Constitutional Rights Certification of Notification." (*Id.*) Among other things, the form indicated Monson had the right to have an attorney present. (*Id.*) Monson read the form and asked to call his parents in order to arrange a lawyer. (*Id.*) Someone told him he could call after he signed the forms. (*Id.*) Monson signed both forms as Marc Mason. (*Id.*) Officers never gave Monson access to a phone. (ECF No. 17, PageID.357.)

While Monson was at the station, Detroit police officers collected forensic evidence. (ECF No. 17, PageID.351–352.) The search of Monson's car turned up nothing. But in the bathroom where Brown was discovered, Officer Paul Mark noticed blood smears on virtually every surface. (*Id.* at PageID.352.) And the bathroom's window was broken out, with blood on the outside of the frame. In the bathroom sink, Mark found a knife, its blade bent. (*Id.*) And in the bedroom next to the bathroom, Mark found a blood-stained toilet tank lid wrapped in a mattress cover. (*Id.*) Dusting for prints, Mark found some on the bathroom mirror, some on the shower walls, and some on the toilet tank lid. (*Id.*) Each set was given its own evidence tag. (*Id.*)

Back at the station, Simon interrogated Monson. (ECF No. 17, PageID.353–354.) During the interrogation, Monson learned that Brown was actually 12 years old. (*Id.* at PageID.353–354.) And Monson learned that Brown succumbed to her injuries. (*Id.*) But the entire time, Monson

insisted he had nothing to do with Brown's murder. (*Id.*) Monson said he was not at the building that night, he was at his daughter's mother's house. (*Id.* at PageID.354.)

For four hours, Simon pushed back. Simon urged Monson to admit that he had a sexual relationship with Brown. (ECF No. 17, PageID.354.) Monson consistently denied it. (ECF No. 17, PageID.354.) And Simon made no attempt to corroborate Monson's alibi. (*Id.*)

Undeterred, around 7:45 that evening, Simon wrote out a statement and told Monson if he signed it he could make his phone call. (*Id.*) The statement made no mention of Monson's alibi and indicated Monson said he had sex with Brown one time. (*Id.* at PageID.355.) Hoping to get his phone call, Monson signed the first statement. (*Id.*) Simon left the station. (*Id.*)

But Monson was not given access to a phone. Instead, officers continued to interrogate Monson for another three hours. (ECF No. 17, PageID.355.) Finally, around midnight, officers escorted Monson to a holding cell. (*Id.*) He did not sleep. (*Id.*)

The next morning, January 21, 1996, Simon returned to the station. (ECF No. 17, PageID.355.) She was assigned the "officer in charge" of Brown's case. (*Id.*) Her job was to oversee the investigation, take evidence to the crime lab, and prepare a report for the Wayne County Prosecutor. (*Id.*)

That same morning, officers retrieved Monson from the holding cell. (ECF No. 17, PageID.356.) They took him to the office of Joan Ghougoian, the homicide unit's commander. (*Id.*) Ghougoian told Monson that her officers wanted to charge Monson with first-degree murder. (*Id.*) Pointing to a stack of paper on her desk, Ghougoian said the evidence against him was "overwhelming." (*Id.*) But Ghougoian offered to help. (*Id.*) She told Monson that if he signed a second statement, establishing that he stabbed Brown in self-defense, she would make sure

Monson would be released in less than 24 hours. (*Id.*) Otherwise, Ghougoian told him, he would go to jail for first-degree murder. (*Id.*)

Monson considered his options. (ECF No. 17, PageID.356.) And as he did, Ghougoian asked him about the crime scene. (*Id.*) She asked him how he thought the murder happened and suggested possible scenarios. (*Id.*) Monson went along. (*Id.*) Memorializing their hypotheticals as an "information summary," Ghougoian urged Monson to act quickly if he wanted to go home. (*Id.*) Relying on Ghougoian's promise of a speedy release, Monson agreed to sign the proposed "information summary." (*Id.*)

At that point, at Ghougoian's behest, Officer Charles Braxton appeared. (ECF No. 17, PageID.357.) Braxton and Ghougoian had a short conversation out of Monson's earshot. (*Id.*) And then Monson was escorted to Braxton's office. (*Id.*) There, Braxton once more read Monson his rights. (*Id.*) Once more, Monson asked if he could use a phone to call a lawyer. (*Id.*) Braxton said, "we'll see." (*Id.*)

Then, with Ghougoian's help, Braxton turned the "information summary" into Monson's second statement. (ECF No. 17, PageID.357.) Exhausted, Monson laid his head down on Braxton's desk. (*Id.*) Occasionally he nodded yes or no in response to a question from Braxton. (*Id.*) But mainly, Braxton typed the statement while referencing a piece of paper on his desk. (*Id.* at PageID.358.) From time to time, Ghougoian entered the room, spoke to Braxton in hushed tones, and, at one point, showed Braxton the bent knife recovered from 7A. (*Id.*)

Eventually, Braxton completed the statement. It told the story of a lover's quarrel turned violent. (ECF No. 17, PageID.359, 360, 382.) After Brown accused him of sleeping with another woman, Monson's statement says he stabbed Brown repeatedly. (*Id.* at PageID.359.) Then the statement said Monson tried to stage an alibi by leaving the building to call 911, only to return to

the building in time to greet police when they arrived. (*Id.* at PageID.360.) Monson never read the statement. (*Id.* at PageID.358.) And he never volunteered any information for the self-defense-stabbing narrative. (*Id.*) That part was fabricated entirely by Braxton and Ghougoian. (*Id.*) Even so, told he would be released, Monson signed his name. (*Id.*) Monson was returned to his cell. (*Id.* at PageID.358.)

The next day, Ghougoian sent a memo to Isaiah McKinnon, then the chief of police. (*Id.*) The memo was meant to inform McKinnon about the Brown case and authorize the release of case specifics to the media. (*Id.* at PageId.359.) But the memo was riddled with misinformation. (*Id.* at PageID.359.) For one, it indicated the Wayne County medical examiner had determined that Brown was stabbed to death. (*Id.* at PageID.359.) But, in fact, the Medical Examiner had yet to conclude anything; and the examiner eventually concluded Brown died as a result of blunt force trauma to the head. (*Id.* at PageID.362–363.) Then the memo said that Brown was selling drugs for Monson and the two had at least one sexual encounter. (*Id.* at PageID.359.) And it said Monson admitted to stabbing Brown after the pair argued about whether Monson was seeing another woman. (*Id.*) Finally, the memo accurately noted that the Wayne County Prosecutor recommended a first-degree murder charge. (*Id.*)

The day after Ghougoian sent the memo to McKinnon, January 23, 1996, the *Detroit Free Press* ran an article covering Brown's murder. (ECF No. 17, PageID.360.) The article said Brown was stabbed to death. (*Id.*) And it quoted Ghougoian. (*Id.*) Ghougoian told the paper that Monson confessed to the crime. (*Id.*) And he tried to cover up his crime. She said Monson faked an alibi by appearing at the building in time to discover Brown's body. (*Id.*)

**E.**

On January 22, 1996, Monson was arraigned on a first-degree murder charge. (ECF No. 17, PageID.359.) He was ordered held without bond. (*Id.*) And after his arraignment, for the first time, Monson was given access to a telephone. (*Id.*)

**F.**

Around the time of Monson's arraignment, Simon started to compile evidence. Simon asked the crime lab to compare Monson's and Brown's prints with prints recovered from the crime scene. (ECF No. 17, PageID.360.) The lab matched Monson's prints with the ones found on the bathroom mirror. (*Id.*) Yet his prints did not match either set of useable prints recovered from the toilet tank lid. (*Id.* at PageID.361.) One set matched Brown's prints, but the other set belonged to a third, as yet unknown person. (*Id.*) So the lab's report indicated that a useable set of prints remained unidentified. (*Id.*) Shortly after, the Wayne County Medical Examiner issued an official autopsy report. (ECF No. 17, PageID.361.) The medical examiner said Brown's death was caused by "cranial cerebral injuries which were the result of a beating." (*Id.*)

**G.**

A day after the medical examiner issued its official report, Monson had his preliminary examination. (ECF No. 17, PageID.361.) Dr. Jeff Harkey testified. Harkey was the pathologist who performed Brown's autopsy. (*Id.*) Harkey testified that Brown looked to be about 17 or 18. (*Id.* at PageID.362.) And he described the injuries to Brown's head, noting that her left ear was torn off and the back of her skull had a fracture running from the left temple around to the right ear. (*Id.*) Harkey said all of Brown's head injuries indicated a blunt force trauma with a heavy object. (*Id.*) And Harkey said the head injuries were what ultimately killed Brown. (*Id.*) Braxton and Simon also testified. Despite the medical examiner's testimony, both officers said Monson

freely and voluntarily confessed to stabbing Brown. And they said nobody promised Monson anything in return for his incriminating admissions. (ECF No. 17, PageID.363.) Simon lied and told the judge that Monson admitted to sleeping with Brown. And she made no mention of the fact that forensic evidence did not support the stabbing story. Then Braxton testified about Monson's second statement. Braxton lied and said he elicited it through a question-and-answer format. Braxton read Monson's second statement into the record. (*Id.*)

Based on the information contained in the second statement, the judge found probable cause to believe Monson committed first-degree murder. (*Id.*) Monson was bound over for trial. (*Id.* at PageID.365.)

## H.

Monson spent a year in jail awaiting trial.[1] (ECF No. 17, PageID.365.) At trial, Monson's second statement was the only evidence connecting him to Brown's murder. To lay a foundation for the statement, Simon and Braxton again testified. (*Id.*) They both told the jury Monson gave the statement freely and voluntarily. (*Id.*)

Monson's trial lasted three days. And in the end, the jury convicted him of second-degree murder. On March 21, 1997, he was sentenced to 30 to 50 years' imprisonment. (*Id.*)

Notably, the jury neither saw nor heard any exculpatory evidence. But DPD had recovered some. Because Simon never told anyone about the crime lab's fingerprint analysis (the one

---

[1] In the meantime, his attorney tried unsuccessfully to suppress Monson's second statement. (*Id.* at PageID.364.) At the suppression hearing, Braxton and Monson testified. (*Id.*) And each offered diametrically opposed versions of events. (*Id.* at PageID.364–365.) Braxton reiterated that Monson gave the statement freely and voluntarily. (*Id.*) Braxton said the day he took the statement his superiors had told him Monson was ready to tell the truth about what happened to Brown. (*Id.*) But Monson said the whole statement was Ghougoian's idea, even down to the outline of events Braxton used to type the statement. (*Id.*) And Monson said he never bothered to read his statement because he only agreed to go along based on Ghougoian's promise that he would be released within 24 hours. (*Id.*)

indicating that a useable set of prints from the toilet lid remained unidentified), Monson's lawyer never knew of the report. And DPD never told the prosecutor that the search of Monson's car turned up nothing. (*Id.*) Nor did the prosecutor know that, twice, a witness contacted Detroit police to say that Robert Lewis—another of the building's tenants—murdered Christina Brown. (*Id.*) So neither the prosecutor nor Monson's lawyer nor the jury ever learned any of the above. (*Id.*)

## I.

After trial, Monson worked unsuccessfully to overturn his conviction. The Michigan Court of Appeals affirmed it, and the Michigan Supreme Court denied leave to appeal. (ECF No. 17, PageID.367.) Unwavering, Monson initiated pro se habeas filings in both state and federal court. (*Id.*)

And while Monson was challenging his conviction, other lawsuits filed against Ghougoian and the police department shed light on DPD's interrogation practices around the time Monson was arrested. (*Id.* at PageID.368.) Ghougoian, specifically, came under internal investigation for her coercive tactics. (*Id.* at PageID.369.) And before the internal investigation wrapped up, Ghougoian resigned. (*Id.*)

The local scrutiny into DPD led to a federal investigation. The Department of Justice began looking into the department's arrest and interrogation methods. (*Id.* at PageID.369.) And the federal investigation led to recommendations for DPD to reform its methods. (*Id.*) But when DPD failed to implement the reforms, the DOJ filed suit. (*Id.*) The DOJ's lawsuit culminated in a 2002 consent decree. (*Id.*) The consent decree required DPD to change its arrest and detention practices, including a requirement that the department provide detainees with access to attorneys, telephone calls, and visitors. (*Id.* at PageID.370.)

**J.**

In the meantime, Monson sat in prison. Then, in 2012, the University of Michigan Law School's Innocence Clinic took Monson's case. (ECF No. 17, PageID.370.) And around the same time, Shellena Bentley walked into a Detroit precinct and asked to make a statement. (*Id.* at PageID.371.) Back in 1996, Bentley and her boyfriend at the time, Robert Lewis, lived in the dilapidated apartment building. Bentley said that on the night of Brown's murder, she and Lewis decided to get high. (*Id.*) So Lewis made multiple trips to 7A to buy drugs. (*Id.*) But when Lewis returned from the last trip, he was covered in blood. (*Id.*) And Bentley said Lewis told her, "I had to kill that bitch. She scratched me." (*Id.*) Then, Bentley said, Lewis kicked her and her children out of the apartment and threatened to kill them if Bentley ever told anyone what happened. (*Id.*) Even so, Bentley said she twice phoned Detroit Police to tell them Robert Lewis murdered Brown. (*Id.*) But Bentley said she only felt comfortable coming forward in person once she learned that Lewis and his brother moved out of state. (*Id.*) Bentley even agreed to take a polygraph, the results of which indicated Bentley was telling the truth. (ECF No. 17, PageID.371–372.)

Two years after Bentley gave her statement, the Michigan Innocence Clinic asked the Wayne County Prosecutor's Conviction Integrity Unit to identify the prints found on the toilet tank lid. (ECF No. 17, PageID.372.) Eventually, the prosecutor's office matched the prints to Lewis. (*Id.*) And Lewis' prints matched other prints found at the crime scene. (*Id.* at PageID.373.)

As a result of Bentley's statement and the fingerprint evidence, in early 2017, a state court granted Monson's motion for a new trial. (ECF No. 17, PageID.373.) And, in August 2017, the Wayne County Prosecutor issued a press release indicating that the office would not retry Monson. (*Id.*) Finally, a few days later, all charges against Monson were dismissed. (*Id.*)

**K.**

Less than a year later, Monson brought this § 1983 civil rights suit against the City of Detroit, DPD, Isaiah McKinnon, Barbara Simon, Jean Ghougoian, Charles Braxton, Vincent Crockett, and Jerome Wilson. (ECF No. 1.) Monson's suit alleges violations of his Fourth, Fifth, Sixth, and Fourteenth Amendment rights. Against the individual Defendants, Monson brings § 1983 claims of coerced confession, false arrest, malicious prosecution, and civil conspiracy. (ECF No. 17, PageID.376–386.) And against Detroit, DPD, and McKinnon, Monson alleges *Monell* claims grounded on DPD's unconstitutional arrest and interrogation practices. (*Id.* at PageID.373–376.) He also brings some state law claims.

Collectively, Defendants move to dismiss all claims. (ECF No. 30.)

**II.**

In deciding a motion to dismiss under Rule 12(b)(6), the Court "construes the complaint in the light most favorable to the plaintiff, accepts the plaintiff's factual allegations as true, and determines whether the complaint 'contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 403 (6th Cir. 2012) (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A facially plausible claim to relief means "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully" but is not akin to a probability requirement. *Id.* Finally, "[t]he plausibility of an inference depends on a host of considerations, including common sense and the strength of competing explanations

for the defendant's conduct." *16630 Southfield Ltd., P'Ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 503 (6th Cir. 2013).

## III.

Defendants throw the kitchen sink at Monson's complaint. Defendants say some of Monson's claims are barred by the relevant statute of limitations. (ECF No. 30, PageID.713–715.) Others are barred by the *Heck* doctrine. (*Id.* at PageID.713) Still more fail because Monson should have brought his claims against the city before the bankruptcy court when Detroit filed for Chapter 9 protection. (*Id.* at PageID.732–741.) And, failing all of the above, the individual Defendants think they are entitled to qualified immunity. (ECF No. 30, PageID.715–727.) In the end, Defendants say none of Monson's claims survive.

### A.

Defendants insist all of Monson's § 1983 claims are barred by *Heck v. Humphrey.* (ECF No. 30, PageID.712.) In *Heck*, the Supreme Court held that a § 1983 plaintiff seeking damages based on an allegedly unconstitutional criminal conviction does not have a cause of action until the underlying conviction has been invalidated. 512 U.S. 417, 489 (1994). In practice, the *Heck* bar means that where a § 1983 claim necessarily undermines the validity of a criminal conviction, that claim does not accrue until the criminal charges have terminated in the plaintiff's favor. *See D'Ambrosio v. Marino*, 747 F.3d 378, 385 (6th Cir. 2014).

Defendants reiterate *Heck's* holding and point out that the state court dismissed Monson's charges without prejudice. (ECF No. 30, PageID.713; ECF No. 33, PageID.1062.) According to Defendants, a dismissal without prejudice neither invalidates Monson's conviction nor terminates the criminal charges in his favor because he could be retried for the same crime and could be

convicted again for the same crime. (ECF No. 30, PageID.713.) So Monson cannot clear the *Heck* bar unless and until he is found not guilty upon retrial. (*Id.*)

However, Defendants' argument raises the *Heck* bar too high. For one, in *Wallace v. Kato*, the Supreme Court explicitly rejected an argument similar to the one Defendants now make. *See Wallace*, 549 U.S. at 393 (rejecting a proposed rule that "an action which would impugn an anticipated future conviction cannot be brought until that conviction occurs and is set aside"). Although Defendants find caselaw to support their position, the caselaw unpersuasively applies *Heck* to *pretrial* dismissals without prejudice. *See, e.g.*, *Thorp v. D.C.*, 142 F. Supp. 3d 132, 145 (D. D.C., 2015). Both the Supreme Court and Sixth Circuit are clear that the *Heck* bar only comes into play once there is a conviction or outstanding criminal judgment in place. *See Eidson v. Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 639 (6th Cir. 2007) (citing *Wallace*, 549 U.S. at 393). And, consistent with *Wallace*, the Sixth Circuit has never read *Heck* to require an acquittal on retrial or finding of actual innocence—especially where the prosecutor foregoes any retrial. *See D'Ambrosio*, 747 F.3d at 385 (citing *Wallace* and other cases recognizing the proposition that *Heck* does not bar a § 1983 suit once a conviction has been vacated even if the defendant is subject to retrial); *see also Jordan v. Blount Cty.*, 885 F.3d 413, 415–16 (6th Cir. 2018). All *Heck* requires is that the criminal proceedings have terminated in the § 1983 plaintiff's favor. *See Jordan*, 885 F.3d at 415–16 (finding *Heck* bar cleared when the "criminal proceeding ended"); *King v. Harwood*, 852 F.3d 568, 578–79 (6th Cir. 2017) (*Heck* bar cleared once criminal complaint was dismissed, thus terminating criminal proceedings); *Sanford v. City of Detroit*, No. 17-13062, 2018 U.S. Dist. LEXIS 205178, at *38–39 (E.D. Mich. Dec. 4, 2018) (collecting authorities to reject the argument that dismissal without prejudice does not satisfy *Heck*).

Two principles animate *Heck's* rule. Primarily, a § 1983 claim seeking damages as a result of an allegedly unconstitutional criminal conviction could require a federal court to declare a state criminal conviction invalid. *Heck*, 512 U.S. at 487. But because a civil declaration of invalidity is not the "appropriate vehicle" to overturn a state criminal conviction, *Heck* bars the filing of any tort action that might do so. *Id.* at 481–82, 486. And *Heck* eliminates the possibility that a prisoner might succeed "in the tort action after having been convicted in the underlying criminal prosecution, in contravention of a strong judicial policy against the creation of two conflicting resolutions arising out of the same or identical transaction." *Id.* at 484. So in some instances, a § 1983 plaintiff needs to wait until his conviction is invalidated. *Id.* at 489.

Given *Heck*'s rule and its rationales, Monson clears the bar. For one, he establishes that his conviction was invalidated. The state court granted Monson's motion for a new trial, filed after newly discovered evidence cast doubt on Monson's guilt. (*See* ECF No. 30, PageId.7903, PageID.1061–1062.) In 2017, the state court entered an order of "Acquittal/Dismissal or Remand" on Monson's 1997 conviction. (ECF No. 30, PageID.790.) Thereafter, the Wayne County Prosecutor publicly announced that Monson would not be retried. So Monson has established that the criminal proceedings terminated in his favor and his § 1983 suit does not require a federal court to invalidate his state criminal conviction. So there is no concern about Monson succeeding in a tort action challenging his conviction while he serves the sentence stemming from that conviction. Therefore, *Heck* is no bar to Monson's suit. *See Sanford*, 2018 U.S. Dist. LEXIS 205178 at *38–39.

## B.

Next, Defendants say Monson's claims against the City of Detroit were discharged in its Chapter 9 Bankruptcy proceeding. Monson alleges the City and its police department employed

detention and interrogation policies, both written and unwritten, that deprived Monson of his Fourth, Fifth, Sixth, and Fourteenth Amendment rights.[2] (ECF No. 17, PageID.374.) And Monson's claims against Detroit all stem from his 1996 arrest and 1997 trial. But the City explains that in 2013, Detroit filed for Chapter 9 Bankruptcy protection. And the bankruptcy court set a date in February 2014 for filing a proof of claim against the City. Monson never filed a proof of claim. Later, in December 2014, the City's plan of adjustment became final. *See In re City of Detroit, Michigan*, 548 B.R. 748, 751 (Bankr. E.D. Mich. 2016). And once that happened, the City discharged its liability on prepetition claims, and plaintiffs seeking damages from the City based on prepetition claims were "enjoined from pursuing a recovery beyond what is provided for in the Plan." *Id.* (citing 11 U.S.C. §§ 524(a)(2), 901(a), 944). As Monson seeks damages for conduct dating back to the 1990s, the City says Monson is precluded by the resolution of the bankruptcy.

Monson thinks the City's argument goes too far. Monson argues that a claim, for the purposes of bankruptcy law, is measured by the "fair contemplation" test. (ECF No. 33, PageID.1085.) Monson points to the fact that his conviction was still on the books during the entirety of the bankruptcy proceeding. (*Id.*) So while the city was going through bankruptcy, his § 1983 claims were barred by *Heck*. (*Id.*) And because *Heck* barred his claims, Monson could not have fairly contemplated that he had § 1983 claims against anyone. (*Id.*)

While Monson has a point, bankruptcy law stands in his way. The bankruptcy code defines a claim as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § § 101(5), 103(f); *see also* Black's Law Dictionary (9th ed.

---

[2] Because a municipal police department is an arm of the municipality, and therefore not a proper defendant in a § 1983 suit, Monson's claims against the police department will be treated as claims against the city. *See Boykin v. Van Buren Twp.*, 479 F.3d 444, 450 (6th Cir. 2007).

2009). On its face, the statutory definition of "claim" has a broad reach. And the legislative history reveals Congress intended the broad language to capture "'all legal obligations of the debtor, no matter how remote or contingent.'" *In re City of Detroit, Michigan*, 548 B.R. at 751 (quoting *Johnson v. Home State Bank*, 501 U.S. 78, 83 (1991)). Including "contingent" claims within the bankruptcy code means a claim may be brought before the bankruptcy court "even if it is a cause of action that has not yet accrued . . . ." *In re Cool Fuel, Inc.*, 210 F.3d 999, 1006–07 (9th Cir. 2000). However, § 101(5) is not "boundless." *In re Hexcel Corp.*, 239 B.R. 564, 566–67 (N.D. Cal. 1999). "[A] claim cannot fall within the purview of section 101(5)—and thus cannot be discharged as a pre-petition claim—unless that claim could have been contemplated by the parties prior to the bankruptcy proceedings." *Id.*; *see also In re City of Detroit, Michigan*, 548 B.R. at 761.

Monson's claims were within his "fair contemplation" before the city entered Chapter 9 protection. As Monson notes, prior to the bankruptcy he was trying to overturn his conviction using both state and federal collateral appeals. (ECF No. 33, PageID.1085.) The Court takes judicial notice of his habeas corpus petition, filed in 2008. *See* Petition for Writ of Habeas Corpus, *Monson v. Scutt*, No. 08-13275 (E.D. Mich. July 30, 2008). So the eventual invalidation of his conviction was within Monson's fair contemplation prior to the bankruptcy. And Monson fairly contemplated the factual basis for his § 1983 claims against the city. His habeas corpus petition challenged the admissibility of his confession. *See* Petition for Writ of Habeas Corpus *supra* at 13. And in 2012, the Michigan Innocence Clinic took Monson's case. (ECF No. 17, PageID.370.) Throughout the time Detroit was in bankruptcy, the clinic was working to exonerate Monson. (*Id.* at PageID.370–372.) So Monson, and eventually his lawyers at the Innocence Clinic, fairly contemplated his claims against the city prior to, and during, the bankruptcy.

Moreover, as another court in this district has noted in deciding a virtually identical issue, a *Heck* barred § 1983 claim falls within the purview of § 101(5). There, as here, the plaintiff brought § 1983 claims against the City of Detroit based on prepetition conduct on the part of Detroit police officers. *Sanford*, 2018 U.S. Dist. LEXIS 205178, at *15. Because a *Heck* barred claim is contingent upon the eventual invalidation of the criminal conviction, the court reasoned the plaintiff's claims were "contingent claims" within the meaning of § 101(5). *See id.* at *18 (citing *In re Motors Liquidation Co.*, 576 B.R. 761, 777 (Bankr. S.D.N.Y. 2017)). And so the court considered them prepetition claims discharged in the bankruptcy proceeding. *Id.*; *see also Stone v. Kmart Corp.*, No. 06-302, 2007 U.S. Dist. LEXIS 24633, 2007 WL 1034959, at *3 (M.D. Ala. Mar. 30, 2007). The same result is mandated here. Monson's claims against the city are barred by the bankruptcy. *See* 11 U.S.C. §§ 524(a)(2).

Finding bankruptcy law unfavorable to his position, Monson retreats to a constitutional challenge. He says Detroit denied him due process by failing to notify him of the bankruptcy. (ECF No. 33, PageID.1083–1084.) Monson alleges that prior to the bankruptcy the City knew its police department had a pattern and practice of unconstitutional arrests and interrogations. (*Id.*) And in its possession the police department had all the information it needed to conclude Monson was a victim of those unconstitutional patterns and practices. (*Id.*) Then, when the City declared bankruptcy, Monson thinks the City should have known Monson had a claim against it. So Monson believes he should have been treated as a known creditor. (*Id.*) And known creditors are entitled to actual notice. (*Id.*) As Monson never received actual notice of the bankruptcy, treating his claims as discharged by the bankruptcy, *see* 11 U.S.C. § 944(c)(2), violates the Due Process Clause. (ECF No. 33, PageID.1082.)

Bankruptcy law distinguishes between known and unknown creditors. *See Paging Network, Inc. v. Nationwide Paging, Inc.*, 534 F.3d 76, 80–81 (1st Cir. 2008). Unknown creditors may be notified by publication; but known creditors are entitled to actual notice. *Id.* (citing *City of New York v. New York, N.H. & H.R. Co.*, 344 U.S. 293, 296 (1953)). Known creditors are those whose claims or identities are "readily ascertainable" by the debtor. *See Paging Network*, 534 F.3d at 81 (citing *Tulsa Prof'l Collection Servs. Inc. v. Pope*, 485 U.S. 478, 490 (1988)). Readily ascertainable means a debtor, through "reasonably diligent efforts" could discover a creditor's claim. *Paging Network*, 534 F.3d at 81 (internal quotations omitted). "Reasonably diligent efforts" does not require "impracticable and extended searches . . . in the name of due process." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 317 (1950). Rather, a debtor must home in on its "own books and records." *In re U.S. Home Corp.*, 223 B.R. 654, 659 (Bankr. S.D.N.Y. 1998). Typically, that means the debtor has something in its possession, either a "demand for payment" or "some communication with a debtor concerning the existence of the creditor's claim." *In re Talon Auto. Group*, 284 B.R. 622, 626 (Bankr. E.D. Mich. 2002) (quoting *In re Drexel Burnham Lambert Group, Inc.*, 151 B.R. 674, 681 (Bankr. S.D.N.Y. 1993)); *see also Paging Network*, 534 F.3d at 81.

Monson's argument substitutes foreseeable for readily ascertainable. *See In re Placid Oil Co.*, 753 F.3d 151, 156–57 (5th Cir. 2014) (holding "the claim of a known creditor must be based on an actualized injury, as opposed to merely foreseeable" and so a tort claimant with merely foreseeable claims was an unknown creditor). True, the police department had records that indicated exculpatory evidence never made it before Monson's jury. And Monson had filed a habeas corpus petition challenging his interrogation. So a claim against the City based on Monson's 1996 arrest and 1997 conviction was, broadly speaking, foreseeable. But "[a] debtor

need not be omnipotent or clairvoyant." *In re Drexel Burnham Lambert Grp, Inc.*, 151 B.R. 674, 681 (Bankr. S.D.N.Y. 1993). And when the City entered bankruptcy, Monson did not even have a legal claim. *Heck* barred his claims because his conviction was still valid. Though Monson was working to overturn his conviction, and therefore working to be able to bring a claim someday, neither Monson nor his lawyers in the clinic ever provided anything to the City that amounted to a demand for payment or a communication concerning the existence of his future claim. *Cf. In re Arch Wireless, Inc.*, 534 F.3d 76, 81–82 (1st Cir. 2008) (emails from creditor to debtor laying out a connection between product and liability sufficed to make creditor known). So his claims were not readily ascertainable to the City.

Instead, Monson's unaccrued claims more closely resembled the claims of an unknown creditor. *See In re Placid Oil Co.*, 753 F.3d at 156–57. An unknown creditor is "a claimant whose identity or claim is not 'reasonably ascertainable' or is merely 'conceivable, conjectural or speculative.'" *In re XO Communs., Inc.*, 301 B.R. 782, 793 (Bankr. S.D.N.Y. 2003) (citing *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 317 (1950)); *see also Paging Network, Inc.*, 534 F.3d at 80 (quoting *Mullane*, 339 U.S. at 317). At the time of the bankruptcy, Monson's § 1983 claims against the City were contingent on the invalidation of his conviction. And even though Monson was working to do just that, hindsight's clarity aside, in 2013 the invalidation of Monson's conviction was still speculative. So at best, Monson had the makings of a future claim against the city. Thus, Monson was an unknown creditor.

Because Monson was an unknown creditor, he was entitled only to constructive notice, not actual notice. *Paging Network*, 534 F.3d at 80–81. And Monson does not challenge the constructive notice procedures used in Detroit's bankruptcy. Nor does he challenge the sufficiency

of Chapter 9's notice provision. *See* 11 U.S.C. § 923. So Monson's Constitutional challenge to his notice of the bankruptcy does not prevail.

## C.

Claims against the City aside, the individual officers involved in Monson's arrest and prosecution say they are entitled to qualified immunity. (ECF No. 30, PageID.715.) Qualified immunity shields police officers from civil liability unless the officers violated a right so clearly established "that every 'reasonable police officer would have understood that what [they were] doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Determining whether police officers are entitled to qualified immunity requires a two-step process, and the Court has discretion in ordering the analysis. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Qualified immunity is not appropriate (1) if the facts alleged show that the officer's conduct violated a constitutional right, and, (2) at the time of the alleged violation, the constitutional right was "clearly established." *Pearson*, 555 U.S. at 231–32. And because qualified immunity is an immunity from suit, it should be resolved at the "earliest possible stage in litigation." *Peatross v. City of Memphis*, 818 F.3d 233, 240 (6th Cir. 2016) (internal quotations omitted).

Although qualified immunity should be resolved early, "that point is usually summary judgment" once a factual record is developed. *Wesley v. Campbell*, 779 F.3d 421, 433–34 (6th Cir. 2015) (internal quotations and citations omitted); *see also Guertin v. Michigan*, 912 F.3d 907, 917 (6th Cir. 2019). A record helps because the qualified-immunity analysis is fact-intensive, and so it is "difficult for a defendant to claim qualified immunity on the pleadings *before discovery*." *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Village Sch. Dist.*, 428 F.3d 223, 235 (6th Cir. 2005) (Sutton, J., concurring); *see also Jacobs v. City of Chicago*, 215 F.3d 758, 775 (7th Cir.

2000) (Easterbrook, J., concurring) ("Rule 12(b)(6) is a mismatch for immunity and almost always a bad ground of dismissal."). Before discovery, the only facts available are those alleged in the complaint, which, as already mentioned, are taken as true and assessed for plausibility. *See Gay v. Cabinet for Health & Family Servs. Dep't*, No. 18-5285, 2019 U.S. App. LEXIS 2336, at *12–13 (6th Cir. Jan. 23, 2019); *Wesley*, 779 F.3d at 434; *Peatross v. City of Memphis*, 818 F.3d 233, 246–247 (6th Cir. 2016); *see also Crawford-El v. Britton*, 523 U.S. 574, 597 (1998); *Goad v. Mitchell*, 297 F.3d 497, 503–05 (6th Cir. 2002) (holding that *Crawford-El* abrogates Sixth Circuit precedent requiring a heightened pleading standard in order for a plaintiff to overcome the defense of qualified immunity).

And so, accepting as true all well-pled factual allegations in Monson's complaint, the Court will analyze each of Defendants' qualified immunity arguments in turn.

### 1.

Monson alleges Joan Ghougoian coerced his confession. According to Monson, following his sleepless, overnight detention, Ghougoian offered to let Monson go home. All Monson had to do was sign a statement saying he stabbed Brown in self-defense. Because Ghougoian promised an early release, Monson signed the statement.

Ghougoian rightly points out that whether a confession is coerced depends on the totality of the circumstances. (ECF No. 30, PageID.716–717.) And on the totality of the circumstances, she says, in 1997 no clearly established law held that a police officer could coerce a confession out of a 23-year-old man merely by promising to release him in exchange for incriminating statements. (*Id.* at PageID.718–719.) In support, she points to Eighth Circuit law that, at the time, found no constitutional infirmity in letting police make promises to suspects, *see United States v.*

*Kilgore* 58 F.3d 350, 353 (8th Cir. 1995). (ECF No. 30, PageID.717.) So Ghougoian thinks she is immune from suit on this claim.

The Due Process Clause of the Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. am. XIV. Consistent with the clause's text, due process safeguards against "certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, [that] are so offensive to a civilized system of justice that they must be condemned." *Miller v. Fenton*, 474 U.S. 104, 109 (1985); *see also Moran v. Burbine*, 475 U.S. 412, 432–34 (1986); *see also Arizona v. Roberson*, 486 U.S. 675, 686 (1988). And to put the constitutional protection against coercive interrogation into practice, the Sixth Circuit relies on a three-part framework to assess whether a confession was the product of police coercion. *See McCall v. Dutton*, 863 F.2d 454, 459 (6th Cir. 1988); *see also United States v. Binford*, 818 F.3d 261, 271 (6th Cir. 2016). The first part assesses whether the police officer's conduct "was objectively coercive." *McCall*, 863 F.2d at 459. Then the test analyzes whether "the 'coercion' in question was sufficient to overbear the will of the accused." *Id.* And the final prong asks whether the alleged police misconduct was "the crucial motivating factor behind [the suspect's] decision to confess . . . ." *Id.* (internal quotations omitted). At bottom, the test "looks to the totality of the circumstances" to see if "a defendant's will was overborne in a particular case." *Mahan*, 190 F.3d at 422 (internal quotations omitted). On a case-by-case basis, the circumstances considered may include "the crucial element of police coercion, . . . the length of the interrogation, . . . the defendant's maturity, . . . physical condition, . . . and mental health . . . ." *Withrow v. Williams*, 507 U.S. 680, 693 (1993) (internal citations omitted).

To be sure, the above offers a general statement of the Sixth Circuit's law on coerced confessions. Yet in qualified immunity cases "the clearly established right must be defined with

specificity[,]" *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019). However, specificity does not require "that 'the very action in question has previously been held unlawful.'" *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866–67 (2017) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Rather, "[t]he contours of the right must be sufficiently clear that a reasonable [police officer] would understand that what [they are] doing violates [a constitutional] right." *Anderson*, 483 U.S. at 640. And there are sometimes cases "where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018).

At the time of Monson's arrest and interrogation, the law was sufficiently clear that offering an illusory quid in exchange for an incriminating quo could be coercive. Building off Supreme Court precedent emphasizing that coercion could be psychological as well as physical, *see Arizona v. Fulminante*, 499 U.S. 279, 287 (1991) (citing *Blackburn v. Alabama*, 361 U.S. 199, 206 (1960), circuits treated police deception as a central factor within the totality-of-the-circumstances framework, *see United States v. Lall*, 607 F.3d 1277, 1285–87 (11th Cir. 2010) (collecting cases). And with varying degrees of thoroughness, the majority of circuits explained how a police officer's empty promises of immediate release could render a confession involuntary. *See United States v. Walton*, 10 F.3d 1024, 1030 (3d Cir. 1993) ("[G]iven the uniquely influential nature of a promise from a law enforcement official not to use a suspect's inculpatory statement, such a promise may be the most significant factor in assessing the voluntariness of an accused's confession in light of the totality of the circumstances."); *United States v. Wrice*, 954 F.2d 406, 411 (6th Cir. 1992) (reasoning that "a promise of lenient treatment or of immediate release may be so attractive as to render a confession involuntary"); *United States v. Rutledge*, 900 F.2d 1127, 1129, 1130 (7th Cir. 1990); *Streetman v. Lynaugh*, 812 F.2d 950, 957 (5th Cir. 1987) ("Similarly, certain promises, if

not kept, are so attractive that they render a resulting confession involuntary. A promise of immediate release or that any statement will not be used against the accused is such a promise." (internal citations omitted)); *United States v. Shears*, 762 F.2d 397, 402 (4th Cir. 1985) ("Nevertheless, there are certain promises whose attraction renders a resulting confession involuntary if the promises are not kept . . . ."). So, by the time of Monson's interrogation, every reasonable officer in Ghougoian's position was on notice that dangling an empty promise of immediate release in exchange for incriminating statements could render a statement involuntary.

Accepting Monson's complaint as true, Ghougoian deliberately induced an inculpatory statement through illusory promises of immediate release. After a sleepless night in jail, and with no counsel present, Monson met with Ghougoian, then the homicide unit's commander. She told him overwhelming evidence supported a first-degree murder charge, despite the fact that the investigation had just begun. But, Monson alleges, Ghougoian extended an olive branch. Ghougoian said she could get him home within 24 hours. All Monson had to do was sign a statement saying he stabbed Brown in self-defense. Monson agreed. Ghougoian drafted an "information summary" indicating Monson stabbed Brown after a verbal sparring. Monson signed. And the information summary became Monson's second statement, admitted against him at trial. Yet the "information summary" was entirely Ghougoian's narrative. Ghougoian proposed the hypotheticals. Ghougoian proposed the self-defense narrative. And rather than establish a stabbing in self-defense, it laid a foundation for a first-degree murder charge. And Monson alleges he signed the statement only because Ghougoian promised to let him go home. Then, instead of releasing him, 24 hours after signing, Monson was arraigned on first-degree murder. All told, at the time Ghougoian dangled empty promises of release to obtain Monson's inculpatory admissions, the unlawfulness of Ghougoian's conduct was sufficiently clear. So Monson has pled a violation of

his clearly established Fourteenth Amendment rights. Ghougoian is not entitled to qualified immunity.[3]

**2.**

Monson says Officer Barbara Simon violated his clearly established right to due process when she failed to turn over potentially exculpatory evidence to the prosecutor. Monson says that at the time of his arrest and trial, *Brady v. Maryland*, 373 U.S. 83, 87 (1963), obligated Simon to tell the prosecutor about the lack of evidence found in Monson's car and the unmatched fingerprints found in 7A's bathroom and on the bloody toilet tank lid. (ECF No. 33, PageID.1065.) Simon was duty bound to disclose the forensic evidence because it "undermined the state's preferred theory of the crime[,]" *Moldowan v. City of Warren*, 578 F.3d 351, 378 (6th Cir. 2009). (ECF No. 33, PageID.1065.) And because Simon did not disclose it, neither Monson's lawyer nor the jury ever saw evidence that contradicted the stabbing theory. (*Id.*)

Simon insists she did not violate Monson's due process rights. And she focuses only on the fingerprints. She says she had no duty to disclose the fingerprints because the prints were "unidentifiable." (ECF No. 30, PageID.724.) And she says unidentifiable fingerprints do not trigger any *Brady* obligation, *see United States v. Howard*, 516 F. App'x 409, 410–11 (6th Cir. 2013). (ECF No. 30, PageID.724.)

Simon is not entitled to qualified immunity. For one, at least as far back as 1990, clearly established law extended *Brady's* obligations to police officers. *See Moldowan*, 578 F.3d at 376–82. And Simon's attempt at dodging a constitutional violation misstates Monson's complaint. The complaint says the prints were unmatched (until the 2010s, when DPD matched them to Robert

---

[3] At this stage, it is not clear whether Monson also raises a Fifth Amendment claim, based on similar facts, against Simon and Braxton. (See ECF No. 17, PageID.379, 383–384.)

Lewis)—not unidentifiable. Monson alleges that back in 1996, forensic investigators found usable sets of fingerprints in the bathroom and on the toilet tank lid. And neither set matched Monson's prints. Making all reasonable inferences in Monson's favor, those unmatched fingerprints suggested at least one unknown person was in Apartment 7A's bathroom, where Brown's body was found. That same person, or possibly another unknown individual, handled the bloody toilet tank lid. And once Simon learned Brown died as a result of a blunt force trauma to the head, sitting on the unidentified fingerprints meant she was hiding evidence that, at the very least, contradicted the state's self-defense-stabbing narrative. Indeed, the fingerprint evidence eventually led, in part, to the dismissal of Monson's charges. And Simon never disclosed the fingerprints to the prosecutor. So Monson pleads facts sufficient to show a violation of a clearly established *Brady* right.

Simon's precedent, *United States v. Howard*, 516 F. App'x 409 (6th Cir. 2013), does not change the result. *Howard* reiterates the baseline *Brady* rule. *Id.* at 410 (success on a *Brady* claim requires a showing of "favorable evidence, suppression, and prejudice"). And read for all it is worth, *Howard* holds that an officer's failure to disclose fingerprint evidence does not give rise to a *Brady* violation when the best that fingerprint evidence can do is help prove a "neutral point." *Id.* at 411. But Simon did not sit on neutral evidence. As just explained, she failed to disclose evidence she knew undercut the state's theory of a stabbing precipitated by a lover's quarrel. And evidence that Monson's fingerprints were not on the supposed "murder weapon." Also, evidence that someone else was in the room was more than neutral when coupled with phone calls from a tipster that another resident committed the murder. So taking Monson's complaint as true, *Howard* is no help; Simon violated *Brady* because she sat on evidence that could have exculpated Monson.

**3.**

Monson also claims Simon violated his right to have an attorney present during interrogation. Recall that Simon first interrogated Monson on the day he was arrested. And at that time, Simon had Monson sign a paper notifying him of his *Miranda* rights. Upon learning of his right to have a lawyer with him, Monson alleges he asked Simon if he could call his parents to "make arrangements" for a lawyer. (ECF No. 17, PageID.353.) Simon denied him the phone call. Because Simon denied Monson a phone call to arrange a lawyer, Monson alleges Simon denied him the Fifth Amendment protection guaranteed by *Miranda v. Arizona*, 384 U.S. 435, 474 (1965). (ECF No. 33, PageID.1073–1074.)

In response, Simon says Monson's request for counsel was less than clear, and points to *Davis v. United States*, 512 U.S. 452 (1994). *Davis* holds that a request for counsel must be unambiguous and unequivocal. 512 U.S. at 459. Simon says Monson's request was ambiguous and equivocal because he asked to call home to arrange a lawyer rather than call a lawyer directly. (ECF No. 30, PageID.724.) And Simon cites to cases that she says find no *Miranda* violation where a suspect asks to call his parents so the parents can call a lawyer, *see, e.g.*, *Flamer v. State of Del.*, 68 F.3d 710, 725 (3d Cir. 1995). (ECF No. 30, PageID.724–725.)

It is true that to bring an interrogation to an end, a suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis*, 512 U.S. at 459. Here, Monson was arrested, notified of his *Miranda* rights, and prior to the start of any questioning, asked to call his parents to "make arrangements" for a lawyer. (ECF No. 17, PageID.353.) Case law covering analogous circumstances indicates that Monson's request to "make arrangements" for a lawyer was not clear enough. *See United States v. Briggs*, 347 F. App'x 750, 753–54 (3d Cir.

2009) (finding ambiguous defendant's statement that "he did not want to answer any questions until he found out if his mother obtained counsel for him"); *United States v. Wheeler*, 84 F. App'x 304, 306 (4th Cir. 2003) (finding that the defendant's statement that he "wanted to call his family to see about a lawyer" was "not a clear, unambiguous request for counsel"); *Flamer v. Delaware*, 68 F.3d 710, 725 (3d Cir. 1995) (finding that the defendant's request to call his mother "to inquire about . . . possible representation" failed to meet Davis's requisite clarity); *United States v. Elder*, No. 15-3091, 2016 U.S. Dist. LEXIS 163559, at *9–11 (D. Neb. Oct. 31, 2016); *State v. Chew*, 695 A.2d 1301, 1318 (N.J. 1997) (holding that suspect made equivocal request for counsel when he asked his mother to call his attorney as police were taking him from his home) overruled on other grounds *State v. Boretsky*, 894 A.2d 659, 667 (N.J. 2006); *Cf. United States v. DeLaurentiis*, 629 F. Supp. 2d 68, 72–76 (D. Me. 2009) (finding defendant's initial request to call her mother to call her uncle to see if he could represent her ambiguous, but defendant's repeated requests for her uncle ultimately satisfied *Davis*). The caselaw suggests that contacting family members to "make arrangements" for a lawyer allows for multiple reasonable inferences. It could mean Monson wanted a lawyer to arrive immediately. Or it could mean Monson wished to see if his parents had money available to retain a lawyer either promptly or sometime in the future. After all, when Monson asked to "make arrangements" for counsel, questioning had not yet begun, and he had yet to be charged. So reasonable officers in Simon's position might reasonably understand Monson's request differently. Therefore, not every reasonable officer in Simon's position would have understood Monson's request as an invocation of his Fifth Amendment right to counsel. Simon is entitled to qualified immunity on Monson's *Miranda* claim.

**4.**

Monson brings malicious prosecution claims against Ghougoian, Simon, Braxton, and the two officers who arrested him. Malicious prosecution under the Fourth Amendment covers "wrongful investigation, prosecution, conviction, and incarceration." *Barnes v. Wright*, 449 F.3d 709, 715-16 (6th Cir. 2006) (internal quotation marks omitted). And the claim has four elements. *Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010). Monson must establish that each officer played a role in the decision to initiate a criminal prosecution against him; there was no probable cause for the prosecution; as a result of the prosecution he suffered a deprivation of liberty; and the criminal proceeding terminated in his favor. *See Sykes*, 625 F.3d at 308–09. And in this case, only the first and second elements are at issue.

At the outset, Braxton and Simon think they are entitled to absolute immunity. They say Monson grounds his malicious prosecution claims on their testimony at his preliminary examination and trial. And they say the Supreme Court says testifying witnesses are entitled to absolute immunity from all § 1983 liability, *see Rehberg v. Paulk*, 566 U.S. 356, 367–29 (2012). (ECF No. 30, PageID.722.) But *Rehberg* does not sweep so broadly. All *Rehberg* says is that grand jury witnesses are immune from § 1983 liability to the extent the § 1983 claims arise out of their testimony before the grand jury. *Rehberg*, 566 U.S. at 361. And Monson does not allege that Simon or Braxton ever testified before a grand jury (nor does he limit his claim to their testimony). So Simon and Braxton are not entitled to absolute immunity.

Failing that, Braxton and Simon, joined by Ghougoian, each say they are entitled to qualified immunity. The officers say Monson has no evidence they influenced or participated in the Wayne County prosecutor's decision to bring charges. (ECF No. 30, PageID.721.) Specifically, they say Monson has not alleged that any of the officers made any knowing misstatements during

their testimony at his preliminary examination. (*Id.* at PageID.721–722.) And without evidence of influence, Monson cannot establish the officers violated his constitutional rights.

Given the facts alleged in the complaint, qualified immunity is not appropriate. To show a violation of his Fourth Amendment rights, Monson must present evidence that the officers' "misstatements and falsehoods in [their] investigatory materials" influenced Monson's "continued detention" or prosecution. *Sykes*, 625 F.3d at 316. All three officers, in various ways, influenced the decision to detain and prosecute.

Braxton and Simon influenced the decision to prosecute by lying on the stand. At the preliminary exam, the first witness was the medical examiner. And the medical examiner testified Brown died as a result of a blunt force trauma to the head. Then Braxton and Simon testified that Monson freely and voluntarily confessed to stabbing Brown after a lover's quarrel and Braxton read the statement into the record. And yet, prior to so testifying, each officer had reason to know their testimony would not conform to the facts as they then knew them to be. Braxton knew Ghougoian, not Monson, came up with the self-defense-stabbing narrative. And Simon knew about all the forensic evidence calling the entire stabbing theory into doubt. And Simon knew Monson said he never slept with Brown. Still, according to Monson's pleading, Braxton and Simon lied. And their lies allowed the prosecutor to establish probable cause at the preliminary hearing. Indeed, without their testimony, the prosecutor would have been left without the evidence needed to establish probable cause on a first-degree murder charge. So their willingness to testify, standing alone, influenced the decision to prosecute.

Relatedly, Simon influenced the decision to prosecute when she pitted exculpatory evidence. She was in charge of the investigation and by the time of the preliminary examination, Simon knew her investigators were turning up evidence inconsistent with the stabbing theory. The

stabbing narrative hinged on Monson stabbing his jealous lover, then fabricating an alibi by getting in his car to drive away to call 911, only to return in time to greet the police when they arrived. But she knew police searched Monson's car and found no traces of blood in it. More importantly, Simon also knew Brown died as a result of blunt force trauma to the head. And she knew forensic investigators found usable, unmatched fingerprints on a bloody toilet tank lid found feet from Brown's body. So Simon knew about at least two pieces of exculpatory evidence. Exculpatory evidence she never disclosed to the prosecutor. And had she disclosed it, the prosecutor may not have brought charges. So, again, Simon influenced the decision to prosecute. *Sykes*, 625 at 316–17. Simon is not entitled to qualified immunity.

Ghougoian, too, influenced the decision to prosecute. Monson alleges his second statement was entirely Ghougoian's work product. She concocted the stabbing-after-an-argument theory. She sketched out the story. And Braxton typed it up. Later, at the preliminary hearing, Braxton lied when he said he elicited the stabbing narrative using a question-and-answer format. But making all reasonable inferences in Monson's favor, Braxton lied to ensure Ghougoian's statement was admitted against Monson. So when Ghougoian's fabricated statement was admitted as evidence against Monson, Ghougoian influenced the prosecutor's decision to proceed with a first-degree murder charge. *Sykes*, 625 at 316–17. Thus, Ghougoian nor Braxton are entitled to qualified immunity.

That leaves the officers who arrested Monson. Monson alleges that Vincent Crockett and Jerome Wilson Monson set the entire malicious prosecution in motion when they arrested him without probable cause. (ECF No. 17, PageID.377; ECF No. 33, PageID.1072–1073.) On the day of Brown's murder, but for Monson's unlawful arrest at the hands of Crockett and Wilson,

homicide investigators never would have built a case against him and he never would have spent 20 years in prison. (*Id.*)

Crockett and Wilson do not defend against malicious prosecution. Instead, they think Monson sues them for false imprisonment and false arrest. (ECF No. 30, PageID.722–723.) And they say Monson's arrest was supported by probable cause, so they believe they are entitled to qualified immunity on those claims. (*Id.*) However, the parties agree that Monson's false arrest and false imprisonment claims are barred by the relevant statutes of limitations. (ECF No. 30, PageID.713–714; ECF No. 33, PageID.1075.) So the probable cause to arrest and imprison are not at issue.

In any event, Crockett's and Wilson's probable-cause argument for qualified immunity on false arrest and false imprisonment also applies to malicious prosecution. *See Sykes*, 625 U.S. at 310–11. And Monson thinks Crockett and Wilson seek qualified immunity on the malicious prosecution claim. (ECF No. 33, PageID.1072–1073.) Recall that malicious prosecution has four elements. And one is a lack of probable cause for the criminal prosecution. *Sykes*, 625 F.3d at 316. Crockett and Wilson say they had probable cause to arrest because Monson was at the scene of the murder, had some interaction with Brown, then left the scene to call 911, and then returned. (ECF No. 30, PageID.723.)

Crockett and Wilson are entitled to qualified immunity if a reasonable officer, given the facts as Crockett and Wilson knew them, could reasonably have believed Monson's arrest was supported by probable cause. *See Regets v. City of Plymouth*, 568 F. App'x 380, 389 (6th Cir. 2014). Monson alleges Crockett and Wilson told him not to leave simply because he was present at the murder scene. (ECF No. 17, PageID.377.) Then they put him in the squad car and took him to the homicide unit. (*Id.*) And it is well-settled that presence at a crime scene does not give rise to

probable cause. *See Ybarra v. Illinois*, 444 U.S. 85, 62 L. Ed. 2d 238, 100 S. Ct. 338 (1979) ("[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person."); *see also Sykes*, 625 F. 3d at 307; *Harris v. Bornhorst*, 513 F.3d 503, 515 (6th Cir. 2008); *United States v. Ingrao*, 897 F.2d 860, 863 (7th Cir. 1990); *United States v. Garcia*, 848 F.2d 58, 60 (4th Cir. 1988), *United States v. Ashcroft*, 607 F.2d 1167, 1172 (5th Cir. 1979). So no reasonable officer in Crockett's or Wilson's position could reasonably believe that probable cause existed to arrest Monson solely because he was present at the crime scene. And even though probable cause requires a totality of the circumstances analysis taking the whole picture into view, *see District of Columbia v. Wesby*, 138 S. Ct. 577, 588 (2018), at this stage, the whole picture is the sketch provided by Monson's complaint. So at this point, Crockett and Wilson are not entitled to qualified immunity on the grounds that they had probable cause to arrest Monson.

## D.

Additionally, Monson alleges a § 1983 civil conspiracy between the individual police officers. Monson alleges the individual officers spun a web of lies that ultimately led to his wrongful conviction and incarceration—all in violation of the Fourth Amendment. A civil conspiracy "is an agreement between two or more persons to injure another by unlawful action." *Stillwagon v. City of Del., Ohio*, 747 F. App'x 361, 374 (6th Cir. 2018) (quoting *Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011)). The claim requires Monson produce evidence of a single conspiratorial plan, a shared objective among the officers to deprive Monson of his constitutional rights, and an overt act—committed in furtherance of the conspiracy—that injured him. *Stillwagon*, 747 F. App'x at 374 (citing *Bazzi*, 658 F.3d at 602).

Defendants say the intracorporate conspiracy doctrine bars Monson's claim. (ECF No. 30, PageID.726.) And Monson seems to think Defendants are at least partially correct. (ECF No. 33, PageID.1074.) But Monson thinks his conspiracy claim should proceed to discovery just to be sure Defendants are correct. (*Id.* at PageID.1075.)

Neither side gets it quite right. The intracorporate conspiracy doctrine is a creature of antitrust law that the Sixth Circuit grafted onto Section 1985 conspiracies. *See Johnson v. Hills & Dales Gen. Hosp.*, 40 F.3d 837, 839–40 (6th Cir. 1994). Section 1985 requires a conspiracy between "two or more persons." 42 U.S.C. § 1985. And the intracorporate conspiracy doctrine says only that "a corporation cannot conspire with its own agents or employees." *Johnson*, 40 F.3d at 839. So where a plaintiff alleges a § 1985 conspiracy and "all of the defendants are members of the same corporate entity, there are not two separate 'people' to form a conspiracy." *Hull v. Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Educ.*, 926 F.2d 505, 510 (6th Cir. 1991). Some circuits apply the intracorporate conspiracy doctrine to § 1983 conspiracies involving municipal entities and municipal employees. *See, e.g.*, *Grider v. City of Auburn*, 618 F.3d 1240, 1260–61 (11th Cir. 2010); *but see* 42 U.S.C. § 1983 ("Every person who, . . . ."). Yet district courts in this circuit are split on the doctrine's applicability in § 1983 conspiracies. Some say it has none at all. *Kinkus v. Vill. of Yorkville*, 476 F. Supp. 2d 829, 840 (S.D. Ohio 2007). At most, other courts say the intracorporate conspiracy doctrine bars § 1983 conspiracy claims against a municipality but permits § 1983 claims alleging conspiracies among individual municipal employees. *Adcock v. City of Memphis*, No. 06-2109, 2007 U.S. Dist. LEXIS 22156, at *12–13 (W.D. Tenn. March 13, 2007).

Monson alleges a conspiracy among individual municipal employees—police officers. And the officers offer nothing to support the application of the intracorporate conspiracy doctrine

to Monson's § 1983 conspiracy claim. Plus, Monson's complaint pleads facts sufficient to plausibly infer that Crockett, Wilson, Simon, Ghougoian, and Braxton conspired to have Monson convicted for Brown's murder. So all the officers shared a common objective to violate Monson's Fourth Amendment rights. And each took overt acts in furtherance of the conspiracy that injured Monson. Crockett and Wilson arrested Monson without probable cause; Simon withheld exculpatory evidence; Ghougoian fabricated a false confession on empty promises of leniency; and Braxton typed up a confession he knew was not Monson's, then lied at the preliminary examination to secure its admission against Monson. So Monson has pled facts sufficient to show a § 1983 conspiracy among the individual officers.

### E.

Monson's final federal claim is against Isaiah McKinnon. McKinnon was Detroit's police chief at the time of Monson's arrest and prosecution. And Monson alleges a claim against McKinnon based on a "supervisory liability" theory. (ECF No. 33, PageID.1063–1064.)

Monson's claim against McKinnon is not actionable. Supervisory liability requires Monson to establish a "direct causal link between the acts of individual officers and the supervisory defendants." *Hays v. Jefferson County*, 668 F.2d 869, 872 (6th Cir. 1982). One way to show the causal link is to allege "the supervisor 'either encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers.'" *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 199) (quoting *Hays*, 668 F.2d at 874). But Monson's complaint does not allow for a plausible inference that McKinnon encouraged or participated in Constitutional violations. The complaint says only that McKinnon read a memo detailing the incriminating admissions Monson made. At most, the complaint alleges

McKinnon knew Monson was arrested and why, and so permits the inference that McKinnon authorized Monson's prosecution. But the complaint offers nothing to suggest McKinnon knew of, let alone approved or acquiesced in, the unconstitutional conduct of his underlings. And it may be fair to infer that, at most, McKinnon was negligent in his supervision of some officers working for him. But negligence on the part of a supervisor is not enough to make out a supervisory liability claim. *Frodge v. City of Newport*, 501 F. App'x 519, 532–33 (6th Cir. 2012) (citing *Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1246 (6th Cir. 1989)). So, even taking all inferences in Monson's favor, the complaint offers nothing to establish a "direct causal link" between McKinnon and the constitutional violations Monson alleges. Accordingly, Monson's claim against McKinnon is dismissed.

### F.

Defendants also move to dismiss Monson's state claims. For starters, Monson concedes the clock has run on his Intentional Infliction of Emotional Distress theory. (ECF No. 33, PageID.1075.) So he agrees to dismiss it. But the remainder of Monson's state claims run parallel to his surviving federal claims. (ECF No. 17, PageID.390–401.) And while staving off discovery on the state law claims is an obvious upside for Defendants, ultimately, the discovery on the state claims is no different than the discovery on the federal claims. So the Court declines Defendants' invitation to dismiss Monson's remaining state law claims at this time.

### IV.

In sum, some of Monson's claims fail and some prevail. Because Monson raises a host of claims and Defendants raise a host of challenges to them, the Court offers a brief recap. Monson's claims against the City of Detroit and the Detroit Police Department are dismissed because they were discharged by the City's bankruptcy. His § 1983 false arrest and false imprisonment claims

are barred by their respective statutes of limitations. Simon is entitled to qualified immunity on Monson's *Miranda* claim. And Monson's supervisory liability claim against McKinnon is not plausible. Accordingly, all those claims are dismissed. However, Monson's remaining § 1983 claims against Crockett, Wilson, Simon, Ghougoian, and Braxton survive. And among Monson's state law claims, his IIED claim is dismissed as untimely. The remainder of his state law claims survive. Accordingly, the Court grants in part and denies in part Defendants' motion to dismiss. (ECF No. 30.) And because some of Defendants' arguments prevail, the Court cannot say that the motion to dismiss amounts to sanctionable conduct. So the Court denies Monson's motion for sanctions. (ECF No. 36.) The Court also grants Monson's motion for leave to file sur-reply. (ECF No. 35.)

     SO ORDERED.

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

Date: March 6, 2019

CERTIFICATE OF SERVICE

     I hereby certify that a copy of the foregoing document was served upon counsel of record and/or pro se parties on this date, March 6, 2019, using the Electronic Court Filing system and/or first-class U.S. mail.

s/William Barkholz
Case Manager
