```
 1                    UNITED STATES DISTRICT COURT

 2                    EASTERN DISTRICT OF MICHIGAN

 3                         SOUTHERN DIVISION

 4    LAMARR MONSON,

 5                    Plaintiff,

 6          vs.                    Case No. 2:18-cv-10638-LJM-SDD

 7                                 Hon. Laurie J. Michelson

 8    The CITY OF DETROIT, a Municipal
      Corporation of the State of Michigan;
 9    the DETROIT POLICE DEPARTMENT;
      ISAIAH McKINNON, a former Chief of
10    Police of the Detroit Police Department;
      JOAN GHOUGOIAN, a former Commander of
11    the Detroit Police Department,
      BARBARA SIMON, an Investigator of the
12    Detroit Police Department; CHARLES
      BRAXTON, a police Sergeant of the Detroit
13    Police Department; VINCENT CROCKETT, a
      Police Officer of the Detroit Police
14    Department; and JEROME WILSON, a Police
      Officer of the Detroit Police Department,
15    jointly and severally,
                          Defendants.
16    _____

17

18          The Videotaped Deposition of BARBARA SIMON,

19          Taken at 210 East 3rd Street, Suite 212

20          Royal Oak, Michigan,

21          Commencing at 10:14 a.m.,

22          Monday, June 3, 2019,

23          Before Lezlie A. Setchell, CSR-2404, RPR, CRR.

24

25
```

SIMON, BARBARA
06/03/2019                                                                 Page 2

```
 1   APPEARANCES:

 2   JOSEPH C. SMITH

 3   Joseph Conrad Smith, PC

 4   28411 Northwestern Highway

 5   Suite 960

 6   Southfield, Michigan 48034

 7   313.859.0229

 8   jcsmith@josephconradsmith.com

 9       Appearing on behalf of the Plaintiff.

10

11   T. JOSEPH SEWARD

12   MICHAEL T. BERGER

13   Seward Henderson, PLLC

14   210 East 3rd Street

15   Suite 212

16   Royal Oak, Michigan 48067

17   248.733.3580

18   jseward@sewardhenderson.com

19   mberger@sewardhenderson.com

20       Appearing on behalf of the Defendants.

21

22   ALSO PRESENT:

23   Lateesa Ward, Esq.

24   John Schmitzer - Computer Specialist

25   Shawn Capron - Video Technician
```

```
 1                    TABLE OF CONTENTS

 2

 3   WITNESS                                    PAGE

 4   BARBARA SIMON

 5

 6   EXAMINATION

 7   BY MR. SMITH                                8

 8   EXAMINATION

 9   BY MR. BERGER                            156

10   RE-EXAMINATION

11   BY MR. SMITH                            168

12   RE-EXAMINATION

13   BY MR. BERGER                            186

14   FURTHER RE-EXAMINATION

15   BY MR. SMITH                            188

16   FURTHER RE-EXAMINATION

17   BY MR. BERGER                            191

18   FURTHER RE-EXAMINATION

19   BY MR. SMITH                            191

20

21

22

23

24

25
```

SIMON, BARBARA
06/03/2019                                                          Page 4

```
 1                          EXHIBITS

 2

 3    EXHIBIT                                      PAGE

 4    (Exhibits attached to transcript.)

 5

 6    EXHIBIT 1                                    18

 7    Third Amended Notice

 8    of Taking Deposition

 9    EXHIBIT 2                                    21

10    Preliminary Complaint Record

11    EXHIBIT 3                                    27

12    Preliminary Complaint Record

13    EXHIBIT 4                                    31

14    Preliminary Examination

15    transcript excerpts

16    February 2, 1996

17    EXHIBIT 6                                    39

18    A.O.W. Report

19    EXHIBIT 5                                    44

20    Jury Trial transcript excerpts

21    March 4, 1997

22    EXHIBIT 7                                    72

23    Jury Trial transcript excerpts

24    March 4, 1997

25    EXHIBIT 8                                    80
```

SIMON, BARBARA
06/03/2019                                                                    Page 5

```
 1   Witness Statement of Raymond Lewis

 2   EXHIBIT 10                                89

 3   Preliminary Examination

 4   February 2, 1996

 5   transcript excerpts

 6   EXHIBIT 11                                96

 7   Latent Print Check

 8   EXHIBIT 12                                105

 9   Simon 96-32

10   Request for Latent Print Search

11   EXHIBIT 14                                113

12   Fingerprints of Robert Lee Lewis

13   EXHIBIT 15                                117

14   Witness Statement of

15   Linda Diane Woods

16   EXHIBIT 15-A                              123

17   Jury Trial transcript excerpts

18   March 3, 1997

19   EXHIBIT 17                                129

20   Consent to Search Form

21   EXHIBIT 16                                133

22   Investigator's Report

23   EXHIBIT 13                                139

24   Report of Investigator

25   Barbara Simon
```

SIMON, BARBARA
06/03/2019                                                                    Page 6

```
 1    EXHIBIT 18                              148

 2    Handwritten document

 3    EXHIBIT 9                               150

 4    Witness Statement of

 5    Lamarr Monson

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

 1   Royal Oak, Michigan

 2   Monday, June 3, 2019

 3   10:14 a.m.

 4              VIDEO TECHNICIAN:  We are now on the

 5       record.  This is the video-recorded deposition of

 6       Barbara Simon being taken on Monday, June 3rd, 2019.

 7       The time is now 10:14 a.m.

 8              We are located at 210 East 3rd Street,

 9       Royal Oak, Michigan.  We are here in the matter of

10       Lamarr Monson versus The City of Detroit, et al.  The

11       Case Number is 2:18-cv-10638-LJM-SDD.  This matter is

12       being held in the United States District Court,

13       Eastern District of Michigan, Southern Division.

14              My name is Shawn Capron, video technician.

15              Will the court reporter swear in the

16       witness and the attorneys identify themselves for the

17       record, please.

18                   BARBARA SIMON,

19       was thereupon called as a witness herein, and after

20       having first been duly sworn to testify to the truth,

21       the whole truth and nothing but the truth, was

22       examined and testified as follows:

23

24              MR. BERGER:  Michael Berger on behalf of

25       the Defendants.

SIMON, BARBARA
06/03/2019                                                                    Page 8

```
 1                    MR. SMITH:  Joseph Smith representing
 2      Lamarr Monson.
 3                    Excuse me.  Let the record reflect that
 4      this is the deposition of Barbara Simon.  It is being
 5      taken pursuant to Notice and for all other purposes
 6      permitted under the Federal Rules of Civil Procedure.
 7                            EXAMINATION
 8   BY MR. SMITH:
 9   Q.  Ms. Simon, as I've just indicated, my name is Joseph
10       Smith.  I represent Lamarr Monson in a case that has
11       been filed in Federal Court.  The primary claim in the
12       case is that he was incarcerated as a result of a
13       conviction in 1997.
14                    Because you're one of the named Defendants
15       in this case, I've asked to take your deposition to
16       find out how much you recall about this particular
17       circumstance.
18                    If I ask a question that is not clear to
19       you, don't hesitate to let me know the question is not
20       clear.  I'll be more than happy to rephrase it or ask
21       a different question altogether.  Similarly, if you
22       don't hear my question, let me know.  I'll certainly
23       try to speak louder.
24                    In addition to that, you should keep in
25       mind that because you're under oath, your answers have
```

```
 1        to be based on your own personal knowledge.  You

 2        should not testify regarding something you've heard or

 3        something that you were told unless you let me know.

 4                Are those ground rules fairly clear?

 5  A.    Yes.

 6  Q.    Let me just indicate that the conviction that I spoke

 7        of earlier arose out of the fatal assault upon a young

 8        lady by the name of Christina Brown, and it occurred

 9        on January the 20th of 1996.

10                Do you -- well, before we get into that,

11        have you been able to review any materials in

12        connection with your deposition this morning?

13                MR. BERGER:  Objection; assumes facts not

14        in evidence.

15                But you can answer the question.

16                THE WITNESS:  Yes.

17  BY MR. SMITH:

18  Q.    Okay.  Can you tell me what you reviewed?

19  A.    Different reports, transcripts.

20  Q.    Well, you have to be a little more definitive than

21        that.

22  A.    Reports, police reports, witness statements,

23        transcripts.

24  Q.    Okay.  How many police reports did you review?

25  A.    I don't recall offhand how many it was, but I read
```

SIMON, BARBARA
06/03/2019                                                                    Page 10

```
 1        police reports.

 2   Q.   But how long ago did you conduct this review?

 3   A.   About a week or so, week-and-a-half ago.

 4   Q.   Okay.  How many witness statements did you review?

 5   A.   I believe two or three, two or three I believe.

 6   Q.   Okay.  And do you recall the names of the witnesses?

 7   A.   One just stands out, statement taken from Mr. Monson.

 8   Q.   Okay.  Any other witnesses?

 9   A.   Not as I can recall.

10   Q.   Do you recall the names of the police officers, the

11        reports that you reviewed?

12   A.   I believe Officer Crockett, I believe Crockett.  I

13        don't remember the other officer's name.

14   Q.   Did these -- well, let me just ask you to what extent

15        that these documents refresh your memory regarding the

16        case of The People versus Monson?

17   A.   I remember some of the case.  You know, it's been a

18        long time.  I don't remember everything that happened.

19        It's been years ago --

20   Q.   Right.

21   A.   -- so...

22   Q.   Do you remember being the officer in charge of that

23        particular case?

24   A.   Yes.

25   Q.   Could you -- you made a reference to a statement by
```

```
 1          Mr. Monson.  Was that the statement that you

 2          personally took from Mr. Monson, or was it more than

 3          one statement that you reviewed?

 4     A.   I'm sorry, a statement I took from Mr. Monson.

 5     Q.   Okay.  Did you review any other statements by

 6          Mr. Monson?

 7     A.   Not as I can recall.

 8     Q.   What transcripts did you review?

 9     A.   The -- what do you mean transcripts, the statement I

10          took from --

11     Q.   I'm just using your word.

12     A.   The statement I took from him?

13     Q.   You indicated a few moments ago that you had reviewed

14          transcripts, and I'm simply asking what transcripts

15          did you review?

16     A.   Oh, I'm sorry, the Walker Hearings.  When I said

17          transcript, I meant the Walker Hearing that was taken.

18     Q.   The Walker Hearing, okay.  Were there any other

19          transcripts that you reviewed?

20     A.   Other than the homicide case, the paperwork that was

21          in there.

22     Q.   Any other transcripts, depositions or, I'm sorry,

23          trial testimony, preliminary hearing testimony?

24     A.   That's what I can recall, just the Walker Hearing.

25     Q.   Just the Walker Hearing and did you ask to review any
```

SIMON, BARBARA
06/03/2019                                                                   Page 12

```
 1        other documents?

 2   A.   No.

 3   Q.   And I assume your attorneys made those documents

 4        available to you?

 5   A.   That's correct.

 6   Q.   Okay.  Now let me begin by asking you to kindly tell

 7        me how old you are.  I hate to have to ask that

 8        question.

 9   A.   I'm sorry, I don't give my age.  I'm grown.

10   Q.   I know, I know, I understand.

11   A.   Over 21.

12   Q.   Can you give me your date of birth?

13   A.   February 24th.

14   Q.   Okay.  And I need to know a little bit about your

15        employment history as well.  When did you first start

16        working for the City of Detroit?

17   A.   July 18, 1977.

18   Q.   And you started as a police officer?

19   A.   Yes, sir.

20   Q.   What training did you have to prepare you for that

21        work?

22   A.   At that time I went to the Police Academy.  If I'm not

23        mistaken, Coleman Young was the Mayor, and I was in

24        the academy for eight-and-a-half weeks.

25   Q.   Okay.  And what was your educational background prior
```

SIMON, BARBARA
06/03/2019                                                                          Page 13

```
 1        to going to the Police Academy?

 2   A.   I had Associate's Degree in law enforcement.

 3   Q.   Okay.  Okay.  How long did you work for the City as a

 4        police officer?

 5   A.   From 1977, and I retired in 2010, I believe, 2010.

 6   Q.   So you've been retired almost ten years now?

 7   A.   Yes.

 8   Q.   Okay.  And was there any specific reason for your

 9        retirement?

10   A.   I just wanted to retire from the City of Detroit.

11   Q.   Okay.

12   A.   I had another job offer, so...

13   Q.   Okay.  Are you currently employed?

14   A.   Yes, I am.

15   Q.   Where do you work?

16   A.   State of Michigan, Special Agent with the Attorney

17        General's office.

18   Q.   Can you summarize the positions you held with the

19        Detroit Police Department?

20   A.   Yes, sir.  I was a patrol officer assigned to the

21        Thirteenth Precinct.  After that I was promoted to an

22        investigator -- oh, I'm sorry -- before I was promoted

23        to investigator, I was at sex crime out of the

24        Thirteenth Precinct, and I was at sex crime.

25   Q.   Okay.
```

SIMON, BARBARA
06/03/2019                                                              Page 14

```
 1   A.   And while I was at sex crime, I was promoted to

 2        investigator.  I worked at the Fourth Precinct for

 3        about four or five months, if that long, and then I

 4        went to Homicide.

 5   Q.   How long were you in the Homicide section?

 6   A.   Oh, goodness, I think it was over 20 years, I believe.

 7   Q.   Okay.  After you finished the academy, was there any

 8        updating in your training while you were a police

 9        officer?

10   A.   What do you mean updating in my training?

11   Q.   I mean, did you have any additional training once you

12        became a police officer?

13   A.   Not while I was at the Thirteenth Precinct, no, sir.

14   Q.   How about in the Homicide section?

15   A.   At Homicide, I had went to different seminars,

16        training, yes.

17   Q.   Okay.  Let me just -- let me ask you this.  Can we

18        agree that in January of 1996, a Detroit police

19        officer could not arrest a person for a crime without

20        probable cause to believe that that person had

21        committed the crime?

22             MR. BERGER:  Objection; calls for a legal

23        conclusion.

24             But you can answer.

25             THE WITNESS:  Back when?  I don't know,
```

SIMON, BARBARA
06/03/2019                                                                     Page 15

```
 1        sir, 1996, I don't.  I don't know, sir.

 2   BY MR. SMITH:

 3   Q.   Did the policy change; is that why you don't know?

 4             MR. BERGER:  Objection; form.

 5             THE WITNESS:  It could have.  I don't

 6        remember.

 7   BY MR. SMITH:

 8   Q.   Okay, you don't remember, okay.  What was the policy

 9        when you retired?

10             MR. BERGER:  Objection; form.

11             THE WITNESS:  I have no idea.  I don't

12        remember.

13   BY MR. SMITH:

14   Q.   So when you retired, you don't know, as you sit here

15        today at least, you don't know whether or not a police

16        officer could arrest a person for a crime without

17        probable cause or not?

18             MR. BERGER:  Objection; calls for a legal

19        conclusion.

20             THE WITNESS:  I don't remember, sir.

21   BY MR. SMITH:

22   Q.   Did you receive any training on that issue while you

23        were in the academy?

24   A.   I can't recall.  It's possible.  I can't recall.

25   Q.   Okay.  I assume that as a police officer during your
```

SIMON, BARBARA
06/03/2019                                                                      Page 16

1      career, you made many arrests; would that be a fair

2      assumption?

3                       MR. BERGER:  Objection; vague.

4                       MR. SMITH:  I apologize for that.

5                       MR. BERGER:  No problem.  It happens.

6   BY MR. SMITH:

7   Q.   In the context of police work, do you know what an

8        arrest is?

9   A.   Yes, I do.

10  Q.   Can you tell me what an arrest is?

11  A.   Arrest is detain a person.

12  Q.   Without their consent, of course?

13                      MR. BERGER:  Objection; calls for a legal

14       conclusion.

15  BY MR. SMITH:

16  Q.   Right?

17  A.   It all depends.

18  Q.   That's your definition of an arrest, just detaining a

19       person?

20  A.   Detaining a person, investigation of that person, yes,

21       sir.

22  Q.   Okay.  And just to be clear, as we sit here today, you

23       don't know whether or not that requires probable cause

24       that a crime was committed or not?

25  A.   It's an investigation that you have to do to see if

SIMON, BARBARA
06/03/2019                                                                              Page 17

```
 1        probable cause, yes, sir.
 2   Q.   Oh, so you do the investigation, you arrest a person
 3        and then you do the investigation to see if there's
 4        probable cause?
 5                  MR. BERGER:  Objection; mischaracterizes
 6        prior testimony.
 7                  THE WITNESS:  No.  That's what you're
 8        saying.  I'm sorry.
 9                  MR. BERGER:  Let's do our -- all of us, we
10        just need to do our best not to speak over each other.
11        We'll all try.
12                  THE WITNESS:  If arrest is made, sir, I
13        don't know.  It's different kinds of arrests.  You can
14        arrest somebody for drunk driving.  You can arrest
15        somebody for robbery.  You can arrest -- so, I mean,
16        you want me to come by and say all arrests are the
17        same, which they're not.
18   BY MR. SMITH:
19   Q.   Okay.  How about an arrest for murder?
20                  MR. BERGER:  Objection; calls for
21        speculation, vague.
22                  THE WITNESS:  It's an investigation, sir.
23        That's just like if you go out here and you commit a
24        murder and they bring you in, it's an investigation
25        done.  And if you did it --
```

```
 1   BY MR. SMITH:

 2   Q.   Well, my question to you, Ms. Simon, is whether or not

 3        you need probable cause in order to arrest someone for

 4        murder?

 5                 MR. BERGER:  Objection; calls for a legal

 6        conclusion.

 7   BY MR. SMITH:

 8   Q.   And by probable cause, I mean that there is at least a

 9        probability that the person you arrested committed the

10        crime.

11                 MR. BERGER:  Objection; calls for a legal

12        conclusion.

13                 THE WITNESS:  I'll agree with that, that's

14        true.

15                 MR. SMITH:  Okay.

16                 MARKED FOR IDENTIFICATION:

17                 EXHIBIT 1

18                 Third Amended Notice

19                 of Taking Deposition

20                 10:33 a.m.

21                 MR. SMITH:  Now I'm going to show you what

22        has been marked as Deposition Exhibit 1, which is your

23        Deposition Notice.  This is the document that we sent

24        to your attorneys asking that you be present for

25        today's deposition.
```

SIMON, BARBARA
06/03/2019                                                                    Page 19

```
 1                    MR. BERGER:  Sorry, Mr. Smith, is that not
 2          on the PDFs that you have?
 3                    MR. SMITH:  It is not.
 4                    MR. BERGER:  Oh, okay.
 5                    MR. SMITH:  It is not.
 6    BY MR. SMITH:
 7    Q.    And the only reason I'm bringing it up is because on
 8          page 4, we asked that you bring certain documents with
 9          you and, you know, I'll just note for your benefit
10          that your attorneys have objected to producing those
11          documents, and I assume you have brought no documents
12          with you today?
13                    MR. BERGER:  Can I see that real quick?
14                    THE WITNESS:  Uh-huh.
15                    MR. BERGER:  If I remember correctly,
16          Mr. Smith, I think it was 2 through 4 that we objected
17          to, and if you want to ask her questions, you're more
18          than welcome to ask her questions about all five.
19                    MR. SMITH:  Okay.
20    BY MR. SMITH:
21    Q.    Did you bring any documents?
22    A.    No, I did not, sir.
23    Q.    And I will simply reserve my right to depose you in
24          the event we do receive documents that are responsive
25          to this schedule of documents to be produced.
```

SIMON, BARBARA
06/03/2019                                                                    Page 20

 1                      Now directing your attention now to January

 2          the 20th of 1996, were you working in the Homicide

 3          section at that time?

 4   A.     Yes, sir.

 5   Q.     And either independently or based on the documents

 6          that you have reviewed, do you recall receiving a call

 7          from patrol officers who had been dispatched to 2752

 8          West Boston in the City of Detroit for a suspected

 9          assault and possible homicide?

10                      MR. BERGER:  Objection; assumes facts not

11          in evidence.

12                      THE WITNESS:  You're asking me did I

13          personally receive a call from them?

14   BY MR. SMITH:

15   Q.     Do you recall receiving a call?

16   A.     No, sir.  No, sir.

17   Q.     You do not recall receiving a call?

18   A.     That's correct.

19   Q.     Excuse me.  Do you recall being contacted at all by

20          police officers either directly or from someone else

21          in your section to advise you of what was going on in

22          the field?

23   A.     Yes, sir.

24   Q.     Okay.  And who was the person that advised you what

25          was happening?

SIMON, BARBARA
06/03/2019

```
 1   A.   If I remember correctly, a call came into Homicide

 2        section, and officers were dispatched out to that

 3        location, and if -- I don't remember.  Information got

 4        back to Homicide about the fatal stabbing.

 5   Q.   Okay.  You don't know how the information, quote, got

 6        back to Homicide?

 7   A.   Well, somebody had to call or come in, whatever

 8        officer went out to the scene.

 9                    MARKED FOR IDENTIFICATION:

10                    EXHIBIT 2

11                    Preliminary Complaint Record

12                    10:37 a.m.

13                    MR. SMITH:  Let me hand you what's been

14        marked Deposition Exhibit 2 for identification.

15                    MR. BERGER:  Thank you, Mr. Smith.

16                    MR. SMITH:  You're welcome.

17   BY MR. SMITH:

18   Q.   Ms. Simon, this document is captioned Preliminary

19        Complaint Record, and in the heading it says:  Fatal

20        stabbing, 2752 West Boston, Apartment A7.

21                    First of all, are you familiar with what a

22        Preliminary Complaint Record is or was in 1996, were

23        you familiar with how that record was used?

24   A.   Yes.  There's the, well, recognize a PCR, preliminary

25        complaint that the officer, responding officer makes
```

```
 1      at the scene.

 2  Q.   Okay.  And this document seems to contain notes of

 3       various kinds, seems to be describing the crime scene,

 4       as well as witnesses that they received information

 5       from.  Is that typical of these kinds of documents?

 6                  MR. BERGER:  Objection; foundation.

 7                  THE WITNESS:  Yes, sir.

 8  BY MR. SMITH:

 9  Q.   Now it's my understanding that in the investigation of

10       this particular incident, you were assigned as the

11       officer in charge?

12                  MR. BERGER:  Asked and answered.

13                  THE WITNESS:  Yes, sir.

14  BY MR. SMITH:

15  Q.   And how does that process work; how is one assigned

16       the officer in charge for a particular case?

17                  MR. BERGER:  Are you talking about in 1996

18       or --

19                  MR. SMITH:  In 1996, yes.

20                  THE WITNESS:  Well, it depends.  We had

21       different squads at that time, and say like my squad

22       was up and if I was the next person up for a case,

23       there's several people in that squad, and if your

24       name, if you're up next, then the case will be

25       assigned to you.
```

 1   BY MR. SMITH:

 2   Q.   So it's just an automatic process?

 3   A.   That's from one squad to another, yes, sir.

 4   Q.   Okay.  So when a call comes in from the field of a

 5        possible homicide, then the next person that's up

 6        becomes the officer in charge of that case?

 7             MR. BERGER:  Mischaracterizes her prior

 8        testimony.

 9             THE WITNESS:  Well, it depends on what

10        squad is -- you have different squads.  Say like you

11        have a baby squad, so baby squad has different squads,

12        okay, so it all depends on what squad is up at that

13        particular time for a case.

14   BY MR. SMITH:

15   Q.   Okay.  When you say a baby squad --

16   A.   Yes, sir.  We had squads like squad 1 was baby and

17        children's squad.  We had so many -- I think it was

18        about seven squads at that time.

19   Q.   Okay.  So if your squad was up, you'd be assigned the

20        officer in charge?

21   A.   If your name was next, yes, sir.

22   Q.   Okay.  Okay.  In this particular case, if you take a

23        look at the document that we've marked as Exhibit 2,

24        you can see that there are several boxes that are

25        checked unknown for method of entry, method of escape,

```
 1          describe the weapon; all of those are marked unknown,

 2          correct?

 3   A.     Yes.

 4   Q.     And then on the next row, the number of perpetrators,

 5          unknown; whether male or female, unknown; whether

 6          adult or juvenile, unknown; whether white or black,

 7          unknown.

 8   A.     That's correct.

 9   Q.     Would you agree with me that based on a reading of

10          this particular PCR, the officers in question had no

11          suspect in this case?

12                  MR. BERGER:  Objection; calls for

13          speculation.

14                  THE WITNESS:  According to the report.

15   BY MR. SMITH:

16   Q.     Okay.  And also, when it says units notified, it says

17          homicide, Simon; do you see that?

18   A.     Yes.

19   Q.     It doesn't say homicide; it says H-O-M, Simon?

20   A.     That's correct.

21   Q.     Do you know what that means?

22   A.     Yes, sir.

23   Q.     What does did mean?

24   A.     It means they called, I could have answered the phone,

25          and told me the situation in squad.  So I'm the person
```

SIMON, BARBARA
06/03/2019                                                                      Page 25

```
 1          they talked to, Simon.

 2   Q.    Okay.  Would that indicate that you were the officer

 3          in charge at that point?

 4   A.    No, sir.  I could have been there, phone rang,

 5          answered the phone.

 6   Q.    Okay.  Would you have given them any directions in

 7          terms of what to do with the witnesses; for example,

 8          bring the witnesses down to Homicide?

 9   A.    If they had witness, yes, sir.

10   Q.    Would that have been --

11   A.    Or I could have or the team that went out there could

12          have told them to convey the witness to Homicide.

13   Q.    Okay.  In 1996, was that the practice of the Homicide

14          section, to have witnesses brought downtown when there

15          was a murder or a serious injury?

16   A.    Yes, sir.

17   Q.    And I assume that was a mandatory thing; I mean, if

18          the witness really wasn't that anxious about going

19          down to police headquarters, they would have to come

20          because that was your procedure?

21                MR. BERGER:  Objection; assumes facts not

22          in evidence.

23                THE WITNESS:  Yes, sir.

24   BY MR. SMITH:

25   Q.    On page 2 of this document, there's a line that says:
```

```
 1        Per code 2790, all witness conveyed to Homicide for

 2        questioning.

 3                    Do you see that?

 4   A.   Uh-huh.

 5                    MR. BERGER:  Is that a yes?

 6                    THE WITNESS:  Yes.  I'm sorry, I'm sorry.

 7        Yes.

 8   BY MR. SMITH:

 9   Q.   Okay.  And as I think you've already testified, that

10        was the practice in a situation like this; when I say

11        a situation like this, I mean a situation where there

12        is a possible homicide?

13   A.   Are you talking about code 2790?

14   Q.   Yes.

15   A.   Code 2790 would have been the actual person or persons

16        that were out at the scene, that was their code, and

17        they had the witness conveyed down.

18   Q.   Okay.  When you say it was their code --

19   A.   Yes.

20   Q.   -- are you speaking about the investigating officer;

21        for example, this is Jerome Wilson?

22   A.   No, sir.  Code 2790 is one of the persons that work

23        out of Homicide.  We had codes at that time.

24   Q.   Okay.

25   A.   Yeah.
```

SIMON, BARBARA
06/03/2019                                                                      Page 27

```
 1   Q.   I see.  Was that your code?

 2   A.   No, I wasn't code 2790.

 3   Q.   Okay.  Okay.

 4                  MARKED FOR IDENTIFICATION:

 5                  EXHIBIT 3

 6                  Preliminary Complaint Record

 7                  10:46 a.m.

 8                  MR. SMITH:  Let me hand you what's been

 9        marked as Simon Deposition Exhibit 2 for

10        identification.

11                  MR. BERGER:  Exhibit 2?

12                  MR. SMITH:  This is Exhibit 3, and this is

13        --

14                  MR. BERGER:  Do you have an extra copy for

15        me?

16                  MR. SMITH:  Yeah, I do.  I'm sorry.

17                  MR. BERGER:  No, that's okay.  Thank you.

18   BY MR. SMITH:

19   Q.   This is another Preliminary Complaint Record, and this

20        one is signed by Vincent L. Crockett, and it seems to

21        be pretty much the same format, number of

22        perpetrators, unknown; whether male or female,

23        unknown; juvenile or adult, unknown; black or white,

24        unknown.

25                  Would you agree that it doesn't appear that
```

SIMON, BARBARA
06/03/2019                                                                  Page 28

```
 1        this officer has any suspects who possibly committed
 2        the crime?
 3                    MR. BERGER:  Objection; calls for
 4        speculation and assumes facts not in evidence.
 5  BY MR. SMITH:
 6  Q.    When I say that, I mean not that he knows of?
 7  A.    Can you repeat your question, please?
 8  Q.    Yes.  It appears that this officer has no knowledge of
 9        any suspect who may have committed the crime when he
10        wrote out this PCR?
11                    MR. BERGER:  Objection; assumes facts not
12        in evidence, calls for speculation.
13                    THE WITNESS:  Yes, that's correct.
14  BY MR. SMITH:
15  Q.    Okay.  And on page 2 of this PCR, the writer says:
16        Conveyed all three witnesses to --
17                    I guess that's Homicide?
18  A.    That's correct.
19  Q.    And that would have been consistent with the policy
20        that you described of bringing witnesses downtown for,
21        downtown to the Homicide section for interrogation?
22  A.    That's correct.
23  Q.    Okay.  Now exactly what procedure would be followed
24        when these witnesses were brought downtown?
25  A.    The officers would talk to, I don't know who they
```

```
 1          spoke to, to let them know what was going on and why

 2          the people were brought down there to Homicide, and

 3          then you might get information from other officers at

 4          the scene why they're being brought down there.  So I

 5          don't know exactly who they talked to if that's what

 6          you're asking me.  I don't know.

 7     Q.   Okay.  It was a general question.  I wasn't talking

 8          about these particular officers.

 9     A.   Oh, okay.  I'm sorry.  I thought you were talking

10          about these --

11     Q.   I'm just talking about the procedure that is followed

12          when the people that were transported downtown as

13          witnesses, what procedure would be followed at that

14          point?

15     A.   Followed, like I said, the officers would tell them

16          the information they have and individual, what that

17          person told them or said about the scene.  Then they

18          would be interviewed by a Homicide officer.

19     Q.   Okay.  And the fact that they were conveyed down and

20          interviewed did not mean that there was probable cause

21          that they committed a crime but that they might have

22          some information regarding a crime?

23     A.   That's correct.

24               MR. BERGER:  Objection; calls for

25          speculation.
```

SIMON, BARBARA
06/03/2019                                                                          Page 30

```
 1   BY MR. SMITH:

 2   Q.   And do you recall giving testimony in this case at the

 3        preliminary examination for Lamarr Monson?

 4   A.   I don't recall, yes.  I don't recall the date if

 5        that's what you mean, the date?

 6   Q.   No.

 7   A.   Okay.

 8   Q.   Do you recall giving testimony at a preliminary

 9        examination at which the Honorable Jimmylee Gray was

10        presiding, and the procedure was a preliminary exam

11        for Mr. Monson?

12   A.   I believe so, yes.

13   Q.   Okay.  And can you just explain briefly what a

14        preliminary examination is?

15   A.   A preliminary exam is held at 36th District Court to

16        see if there's enough, if there's probable cause to

17        bind that person over for trial.

18   Q.   Okay.  And since you were the officer in charge, part

19        of your role would be to attend such an examination;

20        is that correct?

21   A.   That's correct.

22   Q.   Okay.  And in this particular case, you also

23        personally interviewed Lamarr Monson, correct?

24   A.   That's correct.

25                     MARKED FOR IDENTIFICATION:
```

SIMON, BARBARA
06/03/2019                                                                  Page 31

```
 1                    EXHIBIT 4

 2                    Preliminary Examination

 3                    transcript excerpts

 4                    February 2, 1996

 5                    10:52 a.m.

 6                    MR. SMITH:  I'm handing you what's been

 7          marked Deposition Exhibit 4, and I have --

 8                    MR. BERGER:  I think we're missing

 9          Exhibit 4 for her exhibits on the computer.

10                    MR. SMITH:  Is that right?

11                    MR. BERGER:  I think so.

12                    MR. SMITH:  Let me take a look.  You may be

13          right.

14    BY MR. SMITH:

15    Q.    If it's not on the server, it's a short one, we'll

16          just read through it, and what I want to find out is

17          whether this is an accurate transcription of your

18          testimony or if you have any reason to believe that it

19          is not.

20                    And I want to let you know that I have

21          selected pages that I am interested in.  If at any

22          point you want to read the entire transcript, we can

23          arrange that.  I mean, I do have the entire transcript

24          here if you would like to read it.

25    A.    Oh, okay, because I see it was certain pages.
```

```
 1   Q.    Yes, it's certain pages.

 2   A.    Okay.  No problem.

 3   Q.    Okay.  Question:  Did you go to the scene, to the

 4         crime scene and view the body of the victim?

 5                     Answer:  No, I did not.

 6                     Question:  So the information that you had

 7         initially was a fatal stabbing?

 8                     Answer:  Yes, called in by the officer who

 9         responded to the scene.

10                     Question:  Now what time was it that

11         Mr. Monson was arrested, if you know?

12                     Answer:  I don't know the exact time when

13         he was brought down to Homicide.

14                     Question:  Well, my question to you is when

15         he was arrested and when, what time he was arrested;

16         do you know?

17                     Answer:  Around 3, about 3:00.

18                     Question:  And when you say 3:00, would

19         that be in the a.m. or p.m.?

20                     Answer:  P.m.

21                     And so, 3:00 on the morning of January 21st

22         of 1996?

23                     No, ma'am.  January 20th, 1996.

24                     Okay.  January 20th, Saturday?

25                     Yes.
```

```
 1                    So 3:00 in the afternoon on the 20th?

 2                    Yes, ma'am.

 3                    Did I read that correctly?

 4    A.   Yes.

 5    Q.   And do you recognize this as being testimony that you

 6         gave at the preliminary hearing for Lamarr Monson on

 7         February the 2nd of 1996?

 8    A.   Yes.

 9    Q.   Moving over to the next page, which is page 60 at line

10         13:

11                    Question:  Now why were you giving him his

12         rights to begin with, huh?

13                    Answer:  Because, number one, sir, it had

14         come to my attention that when Mr. Monson gave me that

15         name, when he first came in, he said that, told the

16         officer that he did not know the complainant, and then

17         the people out there told me he was the boyfriend of

18         the complainant.  So he was giving false information.

19         So I gave him his Constitutional rights to take a

20         statement from him, sir.

21                    MR. BERGER:  I'm going to object real

22         quick.  I believe that -- I'm reading the transcript

23         and it says Mr. Mason, not Mr. Monson.

24                    Subject to that objection, you can answer.

25                    MR. SMITH:  And you are correct.
```

SIMON, BARBARA
06/03/2019                                                                 Page 34

```
 1  BY MR. SMITH:

 2  Q.   Question:  You gave him his Constitutional rights

 3       because he said he didn't know the complainant?

 4                  Yes, sir.

 5                  Is that right?

 6                  Yes, sir.

 7                  Now did I read that testimony, except for

 8       my saying Monson instead of Mason, did I read that

 9       testimony correctly?

10  A.   Yes.

11  Q.   And does that appear to be an accurate transcription

12       of the testimony you gave at the preliminary hearing

13       on February the 2nd of 1996?

14  A.   Yes.

15  Q.   Now, do you have any independent recollection as you

16       sit here, you know, what people out there gave you the

17       information that Mr. Monson was the boyfriend of the

18       complainant?

19                  MR. BERGER:  Objection; form.

20                  THE WITNESS:  I do believe when I said the

21       people out there, it was the people that was brought

22       into Homicide out there in the hallway or different

23       rooms, out there, not in the particular room I was in.

24  BY MR. SMITH:

25  Q.   Okay.  And the complainant would have been the injured
```

```
 1        person, in this case Christina Brown?

 2   A.   That is correct.

 3   Q.   And when you say you read him his rights because he

 4        gave false information, were you speaking about the

 5        fact that he said his name was Mark Mason as opposed

 6        to Lamarr Monson?

 7   A.   It could have been that and other things, sir.  As I

 8        go back and read as you read, that he gave false

 9        information, he did not know the complainant, and the

10        information that I had received, I can't remember all

11        of it, you know, but I did give him his Constitutional

12        rights before I spoke to him, yes.

13   Q.   Okay.  So you also said in your testimony that he was

14        arrested at 3 p.m.  That was approximately the exact

15        time --

16             Well, let me refer you back to the PCR,

17        because I think 3:00 was the time when they conveyed

18        them down to -- yes, if you look at Exhibit 2 under

19        time, it says 3 p.m., and the date is January the 20th

20        of 1996.

21             Now that's the date and time you give for

22        his arrest in the preliminary examination?

23   A.   It could have been.  I don't recall, sir.  It has 3:00

24        I see, but they have down here 3:00 p.m.  They also

25        have 2:10 p.m., so...
```

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

```
 1   Q.   Well, let's take a look at that.

 2              The 2:10, that's the time that the crime

 3        was reported to police?

 4   A.   Okay, I see what you're saying, yes.  They said 3:00,

 5        yes, sir.

 6   Q.   Okay.  So was it your testimony -- you were under oath

 7        at that preliminary hearing, correct?

 8   A.   Of course.

 9   Q.   Of course.  Was it your testimony that Mr. Monson was

10        actually placed under arrest I guess when they left

11        the scene?

12   A.   I believe so, sir.

13   Q.   And can you tell me the reason why he would have been

14        arrested at that time?

15              MR. BERGER:  Objection; foundation, calls

16        for speculation.

17              THE WITNESS:  No, I can't.

18              MR. SMITH:  Okay.  And moving onto, and I'm

19        back again to Exhibit 4, and I'm looking at page 63.

20              My videographer --

21              VIDEO TECHNICIAN:  I don't have Exhibit 4.

22              MR. SMITH:  Oh, I'm sorry.  No problem.

23   BY MR. SMITH:

24   Q.   Page 63:

25              Question:  Now I notice that you started at
```

1    3:25, but you didn't start taking the statement until

2    7:45.  Now there's a four-hour lapse there.  Can you

3    tell me how you and Mr. Mason were occupying

4    yourselves?

5              Answer:  Yes, sir.

6              Question:  Describe it.

7              Answer:  Well, when I first started talking

8    to Mr. Mason, I gave him his Constitutional rights.

9    We talked for a minute, sir.  Then it came back that

10   Mr. Mason had gave me the wrong name, Mark Mason.  I

11   went back to ask him his real name.  After he gave me

12   his real name, sir, I went and did a DPD and CCH on

13   him.

14             And then the Court asked:  Meaning what?

15             Answer:  That Detroit Police record on him,

16   sir, and criminal history record on him, sir, Monson,

17   I'm sorry.

18             Did I read that accurately?

19   A.  Yes, you did.

20   Q.  And do you believe that to be an accurate

21   transcription of the testimony you gave at

22   Mr. Monson's preliminary hearing?

23   A.  Yes, sir.

24   Q.  Now you're indicating here that there was four hours

25   between the time I guess he was brought into the

SIMON, BARBARA
06/03/2019                                                                    Page 38

```
 1        Homicide section and the time you took his statement,

 2        correct?

 3   A.   Yes.

 4   Q.   Now you describe the fact that he had given you the

 5        wrong name, and you came back and asked him his real

 6        name, and he apparently gave you his real name?

 7   A.   Correct.

 8   Q.   Okay.  Now, first of all, it's not that uncommon for

 9        young people in certain areas of Detroit to have

10        what's called a street name, correct?

11   A.   Yes.

12   Q.   He wasn't arrested because he gave the wrong name, was

13        he?

14               MR. BERGER:  Objection; calls for

15        speculation.

16               THE WITNESS:  Are you asking me -- I don't

17        understand.  Are you asking me why the officers

18        arrested him?

19   BY MR. SMITH:

20   Q.   Well, you were the officer in charge of the case.

21   A.   I understand that but --

22   Q.   And I'm asking you in your opinion as the officer in

23        charge of the case, do you believe that he was

24        arrested because he gave the wrong name?

25   A.   No, sir.  I'm sorry.
```

SIMON, BARBARA
06/03/2019                                                                    Page 39

```
 1                    MR. BERGER:  Objection; calls for

 2          speculation.

 3                    THE WITNESS:  No, sir.

 4     BY MR. SMITH:

 5     Q.   Okay.  And you did a police record check on him and a

 6          criminal history record on him, correct; that's what

 7          it says here?

 8     A.   Yes.

 9     Q.   Do you recall what the results of that was?

10     A.   No, sir.

11                    MR. SMITH:  Let me just jump ahead one

12          exhibit at least.

13                    MARKED FOR IDENTIFICATION:

14                    EXHIBIT 6

15                    A.O.W. Report

16                    11:07 a.m.

17                    MR. SMITH:  I'm handing you what's been

18          marked as Deposition Exhibit 6 for identification.

19                    MR. BERGER:  Do you have a copy for me?

20                    MR. SMITH:  I do.

21                    MR. BERGER:  Thank you.  Thank you very

22          much.  This is 6?

23                    MR. SMITH:  Yes.

24                    MR. BERGER:  Okay.

25     BY MR. SMITH:
```

SIMON, BARBARA
06/03/2019                                                                    Page 40

```
 1   Q.   Now Exhibit 6 which, by the way, I received as part of
 2        the records that were produced, I believe, if not by
 3        the police department by the prosecutor's office, and
 4        my question is:  Do you know what an A.O.W. Report is?
 5   A.   No, I don't remember seeing this, sir.
 6   Q.   Do you know what an A.O.W. Report is?
 7   A.   No.
 8   Q.   Okay.  This report does say that Defendant has no
 9        prior adult convictions or juvenile adjudications or
10        misdemeanor convictions, correct?
11   A.   That's what it says.
12   Q.   And it says:  Defendant has no relationship to
13        criminal justice system at the time of the instant
14        offense.
15             Correct?
16   A.   That's what it says.
17   Q.   It also says:  Defendant has no subsequent or current
18        convictions.
19             Correct?
20   A.   Yes.
21   Q.   Now if you had found a criminal record on Mr. Monson,
22        that would have been part of your investigative file,
23        correct?
24   A.   That's correct.
25   Q.   Have you had an opportunity to review that file?
```

```
 1   A.   No, sir.

 2   Q.   Okay.  In your testimony at the preliminary hearing --

 3        just one second.

 4             How long does it normally take to do a

 5        criminal history check on an individual that has been

 6        brought down to Homicide?

 7   A.   It all depends, sir.  You know, back then, it's not as

 8        modern as it is now.  Your computer would break down

 9        or you had to wait.  So, you know, it's not as modern

10        as it is now back in 1996.

11   Q.   I'm going to just direct your attention to page 65,

12        which is the next page I have in Exhibit 4, and at

13        line 7 you were asked the following question:

14             Did you ever tell him during the course of

15        this four-hour conversation that he was being charged

16        with anything?

17             Answer:  No, sir, I did not.

18             Question:  Did you ever tell him during the

19        course of this four-hour examination, Monson or Mason,

20        whoever you are, you're free to go?

21             And then there were objections, and you

22        never answered that question.

23             I take it the answer to that second

24        question would have been no, you're not free to go?

25             MR. BERGER:  Hold on one second.
```

SIMON, BARBARA
06/03/2019                                                                      Page 42

```
 1                    Okay.  I agree with that statement that she
 2         did not answer that.
 3                    MR. SMITH:  Okay.
 4    BY MR. SMITH:
 5    Q.   First of all, did I read that correctly?
 6    A.   Yes, you did.
 7    Q.   And does that appear to be an accurate transcription
 8         of the testimony you gave at the preliminary hearing
 9         on February 2nd of 1996?
10    A.   That's correct.
11    Q.   Okay.  Now when you arrest someone as a police officer
12         in 1996, was it part of the procedure to tell the
13         person what they were being arrested for?
14    A.   In some cases, yes.
15    Q.   But not in --
16    A.   Excuse me.
17    Q.   Uh-huh.
18    A.   If there's an investigation going on where that person
19         is subject to the crime, you collect evidence and then
20         you let that person know, yes.
21    Q.   So you were busy collecting evidence before letting
22         him know what he was being charged with?
23    A.   It was --
24                    MR. BERGER:  Objection; mischaracterizes
25         prior testimony.
```

```
 1                      Barb?

 2                      THE WITNESS:  I am so sorry.

 3                      MR. BERGER:  That's okay.  I know.  Go

 4         ahead and read his question and then --

 5                      THE WITNESS:  Oh, up here?

 6                      MR. BERGER:  Yes.

 7                      MR. SMITH:  I'm going to repeat the

 8         question.  You can read it but I need to repeat it for

 9         the record.

10    BY MR. SMITH:

11    Q.   So you were busy collecting evidence before letting

12         him know what he was being charged with?

13                      MR. BERGER:  Objection; mischaracterizes

14         her prior testimony.

15                      THE WITNESS:  It was an investigation going

16         on, sir, of a homicide.  I can't recall everything

17         that was done in 1996, but it was an investigation

18         going on, and evidence was being collected, and that's

19         all I can tell you right now.

20    BY MR. SMITH:

21    Q.   Evidence, when you say evidence was being collected,

22         you mean evidence was being collected from the other

23         witnesses who had come down with him, as well as from

24         him?

25                      MR. BERGER:  Objection; assumes facts not
```

SIMON, BARBARA
06/03/2019                                                                    Page 44

```
 1        in evidence.
 2                  THE WITNESS:  Correct and possibly at the
 3        scene.
 4   BY MR. SMITH:
 5   Q.   Now is it the case that in 1996, based on what we've
 6        been reading from your transcript and what you've
 7        testified to, was it the case at that time that
 8        individuals such as Lamarr Monson would not be told
 9        that they were being charged because they might clam
10        up, and if they weren't told, they might give more
11        information?
12   A.   It's possible.
13   Q.   Was that one of the considerations of not telling an
14        individual that he was being charged or about to be
15        charged with murder?
16   A.   I don't know, sir.  Like I told you, evidence and
17        investigation was going on.  So, you know, that was
18        back in 1996.  I don't remember.
19   Q.   You also testified at Mr. Monson's trial, did you not?
20   A.   Yes, sir, I believe so, yes.
21                  MARKED FOR IDENTIFICATION:
22                  EXHIBIT 5
23                  Jury Trial transcript excerpts
24                  March 4, 1997
25                  11:16 a.m.
```

1          MR. SMITH:  Let me hand you what's been

2     marked Deposition Exhibit 5 for identification.

3          MR. BERGER:  Thank you.

4  BY MR. SMITH:

5  Q.  And this document is captioned Jury Trial Before the

6     Honorable Geraldine Bledsoe Ford on Tuesday, March the

7     4th, 1997, and again like before, I have selected

8     pages that I'm interested in asking you questions

9     about.  At any time you wish to read the entire

10    transcript, I do have a copy of that available for

11    you, but I'm sure Mr. Berger does as well.

12         Let me direct your attention to page 34 of

13    the exhibit, and there at line 13 is the following

14    questions and answers:

15         And how are you employed?

16         Investigator, Detroit Police Department.

17         At one time were you the officer in charge

18    of the case of The People versus Lamarr Monson?

19         Yes.

20         When was that?  Would that have been around

21    January the 20th of 1996?

22         Answer:  Yes.

23         First of all, did I read that correctly?

24  A.  Yes.

25  Q.  And does that accurately set forth your testimony at

SIMON, BARBARA
06/03/2019                                                                           Page 46

```
 1       the trial of Lamarr Monson?

 2   A.  Yes.

 3   Q.  Then let's move to page 35:

 4               Question:  What does it mean to be the

 5       officer in charge of the case?

 6               Answer:  Do the investigation, take the

 7       evidence over to the lab, prepare Investigator's

 8       Report for the prosecutor.

 9               Question:  Do you also review the reports

10       that are submitted by the various police agents that

11       are working?

12               Answer:  Yes.

13               Did I read that correctly?

14   A.  Yes.

15   Q.  And is this an accurate transcription of your

16       testimony at the trial of Lamarr Monson?

17   A.  Yes.

18   Q.  I just want to ask you a few follow-up questions

19       regarding the duties of the officer in charge.  When

20       you say do the investigation, what did you mean by

21       that?

22   A.  Investigation, you help investigate.  You put the case

23       together.  You do the lab work.  At that particular

24       time, I don't know if I, if I went to the -- you're

25       supposed to go to the Wayne County Morgue.  You have
```

SIMON, BARBARA
06/03/2019                                                                    Page 47

```
 1         to sit in on the autopsy.  I don't think I did that,
 2         though, that particular time.  You prepare everything.
 3         You take it to the prosecutor.  You talk to the
 4         prosecutor.  You give them their package.  You have
 5         your package.  You leave the file with them, and they
 6         will, you know, see what that person is charged with,
 7         murder 1, murder 2.
 8    Q.   Okay.  And I'm assuming from your testimony that
 9         that's based on the evidentiary information that you
10         provide?
11    A.   Yes, you put everything together, witness statements,
12         police, everything you have, you take it and make the
13         prosecutor their package, and you take them your
14         original folder.
15    Q.   And would that package, by the way, include what is
16         sometimes referred to as exculpatory evidence, and by
17         that I mean evidence that points to innocence rather
18         than guilt?
19    A.   Everything you have you take to the prosecutor.  I
20         can't -- I don't know.  I don't know what you're
21         saying, sir.
22    Q.   Okay.  Well, I'll try to be more plain.
23              If in your investigation you come across
24         evidence that tends to show that an individual is
25         innocent in 1996, did you at that time have an
```

SIMON, BARBARA
06/03/2019                                                                    Page 48

```
 1       obligation to turn that information over to the
 2       prosecutor?
 3                     MR. BERGER:  Objection; calls for a legal
 4       conclusion.
 5                     THE WITNESS:  Yes.
 6   BY MR. SMITH:
 7   Q.   Okay.  And as part of your investigation, did you also
 8       have a duty to make a good faith effort to gather all
 9       pertinent evidence?
10                     MR. BERGER:  Objection; form, calls for a
11       legal conclusion.
12                     THE WITNESS:  Sorry.
13                     MR. BERGER:  It's okay.
14                     THE WITNESS:  Pertinent information, is
15       that what you said?
16   BY MR. SMITH:
17   Q.   Pertinent evidence, evidence that could speak to
18       either the innocence or the guilt of a particular
19       person?
20   A.   You turn all that over to the, yes, to the prosecutor,
21       yes.
22   Q.   But you had to gather it first?
23   A.   That's correct.
24   Q.   And my original question was:  Did you have a duty to
25       make a good faith effort to gather all such evidence?
```

SIMON, BARBARA
06/03/2019                                                                                        Page 49

```
 1                      MR. BERGER:  Objection; calls for a legal
 2          conclusion.
 3                      THE WITNESS:  Yes.
 4     BY MR. SMITH:
 5     Q.   Let me direct your attention to page 39:
 6                      Question:  Now you were given this
 7          information from another police officer that was on
 8          the scene?
 9                      Answer:  That responded to the scene, yes.
10                      Question:  Okay.  And so you found out that
11          his name was actually Lamarr Monson?
12                      Answer:  Yes.
13                      And I wanted to read this because it was a
14          little bit uncertain as to whether or not you got
15          Lamarr Monson's name from a police officer who had
16          responded to the scene or whether Lamarr Monson,
17          himself, gave you his correct name as you testified at
18          the preliminary hearing?
19     A.   I don't recall, sir.
20     Q.   Okay.  Page 41, question, line 15:
21                      Question:  All right.  Is there any type of
22          delay that is engendered when there is a Defendant
23          that gives a false name?
24                      Answer:  Well, what I did after I found out
25          his name, I went and checked the DPD records to see if
```

```
 1        he had a police record and criminal history record on

 2        Mr. Monson.

 3                    Question:  Okay.  And how long did that

 4        take?

 5                    Answer:  I believe the criminal history

 6        took some time because the computer was down.

 7                    Question:  And so is that what caused some

 8        of the delay in between the time that you actually

 9        gave him his rights and the statement was taken?

10                    Answer:  That and I was reading other

11        statements that witnesses had gave.

12                    Okay.

13                    Again, to your knowledge, you didn't pull

14        up any criminal record on Lamarr Monson, did you?

15                    MR. BERGER:  Objection; asked and answered.

16                    THE WITNESS:  Sir, I don't remember.

17        You're going back 23 years.  I don't remember.

18   BY MR. SMITH:

19   Q.   Okay.  By the way, did I read that portion correctly?

20   A.   Yes.

21   Q.   You don't have any doubt that you gave that testimony,

22        correct?

23   A.   I don't have any doubts, no.

24   Q.   Okay.  The other statements were statements of

25        witnesses.  Do you recall or have any recollection as
```

1       to how many witnesses we're talking about that were

2       brought down?

3  A.   I don't remember, sir.

4  Q.   And the PCRs that we looked at, which I believe were

5       Exhibits 1 and 2 -- I'm sorry -- 2 and 3, they

6       referred to taking three witnesses down, but there

7       were more witnesses than that that were brought

8       downtown to investigate this matter, correct?

9              MR. BERGER:  Objection; assumes facts and

10      foundation.

11             THE WITNESS:  I have no idea, sir.  I had

12      to look at the reports to see how many witnesses.  I

13      don't remember, if you want me to read over, see

14      witness they brought down.

15 BY MR. SMITH:

16 Q.   Well, it's not necessary.

17 A.   Okay.

18 Q.   We know that they said three.  I was giving you that.

19 A.   Oh.

20 Q.   I was wondering if there were more witnesses?

21 A.   I don't remember.

22 Q.   Okay.  And by the way, while you're looking at those,

23      the three witnesses were Linda Woods or at least they

24      identified themselves as Linda Woods, Raymond Lewis,

25      and Mark Mason, and it turned out that Mark Mason was

 1      actually Lamarr Monson?

 2                    MR. BERGER:  Is that a question?

 3                    MR. SMITH:  I'm asking is that correct, and

 4      the witness is reviewing the PCR in order to determine

 5      that.

 6                    THE WITNESS:  Yes, sir.

 7   BY MR. SMITH:

 8   Q.   Okay.  Again, on page 42 at line 6 you were asked the

 9        following question:

10                    Okay.  You were reading other statements

11      that witnesses had given in this case?

12                    Answer:  Yes.

13                    Why did you do that?

14                    Answer:  Because we were doing

15      investigation of a fatal stabbing.

16                    Question:  And this is -- were you present

17      at the crime scene?

18                    Answer:  No.

19                    Question:  And did you not see the body of

20      the deceased at the time that you questioned the

21      Defendant?

22                    Answer:  No.

23                    And you don't know what her cause of death

24      was, do you?

25                    Answer:  No, an autopsy hadn't been done at

SIMON, BARBARA
06/03/2019                                                                    Page 53

```
 1       that time.

 2              Question:  Okay.  And so based on some

 3       information that you received about wounds on the body

 4       of the victim, the assumption at that early date was

 5       that this victim had died of a fatal stabbing?

 6              Answer:  Yes.

 7              We can go to the next page as well, line 3:

 8              So how did you proceed?

 9              I took a statement from Mr. Monson.

10              Question:  Okay.  And that's after you read

11       these statements from other witnesses?

12              Yes.

13              Question:  And did you proceed in the

14       question-and-answer form or some other form?

15              The question-and-answer form.

16              Okay.  Did I read that correctly?

17  A.   Yes.

18  Q.   And does this appear to be a fair and accurate

19       transcription of the testimony you gave at Lamarr

20       Monson's trial?

21  A.   Yes.

22  Q.   So part of that four-hour delay is you were reviewing

23       the statements of other witnesses and talking to

24       police officers who had actually responded to the

25       scene?
```

SIMON, BARBARA
06/03/2019                                                                              Page 54

```
 1                      MR. BERGER:  Objection; mischaracterizes
 2          her prior testimony.
 3   BY MR. SMITH:
 4   Q.   Is that correct?
 5   A.   And I believe trying to wait for the CCH to come back
 6          because the computer was down.
 7   Q.   Okay.  So we've got three things, waiting for the CCH?
 8   A.   Waiting for the computer.
 9   Q.   For the computer to come back up?
10   A.   Right.
11   Q.   Reading the witness statements that had been taken by
12          other officers and talking to police officers who were
13          actually at the scene?
14   A.   Correct.
15   Q.   Now when you say that you proceeded in a
16          question-and-answer form, what does that mean?
17   A.   Question-and-answer form, I ask the question.  I write
18          down the question the way I give it, asked him, and I
19          write down that person's answer the way they give it
20          to me.
21   Q.   You don't leave out information that the witness gives
22          you that might be favorable to the witness, do you; I
23          mean, you put down everything they tell you?
24   A.   I write it out the way they tell me.  At the end they
25          have an opportunity to read it, make any corrections,
```

```
 1        and sign it.

 2   Q.   Okay.  Let's go to page 46:

 3                   Now these people who told you, you have

 4        described it as being other officers; is that correct?

 5                   Answer:  Yes, sir.

 6                   Question:  All right.  Now were these other

 7        officers -- can you identify these other officers, if

 8        you may?

 9                   Answer:  I don't remember their names,

10        Mr. Mitchell.

11                   Question:  All right.

12                   They're the responding officers that went

13        out on Boston.

14                   And at line 22:

15                   Now, are you trying to tell me then on a

16        basis of a false name, you've made him a suspect?

17                   Answer:  No, I did not make him a suspect.

18                   Question:  Well, why are you giving his

19        rights?  Why were you giving his rights?

20                   Sir, I had got information from another

21        witness that Mr. Monson -- and there's an

22        interruption -- I'm sorry, Dr. Kanluen is there.

23                   Question:  All right.  That's all right.

24        You proceed.  You proceed.

25                   Answer:  Okay.  I had got other information
```

SIMON, BARBARA
06/03/2019                                                                Page 56

```
 1        that Mr. Monson was Mr. Brown's, was Ms. Brown's

 2        boyfriend.

 3                  Do you see that?

 4   A.   Yes, I do.

 5   Q.   Okay.  I'd like to get you over to page 86, and at

 6        line 3 you were asked:

 7                  Now, did anybody tell you that he or she

 8        saw him do anything to this woman on this night?  Did

 9        anybody?  Anybody come and tell you that at all,

10        Ms. Simon, huh?

11                  Answer:  No.

12                  Did I read that correctly?

13   A.   Yes.

14   Q.   Does this set forth accurately your testimony at the

15        trial of Lamarr Monson?

16   A.   Yes.

17   Q.   Now if nobody, if nobody gave you or if nobody said to

18        you that they saw Mr. Monson do anything to the

19        decedent, nobody came and told you that, you were

20        basing your, I guess, suspicions because at some point

21        he was arrested, you were basing your assumptions upon

22        at least in part what these witnesses had told you?

23   A.   No, sir, there's --

24                  MR. BERGER:  Objection; compound, assumes

25        facts.
```

 1                      THE WITNESS:  No, sir.  It read:  Did

 2          anyone tell you anything that he did to this woman

 3          this night?

 4                      Nobody told me anything about a night as I

 5          can recall.  That's what it says here, this night.

 6   BY MR. SMITH:

 7   Q.   Did anybody -- I'll correct that and give you a chance

 8          to amend your testimony.

 9                      Did anyone tell you --

10                      MR. BERGER:  I'm going to object as it's

11          argumentative.

12   BY MR. SMITH:

13   Q.   Did anyone tell you that he or she saw Lamarr Monson

14          do anything to Christina Brown, either before or

15          after, well, before she was found on the bathroom

16          floor in a pool of blood?

17   A.   Once again, no one told me that he did anything to her

18          that night, and that's, that's all I can say, sir.

19   Q.   I didn't limit my question at all.

20   A.   I'm just limiting it to what I testified here at the

21          trial.

22                      MR. BERGER:  Barb, make sure you listen to

23          his question and answer his question.

24                      THE WITNESS:  Oh, I answered the best of my

25          knowledge.

SIMON, BARBARA
06/03/2019                                                                      Page 58

1              MR. BERGER:  Okay.  Well, I know.

2              THE WITNESS:  Okay.

3              MR. BERGER:  Just make sure you're

4        answering his question.

5              THE WITNESS:  Okay.

6    BY MR. SMITH:

7    Q.   My question is not limited to --

8              Well, how did you interpret this night;

9        what did you think he was talking about?

10   A.   To be honest, I don't know what Mr. Mitchell was

11       talking about, sir.  This is back in '96.  That's the

12       way he put it and I said no.

13   Q.   This is actually in '97.

14   A.   Oh, '97, I'm sorry.

15   Q.   Yeah, the trial was in '97.  He was arrested in '96.

16   A.   Okay.

17   Q.   Were you aware that he was incarcerated from '96 until

18       his trial in '97?

19             MR. BERGER:  Object as compound and assumes

20       facts.

21             THE WITNESS:  No, I don't remember, sir,

22       no.

23   BY MR. SMITH:

24   Q.   Okay.  What do you think this lawyer was referring to

25       when he said this night?  If you don't know or don't

```
 1        recall, that's fine.

 2   A.   I don't know.

 3   Q.   Okay.  As you sit here today, based on the material

 4        that you have reviewed and gone over and transcripts

 5        or anything else you have reviewed, do you have any

 6        knowledge of anyone, anyone reporting that Mr. Monson

 7        had hurt Christina Brown on the night she was

 8        assaulted?

 9   A.   I don't recall, no, sir.

10   Q.   Let's go to page 89 at the bottom, and we'll go over

11        to page 90 as well.

12                 Question:  You said that during the course

13        of the time that you were with Mr. Monson, the

14        Defendant in this matter, there were other witnesses

15        that were being interviewed, correct?

16                 That's correct.

17                 Question:  And they were being interviewed

18        by other people at Homicide?

19                 Answer:  That's correct.

20                 Question:  Were -- and then you were made

21        privy to that information?

22                 Answer:  Correct.

23                 Question:  Would you speak with these

24        people directly also?

25                 Answer:  Yes.
```

```
 1                    Question:  Okay.  And were you aware of

 2        what type of apartment building this was where the

 3        victim was found?

 4                    Answer:  I had been told by the responding

 5        officer that the building was abandoned because it had

 6        been on fire, and people were still living in the

 7        abandoned building.

 8                    Question:  Okay.  And when these people

 9        were being spoken to based upon your observations of

10        some of them, particularly the woman by the name of

11        Linda, was it evident to you that she had been a

12        person that had used drugs in the past?

13                    Answer:  Yes.

14                    Question:  Okay.  And so you would go back

15        and forth acquiring information and then place that

16        together and think about and formulate what you were

17        going to do with this case?

18                    Answer:  Yes.

19                    Now did I read that correctly?

20   A.   Yes.

21   Q.   And does it accurately set forth the testimony that

22        you gave at Lamarr Monson's trial on March the 4th of

23        1997?

24   A.   Yes.

25   Q.   Okay.  Now the information that you were obtaining
```

```
 1         from other people, witnesses and officers, that was

 2         something that was used by you when you decided that

 3         he was going to be arrested -- well, let me rephrase

 4         that because I'm not sure when.  Well, let me just

 5         rephrase the question.

 6                   Did there come a point in time when you

 7         decided that Lamarr Monson should be arrested for the

 8         murder of Christina Brown?  And I'm not basing this on

 9         the testimony that I just read.  I'll get back to that

10         momentarily.  I'm basing this on the material that you

11         had reviewed and gone over.

12                   Did there come a time, independently of the

13         officers who brought the witnesses along with

14         Mr. Monson down to Homicide, independent of them just

15         bringing him down there, did there come a point in

16         time when you looked at the evidence and decided that

17         he should be charged with murder?

18                   MR. BERGER:  I'm going to object because

19         it's compound and assumes facts and overall is

20         confusing.

21                   MR. SMITH:  Let me rephrase the question.

22    BY MR. SMITH:

23    Q.   Between the four hours that you were with Mr. Monson

24         on and off, did there come a point in time when you

25         decided that he should be arrested for murder?
```

SIMON, BARBARA
06/03/2019                                                                    Page 62

```
 1   A.   I don't exactly recall, sir.  I don't remember.

 2   Q.   Now you are the officer in charge, correct, of this

 3        particular case?

 4   A.   I was assigned officer in charge of the case, yes,

 5        sir.

 6   Q.   Did you leave the Homicide section after taking

 7        Mr. Monson's statement?

 8   A.   I don't remember if I left right after I took his

 9        statement, but I remember I was overtime.  Yes, sir, I

10        left.

11   Q.   And did you leave any instructions as to what

12        Mr. Monson's disposition should be, what should be

13        done with him?

14   A.   I don't recall that, sir.

15   Q.   If the evidence in the case shows that he was taken to

16        the ninth floor and put in a lock-up holding cell,

17        would that be consistent with what you would expect?

18             MR. BERGER:  Objection; assumes facts.

19             THE WITNESS:  I don't know.  I can't answer

20        that, sir, because I don't -- the investigation was

21        still going on when I left, so, I don't know who made

22        that determination.

23   BY MR. SMITH:

24   Q.   And that's my, that's my question to you.  You're the

25        officer in charge.  Isn't that your call to decide
```

```
 1       whether or not we're going it keep this man or let him

 2       go?

 3   A.  Well, once again, sir, the investigation was still

 4       going on.  I was not assigned officer in charge of the

 5       case until the next day.

 6   Q.  That's not what you testified to in your earlier

 7       testimony, is it?

 8   A.  I believe so because the case was assigned to me the

 9       next day.

10   Q.  Okay.  Well, there are two things that I want to drill

11       down on there.  One, you testified earlier that the

12       assignments are made as the cases come in, and it's

13       just a question of who's the next person up.  That's

14       what you said?

15   A.  What I said --

16           MR. BERGER:  I'm going to object because it

17       mischaracterizes her prior testimony.

18           THE WITNESS:  What I said, sir, is that the

19       cases, what squad is up next and that person, it could

20       be a squad 2's case, but let me put it this way.  The

21       officer in charge of Homicide assigned the case the

22       next day.  So the case was assigned to me the next

23       day, even though I was there working on it.  It

24       officially was assigned to me the next day.

25   BY MR. SMITH:
```

```
 1   Q.   Okay.  So if I understand your testimony -- well, let
 2        me ask you this before that.  Let me ask you this.
 3                   If you had been the officer in charge, then
 4        it would have been your decision whether or not he was
 5        going to be locked up and held or not?
 6   A.   It could have been, yes.
 7                   MR. BERGER:  I'm going to object that it
 8        assumes facts.
 9   BY MR. SMITH:
10   Q.   Okay.  So as I understand your testimony, what you're
11        saying now is when you left the Homicide section, you
12        didn't know what Mr. Monson's fate was going to be and
13        that someone else made the decision to lock him up?
14                   MR. BERGER:  I'm going to object as it's
15        argumentative and assumes facts and mischaracterizes
16        her prior testimony.
17                   You can go ahead.
18                   THE WITNESS:  Okay.  Yes, sir, that's what
19        I'm saying, sir.
20   BY MR. SMITH:
21   Q.   Now getting back to your trial transcript, in the last
22        paragraph, and I believe this is the prosecutor asking
23        these questions:
24                   And so you would go back and forth
25        acquiring information and then place that together and
```

SIMON, BARBARA
06/03/2019                                                                    Page 65

```
 1        think about and formulate what you were going to do

 2        with this case?

 3                   And you answered:  Yes.

 4   A.   What page are you on, sir?

 5   Q.   90, at the bottom of 90.

 6   A.   Okay.

 7   Q.   Do you see that?

 8   A.   Yes, sir.

 9                   MR. BERGER:  And for the record, I think

10        that's Mr. Mitchell asking the questions.

11                   THE WITNESS:  Yes, sir.

12   BY MR. SMITH:

13   Q.   Okay.  So you're going back and forth acquiring

14        information trying to decide what you were going to do

15        with the case?

16   A.   That's the way he put it, sir.

17   Q.   But you said yes, that's what you were doing?

18   A.   Yes.

19   Q.   Okay.  Now why were you deciding what you were going

20        to do with the case if you had not even been assigned

21        the officer in charge of the case?

22   A.   Once again, sir, the case was assigned to squad 2.  I

23        was in squad 2.  I was doing my part of the

24        investigation.  I left everything there.  The officer

25        in charge at Homicide who come in the next morning
```

```
 1         assigned all the cases.  My name was up next.  I was

 2         assigned the case the next day.

 3    Q.   Now isn't it true, Ms. Simon, that you testified, as a

 4         matter of fact, we've read it --

 5    A.   I'm not denying.  I testified.

 6    Q.   You testified that you were reading all of the

 7         statements.  That was one of the things that delayed

 8         you.  You were reading all of the statements that the

 9         witnesses had made.  You were talking to police

10         officers, and you were trying to decide what to do

11         with the case.  So now you're saying you didn't make

12         the decision to lock him up, correct?

13    A.   Sir --

14              MR. BERGER:  I'm going to object because it

15         mischaracterizes her prior testimony and

16         argumentative.

17              THE WITNESS:  Once again, sir, when I left

18         Homicide, I don't know who took him up on the ninth

19         floor.  I did not take him up on the ninth floor.  I

20         did not lock him up.

21    BY MR. SMITH:

22    Q.   And I'm not saying you took him or that you personally

23         locked him up, but I am saying that you've testified

24         that you were the officer in charge, you were reading

25         all of the statements, and you were deciding what to
```

SIMON, BARBARA
06/03/2019                                                    Page 67

```
 1      do with the case?

 2              MR. BERGER:  I'm going to object because it

 3      assumes facts and mischaracterizes prior testimony.

 4              Read the question.

 5              MR. SMITH:  Please read my question.

 6              MR. BERGER:  And if you understand his

 7      question --

 8              THE WITNESS:  Oh, okay.

 9              (Discussion off the record at 11:49 a.m.)

10              (Back on the record at 11:50 a.m.)

11              THE WITNESS:  Yes.

12   BY MR. SMITH:

13   Q.   That's correct?

14   A.   Yes.

15   Q.   Go to page 91 in the middle.  At line 8, you said that

16        you had certain information that came to you from a

17        certain police officer that arrived at the scene, but

18        you don't recall that police officer's name, correct?

19              MR. BERGER:  Mischaracterizes the

20        transcript.

21              MR. SMITH:  I'm sorry, Mr. Berger.

22              MR. BERGER:  That was the question.  You

23        said that she said that when that's the question.

24              MR. SMITH:  Oh, I'm sorry.

25              MR. BERGER:  Yes.
```

1                     MR. SMITH:  Let me read that again so we

2         can have a clean record.  You may be correct.

3    BY MR. SMITH:

4    Q.   At line 8:

5                     Question:  You said that you had

6         information that came to you from a certain police

7         officer that arrived at the scene, but you don't

8         recall that police officer's name?

9                     Answer:  Correct.

10                    Then at the bottom of page 91:

11                    And if I told you that person's name was

12        Officer Vincent Crockett, that wouldn't mean anything

13        to you, but you recognize him by face?

14                    Answer:  Correct.

15                    Okay.  Oh, at line 16, I didn't read this

16        before, I'm just coming back to it, at line 16 on page

17        91, you were actually asked the following question:

18                    Did you see that officer today waiting to

19        testify for this trial?

20                    Answer:  Yes.

21                    And the person that testified after you was

22        the gentleman he was referring to, Vincent Crockett,

23        correct?

24                    MR. BERGER:  Foundation.

25                    THE WITNESS:  What page are you on?

SIMON, BARBARA
06/03/2019                                                          Page 69

```
 1   BY MR. SMITH:

 2   Q.   Well, I'm actually looking at the Table of Contents

 3        where the witnesses are listed.  If you go to the

 4        front, you see where it says Barbara Simon?

 5   A.   Yes.

 6   Q.   Okay.  It gives the pages where you testified from 34

 7        to 43.  Then Dr. Kanluen interrupted your testimony

 8        because, well, he interrupted your testimony; that's

 9        what the transcript reflects?

10   A.   Yes.

11   Q.   And that then it went back to your testimony at page

12        75.  You completed your testimony at page 111, and

13        Vincent Crockett took the stand at page 117.

14                   Now do you recall any of that?

15   A.   No, sir.

16   Q.   Okay.  Do you recall Vincent Crockett as being one of

17        the officers that responded to the scene?

18   A.   Yes, sir.

19   Q.   Okay.  In fact, he's the one that did Exhibit 3, I

20        believe, the PCR?

21                   MR. BERGER:  Objection; foundation.

22   BY MR. SMITH:

23   Q.   You can take a look at the exhibit.

24   A.   Yes.

25   Q.   Okay.  Going over to page 105 at line 5:
```

SIMON, BARBARA
06/03/2019                                                                    Page 70

```
 1                     All right.  So I go back to my question a
 2          few moments ago, is that before you left the
 3          department that night, the only evidence you have of
 4          this man's alleged involvement was this statement; is
 5          that correct, ma'am?
 6                     Answer:  That's correct.
 7     A.   Yes.
 8     Q.   So it was his own, Lamarr Monson's own statement, that
 9          was the only evidence you had of his involvement?
10     A.   That's all I had at that time, yes.
11     Q.   Okay.  Moving over to page 114.  Let's see.  Let's do
12          115.  Well, we can go to line 24 of 114:
13                     All right.  As officer in charge of the
14          case, tell us, what does that mean?
15                     Answer:  Officer in charge of the case
16          would gather all of the evidence, take it over to the
17          evidence room, would go to the morgue, talk to the
18          doctor.  We go type up the Investigator's Report, go
19          to the prosecutor's office, interview witnesses.
20                     And then at line 15, it says:
21                     And as the officer in charge of the case,
22          you would be in possession of all the witness
23          statements that were pertinent to the case; isn't that
24          correct?
25                     Answer:  That's correct.
```

SIMON, BARBARA
06/03/2019                                                                           Page 71

```
 1   A.   Yes.

 2   Q.   In fact --

 3               MR. BERGER:  I don't think he asked a

 4        question yet.

 5               THE WITNESS:  Oh, I'm sorry.

 6   BY MR. SMITH:

 7   Q.   Did I accurately read that?

 8   A.   Yes.

 9   Q.   And does that accurately state the testimony that you

10        gave at the trial of Lamarr Monson?

11   A.   Yes.

12   Q.   And, in fact, I think you testified that one of the

13        reasons it took four hours to complete your statement

14        was that one of the things you were doing was

15        reviewing all of the witness statements, correct?

16               MR. BERGER:  Objection; asked and answered.

17               THE WITNESS:  And speaking to other people,

18        yes.

19               Excuse me, I need to go to the restroom.

20               MR. BERGER:  Yeah.  We can take a break.

21               VIDEO TECHNICIAN:  Going off the record.

22        The time is 11:58 a.m.  We're off the record.

23               (Recess taken at 11:58 a.m.)

24               (Back on the record at 12:13 p.m.)

25               VIDEO TECHNICIAN:  We are now back on the
```

SIMON, BARBARA
06/03/2019                                                                    Page 72

```
 1        record.  The time is 12:12 p.m.

 2   BY MR. SMITH:

 3   Q.   Okay.  Ms. Simon, do you have any recollection or have

 4        you reviewed any documents that might refresh your

 5        recollection on what information you may have received

 6        from police officers, including Vincent Crockett?

 7                  MR. BERGER:  Objection; compound.

 8                  THE WITNESS:  No.

 9                  MARKED FOR IDENTIFICATION:

10                  EXHIBIT 7

11                  Jury Trial transcript excerpts

12                  March 4, 1997

13                  12:14 p.m.

14   BY MR. SMITH:

15   Q.   I'm going to hand you what's been marked Exhibit 7 for

16        identification.  This is the deposition -- I'm sorry

17        -- this is the trial transcript of selected portions

18        of Vincent Crockett's testimony at the trial of Lamarr

19        Monson on March the 4th, 1997.

20                  As the officer in charge, would you have

21        remained in the courtroom to hear his testimony, by

22        the way?

23   A.   I don't remember if I did or not, sir.  I don't

24        remember.

25   Q.   Was that typical routine that you would listen to the
```

SIMON, BARBARA
06/03/2019                                                                    Page 73

```
 1       testimony?

 2   A.  Yes.

 3   Q.  Let me direct your attention first to page 124.  There

 4       beginning at line 17, oh, it looks like actually 16,

 5       and you said that he went in there with you.

 6               What did you see when you went into the

 7       apartment?

 8               Answer:  There was some people standing in

 9       the front in the living room area.

10               Question:  Would this have been away from

11       where the body was?

12               Answer:  Yes.  The bathroom was toward the

13       rear, and the living room is as soon as you approach

14       it.  I didn't think anyone lived there because it

15       didn't look like a person lived there.

16               Going over to page 127:

17               Question:  And what happened next?

18               I believe I called to verify if EMS was in

19       route, and I think I made another call to Homicide;

20       that's department procedure.

21               Over to page 128:

22               Okay.  Now you had some people that were

23       there.  Were you going to let those people just walk

24       off whenever they wanted to?

25               Answer:  No, they couldn't.
```

SIMON, BARBARA
06/03/2019                                                                    Page 74

```
 1              Question:  Why did you have them sit on the
 2      bed?
 3              Answer:  It's procedure that any time you
 4      have -- when you identify something as a serious
 5      injury or possible homicide scene, you have to contain
 6      everyone there.
 7              Question:  Okay.  And did the Defendant
 8      cooperate?
 9              Answer:  Yes, fully.
10              Question:  Okay.  When you say yes, fully,
11      didn't he try to leave?
12              Answer:  At one point when we first got
13      there when we were walking in the door, everyone
14      wanted to walk out.  We just told them that at this
15      time, everyone is going to stay here.
16              Over to page 133:
17              Were you able to give information to
18      personnel at the Homicide section?
19              Answer:  Yes.
20              Question:  What information did you give?
21              Answer:  That I had been told that he gave
22      one name, and I said, Well, that's not the name he
23      gave us and that allegedly he had been dating the
24      girl, sleeping with her, having sex, and possibly
25      selling drugs for her.
```

1              Question:  Okay.  And you provided that to

2    Homicide at the time?

3              Answer:  Yes.

4              And over to page 138:

5              Now also you talked to Mark Mason there,

6    did you not?

7              Yes, I did.

8              And at that time he told you that he put a

9    blanket over the young lady and that he knew her from

10   the neighborhood; isn't that right?

11             That's right.

12             Question:  He didn't deny knowing her, did

13   he?

14             Answer:  No, he didn't.

15             Okay.  And moving over to page 139 at line

16   15:

17             All right.  And you took these three people

18   to Homicide for what purpose, if you know?

19             So that homicide could interview them.

20             I see.  At that time, sir, you had no

21   suspect, did you?

22             Answer:  At that time, no, I did not.

23             Over to page 142, line 18:

24             All right.  Now you're in homicide and

25   you're waiting.  You brought the people downtown and

SIMON, BARBARA
06/03/2019                                                      Page 76

1    you're waiting?

2              Answer:  Okay.

3              Question:  What I want to know now, sir, is

4    at this point did you talk to anybody who was a

5    homicide detective?

6              Yes, I did.

7              Yes:  And at that point you relayed some

8    information?  Were you able -- were you able to or

9    not?

10             Answer:  Yes, I was.

11             And at that point, you told them

12   information that you had learned from where?

13             Answer:  One of the witnesses.

14             Question:  Where had you learned this

15   information?

16             From one of the witnesses.

17             Question:  I see.  Did you talk to one of

18   the witnesses independent of the other two?

19             Answer:  Yes, I did.

20             Question:  I see.  And where did this

21   conversation take place?

22             Answer:  In one of the squad rooms while I

23   was writing my report.

24             Question:  I see.  Do you remember the name

25   of that witness?

SIMON, BARBARA
06/03/2019                                                                                    Page 77

```
 1                  Answer:  Raymond Lewis.

 2                  Over to page 153 at Line 7:

 3                  Question:  All right.  Now you said that

 4     you talked to Mr. Monson.  He told you that he was

 5     there periodically.  Did he tell you that?

 6                  Answer:  Yes.

 7                  Question:  All right.  Was that true?

 8                  Answer:  I don't know.  He did tell me

 9     that.

10                  Question:  He did tell you periodically; is

11     that right?

12                  Answer:  That's right.

13                  Question:  All right.  And he told you he

14     brought groceries?

15                  Answer:  That's right.

16                  Question:  Is that true?

17                  He did tell me that.

18                  Now, Ms. Simon, first of all, you had said

19     in the testimony we read, I mean, we can go back to it

20     but I don't think that's necessary, you said that he

21     had denied knowing the injured party, Christina Brown,

22     and that the people outside had told you that he was

23     her boyfriend, but he didn't deny knowing her, did he,

24     not according to Mr. Crockett and according -- as a

25     matter of fact, that's in his PCR, that he knew her
```

SIMON, BARBARA
06/03/2019                                                                  Page 78

```
 1        from the neighborhood?

 2                     MR. BERGER:  I'm going to object to form,

 3        compound.

 4                     MR. SMITH:  Yeah, that's a lot of

 5        questions.  Let me break them down.

 6   BY MR. SMITH:

 7   Q.   You did testify earlier that one of the things that

 8        made you suspicious, if I may use that word, one of

 9        the things that made you suspicious was he denied

10        knowing Christina Brown; is that correct?

11   A.   I don't remember.  Can I see the statement, please?

12   Q.   Whose statement would you like to see?

13   A.   You're saying "he," I don't know who, denying who?

14   Q.   No.  I'm talking about your statement.  And, yes, we

15        can go back to your testimony.

16   A.   No.  I'm not saying that.  You kept on saying he

17        denied.  Who are you talking about, Mr. Monson, or the

18        officer here?

19   Q.   No.  It was you who said that Mr. Monson told you that

20        he did not know Christina Brown.  That was your sworn

21        testimony at Mr. Monson's trial.

22   A.   Okay.  Okay.

23   Q.   Mr. Crockett on the other hand tells a different

24        story, correct?

25   A.   Yes.
```

SIMON, BARBARA
06/03/2019                                                            Page 79

```
 1   Q.   Now the witness, Raymond Lewis, he came down, he was

 2        driven downtown along with Mr. Monson because he was,

 3        I guess, considered a witness, correct?

 4              MR. BERGER:  Objection; foundation, assumes

 5        facts.

 6              THE WITNESS:  Yes.

 7              MR. SMITH:  Yeah, and believe me, I'm not

 8        trying to suggest anything.  I mean, it's in the PCR.

 9        We've gone over that material before that he was one

10        of the witnesses that was brought down.

11              Let me --

12              THE WITNESS:  I've got to take this pill.

13              MR. BERGER:  Okay.  Let's --

14              THE WITNESS:  I don't have to get up.  I

15        can do it right here.

16              MR. BERGER:  You want to go off the record

17        for a second while she takes some medication?

18              MR. SMITH:  No.  I'm fine.

19              MR. BERGER:  Okay.  Do you need water?

20              THE WITNESS:  Uh-uh.  I've got a drink

21        right here.

22              It helps drain fluid.

23              MR. BERGER:  I know.

24              THE WITNESS:  Thank you.

25   BY MR. SMITH:
```

SIMON, BARBARA
06/03/2019                                                              Page 80

```
 1   Q.   Are you feeling okay, well enough to continue?

 2   A.   I've got fluid in my lungs from pneumonia.  I'm okay.

 3   Q.   That doesn't, the medication that you're taking, does

 4        that affect your memory at all?

 5   A.   No, sir.  It helps drain some of the fluid.

 6                       MARKED FOR IDENTIFICATION:

 7                       EXHIBIT 8

 8                       Witness Statement of Raymond Lewis

 9                       12:26 p.m.

10                       MR. SMITH:  Okay.  I'm handing you what's

11        been marked as Deposition Exhibit 8 for

12        identification.

13                       MR. BERGER:  Do you have an extra copy?

14        Thank you.

15   BY MR. SMITH:

16   Q.   This is the witness statement that is apparently taken

17        by an individual who identified himself as Raymond

18        Lewis on 1-20-1996 at 4:05.  Would this have been one

19        of the witness statements you would have reviewed

20        during the time you were interrogating Mr. Monson?

21                       MR. BERGER:  Objection; assumes facts,

22        form.

23                       THE WITNESS:  I don't remember this.

24   BY MR. SMITH:

25   Q.   Okay.  Raymond Lewis was apparently a resident at the
```

SIMON, BARBARA
06/03/2019                                                                Page 81

```
 1      apartment building because he gives the address of
 2      2752 West Boston, and he indicates that he was
 3      residing with Shelina Bentley.  I'm going to represent
 4      to you that Shelina Bentley has given a sworn
 5      statement that is part of the record in this case
 6      indicating that her boyfriend's name was actually
 7      Robert Lee Lewis.
 8              Did you or anyone else on the Homicide
 9      squad or section, staff, make any effort to verify the
10      true identity of the person who claimed to be Raymond
11      Lewis?
12              MR. BERGER:  I'm going to object as it
13      assumes facts and also object as to foundation.
14              THE WITNESS:  I don't know, sir.
15   BY MR. SMITH:
16   Q.  Okay.  Do you know whether there was any attempt to
17       interview Shelina Bentley?
18   A.  I don't know.
19   Q.  Okay.  Now there is and will be evidence in this case
20       from Shelina Bentley to the effect that her boyfriend,
21       Robert Lee Lewis, admitted to her that he had killed
22       Christina Brown.  Did you run a criminal background
23       check on Raymond Lewis while you had him in custody?
24              MR. BERGER:  I'm going to object as it
25       assumes facts not in evidence.
```

SIMON, BARBARA
06/03/2019                                                          Page 82

```
 1                    THE WITNESS:  I don't remember, sir.

 2   BY MR. SMITH:

 3   Q.   Okay.  I would like you to assume that Robert Lee

 4        Lewis did have a felony conviction background.  That's

 5        the kind of information that shows up on a background

 6        check, correct?

 7                    MR. BERGER:  Objection; assumes facts not

 8        in evidence, foundation.

 9   BY MR. SMITH:

10   Q.   A criminal background check?

11   A.   Yes.

12   Q.   Okay.  So if the assumption that we're making is true

13        that he had a felony background, you would have

14        expected that to come up on your background check,

15        correct?

16                    MR. BERGER:  Objection; assumes facts,

17        calls for speculation.

18                    THE WITNESS:  Yes.

19   BY MR. SMITH:

20   Q.   And if that had come up, would you have done anything

21        differently?

22                    MR. BERGER:  Objection; calls for

23        speculation.

24                    THE WITNESS:  Yes.

25   BY MR. SMITH:
```

```
 1   Q.   What would you have done?

 2              MR. BERGER:  Calls for speculation.

 3              THE WITNESS:  Investigated, well,

 4        investigate him also.

 5   BY MR. SMITH:

 6   Q.   Okay.  Now he's the man giving you the information

 7        about Mr. Monson that made you think that he was

 8        somehow connected to this murder, correct?

 9              MR. BERGER:  Objection; mischaracterizes

10        her prior testimony and assumes facts.

11              THE WITNESS:  I don't remember, sir.

12   BY MR. SMITH:

13   Q.   Now your memory aside, what would have been your

14        routine and practice, what would have been the

15        practice of a reasonable officer in charge of a

16        homicide investigation who turns up evidence that the

17        person she has in custody has not only given a false

18        name but has a felony criminal record; what would a

19        reasonable officer in charge do at that point?

20              MR. BERGER:  Objection; assumes facts,

21        compound.

22              THE WITNESS:  Assumes, okay --

23              MR. BERGER:  And foundation.

24   BY MR. SMITH:

25   Q.   Now your answer is you just don't remember what the
```

```
 1        best practices would be?
 2                    MR. BERGER:  Objection; mischaracterizes
 3        the record.
 4                    THE WITNESS:  No, sir.  You was asking me
 5        about this specific.  I'm reading this because I
 6        didn't take this statement.
 7   By MR. SMITH:
 8   Q.   Yes, I know.
 9   A.   Oh, okay.
10   Q.   I understand.  Okay.  Take your time and read over
11        this statement, and then I'll read the parts that I'm
12        most interested in.
13   A.   Okay.  You can go ahead and read.
14   Q.   Okay.  The part that I have highlighted begins as
15        follows:
16                    I started to work on Shelina's car trying
17        to get it started.  That's when Mark pulled up.  I
18        asked Mark --
19   A.   Excuse me, sir.  What page are you --
20   Q.   Oh, I'm on the first page, the highlighted portion at
21        the bottom.  I'm sorry.  Yes.
22   A.   Because you said he said working on car, because
23        that's asked for a couple dollars.  That's what the
24        man said here.
25                    MR. SMITH:  Maybe I didn't highlight enough
```

SIMON, BARBARA
06/03/2019                                                                                          Page 85

```
 1      of yours.

 2                   MR. BERGER:  Do you have a highlighter?

 3                   MS. WARD:  Here.

 4                   MR. BERGER:  That's where he started.

 5                   THE WITNESS:  Oh, okay.  I'm sorry.

 6                   MR. SMITH:  That's all right.

 7   BY MR. SMITH:

 8   Q.   I'll start again:

 9                   I started to work on Shelina's car trying

10        to get it started.  That's when Mark pulled up.  I

11        asked Mark for a couple of dollars.  Mark said he

12        didn't have it.  Then Linda and Mark started to talk.

13        Linda asked Mark where was the girl at.  Linda said

14        she had knocked on the door and got no answer, but the

15        door was open a little bit.  Mark said she might be

16        next door to Ken and Kim's apartment.  We all went

17        inside the apartment building to go to Mark's

18        apartment.  Mark went into his apartment and came back

19        running out shouting, quote, Call EMS, unquote.

20        That's when Ken ran down the street to call 911, I

21        guess to a pay phone because it's no phone in our

22        apartment building.

23                   A little further down:

24                   Mark started pumping her chest, and he was

25        saying, Hold on, baby, just hold on.  I could see she
```

```
 1    was breathing and her arm was moving.  She was

 2    gurgling.  There was a lot of blood on the bathroom

 3    floor and on her blouse.

 4              The next page:

 5              Does Mark and Crystal live in that

 6    apartment together?

 7              Yes.

 8              How many times have you been in that

 9    apartment before?

10              A bunch of times.  That's where I cop my

11    dope.

12              What type of dope do you buy?

13              They sell dimes, rocks of crack.

14              Who do you buy from at that apartment?

15              From the girl and Mark.

16              How long have they been selling dope from

17    that apartment?

18              Three weeks.

19              Did they sell dope anywhere before that?

20              They been living in the apartment building

21    for about three months, and they had lived in two

22    other apartments in the building, and they were

23    selling dope in there, blank, they had lived in them.

24              The blank was I'm just not sure what that

25    word is.
```

SIMON, BARBARA
06/03/2019                                                                    Page 87

```
 1                      MR. BERGER:  I think it's together.

 2                      THE WITNESS:  Together.

 3                      MR. SMITH:  Yes, yes.  Okay.

 4   BY MR. SMITH:

 5   Q.   Now although I didn't read it, he claims that in the

 6        beginning of his statement that he had gotten off the

 7        bus at 1 p.m. and that he was, I guess -- well, I need

 8        to take you to page 1, 2, 3, on the fourth page, and

 9        it's not highlighted, I'll tell you that.  It's just

10        an oversight on my part.  Right.

11                      It does say, the question is:

12                      What time did you go to the Eastern Market

13        today to look for work?

14                      He said:  About 4:40 a.m.

15                      And also at the end of the statement -- did

16        you see that part of the testimony, that part of the

17        written record?  I did read it.

18   A.   About 4:40 A?

19   Q.   Yes, uh-huh.

20   A.   Yes.

21   Q.   Okay.

22                      Here we are.  On page 5, the question was:

23                      Before this afternoon, when was the last

24        time you saw Crystal?

25                      Answer:  Last night about 10 p.m. or 11
```

SIMON, BARBARA
06/03/2019                                                                    Page 88

```
 1          p.m. I copped some dope.

 2                    Question:  Was Mark there?

 3                    Answer:  No.

 4                    Now my question to you is:  Do you have any

 5          independent recollection or have you reviewed anything

 6          to suggest that you made any attempt to verify that

 7          Mr. Raymond Lewis so-called was at the Eastern Market

 8          looking for work?

 9                    MR. BERGER:  Objection; form, foundation.

10                    THE WITNESS:  Not as I can recall.

11    BY MR. SMITH:

12    Q.    Do you have any recollection as to or did you do

13          anything to follow up on the fact that he was

14          apparently one of the last people to see her alive?

15    A.    Not as I can recall.

16    Q.    Did you or do you as you sit here today as a 30-year

17          police officer, do you think that such a person would

18          at least be a person of interest?

19                    MR. BERGER:  Objection; mischaracterizes

20          her prior testimony.

21                    THE WITNESS:  It's possible.

22    BY MR. SMITH:

23    Q.    What was it that made you -- or let me ask it this

24          way:  Was there anything that you reviewed or found in

25          the records that you looked at that would suggest that
```

```
 1        Raymond Lewis was a reliable informant?

 2   A.   I don't recall.

 3   Q.   As you sit here today, do you have any recollection of

 4        the cause of death in this case?

 5   A.   No, sir, I don't remember.

 6   Q.   You do not remember?

 7   A.   I don't have anything with the cause of death, no.

 8   Q.   But you would agree with me that in 1996, if you were

 9        the officer in charge of the case, a homicide case,

10        you would want to know the cause of death?

11   A.   Yes.

12   Q.   And we've seen several records where they refer to a

13        stabbing.  Do you know whether that turned out to be

14        the cause of death?

15             MR. BERGER:  Objection; foundation.

16             THE WITNESS:  I don't remember, sir.  I

17        don't recall.

18             MARKED FOR IDENTIFICATION:

19             EXHIBIT 10

20             Preliminary Examination

21             February 2, 1996

22             transcript excerpts

23             12:45 p.m.

24             MR. SMITH:  I'm handing you what's been

25        marked Deposition Exhibit 10 for identification.
```

```
 1                    MR. BERGER:  Thank you.

 2    BY MR. SMITH:

 3    Q.   This is the preliminary examination, again, before the

 4         Honorable Jimmylee Gray on February the 2nd, 2096, and

 5         this is the same preliminary exam that you testified

 6         earlier in your deposition today that you were present

 7         and testified at.  I'm now going to read you some

 8         excerpts from the deposition testimony of Jeff Harkey,

 9         Dr. Jeff Harkey.

10              Let me direct your attention first to page

11         9 at line 13:

12              Doctor, I'd like to ask you about a

13    specific autopsy that was performed on Christina

14    Brown.  Are you familiar with that autopsy?

15              Answer:  Yes.

16              Then at line 21:

17              How are you familiar with that autopsy?

18              Answer:  I was working a weekend at the

19    medical examiner's office.  This was one of the cases

20    that we did on the 21st of January, and I did this

21    case myself.

22              Okay.  Now you say this was one -- I'm

23    sorry -- now you say this was on the 21st of January

24    and this is the medical examiner's office located at

25    Mack; is that correct?
```

SIMON, BARBARA
06/03/2019                                                                 Page 91

```
 1                 Answer:  On Warren.

 2                 At line 9:

 3                 Could you tell how old Christina Brown was

 4    at the time you saw her?

 5                 Answer:  She appeared older than her given

 6    age of 12 years.  Most of us estimated her at around

 7    17.

 8                 When you viewed her body, how tall was she?

 9                 She was five-feet-ten.

10                 And what weight was she?

11                 115 pounds.

12                 And moving over to page 23:

13                 Now, regarding the strangu -- excuse me --

14    now, regarding the strangulation, was this the cause

15    of the victim's death in this case?

16                 Answer:  No, it was not.

17                 Question:  What was the cause of her death?

18                 Answer:  The cause of her death was the

19    extensive injuries on her brain and skull.

20                 Question:  Now these injuries to the brain

21    and the skull, you indicated that this would be caused

22    by blunt force trauma consistent with something heavy

23    being used on the head, correct?

24                 Answer:  Yes.

25                 And at page 24:
```

SIMON, BARBARA
06/03/2019
Page 92

```
1               Question:  Would this injury be consistent
2    with something that would be like the tank of a toilet
3    top, it could be used to make that?  Do you know the
4    top of the toilet?
5               Then there's an objection.
6               Let's go over to page 25:
7               Question:  Would that be in your opinion
8    consistent with a heavy object such as a toilet tank
9    that had been used as the object causing these
10   contusions in the skull fracture?
11              Answer:  Yes, toilet tank is a heavy enough
12   object.
13              Question:  Based upon your examination and
14   the autopsy that you performed, what was the cause of
15   death of Christina Brown?
16              The cause of death were the cranial
17   cerebral injury, the injuries to the skull and brain.
18              And what was the manner of death?
19              Answer:  Homicide.
20              Going to page 37:
21              I'm going to hand you, Doctor, what's been
22   previously shown to defense counsel and marked as
23   People's Proposed Exhibit Number 2.  What does that
24   photograph show?
25              This shows a toilet tank with the lid off,
```

```
 1    and there appears to be water because it has a

 2    reflective surface within the toilet tank.

 3                  Question:  Okay.  Thank you.  I'm going to

 4    show you what has been marked as People's Proposed

 5    Exhibit Number 1, which has also been shown to defense

 6    counsel, and what is depicted in that, that would be

 7    associated with the toilet tank that you just saw?

 8                  Answer:  This looks like the porcelain lid

 9    to the toilet tank.  It's white and has blood stains

10    on it.

11                  Question:  Something red appears on it.  I

12    would ask you, based upon your examination of the

13    victim in this case, would that tank top that you have

14    just described be consistent with blunt force trauma

15    that was noted on the head of Christina Brown?

16                  Answer:  Sufficiently solid and heavy to be

17    consistent with it.

18                  I did my best.  Did I read that okay?

19  A.  Yes.

20  Q.  Now, were you present when the person who did the

21    autopsy testified on February the 2nd of 1996?

22  A.  Not as I can recall, no, sir.

23  Q.  You don't recall?

24  A.  No, sir.

25  Q.  Okay.  Did you ever speak to Dr. Harkey?  You had
```

```
 1        testified earlier that that's part of what you do as

 2        the officer in charge.  Did you ever talk to him?

 3   A.   I don't remember talking to him, no.

 4   Q.   Okay.  But in terms of your routine, at least based on

 5        your testimony, that would have been one of the things

 6        you probably would have done?

 7   A.   Correct.

 8                   MR. SMITH:  Okay.  Now, you know what, I

 9        think I should -- she needs to break at 1:00?

10                   MR. BERGER:  Yeah.

11                   MR. SMITH:  I don't want to get into a

12        long --

13                   MR. BERGER:  Want to break now then?

14                   MR. SMITH:  Yeah, it's eight minutes to 1.

15        So how long would you like to break for?

16                   THE WITNESS:  We can continue if you want

17        to --

18                   MR. BERGER:  Well --

19                   THE WITNESS:  -- for another --

20                   MR. BERGER:  It's probably easier just to

21        break now based on the flow of things.  Somewhere

22        between half hour and 45?  I think we're going to step

23        out of the office for lunch.

24                   MR. SMITH:  Okay.

25                   MR. BERGER:  I don't want to commit
```

```
 1      specifically because I don't know how service will be,

 2      so...

 3                    VIDEO TECHNICIAN:  We're going off the

 4      record.  The time is 12:53 p.m.  We're off the record.

 5                    (Lunch recess taken at 12:53 p.m.)

 6                    (Back on the record at 1:54 p.m.)

 7                    VIDEO TECHNICIAN:  We are now back on the

 8      record.  The time is 1:53 p.m.

 9  BY MR. SMITH:

10  Q.   Good afternoon, Ms. Simon.

11  A.   Good afternoon.

12  Q.   I believe when we went off the record, we had just

13      concluded a discussion of Dr. Jeff Harkey's opinions

14      regarding the cause of death in the murder of

15      Christina Brown.

16                    MR. BERGER:  I just noticed our realtime

17      isn't working.

18                    VIDEO TECHNICIAN:  We're going off the

19      record at 1:54 p.m.  We're off the record.

20                    (Back on the record at 1:54 p.m.)

21                    (Back on the record at 2:03 p.m.)

22                    VIDEO TECHNICIAN:  We are now back on the

23      record.  The time is 2:03 p.m.

24  BY MR. SMITH:

25  Q.   Good afternoon again, Ms. Simon.
```

SIMON, BARBARA
06/03/2019                                                                                    Page 96

```
 1   A.   Good afternoon.

 2   Q.   Now before we took our break, we had just concluded

 3        discussing the testimony of Dr. Harkey who did the

 4        autopsy on Christina Brown and who basically testified

 5        that she died of head injuries that were consistent

 6        with a blow by a toilet tank top.  Do you recall, I

 7        know you didn't go to the scene, but you looked at the

 8        scene photos, did you not, the scene photographs?

 9   A.   I believe so.

10   Q.   As the officer in charge, that would have been part of

11        your review of the evidence in the case, correct?

12   A.   Correct.

13   Q.   Okay.  Do you recall a toilet tank top that, you know,

14        played any significant role in your thinking about

15        this case or evaluating this case?

16   A.   No, sir, I don't remember.

17                   MARKED FOR IDENTIFICATION:

18                   EXHIBIT 11

19                   Latent Print Check

20                   2:05 p.m.

21   BY MR. SMITH:

22   Q.   Let me hand you what has been marked for

23        identification as Exhibit 11.

24                   The first page of this exhibit contains two

25        latent print checks, and these memos are directed to
```

```
 1        you, Investigator Simon, from Randy Richardson of the

 2        Evidence Technician Unit, and it's regarding 2752 West

 3        Boston, Apartment 7.

 4               First of all, the Evidence Technician Unit

 5        in 1996 would have been the unit that would have gone

 6        through the crime scene, dusted for fingerprints, and

 7        made diagrams and basically collected the evidence at

 8        the scene; is that accurate?

 9               MR. BERGER:  Objection; form, compound,

10        assumes facts.

11               THE WITNESS:  Yes.

12   BY MR. SMITH:

13   Q.   Okay.  And a latent print, what was that in 1996; what

14        did that terminology mean, latent print?

15               MR. BERGER:  Foundation.

16               THE WITNESS:  If I remember correctly, I'm

17        trying to find the right words, it's something -- I

18        don't know what you would call that they can take

19        stuff and lift a print off an object.  I don't know

20        what the material was called, yeah, yes.

21   BY MR. SMITH:

22   Q.   Okay.  But anyway, it was, we're talking here about

23        fingerprints that may have been on an object, correct?

24   A.   That's correct.

25   Q.   And by the way, as the officer in charge of this
```

```
 1      particular case, what would be the significance of

 2      fingerprints?

 3                  MR. BERGER:  Objection; calls for

 4      speculation.

 5                  THE WITNESS:  Fingerprints could be lifted,

 6      and they would be sent to the Latent Print Unit for

 7      the officers there to see if the print matches up with

 8      an individual.

 9  BY MR. SMITH:

10  Q.  Okay.  And what would be your recourse if the print

11      was just unknown?

12  A.  You mean if they couldn't find any?

13  Q.  Well, if they weren't trying to match it to an

14      individual, they just didn't -- it was a fingerprint.

15      They didn't know whose it was.  How could they find

16      out the identity of that individual?

17                  MR. BERGER:  Objection; vague.

18                  THE WITNESS:  I don't know.  I don't know

19      about latent prints.

20  BY MR. SMITH:

21  Q.  Okay.  In 1996, there were databases, state databases

22      as well as national databases where they could do

23      comparisons with fingerprints that were on record; is

24      that correct?

25                  MR. BERGER:  Objection; foundation.
```

SIMON, BARBARA
06/03/2019                                                                    Page 99

```
 1                    THE WITNESS:  I can't say on those latent
 2        prints we take them down there.  I don't know where
 3        they would send them to.
 4   BY MR. SMITH:
 5   Q.   Okay.  Let me see if I can clarify this.  I believe
 6        there are two possible situations that we have been
 7        discussing here.  One situation is a situation where
 8        you have a fingerprint lift, and you want to find out
 9        if a known person, if this is the fingerprint of a
10        known person; for example, Lamarr Monday, you want to
11        find out is this his fingerprint.  That's one
12        situation, correct?
13   A.   Yes.
14   Q.   And your laboratory at the Detroit Police Department
15        could tell you whether or not that was his print or
16        not?
17                    MR. BERGER:  Objection; foundation.
18                    THE WITNESS:  Once again, it was sent to
19        the latent print, and I don't recall how they
20        operated, sir.
21   BY MR. SMITH:
22   Q.   Okay.  I'm really trying to find out how you operated,
23        that's really my concern, and particularly I'd like to
24        know how you operated in a situation where you had a
25        print that the identity of the person was unknown, and
```

SIMON, BARBARA
06/03/2019                                                                    Page 100

```
 1        you just wanted to find out whose fingerprint is this?
 2   A.   Once again, a print is lifted.  It's taken to the
 3        latent print.  It's logged in by the people that work
 4        in latent prints.  It's left with them, and what they
 5        do, they will send you results if it's, if the person
 6        is known, unknown, usable, or unusable.
 7   BY MR. SMITH:
 8   Q.   Okay.  And if the print -- if the person was unknown,
 9        what recourse would you have at that point?
10                  MR. BERGER:  Objection; foundation.
11                  THE WITNESS:  If he was fingerprinted and
12        they had to print -- I'm sorry.  Excuse me for one
13        second, sir.  I'm sorry.
14                  Sorry about that.
15                  MR. BERGER:  You can re-ask the question.
16                  THE WITNESS:  I'm sorry.
17                  MR. SMITH:  Okay.  Yeah, I'll re-ask the
18        question.
19   BY MR. SMITH:
20   Q.   Okay.  I asked you:  And if the print, if the person
21        was unknown, what recourse would you have at that
22        point?
23                  And you said:  If he was fingerprinted and
24        they had to print -- I'm sorry.  Excuse me for one
25        minute.
```

```
 1                  So what I was trying to find out is if the

 2          fingerprint came back unknown, what recourse would you

 3          have?

 4                  MR. BERGER:  Objection; foundation.

 5                  THE WITNESS:  To try to find out who the

 6          print belonged to.

 7  BY MR. SMITH:

 8   Q.     Yeah, and how would you do that or you just don't

 9          remember?

10   A.     I don't remember, sir.

11   Q.     Okay.  Okay.

12                  Now going back to this exhibit, which is

13          Exhibit 11, at the bottom of each latent print check,

14          there is an evidence tag number, and there's also a

15          brief description of where the print came from.  Is

16          that accurate; for example, on the top where it says I

17          examined bathroom walls?

18   A.     Yes, that's what he has, yes, sir.

19   Q.     And that's evidence tag number 242490, correct?

20   A.     Correct.

21   Q.     And on the bottom one, he says:  I examined toilet

22          tank top.  And the evidence tag number for that was

23          242491, correct?

24   A.     Correct.

25   Q.     And on both of those there were two lifts.  Do you
```

```
 1        know what that means, by the way, two lifts?

 2                     MR. BERGER:  I'm going to object as

 3        compound.

 4                     THE WITNESS:  I believe that two prints

 5        were lifted.

 6   BY MR. SMITH:

 7   Q.   Okay.  Okay.  And there are boxes below each latent

 8        fingerprint check, and one column is for usable, and

 9        the other is not usable.  Do you know what that means?

10   A.   Yes, sir, the print, the palm print that he gave is

11        usable.  So he picked up something on the fingerprint

12        and palm print on the 242491, meaning that he picked

13        up two lifts, two fingerprints, a palm print,

14        fingerprint.

15   Q.   Okay.  Just so I am clear, if it's usable, that means

16        that you can trace the person that it came from or at

17        least attempt to trace the person that it came from;

18        is that right?

19                     MR. BERGER:  I'll object as foundation,

20        calls for speculation.

21                     THE WITNESS:  Far as I know.

22   BY MR. SMITH:

23   Q.   Okay.  Now as a veteran, I suppose, in the Homicide

24        section, you dealt with fingerprints quite a bit.  I

25        assume that was a big part of your investigative
```

```
 1        process, was it not?

 2                   MR. BERGER:  Objection; compound, assumes

 3        facts.

 4                   THE WITNESS:  Yes, we dealt with

 5        fingerprints, yes, sir.

 6   BY MR. SMITH:

 7   Q.   Okay.  And frequently fingerprints could solve a case,

 8        couldn't it?

 9                   MR. BERGER:  Objection; calls for

10        speculation.

11                   THE WITNESS:  Possible.

12   BY MR. SMITH:

13   Q.   Okay.  Now let's take a look at page 2 of Exhibit 11,

14        and that's a photograph that was part of the Monson

15        investigative file, and that appears to be a toilet

16        tank top which is referenced by the evidence tag

17        number 242491 on page 1, correct?

18                   MR. BERGER:  Objection; calls for

19        speculation, foundation.

20                   THE WITNESS:  It's something covered up.  I

21        don't know what this is on top of it.  Yes, I guess,

22        yeah.

23   BY MR. SMITH:

24   Q.   Okay.  And let's, let's take a look at the third page

25        of Exhibit 11, which is also from the DPD
```

```
 1        investigative file.  This appears to be a

 2        blood-smeared floor, as well as blood on at least

 3        portions of the wall or basin there?

 4   A.   Blood on the floor, yes, sir.

 5   Q.   Okay.  And then there's a basin, looks like maybe even

 6        a door frame.  You can see the blood splattered on

 7        that and portions of the wall as well?

 8   A.   On the floor, yes.

 9   Q.   You see that?

10   A.   I see the blood on the floor and looks like a little

11        blood on the door.

12   Q.   Well, let me ask you --

13   A.   I don't --

14   Q.   I'm sorry.  I didn't mean to cut you off.

15   A.   Are you talking about the wall up here?

16   Q.   No.  If you look down, there's a shower wall, and on

17        the lower left-hand corner, it looks like blood is

18        splattered.

19   A.   Oh, I see now.  I thought you were talking about --

20   Q.   Right, do you see that?

21   A.   Yes, sir.

22   Q.   Okay.  And again, if these photographs are in the DPD

23        investigative file for Lamarr Monson, these are

24        photographs that you would have had access to and

25        would have reviewed, correct?
```

```
 1   A.   Yes.

 2   Q.   Okay.

 3                   MARKED FOR IDENTIFICATION:

 4                   EXHIBIT 12

 5                   Simon 96-32

 6                   Request for Latent Print Search

 7                   2:19 p.m.

 8   BY MR. SMITH:

 9   Q.   I'm handing you what's been marked for identification

10        as Simon Deposition Exhibit 12.  And this document is

11        captioned:  Request for Latent Print Search.

12                   And the request was made, according to the

13        document, by Investigator Simon of Homicide on January

14        24th, 1996, correct?

15   A.   It has my name on it, but this is not my writing.

16   Q.   Okay.  Do you doubt that you made this request?

17   A.   Oh, no, no, no.  I thought you was asking did I write

18        this out.

19   Q.   Okay.  No.  Actually, my question is:  Do you think

20        this is an accurate copy of the document that reflects

21        that you requested a latent print search in the Lamarr

22        Monson case?

23   A.   Yes.

24   Q.   Okay.  And at the bottom under results for

25        examination, you made your request on the 24th, 1996,
```

SIMON, BARBARA
06/03/2019                                                                Page 106

```
 1        January 24th, and your results were back on January

 2        25th of 1996, correct?

 3   A.   Yes.

 4   Q.   Okay.  And the document says:  The above deceased has

 5        been identified by her number 8 finger on evidence tag

 6        242491.

 7                Now we looked at that in connection with

 8        Exhibit 10, I believe, or 11, but you can certainly

 9        look at it again.  It's on page 2, the evidence tag

10        number is on page 2, and it indicates on page 2 that

11        242491 is the toilet tank top, correct?

12   A.   Yes.

13   Q.   Okay.  And the next two lines say:  The above suspect,

14        Lamarr Monson, DPD number 504561 has been identified

15        by his finger on evidence tag number 242489.

16                And if you look on the second page of the

17        exhibit -- actually, I think it's the third page --

18        the third page of the exhibit, 242489 is the bathroom

19        mirror?

20   A.   I don't have anything to say --

21                MR. BERGER:  We're looking at 12.

22                THE WITNESS:  Which exhibit?

23                MR. BERGER:  Put that one down.  He's

24        looking at 12.

25                THE WITNESS:  This is 90, 91.
```

```
 1                        MR. BERGER:  The next one.

 2                        THE WITNESS:  This one is 89.  What number

 3          did you say, sir?

 4    BY MR. SMITH:

 5    Q.    According to the document, Mr. Monson's prints were

 6          identified by his number two finger on evidence tag

 7          242489, and if you look on the third page, you'll see

 8          that that is the bathroom mirror?

 9    A.    Yes.

10    Q.    Okay.  Now, the next line says:  There's still an

11          unidentified usable print and palm prints left.  There

12          are no palm prints in our files on the above suspect

13          for deceased.  Therefore, palm print comparison is not

14          possible at this time.

15                   Now, my question to you is, the reference

16          to an unidentified usable print and palm print, do you

17          know what that refers to, which one of these items it

18          refers to; does it refer to the mirror, does it refer

19          to the toilet tank top?

20    A.    I don't know, sir.

21    Q.    Is this something, though, you would have known

22          probably back in 1996 when you were the officer in

23          charge of this case?

24    A.    Possibly but I don't remember.

25    Q.    Okay.  I didn't see anything in the file asking for
```

SIMON, BARBARA
06/03/2019                                                        Page 108

```
 1        clarification on this point.  Did you review anything

 2        or do you recall asking for clarification on this

 3        point?

 4   A.   I don't remember.

 5   Q.   Okay.  I am going to represent to you that there were

 6        lifts taken from that toilet tank top that were

 7        identified 15 years later, well, actually more, more

 8        like, well, more than 15 years later, and the analysis

 9        indicated that these were the prints of Robert Lee

10        Lewis on the toilet tank top.  Were you aware of that;

11        were you provided anything to review to refresh

12        yourself in terms of what happened with that?

13             MR. BERGER:  Objection; assumes facts not

14        in evidence.

15             THE WITNESS:  No, not as I can recall, sir.

16   BY MR. SMITH:

17   Q.   So as you sit here today, you don't know anything

18        about what happened to the -- excuse me -- let me

19        rephrase that.

20             Can you tell us whether or not you did any

21        follow-up, or you just don't know?

22   A.   I don't know.

23   Q.   Okay.  What would have been your routine as a, I

24        assume, reasonable officer in charge of a murder

25        investigation?
```

```
 1                    MR. BERGER:  Objection to form.

 2                    THE WITNESS:  What do you mean my routine?

 3   BY MR. SMITH:

 4   Q.   Would you, if you had gotten a report back like this

 5        one that I'm holding in my hand that we've marked as,

 6        I believe, Exhibit 12, what would you have done with a

 7        report like this indicating that there are

 8        unidentified usable print and palm print lifts?

 9   A.   I would have followed up on it, sir.  I don't

10        remember.

11   Q.   Okay.  You would have followed up.  Can you tell me

12        what you would have done?

13   A.   Well, ask them to keep the prints on file in case

14        something comes up, you know, and I had to compare it

15        with something.  I don't remember.

16   Q.   And you don't know whether there was any state or

17        national data bank through which you would have the

18        print identified?

19                    MR. BERGER:  Objection; asked and answered.

20                    THE WITNESS:  No, sir.

21   BY MR. SMITH:

22   Q.   By the way, assuming that this print was on the toilet

23        tank top which Dr. Harkey had identified as being an

24        object that was consistent with the murder weapon, if

25        you had found or concluded based upon your review of
```

SIMON, BARBARA
06/03/2019                                                              Page 110

```
 1         this document we've marked as Exhibit 12, if you had

 2         concluded that this print did not belong to Lamarr

 3         Monson, would that have had any significance for you?

 4                   MR. BERGER:  Objection; foundation, assumes

 5         facts not in evidence, calls for speculation.

 6                   THE WITNESS:  It's possible.

 7    BY MR. SMITH:

 8    Q.   Can you tell me what significance it would have had

 9         for you?

10                   MR. BERGER:  Same objections.

11                   THE WITNESS:  If his print was found, is

12         that what you're saying?

13    BY MR. SMITH:

14    Q.   No.  If you concluded that this print on the toilet

15         tank top did not belong to Lamarr Monson?

16    A.   I would have asked him, like I said before, to keep

17         the fingerprint on file to see if it compared to

18         someone else, you know, that's what I would have done.

19    Q.   Well, what light would that have shed on your

20         suspicion that Lamarr Monson was the one who killed

21         Christina Brown?

22    A.   Well, I don't know who found the body, who touched

23         what.  The print would have stayed on file, sir.

24    Q.   Well, okay.  You have to listen to my question.

25         You're answering, you're giving an answer, but it's
```

SIMON, BARBARA
06/03/2019                                                              Page 111

```
 1        not an answer to my question.

 2                    My question is:  If you had determined that

 3        this was not Lamarr Monson's fingerprint that was on

 4        the toilet tank top but it belonged to someone else,

 5        how would that have influenced your assessment of

 6        whether or not he was the murderer of Christina Brown?

 7                    MR. BERGER:  Objection; asked and answered.

 8                    THE WITNESS:  It would have been

 9        investigated.

10   BY MR. SMITH:

11   Q.   Would you have considered that to be evidence that at

12        least pointed towards his innocence?

13   A.   No, I can't say that, no.

14   Q.   And why not?

15   A.   Just because it wasn't his fingerprint doesn't mean

16        that he didn't have anything to do with her homicide.

17   Q.   That's not what I'm asking.  I'm asking -- I'm asking

18        a different question.  I'm not saying that it's

19        conclusive of anything, but if you find a fingerprint

20        on a murder weapon and that fingerprint does not

21        belong to the suspect, that fingerprint does tend to,

22        does tend to suggest that that individual may not be

23        the murderer; would you agree with that?

24                    MR. BERGER:  Objection; argumentative,

25        foundation.
```

SIMON, BARBARA
06/03/2019                                                                Page 112

```
 1                    THE WITNESS:  No, sir.

 2   BY MR. SMITH:

 3   Q.   You wouldn't agree with that?

 4   A.   No, sir.

 5   Q.   And why not?

 6   A.   Because like I stated before, anybody can touch a

 7        toilet and fingerprints come up, but that does not

 8        mean that Mr. Monson or whoever did not have anything

 9        to do with Ms. Brown's homicide.

10   Q.   Again, I'm not saying did it mean he had nothing to do

11        with it, but I'm not going to repeat myself.  You said

12        that the absence of Mr. Monson's fingerprint and the

13        presence of someone else's fingerprint on the murder

14        weapon would not influence your assessment that it was

15        Mr. Monson who committed the murder, correct?

16                    MR. BERGER:  Objection; mischaracterizes

17        her prior testimony.

18                    THE WITNESS:  Correct.  I'm sorry.

19                    MR. BERGER:  It's okay.

20   BY MR. SMITH:

21   Q.   Your answer was correct?

22   A.   Yes.

23   Q.   Okay.

24                    MR. BERGER:  You okay?

25                    THE WITNESS:  Uh-huh.
```

SIMON, BARBARA
06/03/2019                                                               Page 113

```
 1                          MARKED FOR IDENTIFICATION:

 2                          EXHIBIT 14

 3                          Fingerprints of Robert Lee Lewis

 4                          2:33 p.m.

 5                          MR. SMITH:  I'm handing you what's been

 6          marked as Deposition Exhibit 14 for identification.

 7                          MR. BERGER:  Are you guys feeling warm,

 8          too?  Anybody mind if I open the door a little bit?

 9    BY MR. SMITH:

10    Q.    The first page of this exhibit is captioned Lewis,

11          Robert Lee, and you can see on the side of the

12          fingerprint, I guess it's the left thumb print, that

13          this is from 2752 West Boston, and it looks -- there's

14          another date, 3-9-15, and I believe that was, that may

15          reflect the date of the request.

16                          Are you familiar with the general format of

17          this kind of document?

18    A.    No, sir.

19    Q.    You don't deal with fingerprint cards as a homicide

20          detective?

21    A.    Oh, I'm sorry, I meant I'm familiar with this, but the

22          date, is that what you're talking --

23    Q.    No, not the date.  Just the general format of the

24          document, what is it?

25    A.    Oh, yes, it's a person's fingerprint that was
```

1          fingerprinted by an officer and placed on a card.

2          Then they made a copy and put it on the sheet.

3     Q.   Can you tell from this document when he was

4          fingerprinted?

5                     MR. BERGER:  Foundation.

6                     THE WITNESS:  This looks like 11, I don't

7          know, is that 27-73?

8                     MR. SMITH:  Yes, ma'am.

9                     THE WITNESS:  Okay.

10                    MR. BERGER:  Do you have a copy for me?

11                    MR. SMITH:  Yes.

12   BY MR. SMITH:

13    Q.   I will represent to you that this thumb print of

14         Robert Lee Lewis is a thumb print from the toilet tank

15         top that we have been discussing.  I assume you've

16         already testified that the presence of this thumb

17         print left by what I believe the evidence will show

18         was a convicted felon would not have influenced you at

19         all in pointing the finger towards Lamarr Monson?

20                    MR. BERGER:  Objection; mischaracterizes

21         her prior testimony.

22                    THE WITNESS:  Are you saying when it was

23         ID'd, the fingerprint?

24   BY MR. SMITH:

25    Q.   If you had known about this very fingerprint card

SIMON, BARBARA
06/03/2019                                                                    Page 115

```
 1        which had been on file since November the 27th of

 2        1973, would that have influenced you in pursuing a

 3        case against Lamarr Monson?

 4                    MR. BERGER:  Objection; calls for

 5        speculation.

 6                    THE WITNESS:  No, sir.

 7    BY MR. SMITH:

 8    Q.  It would not have influenced you?

 9    A.  No.

10    Q.  Okay.  I'd like for you to assume that about, well,

11        two, two-and-a-half years after 3-9-15, that the State

12        Police examined the toilet tank that we were, that we

13        have been discussing, and found a total of nine

14        fingerprints on the toilet tank top, including palm

15        prints, which all belong to Robert Lee Lewis.  If you

16        had known that fact in 1996 when you were pursuing

17        Lamarr Monson, would that have influenced your

18        decision about that prosecution?

19                    MR. BERGER:  Objection; assumes facts not

20        in evidence, calls for speculation.

21                    THE WITNESS:  He would have been

22        investigated but 3-15, I have no idea.

23    BY MR. SMITH:

24    Q.  I'm asking you if you had known those facts that I

25        just gave you, that a total of nine prints from Robert
```

SIMON, BARBARA
06/03/2019                                                           Page 116

```
 1          Lee Lewis was found on the toilet tank top, would that
 2          have influenced your pursuit of Lamarr Monson?
 3                    MR. BERGER:  Objection; assumes facts not
 4          in evidence, calls for speculation.
 5                    THE WITNESS:  Once again, Mr. Lewis would
 6          have been investigated but that wouldn't have --
 7   BY MR. SMITH:
 8   Q.     I'm not asking you whether he --
 9   A.     Can I finish, sir?
10   Q.     Yes, you may finish.
11   A.     Thank you.  Thank you.  I appreciate it.
12                    Like I was saying, it wouldn't have stopped
13          me from thinking of Mr. Monson as a suspect, but this
14          would have been investigated, also.
15   Q.     And as you sit here today, though, you don't know why
16          finding the thumb print that was found was apparently
17          never investigated; you don't know why that was?
18   A.     I don't know, sir.
19   Q.     I believe I asked you this before, and I apologize if
20          I did, but I don't think I received an answer, but I
21          have to ask you again because it is an important
22          question.
23                    Are you familiar with the term exculpatory
24          evidence?  And all it means is evidence that tends to
25          show --
```

SIMON, BARBARA
06/03/2019                                                                  Page 117

```
 1                    MR. BERGER:  Well, do you want to know
 2         whether she knows it or what?
 3                    MR. SMITH:  I did.  She shook her head.
 4         I'm sorry.
 5    BY MR. SMITH:
 6    Q.   You have to answer out loud.  Do you know what that
 7         term means?
 8    A.   Not offhand, sir, no.
 9    Q.   Okay.  It means evidence that tends to show that
10         someone may be innocent.  That's all.  Would you
11         consider someone else's fingerprint on the probable
12         murder weapon in this case to be exculpatory
13         evidence --
14                    MR. BERGER:  Objection.
15    BY MR. SMITH:
16    Q.   -- someone other than Lamarr Monson?
17                    MR. BERGER:  Objection; form.
18                    THE WITNESS:  Possibly.
19    BY MR. SMITH:
20    Q.   Do you remember or did you review anything in the file
21         pertaining to Linda Woods?
22    A.   I don't remember, sir.
23                    MR. SMITH:  Okay.  Let me just show you.
24                    MARKED FOR IDENTIFICATION:
25                    EXHIBIT 15
```

```
 1                      Witness Statement of

 2                      Linda Diane Woods

 3                      2:42 p.m.

 4    BY MR. SMITH:

 5    Q.   I just handed you what I believe I just marked as --

 6         is that Exhibit 15?  Yes.

 7    A.   Yes.

 8    Q.   And I want you to take your time and at least read the

 9         highlighted portion which is probably the first nine

10         or ten lines.

11                      MR. BERGER:  I don't think this is 15 based

12         on what's on the TV.

13                      MR. SMITH:  Oh, I don't know what's on the

14         TV.  I have no idea.  Oh, I'm sorry, I'm sorry, yeah.

15         I changed that.  That's a different exhibit, so, but

16         this is the exhibit I want.

17                      MR. BERGER:  Okay.  Do you know what number

18         it is?

19                      MR. SMITH:  This is 15.

20                      MR. BERGER:  Oh, this is now 15?

21                      MR. SMITH:  This is now 15.

22                      MR. BERGER:  Okay.

23                      THE WITNESS:  Okay.  I read just the

24         highlighted part.

25                      MR. SMITH:  Well, you can read the whole
```

SIMON, BARBARA
06/03/2019                                                                      Page 119

```
 1        thing.

 2                    THE WITNESS:  Okay.

 3    BY MR. SMITH:

 4    Q.   Okay.  First of all, is a statement like this -- well,

 5         let me rephrase the question.

 6                    Do you know or does this refresh your

 7         memory as to whether or not this statement had any

 8         influence over your decision regarding the prosecution

 9         of Lamarr Monson for the murder of Christina Brown?

10    A.   No, sir.

11                    MR. BERGER:  Objection; form, assumes facts

12         not in evidence.

13                    THE WITNESS:  I don't remember, sir.

14    BY MR. SMITH:

15    Q.   You don't remember whether it influenced you or not?

16    A.   Correct.

17    Q.   Okay.  Let me just read this into the record.

18                    About 7:30 a.m. this morning --

19                    Oh, before I do, before I read this into

20         the record, let me just state that Linda Woods from

21         the earlier Exhibits 2 and 3 that we went over in some

22         detail, she was one of the witnesses that was taken

23         downtown to police headquarters along with Lamarr

24         Monson, correct?

25                    MR. BERGER:  Objection; foundation.
```

SIMON, BARBARA
06/03/2019                                                          Page 120

```
 1    BY MR. SMITH:

 2    Q.   At least according to those documents?

 3    A.   According to the documents, yes.

 4    Q.   Okay.  And so she would have arrived at about the same

 5         time as Lamarr Monson, and obviously they were in the

 6         same car, same scout car, and her statement, like

 7         Lamarr Monson's statement, was taken at 7:45 p.m. on

 8         January the 20th, 1996?

 9              MR. BERGER:  Objection; compound,

10         foundation.

11              THE WITNESS:  Yes.

12    BY MR. SMITH:

13    Q.   Is that what Exhibit 15 says?

14    A.   Yes.

15    Q.   Okay.  So she would have been in police headquarters

16         for about four hours before her statement was taken,

17         correct?

18              MR. BERGER:  Objection; foundation, calls

19         for speculation.

20              THE WITNESS:  I don't remember what time

21         they got there, sir.

22    BY MR. SMITH:

23    Q.   Well, I believe you testified earlier that it was

24         somewhere around 3:00, and I believe you testified

25         that you actually read Lamarr Monson his rights at I
```

```
 1        believe it was 3:25?

 2                    MR. BERGER:  Mischaracterizes prior

 3        testimony.

 4                    THE WITNESS:  Okay.

 5   BY MR. SMITH:

 6   Q.   Well, my question is:  Would it be reasonable to

 7        assume that like Lamarr Monson, Linda Woods was down

 8        at police headquarters for about four hours before

 9        this statement was written up?

10   A.   Yes.

11   Q.   Okay.  This is what the statement says:

12                    About 7:30 a.m. this morning, I got up to

13        use the bathroom.  I heard Mark's car pull up.  I

14        looked out the window and saw Mark's car pull up in

15        the building parking right next to the building.  It's

16        going toward Linwood.  Mark got out of the car and

17        came in the building.  About 45 minutes later, I heard

18        Mark's car pulling out of the lot.  I looked out the

19        window, and he was pulling off fast going towards

20        Dexter.  After Mark pulled off, I went back to sleep.

21        I woke up at about 12:30 p.m. or 12:45 p.m.

22                    Did I read that accurately?

23   A.   Yes.

24   Q.   Now as the officer in charge, this would have been one

25        of the statements that you would have received,
```

SIMON, BARBARA
06/03/2019                                                                    Page 122

```
 1      correct, and reviewed?

 2                  MR. BERGER:  Objection; assumes facts.

 3                  THE WITNESS:  Yes.

 4  BY MR. SMITH:

 5  Q.  Okay.  Did you dispatch someone, because I know you

 6      didn't go to the crime scene, did you dispatch someone

 7      to verify simply her ability to look out a window and

 8      see a car and an individual getting out of that car;

 9      did you verify that?

10  A.  No, because I can't dispatch anyone anywhere.

11  Q.  As the officer in charge of the case, you can't ask a

12      patrolman to check out the facts that are being

13      alleged here?

14  A.  As an officer of the case, sir, we would have to go

15      through 911 and ask them to have that officer call us.

16      I can't dispatch anyone anywhere.

17  Q.  I know that you're not a dispatcher.

18  A.  But I don't remember talking to anyone about this, no.

19  Q.  Well, since you're the one in charge of the case and

20      since you're responsible for gathering all the

21      relevant evidence to submit to the prosecutor, you do

22      have an obligation to verify the credibility of the

23      evidence you're submitting, do you not?

24                  MR. BERGER:  Objection; calls for a legal

25      conclusion, assumes facts.
```

SIMON, BARBARA
06/03/2019                                                                Page 123

```
 1                      THE WITNESS:  Yes.

 2    BY MR. SMITH:

 3    Q.   Did you do that in this case; did you make any effort

 4         to determine whether or not this was a credible

 5         statement by this woman?

 6    A.   No, I don't remember.

 7                      MARKED FOR IDENTIFICATION:

 8                      EXHIBIT 15-A

 9                      Jury Trial transcript excerpts

10                      March 3, 1997

11                      2:51 p.m.

12    BY MR. SMITH:

13    Q.   I'm handing you what I have just marked for

14         identification as Simon Deposition Exhibit 15-A, and

15         this is an excerpt from the jury trial of Lamarr

16         Monson, and this excerpt comes from Monday, March 3rd,

17         1997, of the trial, and I would direct your attention

18         to page 95, which is the third page of the exhibit,

19         line 15:

20                      Question:  So is it not true, Ms. Woods,

21         based upon your description as you sit here -- I'm

22         sorry -- as you sit in that apartment, you cannot see

23         the parking lot that's east of the building, can you?

24                      No, I didn't.  No, I can't.

25                      Question:  All right.  Now, so when you
```

SIMON, BARBARA
06/03/2019                                                          Page 124

```
 1   told the police -- incidentally, let me ask you this
 2   before I go there.
 3           Do you remember making this statement at
 4   all, Ms. Linda Woods, do you remember making this
 5   statement at all?
 6           Yes.  Some of the parts I remember.  Some I
 7   don't.
 8           Some you don't?  Do you remember telling
 9   them that you said you saw him pull up in the building
10   parking lot going towards Linwood?  Do you remember
11   telling the police that?
12           Yes.
13           Question:  But that wasn't --
14           Answer:  Because I, but --
15           Question:  That wasn't true, was it?
16           No, because I was nervous at the time, and
17   I was on drugs at the time.
18           Question:  I see.
19           Answer:  You know, I'm going to be for real
20   --
21           I'm sorry.  This is her answer:  You know,
22   I'm going to be for real with it, you know.
23           Question:  All right.  Because you know
24   from your apartment facing the front door, it would be
25   impossible for you to see the parking lot at that
```

```
 1        point; isn't that right, ma'am?

 2                    Answer:  Yes.

 3                    Question:  Isn't that true?

 4                    Answer:  Okay.

 5                    Question:  So when you told the police at

 6        7:30 in the morning of July 20th on that particular

 7        year that you saw him pull up in the parking lot and

 8        get out of the car and come into the building, ma'am,

 9        that was not true; isn't that right, Ms. Woods, that

10        was not true at all?

11                    Answer:  You're correct.

12                    Question:  All right.  Thank you kindly.

13                    Now as the officer in charge of pursuing a

14        case against Lamarr Monson, were you aware that this

15        witness was on drugs at the time she was interviewed?

16   A.   No, I don't remember that, sir, no.

17   Q.   You did testify earlier that you knew she looked like

18        a person who had been on drugs in the past, correct;

19        do you remember that when you were asked about the

20        witness named Linda?

21                    MR. BERGER:  I think it mischaracterizes

22        her prior testimony.

23   BY MR. SMITH:

24   Q.   You don't remember that?

25   A.   No.
```

 1   Q.   The record will speak for itself.

 2   A.   Okay.  I'm not saying.  I don't remember.

 3   Q.   Okay.  But I found no evidence in the investigative

 4        file that would indicate that you did anything at all

 5        to verify the truth of her original statement.  Would

 6        that be accurate, that you did nothing?

 7   A.   I don't remember --

 8               MR. BERGER:  I'll object as the statement

 9        is argumentative.

10               THE WITNESS:  I'm sorry.

11               MR. BERGER:  No.  Go ahead.

12               THE WITNESS:  I don't remember, sir.

13   BY MR. SMITH:

14   Q.   Let me just restate it.  Did you do anything that you

15        can recall or that you know about as a result of

16        reviewing the records, did you do anything to verify

17        the truth of Linda Woods' statement?

18   A.   I don't recall.

19   Q.   Now as part of your investigation, you've testified, I

20        believe, that when you left the Homicide section,

21        Lamarr Monson was still there and that someone else

22        would have taken over from you?

23   A.   Continue working, yes, sir.

24   Q.   Do you believe he was interrogated by other people?

25               MR. BERGER:  Objection; foundation, calls

```
 1       for speculation.
 2                   THE WITNESS:  I don't know, sir.  It's
 3       possible.  I don't know.
 4  BY MR. SMITH:
 5  Q.   And you don't know whether you left instructions for
 6       him to continue to be interrogated?
 7  A.   Not as I can recall, no.
 8  Q.   When was your next contact with Lamarr Monson, if you
 9       recall?
10  A.   I don't recall.
11  Q.   Okay.  The records show that he signed the statement
12       the following morning that was different from the
13       statement that he signed with you.  Have you had an
14       opportunity to review that statement?
15                   MR. BERGER:  Objection; assumes facts.
16                   THE WITNESS:  I'd have to see the
17       statement, sir.  I don't remember.
18  BY MR. SMITH:
19  Q.   Okay.  Well, you know what you reviewed, correct?  And
20       I'm just asking --
21  A.   My interview, do I remember --
22  Q.   No, no.  I'm asking what you reviewed.  You remember
23       earlier in the deposition, we talked about or I asked
24       you about what you had reviewed to prepare for your
25       deposition?
```

```
 1   A.   Yes.

 2   Q.   And you said that there were certain statements?

 3   A.   That's correct.

 4   Q.   And other things?

 5   A.   Uh-huh.

 6   Q.   And I'm asking was the statement that Lamarr Monson

 7        signed on January 21st of 1996, was that included in

 8        the materials that you reviewed?

 9   A.   It's possible, yes.

10   Q.   So as you sit here today, you don't know whether or

11        not Lieutenant Ghougoian interviewed him on the

12        morning of January 21st of 2000 -- I'm sorry -- of

13        1996?

14   A.   No, sir, I don't know.

15   Q.   Was Joan Ghougoian your superior in January of 1996?

16   A.   I believe she was the Commanding Officer at Homicide.

17   Q.   And what was your relationship with her?

18   A.   She was my supervisor.  What do you mean relationship?

19   Q.   That's what I mean.

20   A.   She was my supervisor.

21   Q.   Okay.  In the statement that Lamarr Monson signed on

22        January 21st of 1996, the statement sets forth a

23        scenario whereby Christina Brown was injured with a

24        knife as Mr. Monson attempted to protect himself.

25        Were you aware of that at all?
```

```
 1                        MR. BERGER:  Objection; assumes facts.

 2                        THE WITNESS:  Which statement, sir?

 3    BY MR. SMITH:

 4    Q.   This is Lamarr Monson, the statement that Lamarr

 5         Monson signed on the 21st, the day after you had taken

 6         your statement.

 7    A.   No, I'm not aware of that, sir.  I don't remember.

 8                        MR. SMITH:  Okay.  Just bear with me.

 9                        Can we go off the record for a moment,

10         please.

11                        VIDEO TECHNICIAN:  Going off the record,

12         3:02 p.m.  We're off the record.

13                        (Recess taken at 3:02 p.m.)

14                        (Back on the record at 3:18 p.m.)

15                        VIDEO TECHNICIAN:  We are now back on the

16         record.  The time is 3:17 p.m.

17                        MARKED FOR IDENTIFICATION:

18                        EXHIBIT 17

19                        Consent to Search Form

20                        3:18 p.m.

21                        MR. BERGER:  Do you have an extra copy,

22         Mr. Smith?

23                        MR. SMITH:  Oh, yes.

24                        MR. BERGER:  Thank you.

25    BY MR. SMITH:
```

```
 1   Q.   Ms. Simon, I've just handed you what's been marked for

 2        identification as Simon Deposition Exhibit 17, and

 3        this is a Consent to Search Form.  Now are you

 4        familiar with the format of this particular document;

 5        I mean, is that something that you used in your work

 6        as an investigator with Homicide?

 7                   MR. BERGER:  Objection; compound.

 8                   THE WITNESS:  Yes.

 9   BY MR. SMITH:

10   Q.   And this appears to be a document in which -- well,

11        why don't you just tell me what the document is or how

12        it's used?

13   A.   This is a Detroit Police Department Consent to Search

14        Form which we used to search automobiles and had the

15        person sign the form giving us permission to search

16        their automobile.

17   Q.   Okay.  And in this particular case, because there was

18        so much blood at the scene, would you be looking for

19        evidence of blood?

20                   MR. BERGER:  Objection; foundation, calls

21        for speculation.

22                   THE WITNESS:  Yes, sir.

23   BY MR. SMITH:

24   Q.   And did Lamarr Monson voluntarily sign this form?

25                   MR. BERGER:  Objection; calls for
```

SIMON, BARBARA
06/03/2019                                                              Page 131

```
 1        speculation, foundation.

 2                    THE WITNESS:  Yes, sir.

 3     BY MR. SMITH:

 4     Q.  Do you know off the top of your head or based on

 5         anything that you have reviewed what the test results

 6         were of the examination of his vehicle?

 7     A.  No, sir.

 8     Q.  Okay.  On page 2, we do include some, include a lab

 9         test result, and that is -- I guess it was evidence

10         tag number 248501.  Is that a test result?

11     A.  Yes, sir.

12     Q.  And that result was negative for blood?

13     A.  Correct.

14     Q.  And would it be accurate to state that the only place

15         -- that they actually only saw one spot on the

16         carpeting in his car that was gray/brown in color that

17         they thought was worthy to be tested?

18                    MR. BERGER:  Objection; foundation, calls

19         for speculation.

20     BY MR. SMITH:

21     Q.  Is that accurate?

22                    MR. BERGER:  Same objection.

23     BY MR. SMITH:

24     Q.  Is that accurate that they just tested one small piece

25         of carpet?
```

SIMON, BARBARA
06/03/2019                                                                      Page 132

```
 1   A.   Yes, sir.

 2   Q.   And it was two inches by three inches, correct?

 3   A.   That's what it says, yes, sir.

 4   Q.   And as you indicated, it was negative.  So they found

 5        no blood in his car, no evidence of blood in his car,

 6        correct?

 7   A.   That's what it says, yes, sir.

 8   Q.   Okay.  Given the amount of blood that was involved in

 9        this case, would you consider that to be exculpatory,

10        and I mean by that that that would tend to show that

11        he was not involved in the murder of Christina Brown?

12                  MR. BERGER:  Objection; calls for a legal

13        conclusion.

14                  THE WITNESS:  No.

15   BY MR. SMITH:

16   Q.   It wouldn't show that; it wouldn't be evidence that he

17        didn't do the murder is what you're saying?

18   A.   Yes.

19   Q.   Okay.  Now given the manner in which I have defined

20        exculpatory evidence, which is evidence that tends to

21        show innocence or tends to disprove the prosecutor's

22        case, that's how I'm defining the word, and so far

23        you've told me that someone else's fingerprints on the

24        murder weapon would not be exculpatory, correct?

25                  MR. BERGER:  Asked and answered,
```

```
 1        mischaracterizes her prior testimony.

 2                    THE WITNESS:  Yes.

 3   BY MR. SMITH:

 4   Q.   You are telling me now that the absence of any blood

 5        stains or blood products in his car within hours of

 6        this very brutal murder would not be exculpatory,

 7        correct?

 8   A.   Correct.

 9                    MARKED FOR IDENTIFICATION:

10                    EXHIBIT 16

11                    Investigator's Report

12                    3:25 p.m.

13   BY MR. SMITH:

14   Q.   Now I'm handing you what's been marked as Simon

15        Exhibit 16 for identification, and I believe that the

16        title of this document is Investigator's Report.  I

17        believe that you testified earlier that as the officer

18        in charge, you were obligated to do the investigation,

19        gather the evidence, and make a report to the

20        prosecutor's office, correct?

21   A.   That's correct.

22   Q.   And was this your report in the Monson case?

23   A.   Yes.

24   Q.   Now in this report, you refer to a cutting; do you see

25        that?
```

SIMON, BARBARA
06/03/2019                                                          Page 134

```
 1   A.   Yes, sir.

 2   Q.   In paragraph 1 that they responded to a cutting?

 3   A.   That's correct.

 4   Q.   That was the information that you had then, correct?

 5   A.   That's correct.

 6   Q.   Okay.  Now if you look on, let's see, under number 1,

 7        it says:  A representative of the Wayne County Medical

 8        Examiner's office will testify that an autopsy was

 9        performed on the body of Complainant Brown, and the

10        cause of death was the result of multiple stab wounds.

11             Do you see that?

12   A.   Yes, sir.

13   Q.   Now that's not true, is it?

14             MR. BERGER:  Objection; foundation.

15             THE WITNESS:  At that particular time, yes,

16        sir, because we hadn't had the -- the autopsy had not

17        been done on the body.

18   BY MR. SMITH:

19   Q.   Well, according to Dr. Harkey, the autopsy was done on

20        January 21st.  Now that was two days after the murder;

21        is that correct?

22             MR. BERGER:  Objection; assumes facts.

23   BY MR. SMITH:

24   Q.   That is what his testimony was.  We went over his

25        testimony.
```

SIMON, BARBARA
06/03/2019                                                              Page 135

```
 1  A.   That was at the exam; is that what you're saying?

 2  Q.   The preliminary exam but he testified when he did the

 3       autopsy, and he said it was on January 21st, a

 4       Saturday?

 5  A.   Okay, yes.

 6  Q.   It was probably the 20th.  It was probably the same

 7       day she was killed?

 8            MR. BERGER:  Objection; assumes facts,

 9       argumentative.

10  BY MR. SMITH:

11  Q.   Let me just ask you:  You could have gathered that

12       information because it was available at least by the

13       22nd, correct?

14            MR. BERGER:  Objection; assumes facts,

15       argumentative.

16            THE WITNESS:  I don't remember the day he

17       did the autopsy.  He said he did the same day.  I

18       don't remember.

19  BY MR. SMITH:

20  Q.   Okay.  My question is:  You could have obtained

21       correct information had you desired to do so?

22            MR. BERGER:  Objection; calls for

23       speculation, assumes facts.

24            THE WITNESS:  On the 22nd?

25  BY MR. SMITH:
```

```
 1   Q.   Any time after the death, you could have picked up the

 2        telephone and called the Wayne County Medical

 3        Examiner's office; I believe you said that was one of

 4        your duties?

 5   A.   That's correct.

 6             MR. BERGER:  Objection; argumentative,

 7        compound, assumes facts.

 8   BY MR. SMITH:

 9   Q.   Okay.  Now you also, in number 2, you state that Paris

10        Thompson was going to be giving some testimony.  Do

11        you know whether or not that was the real name of this

12        individual?

13   A.   I don't remember.

14   Q.   And under paragraph 3, you also state that Linda Woods

15        would be giving testimony about Lamarr Monson arriving

16        at 7:00 a.m. in the morning as she stated in her

17        statement, correct?

18   A.   Yes.

19   Q.   And as I think you told us -- well, let me ask you:

20        That testimony was totally unverified; you never went

21        to her apartment or did anything else to determine

22        whether or not she could, in fact, see out of her

23        window, did you?

24   A.   No.

25             MR. BERGER:  Objection; argumentative.
```

```
 1   BY MR. SMITH:

 2   Q.   Now in number 9, it says:  Investigator Barbara Simon

 3        of the Homicide section will testify to being the

 4        officer in charge of the case and to arresting

 5        Defendant Monson and giving Defendant Monson his

 6        Constitutional rights.

 7                  Is that accurate?

 8   A.   Yes.

 9   Q.   You were the one who arrested him?

10   A.   I'm not going to say.  He was arrested.  As the

11        officer in charge, they would say that I arrested him

12        and gave him his Constitutional rights.

13   Q.   Well, I'm asking you:  Is number 9 in Exhibit 16 your

14        investigative report; is number 9 accurate?  It states

15        that you would testify to being the officer in charge

16        of the case and to arresting Defendant Monson; is that

17        accurate?

18   A.   I was in charge of the case and like I say, he was

19        arrested, sir.  I don't remember if I arrested him,

20        so, I would have to say --

21   Q.   You don't remember if you arrested him?

22   A.   All I can tell you is that he was arrested.

23   Q.   You did tell us and seem to have no problem

24        remembering the fact that when you left, he had not

25        been arrested?
```

SIMON, BARBARA
06/03/2019                                                                        Page 138

```
 1                      MR. BERGER:  Objection; mischaracterizes --
 2   BY MR. SMITH:
 3   Q.   You would leave that up to someone else?
 4                      MR. BERGER:  Objection; mischaracterizes
 5        prior testimony, argumentative.
 6   BY MR. SMITH:
 7   Q.   Do you remember that testimony?
 8   A.   If I remember, you asked me was he and I told you he
 9        was there when I left.  He was still there.  You asked
10        me was he up on the ninth floor.
11   Q.   That was not my question but that's okay.  I can ask
12        the question again.
13   A.   Ask it again.
14   Q.   At the time you left --
15   A.   Okay.
16   Q.   -- had Lamarr Monson been arrested?
17                      MR. BERGER:  Objection.
18                      THE WITNESS:  Not that I can recall.  I
19        don't know.
20   BY MR. SMITH:
21   Q.   When did you arrest Lamarr Monson?
22   A.   The next day I believe he was already arrested, sir,
23        on the ninth floor.
24   Q.   When he was placed in lock-up, he was arrested at that
25        point?
```

```
 1                    MR. BERGER:  Objection; mischaracterizing
 2        her testimony.
 3                    MR. SMITH:  I'm asking.
 4                    THE WITNESS:  I believe so.
 5                    MR. SMITH:  Let me ask the court reporter,
 6        did I use Exhibit 13?
 7                    MR. BERGER:  What number did you make the
 8        Investigator's Report?  I forgot to write that down.
 9                    MR. SMITH:  The investigator report was --
10        it's over there.  It's got a sticker on it.
11                    MR. BERGER:  16.
12                    MARKED FOR IDENTIFICATION:
13                    EXHIBIT 13
14                    Report of Investigator
15                    Barbara Simon
16                    3:35 p.m.
17                    MR. SMITH:  Ms. Simon, I'm handing you
18        what's been marked as Deposition Exhibit 13.
19                    MR. BERGER:  Do you have a copy?
20                    MR. SMITH:  Uh-huh.
21                    MR. BERGER:  Thank you.
22        BY MR. SMITH:
23        Q.   This document is captioned -- oh, by the way, on the
24             Investigator's Report, let's go back to that for just
25             a moment.  We need to go back to that for just a
```

SIMON, BARBARA
06/03/2019                                                                          Page 140

```
 1        moment, and then we'll get to -- what number is the
 2        Investigator's Report?
 3   A.   16.
 4   Q.   Thank you.  So we're going back to Exhibit 16.  At the
 5        bottom of Exhibit 16, that is your signature, correct,
 6        signature of the investigating officer?
 7   A.   Yes.
 8   Q.   And it was approved by Joan Ghougoian?
 9   A.   No.
10   Q.   That's not what it says?
11   A.   No.  It was approved by Lieutenant William Rice for
12        Joan Ghougoian.
13   Q.   Oh, I see, I see.  By the way, when you -- well, let
14        me just ask you:  At any time after you submitted this
15        Investigator's Report, did you submit another
16        Investigator's Report or do you know?
17   A.   I don't remember, no.
18   Q.   Okay.  At any time between submitting this
19        Investigator's Report and the trial of Lamarr Monson,
20        Investigator's Report was submitted in January of
21        1996, and the trial was in March of 1997, at any time
22        did it come to your attention that the head of the
23        Homicide section, Lieutenant Ghougoian, had been
24        accused of making promises to Defendants in order to
25        induce them to give confessions?
```

SIMON, BARBARA
06/03/2019                                                                    Page 141

```
 1   A.   Not as I can remember, sir, no.

 2   Q.   You don't remember any scandal along those lines?

 3              MR. BERGER:  Objection; form.

 4              THE WITNESS:  I heard rumors but I don't

 5        remember any scandals.

 6   BY MR. SMITH:

 7   Q.   Okay, you heard rumors.  Do you recall Lieutenant

 8        Ghougoian being transferred out of Homicide?

 9   A.   I remember she left Homicide, yes.

10   Q.   Okay.  Let's go to what we've marked as Exhibit 13.

11        This is Investigator Barbara Simon, and it says at the

12        top:  Affiant, having subscribed and sworn to an

13        Affidavit for a search warrant, and I have under oath

14        examined Affiant, am satisfied that probable cause

15        exists.

16              Now you were the Affiant for this search

17        warrant?

18   A.   I believe so, yes.

19   Q.   That is your signature that appears after the word

20        Affiant, is it not?

21   A.   Yes.

22   Q.   And this was signed on May the 13th of 1996?

23   A.   Yes.

24   Q.   And why were you signing this Affidavit, can you tell

25        from the face of the Affidavit, itself?
```

SIMON, BARBARA
06/03/2019                                                                Page 142

```
 1                    MR. BERGER:  Take your time to read it all.
 2                    THE WITNESS:  From what it said to draw
 3          blood from Mr. Monson.
 4   BY MR. SMITH:
 5   Q.   Okay.  As the Affiant, you were making this statement
 6        under oath; is that correct?
 7   A.   Yes.
 8   Q.   It says the following:  The following facts are sworn
 9        to by Affiant in support of the issuance of this
10        warrant.
11                    And in the highlighted portion, it says:
12        An autopsy performed on said body revealed that the
13        cause of death was due to multiple stab wounds.
14                    Do you see that?
15   A.   Yes.
16   Q.   So this was four months after the autopsy
17        approximately, four months after the death, and by
18        that time, you had certain ample opportunity to speak
19        to the Medical Examiner, correct?
20                    MR. BERGER:  Objection; compound,
21        argumentative, assumes facts.
22                    THE WITNESS:  Yes.
23   BY MR. SMITH:
24   Q.   And so at that time, you knew that the cause of death
25        was actually a blow to the head with a heavy object,
```

SIMON, BARBARA
06/03/2019                                                                    Page 143

```
 1      correct?

 2                      MR. BERGER:  Objection; argumentative.

 3                      THE WITNESS:  I don't remember, sir.

 4   BY MR. SMITH:

 5   Q.  The Affidavit goes onto state:  Further, Defendant

 6       Monson confession to Affiant that he did have an

 7       altercation with the Defendant and stab her.

 8                      That statement was not true, was it?

 9   A.  I don't remember.

10   Q.  You don't remember whether Mr. Monson confessed to

11       you?

12   A.  I don't recall.  I don't recall.

13   Q.  You don't recall whether he confessed to you?

14   A.  No, that's not what you asked me.  I remember his

15       statement, I don't remember word for word, but I don't

16       recall, sir.

17   Q.  You don't recall whether this statement is true or

18       not?

19   A.  Correct.

20   Q.  By the way, you didn't find in the blood that you were

21       able to draw and the lab results that you were able to

22       obtain, you found nothing to implicate Lamarr Monson,

23       did you?

24                      MR. BERGER:  Objection; argumentative,

25       foundation.
```

SIMON, BARBARA
06/03/2019                                                                          Page 144

```
 1                       THE WITNESS:  I don't recall.

 2   BY MR. SMITH:

 3   Q.   I'm sorry?

 4   A.   I don't recall.

 5                       MR. SMITH:  Madam Court Reporter, I'm going

 6        to have to prevail upon you to mark the next exhibit.

 7                       MR. BERGER:  Do you have an extra copy of

 8        that?

 9                       MR. SMITH:  Yes.

10                       MS. WARD:  Can we just take a one-second

11        break?

12                       MR. BERGER:  Sure.  Do we need to go off

13        the record?

14                       MR. SMITH:  We can go off briefly just to

15        check the exhibits.

16                       VIDEO TECHNICIAN:  We're going off the

17        record.  The time is 3:46 p.m.  We're off the record.

18                       (Recess taken at 3:46 p.m.)

19                       (Back on the record at 3:55 p.m.)

20                       VIDEO TECHNICIAN:  We are now back on the

21        record.  The time is 3:55 p.m.

22   BY MR. SMITH:

23   Q.   Ms. Simon, it has come to my attention that I may have

24        given you either an incorrect or incomplete definition

25        of exculpatory.  So I need to correct that for the
```

SIMON, BARBARA
06/03/2019                                                                      Page 145

```
 1       record.

 2               When I use the term exculpatory, I'm going

 3       to be referring to evidence that either may be

 4       relevant to innocence, that may be favorable to the

 5       Defendant, or that may be impeachment material.

 6       Impeachment material is material that shows that

 7       someone may not be telling the truth.

 8               Now that is probably a better definition of

 9       exculpatory than the one I gave you earlier.  So given

10       that definition, would you have found the fingerprint

11       on the toilet lid that was not Lamarr Monson's

12       fingerprints, would you have found that to be

13       exculpatory?

14               MR. BERGER:  Objection; calls for a legal

15       conclusion.

16               THE WITNESS:  I don't know, sir.

17  BY MR. SMITH:

18  Q.   Okay.  And the laboratory test, the laboratory test on

19       the vehicle that found no blood, would you have found

20       that to be exculpatory?

21               MR. BERGER:  Objection; calls for a legal

22       conclusion.

23               THE WITNESS:  What exhibit was that, sir?

24               MR. SMITH:  It is the exhibit pertaining to

25       the vehicle search.
```

```
 1                          MR. BERGER:  17.

 2                          THE WITNESS:  What was your question again?

 3    BY MR. SMITH:

 4    Q.   Would you have found that to be exculpatory, the

 5         absence of any blood?

 6                          MR. BERGER:  Objection; calls for a legal

 7         -- objection; calls for a legal conclusion.

 8                          THE WITNESS:  I don't know, sir.

 9    BY MR. SMITH:

10    Q.   Okay.  And I want to go back for a moment to Exhibit

11         11, that was the latent print check, and the first

12         latent print check indicates:  I examined bathroom

13         walls.

14                          They give the evidence tag number, and they

15         say that there were palm prints.  Did you submit the

16         palm prints from the bathroom walls for analysis and

17         identification to any forum, either the DPD Latent

18         Print Lab, state database, or federal database?

19    A.   I believe DPD lab, sir.

20    Q.   I found nothing in the record to indicate that there

21         was any report from the DPD lab regarding the prints

22         that were found on the bathroom walls.  That would

23         have been part of the investigative record, correct?

24    A.   Yes.

25    Q.   So if the investigative record contains no submission
```

```
 1        of finger lifts from the bathroom walls, we can assume

 2        that you did not submit them, correct?

 3                    MR. BERGER:  Objection; mischaracterizes

 4        prior testimony.

 5                    THE WITNESS:  No, I'm not going to say

 6        that, no.

 7   BY MR. SMITH:

 8   Q.   As you sit here today, is that something you actually

 9        remember doing, is submitting those prints from the

10        bathroom walls?

11   A.   I don't remember.

12   Q.   Okay.  If the prints from the bathroom walls had not

13        matched the prints of Lamarr Monson, would you have

14        considered that to be exculpatory evidence in the way

15        that I've defined it?

16   A.   No.

17                    MR. BERGER:  Objection; calls for a legal

18        conclusion, calls for speculation.

19   BY MR. SMITH:

20   Q.   I'm sorry?

21   A.   No.

22                    MR. BERGER:  Just if I'm objecting, just

23        wait until --

24                    THE WITNESS:  Oh, I thought you were

25        finished.  I'm sorry.
```

SIMON, BARBARA
06/03/2019                                                                    Page 148

```
 1                         MR. BERGER:  It's okay.  It's okay.  Don't

 2          worry about it.  I'm just trying to keep her happy.

 3     BY MR. SMITH:

 4     Q.   Now based on the photographs that you've reviewed, if

 5          those prints were actually in the blood, would that

 6          change your answer?

 7                         MR. BERGER:  Objection; calls for

 8          speculation, calls for a legal conclusion.

 9                         THE WITNESS:  I don't know.

10                         MARKED FOR IDENTIFICATION:

11                         EXHIBIT 18

12                         Handwritten document

13                         4:02 p.m.

14     BY MR. SMITH:

15     Q.   Okay.  I'm now going to hand you Exhibit 18.  This is

16          a document that was provided to me as part of the

17          Lamarr Monson investigative file.  First of all, do

18          you know who wrote this document?

19     A.   No.

20     Q.   Okay.  What the document says is:  Perpetrator was

21          left handed, exclamation mark.

22                         And the word "left" is underscored twice.

23          First of all, do you know how one can determine

24          whether a perpetrator that delivers a blow to the

25          head, how that can be determined to be left handed?
```

```
 1                     MR. BERGER:  Objection; foundation, calls

 2          for speculation.

 3                     THE WITNESS:  No.

 4    BY MR. SMITH:

 5    Q.   Do you know anything -- do you recognize this note?

 6    A.   No, sir.

 7    Q.   Okay.  You didn't see it as the officer in charge of

 8          the case?

 9    A.   No, not as I can remember, no.

10    Q.   And had you seen it, would that have been something

11          you would have considered to be exculpatory in the

12          event that Lamarr Monson was right-handed?

13                     MR. BERGER:  Objection; calls for

14          speculation, assumes facts not in evidence.

15                     THE WITNESS:  I don't know.

16    BY MR. SMITH:

17    Q.   You don't know?

18    A.   No.

19    Q.   The statement that -- excuse me.

20                     This is not your handwriting, is it?

21    A.   No, sir.

22    Q.   And you don't recognize whose handwriting it is, do

23          you?

24    A.   No, sir.

25    Q.   Okay.  You testified earlier that when you took Lamarr
```

SIMON, BARBARA
06/03/2019                                                              Page 150

```
 1      Monson's statement, you used a question-and-answer

 2      format?

 3   A. Correct.

 4   Q. Would I be correct in assuming that as a homicide

 5      investigator and the officer in charge of this

 6      particular case, one of the first questions you would

 7      have asked him was:  Where were you at or near the

 8      time the murder was committed?

 9              MR. BERGER:  Objection; foundation, assumes

10      facts.

11              THE WITNESS:  Not as my first question.  It

12      could have came in there but not as my first question.

13   BY MR. SMITH:

14   Q. I'm sorry, that wouldn't be first question?

15   A. That's correct.

16   Q. Let me ask you this:  You have a person that you are

17      investigating for a murder, and he tells you that he

18      was not in the apartment or the apartment building

19      during the time period when the murder occurred.  At

20      some point in taking his statement, you would ask him:

21      Where were you?

22              MR. BERGER:  Objection; assumes facts.

23              THE WITNESS:  Yes.

24              MARKED FOR IDENTIFICATION:

25              EXHIBIT 9
```

SIMON, BARBARA
06/03/2019                                                          Page 151

```
 1                    Witness Statement of

 2                    Lamarr Monson

 3                    4:06 p.m.

 4    BY MR. SMITH:

 5    Q.   I just handed you what's been marked for

 6         identification as Exhibit 9.  This is the witness

 7         statement that you apparently took from Lamarr Monson

 8         in question-and-answer format on January the 20th,

 9         1996, at approximately 7:45 p.m. at 1300 Beaubien.

10         I'd like for you to take some time, look over the

11         statement, and when you have succeeded in doing so,

12         just point out to me where in this statement you asked

13         Lamarr Monson his whereabouts.

14    A.   Okay.  I read the statement, sir.

15    Q.   Can you point out to me where you asked Lamarr Monson

16         his whereabouts during the period when the murder took

17         place?

18    A.   I didn't ask him where he was when the murder took

19         place.

20    Q.   Would you agree with me that if Lamarr Monson had told

21         you where he was and you were able to substantiate

22         that that was where he was, that that would have been

23         exculpatory evidence?

24              MR. BERGER:  Objection; calls for a legal

25         conclusion, calls for speculation.
```

SIMON, BARBARA
06/03/2019                                                                    Page 152

```
 1                    THE WITNESS:  I don't know, sir.

 2   BY MR. SMITH:

 3   Q.   Did you make any effort to find out where Lamarr

 4        Monson was during the time when the murder took place?

 5   A.   Not as I can recall.  I don't recall.

 6   Q.   And was that because the following day, you got

 7        another statement claiming that he had had a quarrel

 8        and stabbed Christina Brown and that that statement

 9        was taken at the direction of your boss, Joan

10        Ghougoian?

11                    MR. BERGER:  Objection; assumes facts not

12        in evidence, mischaracterizes the evidence.

13                    THE WITNESS:  I don't know, sir.  I wasn't

14        there.

15   BY MR. SMITH:

16   Q.   Well, I'm asking you to assume that that statement,

17        the second statement was taken at the direction of

18        Joan Ghougoian, and that statement was actually a

19        confession that he was at least in a fight or

20        altercation with the decedent, Christina Brown, and

21        that that statement was taken at the direction of your

22        superior, Joan Ghougoian.  You may assume all those

23        facts.

24   A.   I can't answer that, sir.  I wasn't there.

25                    MR. BERGER:  You have to let Mr. Smith
```

```
 1        finish his question.

 2   BY MR. SMITH:

 3   Q.   I'm not asking you if you were there.  I'm asking you

 4        if that may have influenced your decision not to

 5        pursue where he was, your decision not to follow up on

 6        the fingerprint evidence, or do anything else that

 7        might tend to show he was innocent?

 8                  MR. BERGER:  Objection; assumes facts,

 9        calls for speculation.

10   BY MR. SMITH:

11   Q.   Do you understand my question?

12   A.   No.

13   Q.   Okay.  I'll try it again.

14                  Is it possible the fact that your boss --

15        well, first of all, let's take a step back.

16                  In the statement that you took from Lamarr

17        Monson on the 20th, in response to your questions, he

18        denied getting in a fight with Christina Brown,

19        correct?  I need you to find that on --

20   A.   Yes.

21   Q.   Okay.  He denied carrying any kind of weapon?

22   A.   Yes.

23   Q.   He denied owning a knife?

24   A.   Yes.

25   Q.   And he denied stabbing Christina Brown, correct?
```

```
 1   A.   Yes.

 2   Q.   Okay.  The following morning, a statement is produced

 3        where he allegedly confesses that he had a fight with

 4        her, that she was injured during the fight, and that

 5        statement was taken at the direction of the Commander

 6        of the Homicide section, Joan Ghougoian.

 7               Do you think that that scenario, that

 8        someone came behind you, directed that another

 9        statement be taken, do you think that because that was

10        your superior, you may have wanted to bring yourself

11        in line with that second statement?

12               MR. BERGER:  Objection; foundation, calls

13        for speculation, argumentative.

14   BY MR. SMITH:

15   Q.   Is that a no?

16   A.   I don't know, sir, because I haven't seen this

17        statement.  I don't know.

18               MR. SMITH:  Okay.  Those are all the

19        questions I have for right now.

20               Just a second.  Let me take a break and go

21        over my notes quickly.

22               VIDEO TECHNICIAN:  Going off the record --

23               MR. BERGER:  We got to go off the record

24        for it?

25               MR. SMITH:  Yes.
```

SIMON, BARBARA
06/03/2019                                                                    Page 155

```
 1                    VIDEO TECHNICIAN:  Going off the record at
 2        4:15 p.m.  We're off the record.
 3                    (Recess taken at 4:15 p.m.)
 4                    (Back on the record at 4:27 p.m.)
 5                    VIDEO TECHNICIAN:  We are now back on the
 6        record.  The time is 4:27 p.m.
 7   BY MR. SMITH:
 8   Q.   Ms. Simon, at the beginning of the deposition, I
 9        showed you the Deposition Notice, and paragraph 1 of
10        the schedule of documents to be produced states:  All
11        handwritten notes or printed documents pertaining to
12        the investigation and prosecution of Lamarr Monson for
13        the murder of Christina Brown.
14                    Now my understanding is you did not bring
15        any records that may have conformed to that request,
16        and let me just ask you why not?  And, you know, if
17        you didn't have any records at all, you can say that.
18   A.   I didn't have any records.
19   Q.   Okay, that's an answer, and records and notes and, you
20        know, things like that, not just records but notes as
21        well.  You didn't have any notes or records?
22   A.   No, sir.
23   Q.   Okay.  And did you at any time generate any notes as
24        the officer in charge?
25   A.   I don't remember, sir.
```

SIMON, BARBARA
06/03/2019                                                                          Page 156

```
 1   Q.   Okay.  Do you have or are you aware of an

 2        indemnification agreement between you and the City of

 3        Detroit?

 4   A.   Do I have what, sir?

 5   Q.   An indemnification agreement with the City of Detroit;

 6        in other words, are they agreeing to pay for your

 7        defense and damages that you may incur in this case?

 8   A.   I assume so.

 9              MR. SMITH:  All right.  That's all I have.

10        Thank you.

11              MR. BERGER:  All right.

12                        EXAMINATION

13   BY MR. BERGER:

14   Q.   Ms. Simon, so when are people assigned -- well, in

15        1996, when were people assigned OIC or officer in

16        charge of any cases, what time of day?

17   A.   The cases are usually assigned to the person the next

18        day.

19   Q.   Is there a particular time of the day that that

20        happens?

21   A.   Well, whenever the cases come in, they're assigned to

22        different squads, and whoever the officer in charge of

23        that squad, if your name is up next, they get you

24        assigned to it.

25   Q.   I understand that but was there a particular time of
```

SIMON, BARBARA
06/03/2019                                                                 Page 157

```
 1       day that that occurred?

 2  A.   If it's the day shift, it would be after, a little

 3       after 8 because we start at 8, so it would be after

 4       8:00 in the morning.

 5  Q.   Were you at the scene of Christina Brown's death?

 6  A.   No.

 7  Q.   Do you know what any of the -- do you have any

 8       personal knowledge of what any of the officers did

 9       there?

10  A.   No.

11  Q.   Do you have any personal knowledge of what any of the

12       officers did in between the time that they got there

13       and between the time any of the officers got back to

14       the Detroit Police Department?

15  A.   No.

16  Q.   Do you remember discussing earlier about why you

17       thought Mr. Monson had alleged involvement in

18       Christina Brown's murder?

19  A.   Yes.

20  Q.   Okay.  And the reason you said was because you had a

21       statement from him, correct?

22            MR. SMITH:  Object; misstates her former

23       testimony.

24            THE WITNESS:  A statement was taken from

25       Mr. Monson.
```

```
 1   BY MR. BERGER:

 2   Q.   Okay.  And do you have that statement in front of you?

 3   A.   Yes.

 4   Q.   What about that statement made you think that he had

 5        involvement?

 6   A.   Well, first, asked when the police arrived:  Did you

 7        tell the police that you did not know Christina?  Why

 8        did you tell the police you did not know Christina?

 9              Answer:  Because I didn't want to get mixed

10        up in this because I was selling drugs out of the

11        apartment, and I know I had a warrant out for my

12        arrest.

13              And he also -- I also asked him:  Was

14        Crystal selling drugs for you out of the apartment on

15        Boston?

16              Answer, he answered that:  Yes, she was

17        selling drugs for me.

18              I asked him had he ever threatened her, and

19        he said yes.

20              I asked:  Mr. Monson, you first told me

21        that Crystal was your girlfriend.  After you found out

22        that Crystal was 12 years old, you told me that

23        Crystal was not your girlfriend, that she was just a

24        friend.  Why did you lie?

25              Answer:  Because I didn't want to go to
```

SIMON, BARBARA
06/03/2019                                                                  Page 159

```
 1         jail for messing around with a 12-year-old, with a

 2         12-year-old.

 3                  I asked him had he ever had sex with

 4         Crystal, and he said yes.  He said he had had sex with

 5         her one time three days ago.  He didn't want us to

 6         know that he was messing, had sex with a 12-year-old

 7         child.

 8                  MR. SMITH:  I'm going to object and move to

 9         strike her answer.  For the most part it was totally

10         nonresponsive.

11                  Go ahead, sir.

12                  MR. BERGER:  All right.

13    BY MR. BERGER:

14    Q.   Why did that make you think that he had any

15         involvement in Crystal's -- or I'm sorry -- Christina

16         Brown's death?

17    A.   If I remember, she was selling drugs for him in the

18         apartment.  He stated that she was his girlfriend,

19         they were boyfriend/girlfriend.

20    Q.   So the fact that they were boyfriend/girlfriend, that

21         made you --

22    A.   And that --

23    Q.   Oh, go ahead.

24    A.   The drugs, the selling of crack cocaine, she was 12

25         years old and having sex with her.
```

SIMON, BARBARA
06/03/2019                                                            Page 160

```
 1   Q.   And why did that make you suspicious, that

 2        information?

 3   A.   Because he didn't want to go to jail for messing

 4        around with a 12-year-old.

 5   Q.   At that time did you have reason to arrest Lamarr

 6        Monson?

 7   A.   At that time it was still under investigation.

 8   Q.   Okay.  But given the information provided you, did you

 9        have, did you have a reason to arrest him for any

10        crimes?

11                   MR. SMITH:  Objection.

12                   THE WITNESS:  Yes.

13   BY MR. BERGER:

14   Q.   What crimes?

15   A.   CSC-1.

16   Q.   Anything else?

17   A.   At that particular time, like I said, everything else

18        was under investigation.

19   Q.   What about the drugs?

20   A.   The drugs, yes.

21   Q.   What is CSC-1?

22   A.   Criminal sexual conduct in the first degree, a person

23        under the, as a minor, under the age of 12, 12 and

24        under, 13 and under, I'm sorry.

25   Q.   I'd like you to look at the Exhibit 17.  Is any of
```

```
 1        that in your handwriting?

 2   A.   No, sir.

 3   Q.   And do you see the part where it says witnesses?

 4   A.   Yes.

 5   Q.   Who does that say?

 6   A.   Sergeant LaVonn Gallant, Junior.

 7   Q.   Were you present when this form was completed?

 8   A.   Not as I can recall, no.

 9   Q.   So do you have personal knowledge as to why Lamarr

10        Monson signed it?

11   A.   This form here?

12   Q.   Yes.

13   A.   Number 17?

14   Q.   Yes.

15   A.   No, sir, I wasn't there, no.

16   Q.   When you first met Mr. Monson, he gave you the name

17        Mark Mason, correct?

18   A.   Yes.

19   Q.   At that time did you consider that a street name?

20   A.   I don't recall, sir.  I don't know for sure.

21   Q.   Had you heard, in 1996, had you heard of street names

22        before?

23   A.   Yes.

24   Q.   Can you give me -- well, did street names usually line

25        up with normal everyday names, or did they usually
```

```
 1       line up with other nicknames?

 2               MR. SMITH:  Object to form and foundation.

 3               THE WITNESS:  Basically nicknames, street

 4       names.

 5   BY MR. BERGER:

 6   Q.  Would street names be more consistent with something

 7       like a rap name like Dr. Dre or Akon?

 8               MR. SMITH:  Object to form and foundation.

 9               THE WITNESS:  No, not all the different

10       names.

11   BY MR. BERGER:

12   Q.  But generally would they line up something like that?

13               MR. SMITH:  Object to form and foundation.

14               THE WITNESS:  Possibly.

15   BY MR. BERGER:

16   Q.  Was it unusual to get a street name that was similar

17       to an everyday name?

18               MR. SMITH:  Object to form and foundation.

19               THE WITNESS:  No, not that I can recall.

20   BY MR. BERGER:

21   Q.  When you met Mr. Monson and he gave you the name Mark

22       Mason, did you believe it was a street name or fake

23       name?

24               MR. SMITH:  Form and foundation, asked and

25       answered.
```

```
 1                    THE WITNESS:  I don't remember, sir.

 2  BY MR. BERGER:

 3  Q.   If you looked at Mr. Monson's statement, would that

 4       help refresh your recollection?

 5                    MR. SMITH:  The witness testified that she

 6       does not remember.

 7                    THE WITNESS:  I did ask him when I first

 8       started talking to him when he gave me the name Mark

 9       Mason:  Is that your real name?

10                    He said:  No.

11                    I said:  Why did he give me a fake name?

12                    He said:  That's the name I gave the police

13       officers because I didn't want them to find out I had

14       a warrant on me.

15  BY MR. BERGER:

16  Q.   Going back to Exhibit 17, were you present when any

17       search of Mr. Monson's car was completed?

18  A.   No, sir.

19  Q.   I'd like you to look at Exhibit 16, the Investigator's

20       Report.  You see bullet point, or not bullet point,

21       but number 1, a representative?

22  A.   Yes.

23  Q.   Read that whole statement to yourself, and let me know

24       when you're done.

25                    MR. SMITH:  16, is that Exhibit 16?
```

```
 1                    MR. BERGER:  Correct.

 2                    THE WITNESS:  I'm done.

 3   BY MR. BERGER:

 4   Q.   And at the time you signed this document, was there

 5        anything about that that you believed was untrue?

 6   A.   No.

 7   Q.   To the best of your knowledge, at that time was that

 8        statement true?

 9   A.   Yes.

10   Q.   And why do you say that?

11   A.   Well, at the particular time when I have a

12        representative of the Wayne County Medical Examiner,

13        we don't know who the case is assigned until the next

14        morning or the day after, whatever, which Medical

15        Examiner is going to do the autopsy, and once the

16        representative comes out from the Wayne County Medical

17        Examiner's office, whoever went out to the scene and

18        reviewed the body and signed it that it had multiple

19        stab wounds to the body.  A representative has to come

20        out from the Medical Examiner's office, let me put it,

21        an investigator from the Medical Examiner's office

22        comes out to the homicide scene.

23   Q.   To the best of your information at that time, she had

24        died of multiple stab wounds?

25   A.   That's correct.
```

```
 1   Q.   Okay.  Look at the next page of that document,

 2        number 3, and when you read that for me, let me know

 3        when you're done.

 4   A.   I'm done.

 5   Q.   Okay.  Is there anything about that statement that was

 6        untrue at the time that this document was completed?

 7   A.   No.

 8   Q.   Why do you say that?

 9   A.   Because this is the information that Ms. Woods had

10        gave a written statement on.  I was going from the

11        written statement that she had gave the officer,

12        investigator.

13   Q.   At that time did you have any indication or any other

14        information that would have informed you that she

15        would change her testimony at the time of trial?

16   A.   No.

17   Q.   And if you can look at number 2 for me, please, on the

18        first page and read that, and let me know when you're

19        done.

20   A.   Okay.  There's two 2s.

21   Q.   I'm sorry, the second 2.

22   A.   Talking about Yolanda Brown?

23   Q.   No.  Paris Thompson.  I'm sorry.

24   A.   I'm done.

25   Q.   At the time that this document was completed, is there
```

SIMON, BARBARA
06/03/2019                                                                Page 166

```
 1        anything that, to your knowledge, that was untruthful
 2        about what was stated in the document?
 3   A.   No.
 4   Q.   Would you have had any reason to believe that Paris
 5        Thompson provided you a fake name?
 6   A.   No.
 7   Q.   Would you have had any indication that she would have
 8        provided a different name by the time trial came
 9        around?
10   A.   No.
11   Q.   Can you look at --
12                   I wrote 13 on this.  Is that right?
13                   MS. WARD:  What is it?
14                   MR. BERGER:  It's the Affidavit for the
15        blood draw.  Is that 13?  Okay.
16   BY MR. BERGER:
17   Q.   So if you can look for 13.
18   A.   13, okay, I have it.
19   Q.   Okay.  And this document is dated May 13th, 1996?
20   A.   Yes.
21   Q.   And Mr. Monson's trial would have occurred after this
22        document was signed by you?
23   A.   I don't remember when his trial was.
24   Q.   Okay.  In any event, what is the purpose of this
25        document?
```

SIMON, BARBARA
06/03/2019                                                                    Page 167

```
 1   A.   To draw blood, for the Wayne County Sheriff's office

 2        nurse to draw blood from Mr. Monson.

 3   Q.   Had Mr. Monson already been arrested by the time that

 4        this document was completed?

 5   A.   Yes.

 6   Q.   Had Mr. Monson already been charged by the time this

 7        document was completed?

 8   A.   Yes.

 9   Q.   Would this document have any relation to any decisions

10        as to why Mr. Monson was charged with any crimes?

11               MR. SMITH:  Object to form and foundation.

12               THE WITNESS:  Can you repeat, please?

13   BY MR. BERGER:

14   Q.   Would this document have any relation as to why

15        Mr. Monson was charged with any crimes that had

16        already previously been charged with?

17   A.   Yes.

18   Q.   What do you mean?

19   A.   Why we wanted his blood, is that what you're asking

20        me?

21   Q.   No, no, no.

22   A.   Okay.  I'm sorry.

23   Q.   Could this document have affected whether Mr. Monson

24        had already been charged with crimes, specifically

25        Christina Brown's murder?
```

```
 1   A.   No.

 2   Q.   And why is that?

 3   A.   Because this was blood from Mr. Monson.  This was

 4        several months later.

 5             MR. BERGER:  I don't have any further

 6        questions at this time.

 7             MR. SMITH:  Okay.  I do have a few.

 8                  RE-EXAMINATION

 9   BY MR. SMITH:

10   Q.   First of all, let me just get clear on your testimony.

11        Mr. Monson was the person who called EMS; you knew

12        that, correct?

13             MR. BERGER:  Objection; foundation.

14   BY MR. SMITH:

15   Q.   Did you know that?

16   A.   I don't know.  He said something like he called.  I

17        don't know who placed the call to 911.

18   Q.   Okay.  Let's assume that he was one of the persons

19        that called EMS and asked others to call EMS.  Let's

20        assume that he not only put a blanket over the young

21        lady but was trying to give her CPR.  The police

22        officers that we've been talking about, Vincent

23        Crockett and Jerome Wilson, took him down to 1300 for

24        his efforts where he was interrogated by you for

25        appears four hours.  After that time, you take a
```

SIMON, BARBARA
06/03/2019                                                    Page 169

```
 1      statement in your handwriting, and that's the
 2      statement that you were reading from, the things that
 3      you wrote down, correct?
 4   A.   That's correct.
 5              MR. BERGER:  Well, objection; assumes facts
 6      and form generally.
 7   BY MR. SMITH:
 8   Q.   You did write these things down, did you not?
 9   A.   Yes, I did.
10   Q.   Okay.  And, in fact, this is not a question-and-answer
11      format.  Your first question, What can you tell me
12      about the stabbing of Christina, is a two-page, is
13      followed by a two-page narrative that you wrote out;
14      isn't that right?
15              MR. BERGER:  Objection; mischaracterizes
16      the evidence.
17              THE WITNESS:  It's followed by the answer
18      that Mr. Monson gave me, yes, sir, and I wrote it out,
19      yes.
20   BY MR. SMITH:
21   Q.   So were you writing in shorthand while he spoke these
22      two pages?
23   A.   No, sir, I don't do shorthand.
24   Q.   Okay.  So it's in your handwriting, and you wrote it
25      out as he talked?
```

SIMON, BARBARA
06/03/2019                                                                 Page 170

```
 1   A.   That's correct.

 2   Q.   That's your testimony?

 3   A.   Uh-huh.

 4   Q.   Now you didn't charge Mr. Monson with CSC-1, did you?

 5              MR. BERGER:  Objection; mischaracterizes

 6        the witness.

 7   BY MR. SMITH:

 8   Q.   Neither you, nor anyone in the Homicide section,

 9        charged Mr. Monson with CSC-1?

10              MR. BERGER:  Object, same objection.

11   BY MR. SMITH:

12   Q.   Did you?

13   A.   We can't charge people, sir.  The prosecutor makes the

14        charges.

15   Q.   You, when you arrest, you arrest based on a charge,

16        correct?

17              MR. BERGER:  Mischaracterizes the law.

18              THE WITNESS:  Yes.

19   BY MR. SMITH:

20   Q.   And you have to make certain assumptions about whether

21        the law was violated to even make a recommendation to

22        the prosecutor, correct?

23   A.   Correct.

24   Q.   And you did not make a recommendation to the

25        prosecutor that he be charged with CSC-1, did you?
```

SIMON, BARBARA
06/03/2019                                                                    Page 171

```
 1   A.   I don't remember, sir.

 2   Q.   You didn't make a recommendation to the prosecutor

 3        that he be charged with selling drugs, did you?

 4   A.   I don't recall.

 5   Q.   Were any drugs or any other contraband found in the

 6        apartment where Vincent Crockett and Jerome Wilson

 7        went?

 8               MR. BERGER:  Objection; foundation.

 9               THE WITNESS:  I don't know, sir.  I wasn't

10        there.

11   BY MR. SMITH:

12   Q.   But you were charged with gathering up all of the

13        evidence, you were the officer in charge; isn't that

14        right?  That's what you told us earlier today.

15               MR. BERGER:  Objection; argumentative.

16               THE WITNESS:  Yes, but you asked me was any

17        -- I don't know what was found in the apartment.  I

18        did not go to the scene.

19   BY MR. SMITH:

20   Q.   You didn't go to the scene but you gathered the

21        evidence.  Did you read the technician's report?

22   A.   Yes.

23               MR. BERGER:  Objection; compound.

24   BY MR. SMITH:

25   Q.   Did you read the report of the evidence technician?
```

SIMON, BARBARA
06/03/2019                                                                    Page 172

```
 1   A.   The evidence they collected, yes.

 2   Q.   Did they collect any drugs or contraband from the

 3        apartment?

 4   A.   Not as I know of.

 5   Q.   Now, Mr. Monson told you that the warrant was for

 6        traffic tickets, did he not?

 7   A.   No, sir.  He just said he had a warrant out on him.

 8   Q.   That's what you wrote.  My question was different.

 9        Mr. Monson told you that the warrant was for traffic

10        tickets, did he not?

11   A.   I don't remember that, sir.

12   Q.   So what you're telling us is what you wrote down?

13   A.   I wrote down what he told me.

14   Q.   He told you where he was that night, didn't he?

15   A.   Which night are you talking about, sir?

16   Q.   The night of the murder of Christina Brown.

17   A.   I don't remember him saying where he was, sir.

18   Q.   You don't remember because you didn't write it down,

19        did you?

20   A.   I wrote down what he told me again, sir.

21   Q.   You told me earlier that one of the things you would

22        have asked was where were you?

23   A.   Yes.

24   Q.   But you didn't write that down?

25   A.   He didn't tell me, sir.
```

```
 1   Q.   Did you ask the question?

 2   A.   I don't remember.

 3   Q.   You told us earlier you did ask the question or would

 4        have asked the question, but one thing we do know is

 5        that you didn't write it down?

 6   A.   I wrote down what he told me.

 7                  MR. BERGER:  Objection -- Barb, hold on.

 8                  THE WITNESS:  I'm sorry.

 9                  MR. BERGER:  Objection; argumentative,

10        assumes facts not in evidence, mischaracterizes prior

11        testimony.

12                  Now you can go ahead.

13   BY MR. SMITH:

14   Q.   Now, you've also testified that you were not present

15        when the search of the car was completed.  What does

16        that have to do with anything?  You were the officer

17        in charge.  Your job was to gather the evidence --

18   A.   Excuse me, sir.

19                  MR. BERGER:  Objection; argumentative and

20        you can keep your tone of voice down.

21                  THE WITNESS:  Yeah, please don't holler at

22        me, please, okay?  Thank you.

23   BY MR. SMITH:

24   Q.   Let me see if we can come at this more calmly.

25   A.   I'm calm.  Just do not holler at me, sir, please.
```

1        That's all I ask you.

2    Q.   I didn't realize my voice was rising.

3    A.   Okay.

4    Q.   And I apologize.

5    A.   I accept it.  Okay.

6    Q.   But you were the officer in charge of this case, were

7        you not?

8    A.   That's correct.

9    Q.   And you weren't present when all of the other

10        statements were taken, were you?

11   A.   What statements are you talking -- I was --

12   Q.   Statements of witnesses.

13   A.   First of all, will you let me finish my answer?

14   Q.   You asked me a question.

15   A.   I was at homicide.  You asked me was I present when

16        all the statements were taken.  What statements?  Are

17        you talking the people that were there?  I was at

18        Homicide for a certain amount of time, sir.

19   Q.   My point is this, because you already testified to

20        this.  Your job was to gather the evidence from all

21        sources.  You were to gather the evidence that were

22        statements taken by other officers.  You were to

23        gather the evidence of laboratory reports.  Do you

24        remember that testimony; was that your job?

25   A.   My job was the case was to be put together, evidence

```
 1        was all together when I got it, some of it when it was

 2        assigned to me the next morning, yes, sir.

 3   Q.   And you were supposed to review the evidence so you

 4        could inform the prosecutor the nature of the case,

 5        correct?

 6   A.   Yes.

 7   Q.   And other than what you wrote down in your statement,

 8        because that is your handwriting, correct?

 9             MR. BERGER:  I'm going to object as

10        compound and mischaracterizes the evidence.

11   BY MR. SMITH:

12   Q.   That is your handwriting in that statement?

13   A.   This one, yes, it is, sir, yes.

14   Q.   Now based -- well, let me say, other than what you

15        wrote down in that statement, there was no evidence of

16        any drugs in the apartment, was there?

17             MR. BERGER:  Objection; assumes facts not

18        in evidence.

19   BY MR. SMITH:

20   Q.   Can you agree with that?

21             MR. BERGER:  Objection; foundation.

22             THE WITNESS:  Oh, I'm sorry.

23             MR. BERGER:  Go on.

24             THE WITNESS:  I wasn't there, sir.  I don't

25        know.  I answered that.
```

SIMON, BARBARA
06/03/2019                                                          Page 176

```
 1   BY MR. SMITH:

 2   Q.   But you had evidence technicians that gathered all of

 3        the evidence from the apartment, correct?

 4   A.   Far as I know, there's no just attorney.  I don't know

 5        what was there.  I was not there, sir.

 6   Q.   Just as you were required to review the statements of

 7        witnesses, you were also required to review laboratory

 8        reports, were you not?

 9              MR. BERGER:  Objection; calls for a legal

10        conclusion.

11              THE WITNESS:  Yes.

12   BY MR. SMITH:

13   Q.   Okay.  And one laboratory report was the lab work that

14        was done on Mr. Monson's automobile, correct?

15   A.   The vehicle, yes, yes.

16   Q.   And that laboratory report showed that no blood was

17        found, correct?

18              MR. BERGER:  Foundation.

19              THE WITNESS:  If I remember, yes.

20   BY MR. SMITH:

21   Q.   Did you communicate that fact to the prosecutor?

22   A.   I don't remember, sir.  The prosecutor had a copy of

23        everything.  I don't remember.

24              MR. SMITH:  Okay.  Move to strike the last

25        comment, lack of foundation obviously.
```

SIMON, BARBARA
06/03/2019                                                              Page 177

```
 1   BY MR. SMITH:

 2   Q.   Now you would agree with me, would you not, that there

 3        is not much difference between ignoring evidence and

 4        lying about evidence; you would agree with that?

 5                  MR. BERGER:  Objection; argumentative.

 6                  THE WITNESS:  No, I'm not going to agree

 7        with you on that, sir.

 8   BY MR. SMITH:

 9   Q.   But the fact is you did ignore certain evidence,

10        correct?

11                  MR. BERGER:  Objection; mischaracterizes

12        her testimony.

13                  THE WITNESS:  Not as I can recall, no.

14   BY MR. SMITH:

15   Q.   Well, you ignored the fact that you got a statement

16        from someone that you, yourself, described as being a

17        drug user, and you didn't even bother to check to see

18        if her apartment faced the parking lot which she

19        claims she saw someone from; am I correct there?

20                  MR. BERGER:  Objection; compound,

21        argumentative.

22                  THE WITNESS:  I did not go out to the

23        scene, sir.

24   BY MR. SMITH:

25   Q.   Yeah, that's my point.
```

```
 1   A.   That's right.

 2   Q.   And you had no one else go out to the scene?

 3   A.   There was officers from Homicide at the scene, sir.

 4   Q.   Okay.  Did you bother asking anyone:  Is it possible

 5        that this young lady could have seen the parking lot

 6        from where her apartment faces?

 7   A.   I don't remember.

 8   Q.   You also ignored a lot of fingerprint evidence, did

 9        you not?

10             MR. BERGER:  Objection; argumentative,

11        mischaracterizes her testimony.

12             THE WITNESS:  Not as I can recall, sir.

13   BY MR. SMITH:

14   Q.   Did you tell the prosecutor that there was a

15        fingerprint on the murder weapon?

16   A.   Excuse me.

17             I'm sorry.

18   Q.   Are we all set?

19   A.   I'm fine.

20   Q.   Did you tell the prosecutor about the fingerprint on

21        the probable murder weapon that was not Mr. Lamarr's?

22             MR. BERGER:  Objection; assumes facts.

23             THE WITNESS:  I don't recall.

24   BY MR. SMITH:

25   Q.   If you want to take a look at the Investigator's
```

SIMON, BARBARA
06/03/2019                                                                Page 179

```
 1        Report, I believe you testified that you did not know
 2        what the prosecutor might charge when you did your
 3        report?
 4   A.   That's correct.
 5   Q.   Now there is a line on the report that actually says
 6        first degree premeditated murder homicide?  And this
 7        is Simon Exhibit 16.
 8   A.   That's correct.
 9   Q.   So you were aware of that, were you not?
10   A.   Once again, after the prosecutor reads everything,
11        they make the determination.  This was not on here
12        after he or she read it.  Thank you.
13   Q.   Now you claimed, when Mr. Berger was asking you
14        questions, you claimed that --
15   A.   What exhibit, sir?
16   Q.   This is Exhibit 13, your Affidavit.
17             You claimed after Mr. Berger's questioning
18        that none of this had anything to do with the charges
19        that were pending against Lamarr Monson, that he had
20        already been charged.  He had not been convicted, had
21        he?
22             MR. BERGER:  Objection; mischaracterizes
23        prior testimony.
24             THE WITNESS:  I don't remember, sir.
25   BY MR. SMITH:
```

```
 1   Q.   Well, I can represent to you that the date of his

 2        conviction was March the 7th of 1997.

 3   A.   Okay.

 4   Q.   This Affidavit is May 13th of 1996.

 5   A.   Okay.

 6   Q.   Do you see that on the document?

 7   A.   Yes, I do.

 8   Q.   Okay.  So you were still in the process of prosecuting

 9        Mr. Monson when you signed this false Affidavit, were

10        you not?

11             MR. BERGER:  Objection; mischaracterizes

12        prior testimony, mischaracterizes the evidence.

13             THE WITNESS:  You say it's false, sir.  I'm

14        not saying it's false.  That's your words.

15   BY MR. SMITH:

16   Q.   Okay.  I thought we had agreed that you never took a

17        confession from Mr. Monson?

18             MR. BERGER:  That mischaracterizes

19        testimony and the evidence.

20   BY MR. SMITH:

21   Q.   Did you ever take a confession from him; did you ever

22        take a statement where he agreed that he had somehow

23        hurt Christina Brown?

24   A.   I took a statement from Mr. Monson on -- this is the

25        only statement I took from Mr. Monson.  Any other
```

SIMON, BARBARA
06/03/2019                                                                                   Page 181

```
 1      statement I don't know anything about.

 2  Q.  The statement that you took was not a confession, was

 3      it?

 4  A.  The statement I took was a statement from him.  No.

 5  Q.  And in the statement that you took, he never said that

 6      he had an altercation with the Defendant and stabbed

 7      her, did he?

 8              MR. BERGER:  Objection; asked and answered.

 9              THE WITNESS:  He didn't say he stabbed her,

10      but he at one time said he hit her.

11  BY MR. SMITH:

12  Q.  He said he hit her?

13  A.  If I'm not mistaken.

14  Q.  Well, you need to find that because I believe you're

15      onto something.

16  A.  Excuse me.  Let me look.  Thank you.

17              I'm sorry, sir, he said he -- I said has he

18      ever threatened Crystal.

19              He said:  Yes, I threatened to hit her.

20              That's what he said, sir, threatened to hit

21      her.

22  Q.  That, too, was in your handwriting?

23  A.  That's correct.

24  Q.  Now would you agree with me that, generally speaking,

25      if a person will lie under oath in one context,
```

```
 1        they'll lie under oath in another context?

 2                  MR. BERGER:  Objection; argumentative.

 3   BY MR. SMITH:

 4   Q.   Would you agree with me?

 5   A.   No, I would not agree with you.

 6   Q.   Okay.  So your position would be that, well, even if

 7        you lied on your Affidavit which was under oath, that

 8        doesn't necessarily mean you're lying here today,

 9        correct?

10                  MR. BERGER:  Objection; argumentative and

11        assumes facts.

12                  THE WITNESS:  I wouldn't lie, sir, and I

13        don't appreciate you saying I lied.

14   BY MR. SMITH:

15   Q.   Well, ma'am, I'm just exploring the facts.

16   A.   And I'm just telling you I don't appreciate you saying

17        I'm lying.

18   Q.   Well, I don't know how you characterize this Affidavit

19        that you wrote, but I can say the things that you said

20        in this sworn Affidavit are simply not true.

21                  MR. BERGER:  I'm going to object as it's

22        argumentative, and that's an improper way to treat my

23        client.

24                  MR. SMITH:  Okay.  Okay.

25   BY MR. SMITH:
```

```
 1   Q.   Let me just ask this question:  If a jury finds that

 2        you lied on your Affidavit, do you think it would at

 3        least be reasonable for them to consider that you may

 4        be lying under oath in other situations?

 5                    MR. BERGER:  I'm going to object as that's

 6        argumentative and that's improper.

 7                    THE WITNESS:  I'm not going to sit here and

 8        let you call me a liar.  I don't appreciate it.  So,

 9        don't call me a liar again.  I'm done.

10   BY MR. SMITH:

11   Q.   Ma'am --

12   A.   Sir, no.  I was speaking.  Now I'm respecting you, and

13        you will respect me.  Do not sit up here and call me a

14        liar.

15   Q.   I have respected you throughout this deposition.

16   A.   And I have respected you, and I have not called you a

17        liar, and I'm not going to sit here and let you call

18        me a liar.

19   Q.   And I am not going to call you a liar.

20   A.   I'm done.

21   Q.   Are you terminating the deposition?

22   A.   No, I'm not.  I'm done.  You're calling me a liar.

23                    MR. BERGER:  Hold on.  Hold on.  We are not

24        terminating the deposition, but is there a question

25        pending?
```

```
 1              MR. SMITH:  Your client has basically
 2    accused me of calling her a liar.  Now my job here is
 3    to explore the facts.  My job here is to look at
 4    evidence.  I'm not personal.  I don't know you,
 5    Ms. Simon, but I do know that I have a client to
 6    represent, and I do know that when I see things like
 7    what I see in this Affidavit that are not true, I do
 8    have an obligation as a lawyer to speak on those
 9    things, and that's all I've done.
10              MR. BERGER:  Hold --
11              THE WITNESS:  And I can respect that, sir.
12    I can respect that.
13              MR. BERGER:  Barb, Barb, hold on.  Hold on.
14              Mr. Smith, do you have a question pending?
15              MR. SMITH:  I don't have one pending.
16              MR. BERGER:  Okay.  Let's take a minute
17    break, and let's all calm down.  Can we agree with
18    that?
19              MR. SMITH:  We can agree with that, yes.
20              MR. BERGER:  Okay.
21              VIDEO TECHNICIAN:  We're going off the
22    record.  The time is 5:14 p.m.  We're off the record.
23              (Recess taken at 5:15 p.m.)
24              (Mr. Seward entered the deposition room.)
25              (Back on the record at 5:25 p.m.)
```

```
 1                    VIDEO TECHNICIAN:  We are now back on the

 2          record.  The time is 5:25 p.m.

 3                    MR. SMITH:  Okay.  You've had a moment to

 4          cool down I hope, at least I have, and I do have a few

 5          more questions to ask you, Ms. Simon, but they are on

 6          the issue of credibility.

 7   BY MR. SMITH:

 8   Q.     I want to direct your attention to Exhibit 3, which is

 9          Vincent Crockett's PCR.  This is the document which I

10          think you indicated that you actually had reviewed as

11          part of your responsibility as the officer in charge

12          of this murder investigation.

13                    At the bottom it says:  Writer talked to

14          witness number 3, who is Mark Mason, who stated he put

15          a blanket on complainant, and he knows her from the

16          neighborhood.

17                    Now I want to direct your attention to

18          Vincent's sworn testimony in court, which is

19          Exhibit 7, page 138.  In there he states as follows:

20                    Now, also you talked to Mark Mason there,

21          did you not?

22                    Answer:  Yes, I did.

23                    Question:  And at that time he told you he

24          put a blanket over the young lady and that he knew her

25          from the neighborhood; isn't that right?
```

SIMON, BARBARA
06/03/2019                                                                      Page 186

```
 1                    Answer:  That's right.

 2                    Question:  He didn't deny knowing her, did

 3       he?

 4                    Answer:  No, he didn't.

 5                    Now I'd like to direct your attention to

 6       your own testimony, which is Exhibit 5, and what you

 7       say there is --

 8   A.  What page, sir?

 9   Q.  92, line 6, line 7 really.  What you say there is:

10                    Mr. Monson told him that he did not know

11       the complainant.  He had seen her in the neighborhood.

12   A.  Which line are you on, sir?

13   Q.  I'm on line 7 and 8 and 9.  That was your sworn

14       testimony, right?

15   A.  That's correct.

16                    MR. SMITH:  That's all I have.  Thank you.

17                    RE-EXAMINATION

18   BY MR. BERGER:

19   Q.  Ms. Simon, could you grab Exhibit 13?

20   A.  13 you said?

21   Q.  13.  Here you are.

22   A.  Okay.

23   Q.  In that statement is there anything that's untruthful?

24   A.  Mr. Monson, he confessed to -- he confessed not to me

25       but to Sergeant Charles Braxton, I believe.
```

SIMON, BARBARA
06/03/2019                                                                    Page 187

```
 1   Q.   Okay.  Now why would that statement be incorrect?

 2   A.   Because I took a statement from him that he gave a

 3        confession to another officer.

 4   Q.   Would you have put that in there purposely as an

 5        untruthful statement?

 6                  MR. SMITH:  I object to the form of the

 7        question.

 8                  THE WITNESS:  I'm sorry, I couldn't hear

 9        you.

10   BY MR. BERGER:

11   Q.   Would you have put that statement in there

12        purposefully as an untruthful statement?

13   A.   I would not have, no.

14                  MR. SMITH:  Object to the form of the

15        question.

16   BY MR. BERGER:

17   Q.   Would that have been an honest mistake?

18   A.   Yes.

19                  MR. SMITH:  Object to the form of the

20        question.

21   BY MR. BERGER:

22   Q.   Now can you grab, I don't have the exhibit,

23        Mr. Monson's statement to you.

24                  Now you've looked through that whole

25        statement several times through this deposition?
```

```
 1   A.   That's correct.

 2   Q.   Is everything on that statement in your handwriting?

 3   A.   Everything but the signature, sir.

 4   Q.   And whose handwriting are the signatures?

 5   A.   Mr. Monson.

 6   Q.   Was he given the opportunity to read the statement?

 7   A.   Yes.

 8   Q.   And after he was given the opportunity to read each

 9        page of the statement, did he put his signatures?

10   A.   His signatures appeared on all pages but one.

11   Q.   And which page was that?

12   A.   Five.

13                  MR. BERGER:  Okay.  No further questions

14        right now.

15                    FURTHER RE-EXAMINATION

16   BY MR. SMITH:

17   Q.   Could you go back to Exhibit 13, please.

18                  Now, first of all, do you recall testifying

19        earlier today that you gave testimony at the

20        preliminary hearing at the same time or on the same

21        day that Dr. Harkey gave his testimony; do you recall

22        that?

23   A.   Yes.

24   Q.   And when I asked you if you stayed to hear his

25        testimony, you said probably so; do you recall that?
```

```
 1                    MR. BERGER:  Objection; mischaracterizes
 2        the prior testimony.
 3                    THE WITNESS:  I think I said probably not,
 4        sir.
 5   BY MR. SMITH:
 6   Q.   Well, I think the record will speak for itself.
 7   A.   Okay.
 8   Q.   We did go over his testimony, correct?
 9   A.   Yes.
10   Q.   And his testimony was in February of 1996, correct;
11        that was the date of the preliminary examination,
12        February 2nd, 1996?
13   A.   I have mine.  I don't know if I have the doctor's.
14                    Yes, I have it, yes.
15   Q.   Okay.  And earlier today, we went over the excerpts
16        from that deposition in detail, did we not?
17   A.   Yes.
18   Q.   And the doctor testified that in his opinion, the
19        cause of death in this case was due to her being
20        bludgeoned by a blunt force object?
21   A.   That's correct.
22   Q.   And he also testified that in his opinion, the object
23        found at the crime scene, which was a toilet tank top,
24        was consistent with what had caused her injury; do you
25        recall that?
```

```
 1                    And I believe you will find that on page
 2        37.
 3   A.   Which line are you going by?
 4   Q.   Well, it's really the very last line, but you have to
 5        read the whole paragraph to get the gist of it.
 6   A.   You mean the last answer at the bottom, sir; is that
 7        what you're asking me?
 8   Q.   Yes, and the entire paragraph, and the gist of that is
 9        that the fatal injuries that she suffered was
10        consistent with being struck by an object such as that
11        toilet tank top?
12                    MR. BERGER:  Objection; mischaracterizes
13        the evidence.
14                    THE WITNESS:  Yes.
15   BY MR. SMITH:
16   Q.   And if you'll pick up Exhibit 13, your Affidavit or
17        sworn statement, you state under oath:  An autopsy
18        performed on said body revealed that the cause of
19        death was due to multiple stab wounds.
20                    Was that your testimony?
21   A.   Yes, that's what it says, yes.
22   Q.   And that just happened to be consistent with the
23        confession that was taken a day after you took your
24        statement from Mr. Lamarr Monson.  I believe you have
25        had a -- you're able to recall that that was
```

```
 1        Mr. Braxton who took that confession the next day?

 2                    MR. BERGER:  Objection; compound, assumes

 3        facts.

 4                    THE WITNESS:  Yes.

 5                    MR. BERGER:  Foundation.

 6                    THE WITNESS:  Oh, I'm sorry.

 7                    MR. BERGER:  It's okay.

 8                    MR. SMITH:  Those are all the questions I

 9        have.  Thank you.

10                    FURTHER RE-EXAMINATION

11   BY MR. BERGER:

12   Q.   Ms. Simon, that statement that you were just talking

13        or that sentence that you were just speaking with

14        Mr. Smith about --

15   A.   Yes.

16   Q.   -- if that's inaccurate, would that be because of an

17        honest mistake?

18   A.   Yes.

19                    MR. BERGER:  That's it.

20                    FURTHER RE-EXAMINATION

21   BY MR. SMITH:

22   Q.   Now as the officer in charge, you testified earlier

23        that part of your duty was to talk to the Medical

24        Examiner to interface with them.  The autopsy was

25        completed on February the 2nd, 1996, and four months
```

SIMON, BARBARA
06/03/2019                                                          Page 192

```
1        later, you're swearing under oath that the cause of

2        death was multiple stab wounds, and you say that was

3        an honest mistake?

4    A.  That's correct.

5                    MR. BERGER:  Objection; argumentative,

6        mischaracterizes prior testimony.

7                    MR. SMITH:  Thank you.  No other questions.

8                    MR. BERGER:  All set.

9                    VIDEO TECHNICIAN:  This concludes the

10       videotaped deposition.  We are now going off the

11       record at 5:38 p.m.  We're off the record.

12                    (The deposition was concluded at 5:38 p.m.

13            Signature of the witness was not requested by

14            counsel for the respective parties hereto.)

15

16

17

18

19

20

21

22

23

24

25
```

SIMON, BARBARA
06/03/2019                                                                Page 193

```
 1                    CERTIFICATE OF NOTARY

 2   STATE OF MICHIGAN )

 3                     ) SS

 4   COUNTY OF MACOMB  )

 5

 6              I, LEZLIE A. SETCHELL, certify that this

 7        deposition was taken before me on the date

 8        hereinbefore set forth; that the foregoing questions

 9        and answers were recorded by me stenographically and

10        reduced to computer transcription; that this is a

11        true, full and correct transcript of my stenographic

12        notes so taken; and that I am not related to, nor of

13        counsel to, either party nor interested in the event

14        of this cause.

15

16

17

18

19

20

21

22             LEZLIE A. SETCHELL, CSR-2404

23             Notary Public,

24             Macomb County, Michigan.

25        My Commission expires: April 17, 2024
```

SIMON, BARBARA
06/03/2019

Index: 1..4:40

---
**1**
---

**1** 18:17,22 23:16 47:7 51:5 87:7,8 93:5 94:14 103:17 134:2,6 155:9 163:21

**1-20-1996** 80:18

**10** 87:25 89:19, 25 106:8

**105** 69:25

**10:33** 18:20

**10:37** 21:12

**10:46** 27:7

**10:52** 31:5

**11** 87:25 96:18, 23 101:13 103:13,25 106:8 114:6 146:11

**111** 69:12

**114** 70:11,12

**115** 70:12 91:11

**117** 69:13

**11:07** 39:16

**11:16** 44:25

**11:49** 67:9

**11:50** 67:10

**11:58** 71:22,23

**12** 91:6 105:4,10 106:21,24 109:6 110:1 158:22 159:24 160:23

**12-year-old** 159:1,2,6 160:4

**124** 73:3

**127** 73:16

**128** 73:21

**12:12** 72:1

**12:13** 71:24

**12:14** 72:13

**12:26** 80:9

**12:30** 121:21

**12:45** 89:23 121:21

**12:53** 95:4,5

**13** 33:10 45:13 90:11 139:6,13, 18 141:10 160:24 166:12,15,17,18 179:16 186:19, 20,21 188:17 190:16

**1300** 151:9 168:23

**133** 74:16

**138** 75:4 185:19

**139** 75:15

**13th** 141:22 166:19 180:4

**14** 113:2,6

**142** 75:23

**15** 49:20 70:20 75:16 108:7,8 117:25 118:6,11, 19,20,21 120:13 123:19

**15-A** 123:8,14

**153** 77:2

**16** 68:15,16 73:4 133:10,15 137:13 139:11 140:3,4,5 163:19,25 179:7

**17** 73:4 91:7 129:18 130:2 146:1 160:25 161:13 163:16

**18** 12:17 75:23 148:11,15

**1973** 115:2

**1977** 12:17 13:5

**1996** 9:9 14:18 15:1 20:2 21:22 22:17,19 25:13

31:4 32:22,23 33:7 34:13 35:20 41:10 42:9,12 43:17 44:5,18 45:21 47:25 89:8, 21 93:21 97:5,13 98:21 105:14,25 106:2 107:22 115:16 120:8 128:7,13,15,22 140:21 141:22 151:9 156:15 161:21 166:19 180:4 189:10,12 191:25

**1997** 8:13 44:24 45:7 60:23 72:12, 19 123:10,17 140:21 180:2

**1:00** 94:9

**1:53** 95:8

**1:54** 95:6,19,20

---
**2**
---

**2** 19:16 21:10,14 23:23 25:25 27:9, 11 28:15 31:4 35:18 47:7 51:5 65:22,23 87:8 89:21 92:23 103:13 106:9,10 119:21 131:8 136:9 165:17,21

**2's** 63:20

**20** 14:6

**2000** 128:12

**2010** 13:5

**2096** 90:4

**20th** 9:9 20:2 32:23,24 33:1 35:19 45:21 120:8 125:6 135:6 151:8 153:17

**21** 12:11 90:16

**21st** 32:21 90:20,23 128:7,

12,22 129:5 134:20 135:3

**22** 55:14

**22nd** 135:13,24

**23** 50:17 91:12

**24** 70:12 91:25

**242489** 106:15, 18 107:7

**242490** 101:19

**242491** 101:23 102:12 103:17 106:6,11

**248501** 131:10

**24th** 12:13 105:14,25 106:1

**25** 92:6

**25th** 106:2

**27-73** 114:7

**2752** 20:7 21:20 81:2 97:2 113:13

**2790** 26:1,13,15, 22 27:2

**27th** 115:1

**2:03** 95:21,23

**2:05** 96:20

**2:10** 35:25 36:2

**2:19** 105:7

**2:33** 113:4

**2:42** 118:3

**2:51** 123:11

**2nd** 33:7 34:13 42:9 90:4 93:21 189:12 191:25

**2s** 165:20

---
**3**
---

**3** 27:5,12 32:17 35:14,19 51:5 53:7 56:6 69:19 87:8 119:21 123:10 136:14

165:2 185:8,14

**3-15** 115:22

**3-9-15** 113:14 115:11

**30-year** 88:16

**34** 45:12 69:6

**35** 46:3

**36th** 30:15

**37** 92:20 190:2

**39** 49:5

**3:00** 32:17,18,21 33:1 35:17,23,24 36:4 120:24

**3:02** 129:12,13

**3:17** 129:16

**3:18** 129:14,20

**3:25** 37:1 121:1 133:12

**3:35** 139:16

**3:46** 144:17,18

**3:55** 144:19,21

**3rd** 123:16

---
**4**
---

**4** 19:8,16 31:1,7,9 36:19,21 41:12 44:24 72:12

**41** 49:20

**42** 52:8

**43** 69:7

**45** 94:22 121:17

**46** 55:2

**4:02** 148:13

**4:05** 80:18

**4:06** 151:3

**4:15** 155:2,3

**4:27** 155:4,6

**4:40** 87:14,18

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

SIMON, BARBARA
06/03/2019

Index: 4th..apartment

**4th** 45:7 60:22 72:19

---

**5**

**5** 44:22 45:2 69:25 87:22 186:6

**504561** 106:14

**5:14** 184:22

**5:15** 184:23

**5:25** 184:25 185:2

**5:38** 192:11,12

---

**6**

**6** 39:14,18,22 40:1 52:8 186:9

**60** 33:9

**63** 36:19,24

**65** 41:11

---

**7**

**7** 41:13 72:10,15 77:2 97:3 185:19 186:9,13

**75** 69:12

**7:00** 136:16

**7:30** 119:18 121:12 125:6

**7:45** 37:2 120:7 151:9

**7th** 180:2

---

**8**

**8** 67:15 68:4 80:7, 11 106:5 157:3 186:13

**86** 56:5

**89** 59:10 107:2

**8:00** 157:4

---

**9**

**9** 90:11 91:2 137:2,13,14 150:25 151:6 186:13

**90** 59:11 65:5 106:25

**91** 67:15 68:10, 17 106:25

**911** 85:20 122:15 168:17

**92** 186:9

**95** 123:18

**96** 58:11,15,17

**96-32** 105:5

**97** 58:13,14,15, 18

---

**A**

**a.m.** 18:20 21:12 27:7 31:5 32:19 39:16 44:25 67:9, 10 71:22,23 87:14 119:18 121:12 136:16

**A.O.W.** 39:15 40:4,6

**A7** 21:20

**abandoned** 60:5,7

**ability** 122:7

**able** 9:11 74:17 76:8 143:21 151:21 190:25

**absence** 112:12 133:4 146:5

**academy** 12:22,24 13:1 14:7 15:23

**accept** 174:5

**access** 104:24

**accurate** 31:17 34:11 37:20 42:7 46:15 53:18 97:8 101:16 105:20 126:6 131:14,21, 24 137:7,14,17

**accurately** 37:18 45:25 56:14 60:21 71:7, 9 121:22

**accused** 140:24 184:2

**acquiring** 60:15 64:25 65:13

**actual** 26:15

**addition** 8:24

**additional** 14:11

**address** 81:1

**adjudications** 40:9

**admitted** 81:21

**adult** 24:6 27:23 40:9

**advise** 20:21

**advised** 20:24

**affect** 80:4

**Affiant** 141:12, 14,16,20 142:5,9 143:6

**Affidavit** 141:13,24,25 143:5 166:14 179:16 180:4,9 182:7,18,20 183:2 184:7 190:16

**afternoon** 33:1 87:23 95:10, 11,25 96:1

**age** 12:9 91:6 160:23

**Agent** 13:16

**agents** 46:10

**ago** 10:2,3,19 11:13 70:2 159:5

**agree** 14:18 18:13 24:9 27:25 42:1 89:8 111:23 112:3 151:20 175:20 177:2,4,6 181:24 182:4,5 184:17,19

**agreed** 180:16, 22

**agreeing** 156:6

**agreement** 156:2,5

**ahead** 39:11 43:4 64:17 84:13 126:11 159:11,23 173:12

**Akon** 162:7

**alive** 88:14

**alleged** 70:4 122:13 157:17

**allegedly** 74:23 154:3

**altercation** 143:7 152:20 181:6

**altogether** 8:21

**amend** 57:8

**Amended** 18:18

**amount** 132:8 174:18

**ample** 142:18

**analysis** 108:8 146:16

**answer** 9:15 14:24 32:5,8,12, 17,20 33:13,24 37:5,7,15 41:17, 23 42:2 45:22 46:6,12 49:9,12,

24 50:5,10 52:12, 14,18,22,25 53:6 54:19 55:5,9,17, 25 56:11 57:23 59:19,22,25 60:4, 13,18 62:19 68:9, 14,20 70:6,15,25 73:8,12,25 74:3, 9,12,19,21 75:3, 14,22 76:2,10,13, 19,22 77:1,6,8, 12,15 83:25 85:14 87:25 88:3 90:15,18 91:1,5, 16,18,24 92:11, 19 93:8,16 110:25 111:1 112:21 116:20 117:6 124:14,19, 21 125:2,4,11 148:6 152:24 155:19 158:9,16, 25 159:9 169:17 174:13 185:22 186:1,4 190:6

**answered** 22:12 24:24 25:5 41:22 50:15 57:24 65:3 71:16 109:19 111:7 132:25 158:16 162:25 175:25 181:8

**answering** 58:4 110:25

**answers** 8:25 45:14

**anxious** 25:18

**anybody** 56:7, 9 57:7 76:4 112:6 113:8

**anyway** 97:22

**apartment** 21:20 60:2 73:7 81:1 85:16,17,18, 22 86:6,9,14,17, 20 97:3 123:22 124:24 136:21 150:18 158:11,14 159:18 171:6,17 172:3 175:16 176:3 177:18

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

178:6

**apartments**
86:22

**apologize**
16:4 116:19
174:4

**apparently**
38:6 80:16,25
88:14 116:16
151:7

**appear** 27:25
34:11 42:7 53:18

**appeared** 91:5
188:10

**appears** 28:8
93:1,11 103:15
104:1 130:10
141:19 168:25

**appreciate**
116:11 182:13,16
183:8

**approach**
73:13

**approved**
140:8,11

**approximatel**
**y** 35:14 142:17
151:9

**area** 73:9

**areas** 38:9

**argumentativ**
**e** 57:11 64:15
66:16 111:24
126:9 135:9,15
136:6,25 138:5
142:21 143:2,24
154:13 171:15
173:9,19 177:5,
21 178:10 182:2,
10,22 183:6
192:5

**arm** 86:1

**arose** 9:7

**arrange** 31:23

**arrest** 14:19
15:16 16:8,10,11,

18 17:2,12,14,15,
19 18:3 35:22
36:10 42:11
138:21 158:12
160:5,9 170:15

**arrested** 18:9
32:11,15 35:14
36:14 38:12,18,
24 42:13 56:21
58:15 61:3,7,25
137:9,10,11,19,
21,22,25 138:16,
22,24 167:3

**arresting**
137:4,16

**arrests** 16:1
17:13,16

**arrived** 67:17
68:7 120:4 158:6

**arriving** 136:15

**aside** 83:13

**asked** 8:15 19:8
22:12 37:14 38:5
41:13 50:15 52:8
54:18 56:6 68:17
71:3,16 84:18,23
85:11,13 100:20
109:19 110:16
111:7 116:19
125:19 127:23
132:25 138:8,9
143:14 150:7
151:12,15 158:6,
13,18,20 159:3
162:24 168:19
171:16 172:22
173:4 174:14,15
181:8 188:24

**asking** 11:14
12:6 18:24 20:12
29:6 38:16,17,22
45:8 52:3 64:22
65:10 84:4
105:17 107:25
108:2 111:17
115:24 116:8
127:20,22 128:6
137:13 139:3
152:16 153:3
167:19 178:4
179:13 190:7

**assault** 9:7
20:9

**assaulted**
59:8

**assessment**
111:5 112:14

**assigned**
13:20 22:10,15,
25 23:19 62:4
63:4,8,21,22,24
65:20,22 66:1,2
156:14,15,17,21,
24 164:13 175:2

**assignments**
63:12

**Associate's**
13:2

**associated**
93:7

**assume** 12:3
15:25 19:11
25:17 82:3
102:25 108:24
114:15 115:10
121:7 147:1
152:16,22 156:8
168:18,20

**assumes** 9:13
20:10 25:21 28:4,
11 43:25 51:9
56:24 58:19
61:19 62:18 64:8,
15 67:3 79:4
80:21 81:13,25
82:7,16 83:10,20,
22 97:10 103:2
108:13 110:4
115:19 116:3
119:11 122:2,25
127:15 129:1
134:22 135:8,14,
23 136:7 142:21
149:14 150:9,22
152:11 153:8
169:5 173:10
175:17 178:22
182:11 191:2

**assuming**
47:8 109:22
150:4

**assumption**
16:2 53:4 82:12

**assumptions**
56:21 170:20

**attempt** 81:16
88:6 102:17

**attempted**
128:24

**attend** 30:19

**attention** 20:1
33:14 41:11
45:12 49:5 73:3
90:10 123:17
140:22 144:23
185:8,17 186:5

**attorney** 13:16
176:4

**attorneys** 12:3
18:24 19:10

**automatic**
23:2

**automobile**
130:16 176:14

**automobiles**
130:14

**autopsy** 47:1
52:25 90:13,14,
17 92:14 93:21
96:4 134:8,16,19
135:3,17 142:12,
16 164:15 190:17
191:24

**available** 12:4
45:10 135:12

**aware** 58:17
60:1 108:10
125:14 128:25
129:7 156:1
179:9

─────────
**B**
─────────

**baby** 23:11,15,
16 85:25

**back** 14:25 21:4,
6 35:8,16 36:19
37:9,11 38:5

41:7,10 44:18
50:17 54:5,9
58:11 60:14 61:9
64:21,24 65:13
67:10 68:16
69:11 70:1 71:24,
25 77:19 78:15
85:18 95:6,7,20,
21,22 101:2,12
106:1 107:22
109:4 121:20
129:14,15
139:24,25 140:4
144:19,20 146:10
153:15 155:4,5
157:13 163:16
184:25 185:1
188:17

**background**
12:25 81:22 82:4,
5,10,13,14

**bank** 109:17

**Barb** 43:1 57:22
173:7 184:13

**Barbara** 8:4
69:4 137:2
139:15 141:11

**based** 9:1 20:5
24:9 44:5 47:9
53:2 59:3 60:9
92:13 93:12 94:4,
21 109:25 118:11
123:21 131:4
148:4 170:15
175:14

**basically** 96:4
97:7 162:3 184:1

**basin** 104:3,5

**basing** 56:20,
21 61:8,10

**basis** 55:16

**bathroom**
57:15 73:12 86:2
101:17 106:18
107:8 121:13
146:12,16,22
147:1,10,12

**bear** 129:8

SIMON, BARBARA
06/03/2019

Index: Beaubien..call

**Beaubien** 151:9

**bed** 74:2

**beginning** 73:4 87:6 155:8

**begins** 84:14

**believe** 10:5,12 13:5 14:6,20 30:12 31:18 33:22 34:20 36:12 37:20 38:23 40:2 44:20 50:5 51:4 54:5 63:8 64:22 69:20 73:18 79:7 95:12 96:9 99:5 102:4 106:8 109:6 113:14 114:17 116:19 118:5 120:23,24 121:1 126:20,24 128:16 133:15,17 136:3 138:22 139:4 141:18 146:19 162:22 166:4 179:1 181:14 186:25 190:1,24

**believed** 164:5

**belong** 110:2, 15 111:21 115:15

**belonged** 101:6 111:4

**benefit** 19:9

**Bentley** 81:3,4, 17,20

**Berger** 9:13 14:22 15:4,10,18 16:3,5,13 17:5,9, 20 18:5,11 19:1, 4,13,15 20:10 21:15 22:6,12,17 23:7 24:12 25:21 26:5 27:11,14,17 28:3,11 29:24 31:8,11 33:21 34:19 36:15 38:14 39:1,19,21, 24 41:25 42:24 43:3,6,13,25 45:3,11 48:3,10,

13 49:1 50:15 51:9 52:2 54:1 56:24 57:10,22 58:1,3,19 61:18 62:18 63:16 64:7, 14 65:9 66:14 67:2,6,19,21,22, 25 68:24 69:21 71:3,16,20 72:7 78:2 79:4,13,16, 19,23 80:13,21 81:12,24 82:7,16, 22 83:2,9,20,23 84:2 85:2,4 87:1 88:9,19 89:15 90:1 94:10,13,18, 20,25 95:16 97:9, 15 98:3,17,25 99:17 100:10,15 101:4 102:2,19 103:2,9,18 106:21,23 107:1 108:13 109:1,19 110:4,10 111:7, 24 112:16,19,24 113:7 114:5,10, 20 115:4,19 116:3 117:1,14, 17 118:11,17,20, 22 119:11,25 120:9,18 121:2 122:2,24 125:21 126:8,11,25 127:15 129:1,21, 24 130:7,20,25 131:18,22 132:12,25 134:14,22 135:8, 14,22 136:6,25 138:1,4,17 139:1, 7,11,19,21 141:3 142:1,20 143:2, 24 144:7,12 145:14,21 146:1, 6 147:3,17,22 148:1,7 149:1,13 150:9,22 151:24 152:11,25 153:8 154:12,23 156:11,13 158:1 159:12,13 160:13 162:5,11,15,20 163:2,15 164:1,3 166:14,16 167:13 168:5,13 169:5,

15 170:5,10,17 171:8,15,23 173:7,9,19 175:9, 17,21,23 176:9, 18 177:5,11,20 178:10,22 179:13,22 180:11,18 181:8 182:2,10,21 183:5,23 184:10, 13,16,20 186:18 187:10,16,21 188:13 189:1 190:12 191:2,5,7, 11,19 192:5,8

**Berger's** 179:17

**best** 17:10 57:24 84:1 93:18 164:7, 23

**better** 145:8

**big** 102:25

**bind** 30:17

**birth** 12:12

**bit** 12:14 49:14 85:15 102:24 113:8

**black** 24:6 27:23

**blank** 86:23,24

**blanket** 75:9 168:20 185:15,24

**Bledsoe** 45:6

**blood** 57:16 86:2 93:9 104:2, 4,6,10,11,17 130:18,19 131:12 132:5,8 133:4,5 142:3 143:20 145:19 146:5 148:5 166:15 167:1,2,19 168:3 176:16

**blood-smeared** 104:2

**blouse** 86:3

**blow** 96:6 142:25 148:24

**bludgeoned** 189:20

**blunt** 91:22 93:14 189:20

**body** 32:4 52:19 53:3 73:11 91:8 110:22 134:9,17 142:12 164:18,19 190:18

**boss** 152:9 153:14

**Boston** 20:8 21:20 55:13 81:2 97:3 113:13 158:15

**bother** 177:17 178:4

**bottom** 59:10 65:5 68:10 84:21 101:13,21 105:24 140:5 185:13 190:6

**boxes** 23:24 102:7

**boyfriend** 33:17 34:17 56:2 77:23 81:20

**boyfriend's** 81:6

**boyfriend/girlfriend** 159:19,20

**brain** 91:19,20 92:17

**Braxton** 186:25 191:1

**break** 41:8 71:20 78:5 94:9, 13,15,21 96:2 144:11 154:20 184:17

**breathing** 86:1

**brief** 101:15

**briefly** 30:13 144:14

**bring** 17:24 19:8,21 25:8 154:10 155:14

**bringing** 19:7 28:20 61:15

**brought** 19:11 25:14 28:24 29:2, 4 32:13 34:21 37:25 41:6 51:2, 7,14 61:13 75:25 77:14 79:10

**Brown** 9:8 35:1 57:14 59:7 61:8 77:21 78:10,20 81:22 90:14 91:3 92:15 93:15 95:15 96:4 110:21 111:6 119:9 128:23 132:11 134:9 152:8,20 153:18, 25 155:13 165:22 172:16 180:23

**Brown's** 56:1 112:9 157:5,18 159:16 167:25

**brutal** 133:6

**building** 60:2, 5,7 81:1 85:17,22 86:20,22 121:15, 17 123:23 124:9 125:8 150:18

**bullet** 163:20

**bunch** 86:10

**bus** 87:7

**busy** 42:21 43:11

**buy** 86:12,14

---

**C**

**call** 20:6,13,15, 17 21:1,7 23:4 62:25 73:19 85:19,20 97:18 122:15 168:17,19

**MIdeps@uslegalsupport.com**
**Ann Arbor | Detroit | Flint | Jackson**

**U. S. LEGAL SUPPORT**
**Bingham Farms/Southfield | Grand Rapids**

**Phone: 888.644.8080**
**Lansing | Mt. Clemens | Saginaw | Troy**

SIMON, BARBARA
06/03/2019

183:8,9,13,17,19

**called** 24:24
32:8 38:10 73:18
97:20 136:2
168:11,16,19
183:16

**calling** 183:22
184:2

**calls** 14:22
15:18 16:13
17:20 18:5,11
24:12 28:3,12
29:24 36:15
38:14 39:1 48:3,
10 49:1 82:17,22
83:2 98:3 102:20
103:9,18 110:5
115:4,20 116:4
120:18 122:24
126:25 130:20,25
131:18 132:12
135:22 145:14,21
146:6,7 147:17,
18 148:7,8 149:1,
13 151:24,25
153:9 154:12
176:9

**calm** 173:25
184:17

**calmly** 173:24

**captioned**
21:18 45:5
105:11 113:10
139:23

**car** 84:16,22
85:9 120:6
121:13,14,16,18
122:8 125:8
131:16 132:5
133:5 163:17
173:15

**card** 114:1,25

**cards** 113:19

**career** 16:1

**carpet** 131:25

**carpeting**
131:16

**carrying**
153:21

**case** 8:10,12,15
10:16,17,23
11:20 22:16,22,
24 23:6,13,22
24:11 30:2,22
35:1 38:20,23
44:5,7 45:18
46:5,22 52:11
60:17 62:3,4,15
63:5,8,20,21,22
65:2,15,20,21,22
66:2,11 67:1
70:14,15,21,23
81:5,19 89:4,9
90:21 91:15
93:13 96:11,15
98:1 103:7
105:22 107:23
109:13 115:3
117:12 122:11,
14,19 123:3
125:14 130:17
132:9,22 133:22
137:4,16,18
149:8 150:6
156:7 164:13
174:6,25 175:4
189:19

**cases** 42:14
63:12,19 66:1
90:19 156:16,17,
21

**cause** 14:20
15:17 16:23 17:1,
4 18:3,8 29:20
30:16 52:23 89:4,
7,10,14 91:14,17,
18 92:14,16
95:14 134:10
141:14 142:13,24
189:19 190:18
192:1

**caused** 50:7
91:21 189:24

**causing** 92:9

**CCH** 37:12 54:5,
7

**cell** 62:16

**cerebral** 92:17

**certain** 19:8
31:25 32:1 38:9

67:16,17 68:6
128:2 142:18
170:20 174:18
177:9

**certainly** 8:22
106:8

**chance** 57:7

**change** 15:3
148:6 165:15

**changed**
118:15

**characterize**
182:18

**charge** 10:22
22:11,16 23:6,20
25:3 30:18 38:20,
23 45:17 46:5,19
62:2,4,25 63:4,21
64:3 65:21,25
66:24 70:13,15,
21 72:20 83:15,
19 89:9 94:2
96:10 97:25
107:23 108:24
121:24 122:11,19
125:13 133:18
137:4,11,15,18
149:7 150:5
155:24 156:16,22
170:4,13,15
171:13 173:17
174:6 179:2
185:11 191:22

**charged** 41:15
42:22 43:12 44:9,
14,15 47:6 61:17
167:6,10,15,16,
24 170:9,25
171:3,12 179:20

**charges**
170:14 179:18

**Charles** 186:25

**check** 39:5 41:5
81:23 82:6,10,14
96:19 101:13
102:8 122:12
144:15 146:11,12
177:17

**checked** 23:25
49:25

**checks** 96:25

**chest** 85:24

**child** 159:7

**children's**
23:17

**Christina** 9:8
35:1 57:14 59:7
61:8 77:21 78:10,
20 81:22 90:13
91:3 92:15 93:15
95:15 96:4
110:21 111:6
119:9 128:23
132:11 152:8,20
153:18,25 155:13
157:5,18 158:7,8
159:15 167:25
169:12 172:16
180:23

**circumstance**
8:17

**City** 12:16 13:3,
10 20:8 156:2,5

**Civil** 8:6

**claim** 8:11

**claimed** 81:10
179:13,14,17

**claiming** 152:7

**claims** 87:5
177:19

**clam** 44:9

**clarification**
108:1,2

**clarify** 99:5

**clean** 68:2

**clear** 8:18,20
9:4 16:22 102:15
168:10

**client** 182:23
184:1,5

**cocaine** 159:24

**code** 26:1,13,
15,16,18,22 27:1,
2

**codes** 26:23

**Coleman**
12:23

**collect** 42:19
172:2

**collected**
43:18,21,22 97:7
172:1

**collecting**
42:21 43:11

**color** 131:16

**column** 102:8

**come** 17:16
21:7 25:19 33:14
43:23 47:23 54:5,
9 56:9 61:6,12,
15,24 63:12
65:25 82:14,20
112:7 125:8
140:22 144:23
156:21 164:19
173:24

**comes** 23:4
109:14 123:16
164:16,22

**coming** 68:16

**Commander**
154:5

**Commanding**
128:16

**comment**
176:25

**commit** 17:23
94:25

**committed**
14:21 16:24 18:9
28:1,9 29:21
112:15 150:8

**communicate**
176:21

**compare**
109:14

**compared**
110:17

**comparison**
107:13

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

SIMON, BARBARA
06/03/2019

Index: comparisons..currently

**comparisons**
98:23

**complainant**
33:16,18 34:3,18,
25 35:9 134:9
185:15 186:11

**complaint**
21:11,19,22,25
27:6,19

**complete**
71:13

**completed**
69:12 161:7
163:17 165:6,25
167:4,7 173:15
191:25

**compound**
56:24 58:19
61:19 72:7 78:3
83:21 97:9 102:3
103:2 120:9
130:7 136:7
142:20 171:23
175:10 177:20
191:2

**computer** 31:9
41:8 50:6 54:6,8,
9

**concern** 99:23

**concluded**
95:13 96:2
109:25 110:2,14
192:12

**concludes**
192:9

**conclusion**
14:23 15:19
16:14 18:6,12
48:4,11 49:2
122:25 132:13
145:15,22 146:7
147:18 148:8
151:25 176:10

**conclusive**
111:19

**conduct** 10:2
160:22

**confessed**
143:10,13 186:24

**confesses**
154:3

**confession**
143:6 152:19
180:17,21 181:2
187:3 190:23
191:1

**confessions**
140:25

**conformed**
155:15

**confusing**
61:20

**connected**
83:8

**connection**
9:12 106:7

**consent** 16:12
129:19 130:3,13

**consider**
117:11 132:9
161:19 183:3

**consideratio
ns** 44:13

**considered**
79:3 111:11
147:14 149:11

**consistent**
28:19 62:17
91:22 92:1,8
93:14,17 96:5
109:24 162:6
189:24 190:10,22

**Constitutiona
l** 33:19 34:2 35:11
37:8 137:6,12

**contact** 127:8

**contacted**
20:19

**contain** 22:2
74:5

**contains** 96:24
146:25

**Contents** 69:2

**context** 16:7
181:25 182:1

**continue** 80:1
94:16 126:23
127:6

**contraband**
171:5 172:2

**contusions**
92:10

**conversation**
41:15 76:21

**convey** 25:12

**conveyed**
26:1,17 28:16
29:19 35:17

**convicted**
114:18 179:20

**conviction**
8:13 9:6 82:4
180:2

**convictions**
40:9,10,18

**cool** 185:4

**cooperate**
74:8

**cop** 86:10

**copped** 88:1

**copy** 27:14
39:19 45:10
80:13 105:20
114:2,10 129:21
139:19 144:7
176:22

**corner** 104:17

**correct** 12:5
20:18 24:2,8,20
28:13,18,22
29:23 30:20,21,
23,24 33:25 35:2
36:7 38:2,7,10
39:6 40:10,15,19,
23,24 42:10 44:2
48:23 49:17
50:22 51:8 52:3
54:4,14 55:4 57:7
59:15,16,19,22
62:2 66:12 67:13,

18 68:2,9,14,23
70:5,6,24,25
71:15 78:10,24
79:3 82:6,15 83:8
90:25 91:23 94:7
96:11,12 97:23,
24 98:24 99:12
101:19,20,23,24
103:17 104:25
105:14 106:2,11
112:15,18,21
119:16,24 120:17
122:1 125:11,18
127:19 128:3
131:13 132:2,6,
24 133:7,8,20,21
134:3,4,5,21
135:13,21 136:5,
17 140:5 142:6,
19 143:1,19
144:25 146:23
147:2 150:3,4,15
153:19,25 157:21
161:17 164:1,25
168:12 169:3,4
170:1,16,22,23
174:8 175:5,8
176:3,14,17
177:10,19 179:4,
8 181:23 182:9
186:15 188:1
189:8,10,21
192:4

**corrections**
54:25

**correctly**
19:15 21:1 33:3
34:9 42:5 45:23
46:13 50:19
53:16 56:12
60:19 97:16

**counsel** 92:22
93:6 192:14

**County** 46:25
134:7 136:2
164:12,16 167:1

**couple** 84:23
85:11

**course** 16:12
36:8,9 41:14,19
59:12

**court** 8:11 30:15
37:14 139:5
144:5 185:18

**courtroom**
72:21

**covered**
103:20

**CPR** 168:21

**crack** 86:13
159:24

**cranial** 92:16

**credibility**
122:22 185:6

**credible** 123:4

**crime** 13:23,24
14:1,19,21 15:16
16:24 18:10 22:3
28:2,9 29:21,22
32:4 36:2 42:19
52:17 97:6 122:6
189:23

**crimes** 160:10,
14 167:10,15,24

**criminal** 37:16
39:6 40:13,21
41:5 50:1,5,14
81:22 82:10
83:18 160:22

**Crockett** 10:12
27:20 68:12,22
69:13,16 72:6
77:24 78:23
168:23 171:6

**Crockett's**
72:18 185:9

**Crystal** 86:5
87:24 158:14,21,
22,23 159:4
181:18

**Crystal's**
159:15

**CSC-1** 160:15,
21 170:4,9,25

**current** 40:17

**currently**
13:13

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

SIMON, BARBARA
06/03/2019

**custody** 81:23 83:17

**cut** 104:14

**cutting** 133:24 134:2

**D**

**damages** 156:7

**data** 109:17

**database** 146:18

**databases** 98:21,22

**date** 12:12 30:4, 5 35:19,21 53:4 113:14,15,22,23 180:1 189:11

**dated** 166:19

**dating** 74:23

**day** 63:5,9,22, 23,24 66:2 129:5 135:7,16,17 138:22 152:6 156:16,18,19 157:1,2 164:14 188:21 190:23 191:1

**days** 134:20 159:5

**deal** 113:19

**dealt** 102:24 103:4

**death** 52:23 89:4,7,10,14 91:15,17,18 92:15,16,18 95:14 134:10 136:1 142:13,17, 24 157:5 159:16 189:19 190:19 192:2

**deceased** 52:20 106:4 107:13

**decedent** 56:19 152:20

**decide** 62:25 65:14 66:10

**decided** 61:2, 7,16,25

**deciding** 65:19 66:25

**decision** 64:4, 13 66:12 115:18 119:8 153:4,5

**decisions** 167:9

**Defendant** 40:8,12,17 49:22 52:21 59:14 74:7 137:5,16 143:5,7 145:5 181:6

**Defendants** 8:14 140:24

**defense** 92:22 93:5 156:7

**defined** 132:19 147:15

**defining** 132:22

**definition** 16:18 144:24 145:8,10

**definitive** 9:20

**degree** 13:2 160:22 179:6

**delay** 49:22 50:8 53:22

**delayed** 66:7

**delivers** 148:24

**denied** 77:21 78:9,17 153:18, 21,23,25

**deny** 75:12 77:23 186:2

**denying** 66:5 78:13

**department** 13:19 40:3 45:16 70:3 73:20 99:14 130:13 157:14

**depends** 16:17 22:20 23:9,12 41:7

**depicted** 93:6

**depose** 19:23

**deposition** 8:4,15 9:12 18:19,22,23,25 21:14 27:9 31:7 39:18 45:2 72:16 80:11 89:25 90:6, 8 105:10 113:6 123:14 127:23,25 130:2 139:18 155:8,9 183:15, 21,24 184:24 187:25 189:16 192:10,12

**depositions** 11:22

**describe** 24:1 37:6 38:4

**described** 28:20 55:4 93:14 177:16

**describing** 22:3

**description** 101:15 123:21

**desired** 135:21

**detail** 119:22 189:16

**detain** 16:11

**detaining** 16:18,20

**detective** 76:5 113:20

**determination** 62:22 179:11

**determine** 52:4 123:4 136:21 148:23

**determined** 111:2 148:25

**Detroit** 12:16 13:10,19 14:18 20:8 37:15 38:9 45:16 99:14 130:13 156:3,5 157:14

**Dexter** 121:20

**diagrams** 97:7

**Diane** 118:2

**died** 53:5 96:5 164:24

**difference** 177:3

**different** 8:21 9:19 14:15 17:13 22:21 23:10,11 34:22 78:23 111:18 118:15 127:12 156:22 162:9 166:8 172:8

**differently** 82:21

**dimes** 86:13

**direct** 41:11 45:12 49:5 73:3 90:10 123:17 185:8,17 186:5

**directed** 96:25 154:8

**directing** 20:1

**direction** 152:9,17,21 154:5

**directions** 25:6

**directly** 20:20 59:24

**discussing** 96:3 99:7 114:15 115:13 157:16

**discussion** 67:9 95:13

**dispatch** 122:5,6,10,16

**dispatched** 20:7 21:2

**dispatcher** 122:17

**disposition** 62:12

**disprove** 132:21

**District** 30:15

**doctor** 70:18 90:12 92:21 189:18

**doctor's** 189:13

**document** 18:23 21:18 22:2 23:23 25:25 45:5 105:10,13,20 106:4 107:5 110:1 113:17,24 114:3 130:4,10, 11 133:16 139:23 148:12,16,18,20 164:4 165:1,6,25 166:2,19,22,25 167:4,7,9,14,23 180:6 185:9

**documents** 10:15 12:1,3 19:8,11,21,24,25 20:5 22:5 72:4 120:2,3 155:10, 11

**doing** 52:14 65:17,23 71:14 147:9 151:11

**dollars** 84:23 85:11

**door** 74:13 85:14,15,16 104:6,11 113:8 124:24

**dope** 86:11,12, 16,19,23 88:1

**doubt** 50:21 105:16

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

SIMON, BARBARA
06/03/2019

Index: doubts..fact

**doubts** 50:23

**downtown** 25:14 28:20,21, 24 29:12 51:8 75:25 79:2 119:23

**DPD** 37:12 49:25 103:25 104:22 106:14 146:17,19,21

**Dr** 55:22 69:7 90:9 93:25 95:13 96:3 109:23 134:19 162:7 188:21

**drain** 79:22 80:5

**draw** 142:2 143:21 166:15 167:1,2

**Dre** 162:7

**drill** 63:10

**drink** 79:20

**driven** 79:2

**driving** 17:14

**drug** 177:17

**drugs** 60:12 74:25 124:17 125:15,18 158:10,14,17 159:17,24 160:19,20 171:3, 5 172:2 175:16

**drunk** 17:14

**due** 142:13 189:19 190:19

**dusted** 97:6

**duties** 46:19 136:4

**duty** 48:8,24 191:23

**E**

**earlier** 9:7 63:6, 11 78:7 90:6 94:1

119:21 120:23 125:17 127:23 133:17 145:9 149:25 157:16 171:14 172:21 173:3 188:19 189:15 191:22

**early** 53:4

**easier** 94:20

**east** 123:23

**Eastern** 87:12 88:7

**educational** 12:25

**effect** 81:20

**effort** 48:8,25 81:9 123:3 152:3

**efforts** 168:24

**eight** 94:14

**eight-and-a-half** 12:24

**either** 20:5,20 48:18 57:14 144:24 145:3 146:17

**else's** 112:13 117:11 132:23

**employed** 13:13 45:15

**employment** 12:15

**EMS** 73:18 85:19 168:11,19

**enforcement** 13:2

**engendered** 49:22

**entered** 184:24

**entire** 31:22,23 45:9 190:8

**entry** 23:25

**escape** 23:25

**estimated** 91:6

**evaluating** 96:15

**event** 19:24 149:12 166:24

**everyday** 161:25 162:17

**evidence** 9:14 20:11 25:22 28:4, 12 42:19,21 43:11,18,21,22 44:1,16 46:7 47:16,17,24 48:9, 17,25 61:16 62:15 70:3,9,16, 17 81:19,25 82:8 83:16 96:11 97:2, 4,7 101:14,19,22 103:16 106:5,9, 15 107:6 108:14 110:5 111:11 114:17 115:20 116:4,24 117:9, 13 119:12 122:21,23 126:3 130:19 131:9 132:5,16,20 133:19 145:3 146:14 147:14 149:14 151:23 152:12 153:6 169:16 171:13, 21,25 172:1 173:10,17 174:20,21,23,25 175:3,10,15,18 176:2,3 177:3,4,9 178:8 180:12,19 184:4 190:13

**evident** 60:11

**evidentiary** 47:9

**exact** 32:12 35:14

**exactly** 28:23 29:5 62:1

**exam** 30:10,15 90:5 135:1,2

**examination** 8:7 30:3,9,14,19 31:2 35:22 41:19 89:20 90:3 92:13

93:12 105:25 131:6 156:12 189:11

**examined** 101:17,21 115:12 141:14 146:12

**Examiner** 142:19 164:12,15 191:24

**examiner's** 90:19,24 134:8 136:3 164:17,20, 21

**example** 25:7 26:21 99:10 101:16

**excerpt** 123:15,16

**excerpts** 31:3 44:23 72:11 89:22 90:8 123:9 189:15

**exclamation** 148:21

**exculpatory** 47:16 116:23 117:12 132:9,20, 24 133:6 144:25 145:2,9,13,20 146:4 147:14 149:11 151:23

**excuse** 8:3 20:19 42:16 71:19 84:19 91:13 100:12,24 108:18 149:19 173:18 178:16 181:16

**exhibit** 18:17, 22 21:10,14 23:23 27:5,9,11, 12 31:1,7,9 35:18 36:19,21 39:12, 14,18 40:1 41:12 44:22 45:2,13 69:19,23 72:10, 15 80:7,11 89:19, 25 92:23 93:5 96:18,23,24 101:12,13

103:13,25 105:4, 10 106:8,17,18, 22 109:6 110:1 113:2,6,10 117:25 118:6,15, 16 120:13 123:8, 14,18 129:18 130:2 133:10,15 137:13 139:6,13, 18 140:4,5 141:10 144:6 145:23,24 146:10 148:11,15 150:25 151:6 160:25 163:16,19,25 179:7,15,16 185:8,19 186:6, 19 187:22 188:17 190:16

**exhibits** 31:9 51:5 119:21 144:15

**exists** 141:15

**expect** 62:17

**expected** 82:14

**explain** 30:13

**explore** 184:3

**exploring** 182:15

**extensive** 91:19

**extent** 10:14

**extra** 27:14 80:13 129:21 144:7

**F**

**face** 68:13 141:25

**faced** 177:18

**faces** 178:6

**facing** 124:24

**fact** 29:19 35:5 38:4 66:4 69:19 71:2,12 77:25

**MIdeps@uslegalsupport.com**
**Ann Arbor | Detroit | Flint | Jackson**

**U. S. LEGAL SUPPORT**
**Bingham Farms/Southfield | Grand Rapids**

**Phone: 888.644.8080**
**Lansing | Mt. Clemens | Saginaw | Troy**

SIMON, BARBARA
06/03/2019

88:13 115:16 136:22 137:24 153:14 159:20 169:10 176:21 177:9,15

**facts** 9:13 20:10 25:21 28:4,11 43:25 51:9 56:25 58:20 61:19 62:18 64:8,15 67:3 79:5 80:21 81:13,25 82:7,16 83:10,20 97:10 103:3 108:13 110:5 115:19,24 116:3 119:11 122:2,12,25 127:15 129:1 134:22 135:8,14, 23 136:7 142:8, 21 149:14 150:10,22 152:11,23 153:8 169:5 173:10 175:17 178:22 182:11,15 184:3 191:3

**fair** 16:1 53:18

**fairly** 9:4

**faith** 48:8,25

**fake** 162:22 163:11 166:5

**false** 33:18 35:4, 8 49:23 55:16 83:17 180:9,13, 14

**familiar** 21:21, 23 90:14,17 113:16,21 116:23 130:4

**far** 102:21 132:22 176:4

**fast** 121:19

**fatal** 9:7 21:4,19 32:7 52:15 53:5 190:9

**fate** 64:12

**favorable** 54:22 145:4

**February** 12:13 31:4 33:7 34:13 42:9 89:21 90:4 93:21 189:10,12 191:25

**federal** 8:6,11 146:18

**feeling** 80:1 113:7

**felon** 114:18

**felony** 82:4,13 83:18

**female** 24:5 27:22

**field** 20:22 23:4

**fight** 152:19 153:18 154:3,4

**file** 40:22,25 47:5 103:15 104:1,23 107:25 109:13 110:17,23 115:1 117:20 126:4 148:17

**filed** 8:11

**files** 107:12

**find** 8:16 31:16 97:17 98:12,15 99:8,11,22 100:1 101:1,5 111:19 143:20 152:3 153:19 163:13 181:14 190:1

**finding** 116:16

**finds** 183:1

**fine** 59:1 79:18 178:19

**finger** 106:5,15 107:6 114:19 147:1

**fingerprint** 98:14 99:8,9,11 100:1 101:2 102:8,11,14 110:17 111:3,15, 19,20,21 112:12, 13 113:12,19,25 114:23,25 117:11

145:10 153:6 178:8,15,20

**fingerprinted** 100:11,23 114:1, 4

**fingerprints** 97:6,23 98:2,5,23 102:13,24 103:5, 7 112:7 113:3 115:14 132:23 145:12

**finish** 116:9,10 153:1 174:13

**finished** 14:7 147:25

**fire** 60:6

**first** 12:15 21:21 33:15 37:7 38:8 42:5 45:23 48:22 73:3 74:12 77:18 84:20 90:10 96:24 97:4 113:10 118:9 119:4 146:11 148:17,23 150:6, 11,12,14 153:15 158:6,20 160:22 161:16 163:7 165:18 168:10 169:11 174:13 179:6 188:18

**five** 14:3 19:18 188:12

**five-feet-ten** 91:9

**floor** 57:16 62:16 66:19 86:3 104:2,4,8,10 138:10,23

**flow** 94:21

**fluid** 79:22 80:2, 5

**folder** 47:14

**follow** 88:13 153:5

**follow-up** 46:18 108:21

**followed** 28:23 29:11,13,15 109:9,11 169:13, 17

**following** 41:13 45:13 52:9 68:17 127:12 142:8 152:6 154:2

**follows** 84:15 185:19

**force** 91:22 93:14 189:20

**Ford** 45:6

**forgot** 139:8

**form** 15:4,10 34:19 48:10 53:14,15 54:16, 17 78:2 80:22 88:9 97:9 109:1 117:17 119:11 129:19 130:3,14, 15,24 141:3 161:7,11 162:2,8, 13,18,24 167:11 169:6 187:6,14, 19

**format** 27:21 113:16,23 130:4 150:2 151:8 169:11

**former** 157:22

**formulate** 60:16 65:1

**forth** 45:25 56:14 60:15,21 64:24 65:13 128:22

**forum** 146:17

**found** 40:21 49:10,24 57:15 60:3 88:24 109:25 110:11,22 115:13 116:1,16 126:3 132:4 143:22 145:10, 12,19 146:4,20, 22 158:21 171:5, 17 176:17 189:23

**foundation** 22:6 36:15 51:10 68:24 69:21 79:4 81:13 82:8 83:23 88:9 89:15 97:15 98:25 99:17 100:10 101:4 102:19 103:19 110:4 111:25 114:5 119:25 120:10,18 126:25 130:20 131:1,18 134:14 143:25 149:1 150:9 154:12 162:2,8, 13,18,24 167:11 168:13 171:8 175:21 176:18,25 191:5

**four** 14:3 37:24 61:23 71:13 120:16 121:8 142:16,17 168:25 191:25

**four-hour** 37:2 41:15,19 53:22

**fourth** 14:2 87:8

**fracture** 92:10

**frame** 104:6

**free** 41:20,24

**frequently** 103:7

**friend** 158:24

**front** 69:4 73:9 124:24 158:2

**fully** 74:9,10

**further** 85:23 143:5 168:5 188:13,15 191:10,20

**G**

**Gallant** 161:6

**gather** 48:8,22, 25 70:16 133:19 173:17 174:20, 21,23

**MIdeps@uslegalsupport.com**
**Ann Arbor | Detroit | Flint | Jackson**

**U. S. LEGAL SUPPORT**
**Bingham Farms/Southfield | Grand Rapids**

Phone:  **888.644.8080**
**Lansing | Mt. Clemens | Saginaw | Troy**

**gathered** 135:11 171:20 176:2

**gathering** 122:20 171:12

**general** 29:7 113:16,23

**General's** 13:17

**generally** 162:12 169:6 181:24

**generate** 155:23

**gentleman** 68:22

**Geraldine** 45:6

**getting** 64:21 122:8 153:18

**Ghougoian** 128:11,15 140:8, 12,23 141:8 152:10,18,22 154:6

**girl** 74:24 85:13 86:15

**girlfriend** 158:21,23 159:18

**gist** 190:5,8

**give** 12:9,12 35:11,21 44:10 47:4 54:18,19 57:7 74:17,20 140:25 146:14 161:24 163:11 168:21

**given** 25:6 38:4 49:6 52:11 81:4 83:17 91:5 132:8, 19 144:24 145:9 160:8 188:6,8

**gives** 49:23 54:21 69:6 81:1

**giving** 30:2,8 33:11,18 51:18 55:18,19 83:6

**go** 17:23 32:3 35:8 41:20,24 43:3 46:25 53:7 55:2 59:10 60:14 63:2 64:17,24 67:15 69:3 70:1, 12,17,18 71:19 77:19 78:15 79:16 84:13 85:17 87:12 92:6 96:7 122:6,14 124:2 126:11 129:9 139:24,25 141:10 144:12,14 146:10 154:20,23 158:25 159:11,23 160:3 171:18,20 173:12 175:23 177:22 178:2 188:17 189:8

**goes** 143:5

**going** 13:1 18:21 20:21 25:18 29:1 33:21 41:11 42:18 43:7, 15,18 44:17 50:17 57:10 60:17 61:3,18 62:21 63:1,4,16 64:5,7,12,14 65:1,13,14,19 66:14 67:2 69:25 71:21 72:15 73:16,23 74:15 78:2 81:3,12,24 90:7 92:20,21 93:3 94:22 95:3, 18 101:12 102:2 108:5 112:11 121:16,19 124:10,19,22 129:11 136:10 137:10 140:4 144:5,16 145:2 147:5 148:15 154:22 155:1 159:8 163:16 164:15 165:10 175:9 177:6 182:21 183:5,7, 17,19 184:21 190:3 192:10

**good** 48:8,25 95:10,11,25 96:1

**goodness** 14:6

**gotten** 87:6 109:4

**grab** 186:19 187:22

**Gray** 30:9 90:4

**gray/brown** 131:16

**groceries** 77:14

**ground** 9:4

**grown** 12:9

**guess** 28:17 36:10 37:25 56:20 79:3 85:21 87:7 103:21 113:12 131:9

**guilt** 47:18 48:18

**gurgling** 86:2

**guys** 113:7

---

**H**

**H-O-M** 24:19

**half** 94:22

**hallway** 34:22

**hand** 21:13 27:8 45:1 72:15 78:23 92:21 96:22 109:5 148:15

**handed** 118:5 130:1 148:21,25 151:5

**handing** 31:6 39:17 80:10 89:24 105:9 113:5 123:13 133:14 139:17

**handwriting** 149:20,22 161:1 169:1,24 175:8,

12 181:22 188:2, 4

**handwritten** 148:12 155:11

**happened** 10:18 73:17 108:12,18 190:22

**happening** 20:25

**happens** 16:5 156:20

**happy** 8:20 148:2

**Harkey** 90:8,9 93:25 96:3 109:23 134:19 188:21

**Harkey's** 95:13

**hate** 12:7

**head** 91:23 93:15 96:5 117:3 131:4 140:22 142:25 148:25

**heading** 21:19

**headquarters** 25:19 119:23 120:15 121:8

**hear** 8:22 72:21 187:8 188:24

**heard** 9:2 121:13,17 141:4, 7 161:21

**hearing** 11:17, 18,23,24,25 33:6 34:12 36:7 37:22 41:2 42:8 49:18 188:20

**Hearings** 11:16

**heavy** 91:22 92:8,11 93:16 142:25

**held** 13:18 30:15 64:5

**help** 46:22 163:4

**helps** 79:22 80:5

**hereto** 192:14

**hesitate** 8:19

**highlight** 84:25

**highlighted** 84:14,20 87:9 118:9,24 142:11

**highlighter** 85:2

**history** 12:15 37:16 39:6 41:5 50:1,5

**hit** 181:10,12,19, 20

**hold** 41:25 85:25 173:7 183:23 184:10,13

**holding** 62:16 109:5

**holler** 173:21, 25

**homicide** 11:20 14:4,5,14, 15 20:2,9 21:1,4, 6 23:5 24:17,19 25:8,12,13 26:1, 12,23 28:17,21 29:2,18 32:13 34:22 38:1 41:6 43:16 59:18 61:14 62:6 63:21 64:11 65:25 66:18 73:19 74:5, 18 75:2,18,19,24 76:5 81:8 83:16 89:9 92:19 102:23 105:13 111:16 112:9 113:19 126:20 128:16 130:6 137:3 140:23 141:8,9 150:4 154:6 164:22 170:8 174:15,18 178:3 179:6

**honest** 58:10 187:17 191:17

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

SIMON, BARBARA
06/03/2019

Index: Honorable..Jerome

192:3

**Honorable**
30:9 45:6 90:4

**hope** 185:4

**hour** 94:22

**hours** 37:24
61:23 71:13
120:16 121:8
133:5 168:25

**huh** 33:12 56:10

**hurt** 59:7 180:23

---

**I**

**ID'D** 114:23

**idea** 15:11 51:11
115:22 118:14

**identification**
18:16 21:9,14
27:4,10 30:25
39:13,18 44:21
45:2 72:9,16
80:6,12 89:18,25
96:17,23 105:3,9
113:1,6 117:24
123:7,14 129:17
130:2 133:9,15
139:12 146:17
148:10 150:24
151:6

**identified**
51:24 80:17
106:5,14 107:6
108:7 109:18,23

**identify** 55:7
74:4

**identity** 81:10
98:16 99:25

**ignore** 177:9

**ignored** 177:15
178:8

**ignoring** 177:3

**impeachment**
145:5,6

**implicate**
143:22

**important**
116:21

**impossible**
124:25

**improper**
182:22 183:6

**inaccurate**
191:16

**incarcerated**
8:12 58:17

**inches** 132:2

**incident** 22:10

**incidentally**
124:1

**include** 47:15
131:8

**included** 128:7

**including** 72:6
115:14

**incomplete**
144:24

**incorrect**
144:24 187:1

**incur** 156:7

**indemnificati
on** 156:2,5

**independent**
34:15 61:14
76:18 88:5

**independentl
y** 20:5 61:12

**indicate** 9:6
25:2 126:4
146:20

**indicated** 8:9
11:13 91:21
108:9 132:4
185:10

**indicates** 81:2
106:10 146:12

**indicating**
37:24 81:6 109:7

**indication**
165:13 166:7

**individual**
29:16 41:5 44:14
47:24 80:17 98:8,
14,16 111:22
122:8 136:12

**individuals**
44:8

**induce** 140:25

**influence**
112:14 119:8

**influenced**
111:5 114:18
115:2,8,17 116:2
119:15 153:4

**inform** 175:4

**informant**
89:1

**information**
21:3,5 22:4 29:3,
16,22 32:6 33:18
34:17 35:4,9,10
44:11 47:9 48:1,
14 49:7 53:3
54:21 55:20,25
59:21 60:15,25
64:25 65:14
67:16 68:6 72:5
74:17,20 76:8,12,
15 82:5 83:6
134:4 135:12,21
160:2,8 164:23
165:9,14

**informed**
165:14

**initially** 32:7

**injured** 34:25
77:21 128:23
154:4

**injuries** 91:19,
20 92:17 96:5
190:9

**injury** 25:15
74:5 92:1,17
189:24

**innocence**
47:17 48:18
111:12 132:21
145:4

**innocent** 47:25
117:10 153:7

**inside** 85:17

**instant** 40:13

**instructions**
62:11 127:5

**interest** 88:18

**interested**
31:21 45:8 84:12

**interface**
191:24

**interpret** 58:8

**interrogated**
126:24 127:6
168:24

**interrogating**
80:20

**interrogation**
28:21

**interrupted**
69:7,8

**interruption**
55:22

**interview**
70:19 75:19
81:17 127:21

**interviewed**
29:18,20 30:23
59:15,17 125:15
128:11

**investigate**
46:22 51:8 83:4

**investigated**
83:3 111:9
115:22 116:6,14,
17

**investigating**
26:20 140:6
150:17

**investigation**
16:20,25 17:2,3,
22,24 22:9 42:18
43:15,17 44:17
46:6,20,22 47:23
48:7 52:15 62:20
63:3 65:24 83:16

108:25 126:19
133:18 155:12
160:7,18 185:12

**investigative**
40:22 102:25
103:15 104:1,23
126:3 137:14
146:23,25 148:17

**investigator**
13:22,23 14:2
45:16 97:1
105:13 130:6
137:2 139:9,14
141:11 150:5
164:21 165:12

**Investigator's**
46:7 70:18
133:11,16 139:8,
24 140:2,15,16,
19,20 163:19
178:25

**involved**
132:8,11

**involvement**
70:4,9 157:17
158:5 159:15

**issuance**
142:9

**issue** 15:22
185:6

**items** 107:17

---

**J**

**jail** 159:1 160:3

**January** 9:9
14:18 20:1 32:21,
23,24 35:19
45:21 90:20,23
105:13 106:1
120:8 128:7,12,
15,22 134:20
135:3 140:20
151:8

**Jeff** 90:8,9 95:13

**Jerome** 26:21
168:23 171:6

**MIdeps@uslegalsupport.com**
**Ann Arbor | Detroit | Flint | Jackson**

**U. S. LEGAL SUPPORT**
**Bingham Farms/Southfield | Grand Rapids**

**Phone:  888.644.8080**
**Lansing | Mt. Clemens | Saginaw | Troy**

SIMON, BARBARA
06/03/2019

**Jimmylee** 30:9 90:4

**Joan** 128:15 140:8,12 152:9, 18,22 154:6

**job** 13:12 173:17 174:20,24,25 184:2,3

**Joseph** 8:1,9

**July** 12:17 125:6

**jump** 39:11

**Junior** 161:6

**jury** 44:23 45:5 72:11 123:9,15 183:1

**justice** 40:13

**juvenile** 24:6 27:23 40:9

**K**

**Kanluen** 55:22 69:7

**keep** 8:24 63:1 109:13 110:16 148:2 173:20

**Ken** 85:16,20

**kept** 78:16

**killed** 81:21 110:20 135:7

**Kim's** 85:16

**kind** 82:5 113:17 153:21

**kindly** 12:6 125:12

**kinds** 17:13 22:3,5

**knew** 75:9 77:25 125:17 142:24 168:11 185:24

**knife** 128:24 153:23

**knocked** 85:14

**know** 8:19,22 9:3 10:17 12:10, 14 14:25 15:1,3, 14,15 16:7,23 17:13 19:9 21:5 24:21 28:25 29:1, 5,6 31:20 32:11, 12,16 33:16 34:3, 16 35:9,11 40:4,6 41:7,9 42:20,22 43:3,12 44:16,17 46:24 47:6,20 51:18 52:23 58:1, 10,25 59:2 62:19, 21 64:12 66:18 75:18 76:3 77:8 78:13,20 79:23 81:14,16,18 84:8 89:10,13 92:3 94:8 95:1 96:7,13 97:18,19 98:15, 18 99:2,24 102:1, 9,21 103:21 107:17,20 108:17,21,22 109:14,16 110:18,22 114:7 116:15,17,18 117:1,6 118:13, 17 119:6 122:5, 17 124:19,21,22, 23 126:15 127:2, 3,5,19 128:10,14 131:4 136:11 138:19 140:16 145:16 146:8 148:9,18,23 149:5,15,17 152:1,13 154:16, 17 155:16,20 157:7 158:7,8,11 159:6 161:20 163:23 164:13 165:2,18 168:15, 16,17 171:9,17 172:4 173:4 175:25 176:4 179:1 181:1 182:18 184:4,5,6 186:10 189:13

**knowing** 75:12 77:21,23 78:10 186:2

**knowledge** 9:1 28:8 50:13 57:25 59:6 157:8, 11 161:9 164:7 166:1

**known** 99:9,10 100:6 107:21 114:25 115:16,24

**knows** 28:6 117:2 185:15

**L**

**lab** 46:7,23 131:8 143:21 146:18, 19,21 176:13

**laboratory** 99:14 145:18 174:23 176:7,13, 16

**lack** 176:25

**lady** 9:8 75:9 168:21 178:5 185:24

**Lamarr** 8:2,10 30:3,23 33:6 35:6 44:8 45:18 46:1, 16 49:11,15,16 50:14 52:1 53:19 56:15 57:13 60:22 61:7 70:8 71:10 72:18 99:10 104:23 105:21 106:14 110:2,15,20 111:3 114:19 115:3,17 116:2 117:16 119:9,23 120:5,7,25 121:7 123:15 125:14 126:21 127:8 128:6,21 129:4 130:24 136:15 138:16,21 140:19 143:22 145:11 147:13 148:17 149:12,25 151:2, 7,13,15,20 152:3 153:16 155:12 160:5 161:9 179:19 190:24

**Lamarr's** 178:21

**lapse** 37:2

**latent** 96:19,25 97:13,14 98:6,19 99:1,19 100:3,4 101:13 102:7 105:6,11,21 146:11,12,17

**Lavonn** 161:6

**law** 13:2 170:17, 21

**lawyer** 58:24 184:8

**learned** 76:12, 14

**leave** 47:5 54:21 62:6,11 74:11 138:3

**Lee** 81:7,21 82:3 108:9 113:3,11 114:14 115:15 116:1

**left** 36:10 62:8, 10,21 64:11 65:24 66:17 70:2 100:4 107:11 113:12 114:17 126:20 127:5 137:24 138:9,14 141:9 148:21,22, 25

**left-hand** 104:17

**legal** 14:22 15:18 16:13 18:5, 11 48:3,11 49:1 122:24 132:12 145:14,21 146:6, 7 147:17 148:8 151:24 176:9

**let's** 17:9 36:1 46:3 55:2 59:10 70:11 79:13 92:6 103:13,24 134:6 139:24 141:10 153:15 168:18,19 184:16,17

**letting** 42:21 43:11

**Lewis** 51:24 77:1 79:1 80:8, 18,25 81:7,11,21, 23 82:4 88:7 89:1 108:10 113:3,10 114:14 115:15 116:1,5

**liar** 183:8,9,14, 17,18,19,22 184:2

**lid** 92:25 93:8 145:11

**lie** 158:24 181:25 182:1,12

**lied** 182:7,13 183:2

**Lieutenant** 128:11 140:11,23 141:7

**lift** 97:19 99:8

**lifted** 98:5 100:2 102:5

**lifts** 101:25 102:1,13 108:6 109:8 147:1

**light** 110:19

**limit** 57:19

**limited** 58:7

**limiting** 57:20

**Linda** 51:23,24 60:11 85:12,13 117:21 118:2 119:20 121:7 124:4 125:20 126:17 136:14

**line** 25:25 33:9 41:13 45:13 49:20 52:8 53:7 55:14 56:6 67:15 68:4,15,16 69:25 70:12,20 73:4 75:15,23 77:2 90:11,16 91:2 107:10 123:19 154:11 161:24

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

162:1,12 179:5
186:9,12,13
190:3,4

**lines** 106:13
118:10 141:2

**Linwood**
121:16 124:10

**listed** 69:3

**listen** 57:22
72:25 110:24

**little** 9:20 12:14
49:14 85:15,23
104:10 113:8
157:2

**live** 86:5

**lived** 73:14,15
86:21,23

**living** 60:6 73:9,
13 86:20

**located** 90:24

**location** 21:3

**lock** 64:13
66:12,20

**lock-up** 62:16
138:24

**locked** 64:5
66:23

**logged** 100:3

**long** 10:2,18
13:3 14:3,5 41:4
50:3 86:16 94:12,
15

**look** 23:23 31:12
35:18 36:1 51:12
69:23 73:15
87:13 103:13,24
104:16 106:9,16
107:7 122:7
134:6 151:10
160:25 163:19
165:1,17 166:11,
17 178:25 181:16
184:3

**looked** 51:4
61:16 88:25 96:7
106:7 121:14,18

125:17 163:3
187:24

**looking** 36:19
51:22 69:2 88:8
106:21,24 130:18

**looks** 73:4 93:8
104:5,10,17
113:13 114:6

**lot** 78:4 86:2
121:18 123:23
124:10,25 125:7
177:18 178:5,8

**loud** 117:6

**louder** 8:23

**lower** 104:17

**lunch** 94:23
95:5

**lungs** 80:2

**lying** 177:4
182:8,17 183:4

---

**M**

---

**ma'am** 32:23
33:2 70:5 114:8
125:1,8 182:15
183:11

**Mack** 90:25

**Madam** 144:5

**making** 82:12
124:3,4 140:24
142:5

**male** 24:5 27:22

**man** 63:1 83:6
84:24

**man's** 70:4

**mandatory**
25:17

**manner** 92:18
132:19

**March** 44:24
45:6 60:22 72:12,
19 123:10,16
140:21 180:2

**mark** 35:5 37:10
51:25 75:5 84:17,
18 85:10,11,12,
13,15,18,24 86:5,
15 88:2 121:16,
20 144:6 148:21
161:17 162:21
163:8 185:14,20

**Mark's** 85:17
121:13,14,18

**marked** 18:16,
22 21:9,14 23:23
24:1 27:4,9 30:25
31:7 39:13,18
44:21 45:2 72:9,
15 80:6,11 89:18,
25 92:22 93:4
96:17,22 105:3,9
109:5 110:1
113:1,6 117:24
118:5 123:7,13
129:17 130:1
133:9,14 139:12,
18 141:10 148:10
150:24 151:5

**Market** 87:12
88:7

**Mason** 33:23
34:8 35:5 37:3,8,
10 41:19 51:25
75:5 161:17
162:22 163:9
185:14,20

**match** 98:13

**matched**
147:13

**matches** 98:7

**material** 59:3
61:10 79:9 97:20
145:5,6

**materials** 9:11
128:8

**matter** 51:8
59:14 66:4 77:25

**Mayor** 12:23

**mean** 11:9
14:10,11 17:15
18:8 24:23 25:17
26:11 28:6 29:20

30:5 31:23 43:22
46:4,20 47:17
54:16,23 68:12
70:14 77:19 79:8
97:14 98:12
104:14 109:2
111:15 112:8,10
128:18,19 130:5
132:10 167:18
182:8 190:6

**meaning** 37:14
102:12

**means** 24:21,
24 102:1,9,15
116:24 117:7,9

**meant** 11:17
113:21

**medical** 90:19,
24 134:7 136:2
142:19 164:12,
14,16,20,21
191:23

**medication**
79:17 80:3

**memory** 10:15
80:4 83:13 119:7

**memos** 96:25

**messing**
159:1,6 160:3

**met** 161:16
162:21

**method** 23:25

**Michigan**
13:16

**middle** 67:15

**mind** 8:25 113:8

**mine** 189:13

**minor** 160:23

**minute** 37:9
100:25 184:16

**minutes** 94:14
121:17

**mirror** 106:19
107:8,18

**mischaracteri
zes** 17:5 23:7
42:24 43:13 54:1
63:17 64:15
66:15 67:3,19
83:9 84:2 88:19
112:16 114:20
121:2 125:21
133:1 138:1,4
147:3 152:12
169:15 170:5,17
173:10 175:10
177:11 178:11
179:22 180:11,
12,18 189:1
190:12 192:6

**mischaracteri
zing** 139:1

**misdemeanor**
40:10

**missing** 31:8

**misstates**
157:22

**mistake** 187:17
191:17 192:3

**mistaken**
12:23 181:13

**Mitchell** 55:10
58:10 65:10

**mixed** 158:9

**modern** 41:8,9

**moment** 129:9
139:25 140:1
146:10 185:3

**momentarily**
61:10

**moments**
11:13 70:2

**Monday** 99:10
123:16

**Monson** 8:2,10
10:7,16 11:1,2,4,
6 30:3,11,23
32:11 33:6,14,23
34:8,17 35:6 36:9
37:16 40:21
41:19 44:8 45:18

46:1,16 49:11,16
50:2,14 52:1 53:9
55:21 56:1,15,18
57:13 59:6,13
61:7,14,23 71:10
72:19 77:4 78:17,
19 79:2 80:20
83:7 103:14
104:23 105:22
106:14 110:3,15,
20 112:8,15
114:19 115:3,17
116:2,13 117:16
119:9,24 120:5,
25 121:7 123:16
125:14 126:21
127:8 128:6,21,
24 129:4,5
130:24 133:22
136:15 137:5,16
138:16,21 140:19
142:3 143:6,10,
22 147:13 148:17
149:12 151:2,7,
13,15,20 152:4
153:17 155:12
157:17,25 158:20
160:6 161:10,16
162:21 167:2,3,6,
10,15,23 168:3,
11 169:18 170:4,
9 172:5,9 179:19
180:9,17,24,25
186:10,24 188:5
190:24

**Monson's**
37:22 44:19
49:15 53:20
60:22 62:7,12
64:12 70:8 78:21
107:5 111:3
112:12 120:7
145:11 150:1
163:3,17 166:21
176:14 187:23

**months** 14:3
86:21 142:16,17
168:4 191:25

**morgue** 46:25
70:17

**morning** 9:12
32:21 65:25
119:18 121:12

125:6 127:12
128:12 136:16
154:2 157:4
164:14 175:2

**move** 46:3
159:8 176:24

**moving** 33:9
36:18 70:11
75:15 86:1 91:12

**multiple**
134:10 142:13
164:18,24 190:19
192:2

**murder** 17:19,
24 18:4 25:15
44:15 47:7 61:8,
17,25 83:8 95:14
108:24 109:24
111:20 112:13,15
117:12 119:9
132:11,17,24
133:6 134:20
150:8,17,19
151:16,18 152:4
155:13 157:18
167:25 172:16
178:15,21 179:6
185:12

**murderer**
111:6,23

---

### N

**name** 8:9 9:8
10:13 22:24
23:21 33:15 35:5
37:10,11,12 38:5,
6,10,12,24 49:11,
15,17,23,25
55:16 60:10 66:1
67:18 68:8,11
74:22 76:24 81:6
83:18 105:15
136:11 156:23
161:16,19 162:7,
16,17,21,22,23
163:8,9,11,12
166:5,8

**named** 8:14
125:20

**names** 10:6,10
55:9 161:21,24,
25 162:4,6,10

**narrative**
169:13

**national** 98:22
109:17

**nature** 175:4

**near** 150:7

**necessarily**
182:8

**necessary**
51:16 77:20

**need** 12:14
17:10 18:3 43:8
71:19 79:19 87:7
139:25 144:12,25
153:19 181:14

**needs** 94:9

**negative**
131:12 132:4

**neighborhoo
d** 75:10 78:1
185:16,25 186:11

**Neither** 170:8

**nervous**
124:16

**never** 41:22
116:17 136:20
180:16 181:5

**nicknames**
162:1,3

**night** 56:8 57:3,
4,5,18 58:8,25
59:7 70:3 87:25
172:14,15,16

**nine** 115:13,25
118:9

**ninth** 62:16
66:18,19 138:10,
23

**nonresponsi
ve** 159:10

**normal** 161:25

**normally** 41:4

**note** 19:9 149:5

**noted** 93:15

**notes** 22:2
154:21 155:11,
19,20,21,23

**notice** 8:5
18:18,23 36:25
155:9

**noticed** 95:16

**notified** 24:16

**November**
115:1

**number** 24:4
27:21 33:13
92:23 93:5
101:14,19,22
103:17 106:5,10,
14,15 107:2,6
118:17 131:10
134:6 136:9
137:2,13,14
139:7 140:1
146:14 161:13
163:21 165:2,17
185:14

**nurse** 167:2

---

### O

**oath** 8:25 36:6
141:13 142:6
181:25 182:1,7
183:4 190:17
192:1

**object** 33:21
57:10 58:19
61:18 63:16 64:7,
14 66:14 67:2
78:2 81:12,13,24
92:8,9,12 97:19,
23 102:2,19
109:24 126:8
142:25 157:22
159:8 162:2,8,13,
18 167:11 170:10
175:9 182:21
183:5 187:6,14,
19 189:20,22

190:10

**objected**
19:10,16

**objecting**
147:22

**objection** 9:13
14:22 15:4,10,18
16:3,13 17:5,20
18:5,11 20:10
22:6 24:12 25:21
28:3,11 29:24
33:24 34:19
36:15 38:14 39:1
42:24 43:13,25
48:3,10 49:1
50:15 51:9 54:1
56:24 62:18
69:21 71:16 72:7
79:4 80:21 82:7,
16,22 83:9,20
84:2 88:9,19
89:15 92:5 97:9
98:3,17,25 99:17
100:10 101:4
103:2,9,18
108:13 109:1,19
110:4 111:7,24
112:16 114:20
115:4,19 116:3
117:14,17
119:11,25 120:9,
18 122:2,24
126:25 127:15
129:1 130:7,20,
25 131:18,22
132:12 134:14,22
135:8,14,22
136:6,25 138:1,4,
17 139:1 141:3
142:20 143:2,24
145:14,21 146:6,
7 147:3,17 148:7
149:1,13 150:9,
22 151:24 152:11
153:8 154:12
160:11 168:13
169:5,15 170:5,
10 171:8,15,23
173:7,9,19
175:17,21 176:9
177:5,11,20
178:10,22 179:22
180:11 181:8
182:2,10 189:1

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

SIMON, BARBARA
06/03/2019

190:12 191:2 192:5

**objections** 41:21 110:10

**obligated** 133:18

**obligation** 48:1 122:22 184:8

**observations** 60:9

**obtain** 143:22

**obtained** 135:20

**obtaining** 60:25

**obviously** 120:5 176:25

**occupying** 37:3

**occurred** 9:8 150:19 157:1 166:21

**offense** 40:14

**offer** 13:12

**offhand** 9:25 117:8

**office** 13:17 40:3 70:19 90:19, 24 94:23 133:20 134:8 136:3 164:17,20,21 167:1

**officer** 10:12,22 12:18 13:4,20 14:9,12,19 15:16, 25 21:8,25 22:11, 16 23:6,20 25:2 26:20 28:1,8 29:18 30:18 32:8 33:16 38:20,22 42:11 45:17 46:5, 19 49:7,15 60:5 62:2,4,25 63:4,21 64:3 65:21,24 66:24 67:17 68:7, 12,18 70:13,15,

21 72:20 78:18 83:15,19 88:17 89:9 94:2 96:10 97:25 107:22 108:24 114:1 121:24 122:11, 14,15 125:13 128:16 133:17 137:4,11,15 140:6 149:7 150:5 155:24 156:15,22 165:11 171:13 173:16 174:6 185:11 187:3 191:22

**officer's** 10:13 67:18 68:8

**officers** 10:10 20:7,20 21:2 24:10 28:25 29:3, 8,15 38:17 53:24 54:12 55:4,7,12 61:1,13 66:10 69:17 72:6 98:7 157:8,12,13 163:13 168:22 174:22 178:3

**officially** 63:24

**oh** 11:16 13:22 14:6 17:2 19:4 29:9 31:25 36:22 43:5 51:19 57:24 58:14 67:8,24 68:15 71:5 73:4 84:9,20 85:5 104:19 105:17 113:21,25 118:13,14,20 119:19 129:23 139:23 140:13 147:24 159:23 175:22 191:6

**OIC** 156:15

**okay** 9:18,24 10:4,6,8 11:5,18 12:6,14,25 13:3, 8,11,13,25 14:7, 17 15:8,25 16:22 17:19 18:15 19:4, 19 20:24 21:5 22:2 23:4,12,15, 19,22 24:16 25:2,

6,13 26:9,18,24 27:3,17 28:15,23 29:7,9,19 30:7, 13,18,22 31:25 32:2,3,24 34:25 35:13 36:4,6,18 38:8 39:5,24 40:8 41:2 42:1,3,11 43:3 47:8,22 48:7,13 49:10,20 50:3,12,19,24 51:17,22 52:8,10 53:2,10,16 54:7 55:2,25 56:5 58:1,2,5,16,24 59:3 60:1,8,14,25 63:10 64:1,10,18 65:6,13,19 67:8 68:15 69:6,16,19, 25 70:11 72:3 73:22 74:7,10 75:1,15 76:2 78:22 79:13,19 80:1,2,10,25 81:16,19 82:3,12 83:6,22 84:9,10, 13,14 85:5 87:3, 21 90:22 93:3,18, 25 94:4,8,24 96:13 97:13,22 98:10,21 99:5,22 100:8,17,20 101:11 102:7,15, 23 103:7,13,24 104:5,22 105:2, 16,19,24 106:4, 13 107:10,25 108:5,23 109:11 110:24 112:19, 23,24 114:9 115:10 117:9,23 118:17,22,23 119:2,4,17 120:4, 15 121:4,11 122:5 125:4 126:2,3 127:11, 19 128:21 129:8 130:17 131:8 132:8,19 134:6 135:5,20 136:9 138:11,15 140:18 141:7,10 142:5 145:18 146:10 147:12 148:1,15, 20 149:7,25

151:14 153:13,21 154:2,18 155:19, 23 156:1 157:20 158:2 160:8 165:1,5,20 166:15,18,19,24 167:22 168:7,18 169:10,24 173:22 174:3,5 176:13, 24 178:4 180:3,5, 8,16 182:6,24 184:16,20 185:3 186:22 187:1 188:13 189:7,15 191:7

**old** 12:7 91:3 158:22 159:25

**older** 91:5

**once** 14:11 57:17 63:3 65:22 66:17 99:18 100:2 116:5 164:15 179:10

**one-second** 144:10

**open** 85:15 113:8

**operated** 99:20,22,24

**opinion** 38:22 92:7 189:18,22

**opinions** 95:13

**opportunity** 40:25 54:25 127:14 142:18 188:6,8

**opposed** 35:5

**order** 18:3 52:4 140:24

**original** 47:14 48:24 126:5

**outside** 77:22

**overall** 61:19

**oversight** 87:10

**overtime** 62:9

**owning** 153:23

---

**P**

---

**p.m.** 32:19,20 35:14,19,24,25 71:24 72:1,13 80:9 87:7,25 88:1 89:23 95:4,5,6,8, 19,20,21,23 96:20 105:7 113:4 118:3 120:7 121:21 123:11 129:12, 13,14,16,20 133:12 139:16 144:17,18,19,21 148:13 151:3,9 155:2,3,4,6 184:22,23,25 185:2 192:11,12

**package** 47:4, 5,13,15

**page** 19:8 25:25 28:15 33:9 36:19, 24 41:11,12 45:12 46:3 49:5, 20 52:8 53:7 55:2 56:5 59:10,11 65:4 67:15 68:10, 16,25 69:11,12, 13,25 70:11 73:3, 16,21 74:16 75:4, 15,23 77:2 84:19, 20 86:4 87:8,22 90:10 91:12,25 92:6,20 96:24 103:13,17,24 106:9,10,16,17, 18 107:7 113:10 123:18 131:8 165:1,18 185:19 186:8 188:9,11 190:1

**pages** 31:21,25 32:1 45:8 69:6 169:22 188:10

**palm** 102:10,12, 13 107:11,12,13, 16 109:8 115:14 146:15,16

**MIdeps@uslegalsupport.com**
**Ann Arbor | Detroit | Flint | Jackson**

**U. S. LEGAL SUPPORT**
**Bingham Farms/Southfield | Grand Rapids**

**Phone:  888.644.8080**
**Lansing | Mt. Clemens | Saginaw | Troy**

SIMON, BARBARA
06/03/2019

**paperwork** 11:20

**paragraph** 64:22 134:2 136:14 155:9 190:5,8

**Paris** 136:9 165:23 166:4

**parking** 121:15 123:23 124:10,25 125:7 177:18 178:5

**part** 30:18 40:1, 22 42:12 48:7 53:22 56:22 65:23 81:5 84:14 87:10,16 94:1 96:10 102:25 103:14 118:24 126:19 146:23 148:16 159:9 161:3 185:11 191:23

**particular** 8:16 10:23 22:10,16 23:13,22 24:10 29:8 30:22 34:23 46:23 47:2 48:18 62:3 98:1 125:6 130:4,17 134:15 150:6 156:19,25 160:17 164:11

**particularly** 60:10 99:23

**parties** 192:14

**parts** 84:11 124:6

**party** 77:21

**patrol** 13:20 20:7

**patrolman** 122:12

**pay** 85:21 156:6

**PCR** 21:24 24:10 28:10,15 35:16 52:4 69:20 77:25 79:8 185:9

**PCRS** 51:4

**PDFS** 19:2

**pending** 179:19 183:25 184:14,15

**people** 10:16 22:23 29:2,12 33:17 34:16,21 38:9 45:18 55:3 59:18,24 60:6,8 61:1 71:17 73:8, 22,23 75:17,25 77:22 88:14 100:3 126:24 156:14,15 170:13 174:17

**People's** 92:23 93:4

**performed** 90:13 92:14 134:9 142:12 190:18

**period** 150:19 151:16

**periodically** 77:5,10

**permission** 130:15

**permitted** 8:6

**perpetrator** 148:20,24

**perpetrators** 24:4 27:22

**person** 14:19, 20 15:16 16:11, 19,20 17:2 18:9 20:24 22:22 23:5 24:25 26:15 29:17 30:17 35:1 42:13,18,20 47:6 48:19 60:12 63:13,19 68:21 73:15 81:10 83:17 88:17,18 93:20 99:9,10,25 100:5,8,20 102:16,17 125:18 130:15 150:16 156:17 160:22

168:11 181:25

**person's** 54:19 68:11 113:25

**personal** 9:1 157:8,11 161:9 184:4

**personally** 11:2 20:13 30:23 66:22

**personnel** 74:18

**persons** 26:15, 22 168:18

**pertaining** 117:21 145:24 155:11

**pertinent** 48:9, 14,17 70:23

**phone** 24:24 25:4,5 85:21

**photograph** 92:24 103:14

**photographs** 96:8 104:22,24 148:4

**photos** 96:8

**pick** 190:16

**picked** 102:11, 12 136:1

**piece** 131:24

**pill** 79:12

**place** 60:15 64:25 76:21 131:14 151:17,19 152:4

**placed** 36:10 114:1 138:24 168:17

**plain** 47:22

**played** 96:14

**please** 28:7 67:5 78:11 129:10 165:17 167:12 173:21, 22,25 188:17

**pneumonia** 80:2

**point** 25:3 29:14 31:22 56:20 61:6, 15,24 74:12 76:4, 7,11 83:19 100:9, 22 108:1,3 125:1 138:25 150:20 151:12,15 163:20 174:19 177:25

**pointed** 111:12

**pointing** 114:19

**points** 47:17

**police** 9:22,24 10:1,10 12:18,22 13:1,4,19 14:8, 12,18 15:15,25 16:7 20:20 25:19 36:3 37:15 39:5 40:3 42:11 45:16 46:10 47:12 49:7, 15 50:1 53:24 54:12 66:9 67:17, 18 68:6,8 72:6 88:17 99:14 115:12 119:23 120:15 121:8 124:1,11 125:5 130:13 157:14 158:6,7,8 163:12 168:21

**policy** 15:3,8 28:19

**pool** 57:16

**porcelain** 93:8

**portion** 50:19 84:20 118:9 142:11

**portions** 72:17 104:3,7

**position** 182:6

**positions** 13:18

**possession** 70:22

**possible** 15:24 20:9 23:5 26:12

44:12 74:5 88:21 99:6 103:11 107:14 110:6 127:3 128:9 153:14 178:4

**possibly** 28:1 44:2 74:24 107:24 117:18 162:14

**pounds** 91:11

**practice** 25:13 26:10 83:14,15

**practices** 84:1

**Precinct** 13:21, 24 14:2,13

**preliminary** 11:23 21:11,18, 22,24 27:6,19 30:3,8,10,14,15 31:2 33:6 34:12 35:22 36:7 37:22 41:2 42:8 49:18 89:20 90:3,5 135:2 188:20 189:11

**premeditated** 179:6

**prepare** 12:20 46:7 47:2 127:24

**presence** 112:13 114:16

**present** 18:24 52:16 90:6 93:20 161:7 163:16 173:14 174:9,15

**presiding** 30:10

**pretty** 27:21

**prevail** 144:6

**previously** 92:22 167:16

**primary** 8:11

**print** 96:19,25 97:13,14,19 98:6, 7,10 99:15,19,25 100:2,3,8,12,20, 24 101:6,13,15

**MIdeps@uslegalsupport.com**
**Ann Arbor | Detroit | Flint | Jackson**

**U. S. LEGAL SUPPORT**
**Bingham Farms/Southfield | Grand Rapids**

**Phone: 888.644.8080**
**Lansing | Mt. Clemens | Saginaw | Troy**

SIMON, BARBARA
06/03/2019

Index: printed..reason

102:10,12,13
105:6,11,21
107:11,13,16
109:8,18,22
110:2,11,14,23
113:12 114:13,
14,17 116:16
146:11,12,18

**printed** 155:11

**prints** 98:19
99:2 100:4 102:4
107:5,11,12
108:9 109:13
115:15,25
146:15,16,21
147:9,12,13
148:5

**prior** 12:25 17:6
23:7 40:9 42:25
43:14 54:2 63:17
64:16 66:15 67:3
83:10 88:20
112:17 114:21
121:2 125:22
133:1 138:5
147:4 173:10
179:23 180:12
189:2 192:6

**privy** 59:21

**probability**
18:9

**probable**
14:20 15:17
16:23 17:1,4
18:3,8 29:20
30:16 117:11
141:14 178:21

**probably** 94:6,
20 107:22 118:9
135:6 145:8
188:25 189:3

**problem** 16:5
32:2 36:22
137:23

**procedure** 8:6
25:20 28:23
29:11,13 30:10
42:12 73:20 74:3

**proceed** 53:8,
13 55:24

**proceeded**
54:15

**process** 22:15
23:2 103:1 180:8

**produced**
19:25 40:2 154:2
155:10

**producing**
19:10

**products**
133:5

**promises**
140:24

**promoted**
13:21,22 14:1

**Proposed**
92:23 93:4

**prosecuting**
180:8

**prosecution**
115:18 119:8
155:12

**prosecutor**
46:8 47:3,4,13,19
48:2,20 64:22
122:21 170:13,
22,25 171:2
175:4 176:21,22
178:14,20 179:2,
10

**prosecutor's**
40:3 70:19
132:21 133:20

**protect** 128:24

**provide** 47:10

**provided** 75:1
108:11 148:16
160:8 166:5,8

**pull** 50:13
121:13,14 124:9
125:7

**pulled** 84:17
85:10 121:20

**pulling** 121:18,
19

**pumping**
85:24

**purpose** 75:18
166:24

**purposefully**
187:12

**purposely**
187:4

**purposes** 8:5

**pursuant** 8:5

**pursue** 153:5

**pursuing**
115:2,16 125:13

**pursuit** 116:2

**put** 46:22 47:11
54:23 58:12
62:16 63:20
65:16 75:8
106:23 114:2
164:20 168:20
174:25 185:14,24
187:4,11 188:9

**Q**

**quarrel** 152:7

**question** 8:18,
19,21,22 9:15
12:8 18:2 24:10
28:7 29:7 32:3,6,
10,14,18 33:11
34:2 36:25 37:6
40:4 41:13,18,22,
24 43:4,8 46:4,9
48:24 49:6,10,20,
21 50:3,7 52:2,9,
16,19 53:2,10,13
54:17,18 55:6,11,
18,23 57:19,23
58:4,7 59:12,17,
20,23 60:1,8,14
61:5,21 62:24
63:13 67:4,5,7,
22,23 68:5,17
70:1 71:4 73:10,
17 74:1,7,10,20
75:1,12 76:3,14,
17,20,24 77:3,7,
10,13,16 87:11,

22 88:2,4 91:17,
20 92:1,7,13
93:3,11 100:15,
18 105:19 107:15
110:24 111:1,2,
18 116:22 119:5
121:6 123:20,25
124:13,15,18,23
125:3,5,12
135:20 138:11,12
146:2 150:11,12,
14 153:1,11
169:11 172:8
173:1,3,4 174:14
183:1,24 184:14
185:23 186:2
187:7,15,20

**question-**
**and-answer**
53:14,15 54:16,
17 150:1 151:8
169:10

**questioned**
52:20

**questioning**
26:2 179:17

**questions**
19:17,18 45:8,14
46:18 64:23
65:10 78:5 150:6
153:17 154:19
168:6 179:14
185:5 188:13
191:8 192:7

**quick** 19:13
33:22

**quickly** 154:21

**quite** 102:24

**quote** 21:5
85:19

**R**

**ran** 85:20

**Randy** 97:1

**rang** 25:4

**rap** 162:7

**Raymond**
51:24 77:1 79:1
80:8,17,25 81:10,
23 88:7 89:1

**re-ask** 100:15,
17

**RE-**
**EXAMINATIO**
**N** 168:8 186:17
188:15 191:10,20

**read** 9:25 31:16,
22,24 33:3 34:7,8
35:3,8 37:18 42:5
43:4,8 45:9,23
46:13 49:13
50:19 51:13
53:10,16 54:25
56:12 57:1 60:19
61:9 66:4 67:4,5
68:1,15 71:7
77:19 84:10,11,
13 87:5,17 90:7
93:18 118:8,23,
25 119:17,19
120:25 121:22
142:1 151:14
163:23 165:2,18
171:21,25 179:12
188:6,8 190:5

**reading** 24:9
33:22 44:6 50:10
52:10 54:11 66:6,
8,24 84:5 169:2

**reads** 179:10

**real** 19:13 33:21
37:11,12 38:5,6
124:19,22 136:11
163:9

**realize** 174:2

**really** 25:18
99:22,23 186:9
190:4

**realtime** 95:16

**rear** 73:13

**reason** 13:8
19:7 31:18 36:13
157:20 160:5,9
166:4

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

**reasonable**
83:15,19 108:24
121:6 183:3

**reasons** 71:13

**recall** 8:16 9:25
10:6,9,10 11:7,24
15:24 20:6,15,17,
19 30:2,4,8 35:23
39:9 43:16 49:19
50:25 57:5 59:1,9
62:1,14 67:18
68:8 69:14,16
88:10,15 89:2,17
93:22,23 96:6,13
99:19 108:2,15
126:15,18 127:7,
9,10 138:18
141:7 143:12,13,
16,17 144:1,4
152:5 161:8,20
162:19 171:4
177:13 178:12,23
188:18,21,25
189:25 190:25

**receive** 15:22
19:24 20:13

**received** 22:4
35:10 40:1 53:3
72:5 116:20
121:25

**receiving**
20:6,15,17

**recess** 71:23
95:5 129:13
144:18 155:3
184:23

**recognize**
21:24 33:5 68:13
149:5,22

**recollection**
34:15 50:25 72:3,
5 88:5,12 89:3
163:4

**recommenda
tion** 170:21,24
171:2

**record** 8:3
21:11,19,22,23
27:6,19 37:15,16
39:5,6 40:21 43:9

50:1,14 65:9
67:9,10 68:2
71:21,22,24 72:1
79:16 81:5 83:18
84:3 87:17 95:4,
6,8,12,19,20,21,
23 98:23 119:17,
20 126:1 129:9,
11,12,14,16
144:13,17,19,21
145:1 146:20,23,
25 154:22,23
155:1,2,4,6
184:22,25 185:2
189:6 192:11

**records** 40:2
49:25 88:25
89:12 126:16
127:11 155:15,
17,18,19,20,21

**recourse**
98:10 100:9,21
101:2

**red** 93:11

**refer** 35:16
89:12 107:18
133:24

**reference**
10:25 107:15

**referenced**
103:16

**referred** 47:16
51:6

**referring** 58:24
68:22 145:3

**refers** 107:17,
18

**reflect** 8:3
113:15

**reflective** 93:2

**reflects** 69:9
105:20

**refresh** 10:15
72:4 108:11
119:6 163:4

**regarding** 9:2
10:15 29:22
46:19 91:13,14

95:14 97:2 119:8
146:21

**relation** 167:9,
14

**relationship**
40:12 128:17,18

**relayed** 76:7

**relevant**
122:21 145:4

**reliable** 89:1

**remained**
72:21

**remember**
10:13,17,18,22
15:6,8,12,20
19:15 21:1,3
35:10 40:5 44:18
50:16,17 51:3,13,
21 55:9 58:21
62:1,8,9 72:23,24
76:24 78:11
80:23 82:1 83:11,
25 89:5,6,16 94:3
96:16 97:16
101:9,10 107:24
108:4 109:10,15
117:20,22
119:13,15 120:20
122:18 123:6
124:3,4,6,8,10
125:16,19,24
126:2,7,12
127:17,21,22
129:7 135:16,18
136:13 137:19,21
138:7,8 140:17
141:1,2,5,9
143:3,9,10,14,15
147:9,11 149:9
155:25 157:16
159:17 163:1,6
166:23 171:1
172:11,17,18
173:2 174:24
176:19,22,23
178:7 179:24

**remembering**
137:24

**repeat** 28:7
43:7,8 112:11
167:12

**rephrase** 8:20
61:3,5,21 108:19
119:5

**report** 24:14
39:15 40:4,6,8
46:8 70:18 76:23
109:4,7 133:11,
16,19,22,24
137:14 139:8,9,
14,24 140:2,15,
16,19,20 146:21
163:20 171:21,25
176:13,16 179:1,
3,5

**reported** 36:3

**reporter** 139:5
144:5

**reporting** 59:6

**reports** 9:19,
22,24 10:1,11
46:9 51:12
174:23 176:8

**represent** 8:10
81:3 108:5
114:13 180:1
184:6

**representativ
e** 134:7 163:21
164:12,16,19

**representing**
8:1

**request** 105:6,
11,12,16,25
113:15 155:15

**requested**
105:21 192:13

**required**
176:6,7

**requires** 16:23

**reserve** 19:23

**resident** 80:25

**residing** 81:3

**respect** 183:13
184:11,12

**respected**
183:15,16

**respecting**
183:12

**respective**
192:14

**responded**
32:9 49:9,16
53:24 69:17
134:2

**responding**
21:25 55:12 60:4

**response**
153:17

**responsibility**
185:11

**responsible**
122:20

**responsive**
19:24

**restate** 126:14

**restroom**
71:19

**result** 8:12
126:15 131:9,10,
12 134:10

**results** 39:9
100:5 105:24
106:1 131:5
143:21

**retire** 13:10

**retired** 13:5,6
15:9,14

**retirement**
13:9

**revealed**
142:12 190:18

**review** 9:11,24
10:2,4 11:5,8,15,
25 40:25 46:9
96:11 108:1,11
109:25 117:20
127:14 175:3
176:6,7

**reviewed** 9:18
10:11 11:3,13,19
20:6 59:4,5 61:11
72:4 80:19 88:5,

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

SIMON, BARBARA
06/03/2019

Index: reviewing..Similarly

24 104:25 122:1
127:19,22,24
128:8 131:5
148:4 164:18
185:10

**reviewing**
52:4 53:22 71:15
126:16

**Rice** 140:11

**Richardson**
97:1

**right** 10:20
16:16 19:23
31:10,13 34:5
43:19 49:21
54:10 55:6,11,23
62:8 70:1,13
75:10,11,17,24
77:3,7,11,12,13,
15 79:15,21 85:6
87:10 97:17
102:18 104:20
121:15 123:25
124:23 125:1,9,
12 154:19 156:9,
11 159:12 166:12
169:14 171:14
178:1 185:25
186:1,14 188:14

**right-handed**
149:12

**rights** 33:12,19
34:2 35:3,12 37:8
50:9 55:19
120:25 137:6,12

**rising** 174:2

**robbery** 17:15

**Robert** 81:7,21
82:3 108:9 113:3,
11 114:14
115:15,25

**rocks** 86:13

**role** 30:19 96:14

**room** 34:23
70:17 73:9,13
184:24

**rooms** 34:23
76:22

**route** 73:19

**routine** 72:25
83:14 94:4
108:23 109:2

**row** 24:4

**rules** 8:6 9:4

**rumors** 141:4,7

**run** 81:22

**running** 85:19

―――――――

**S**

**satisfied**
141:14

**Saturday**
32:24 135:4

**saw** 56:8,18
57:13 87:24 91:4
93:7 121:14
124:9 125:7
131:15 177:19

**saying** 17:8
34:8 36:4 47:21
64:11,19 66:11,
22,23 78:13,16
85:25 110:12
111:18 112:10
114:22 116:12
126:2 132:17
135:1 172:17
180:14 182:13,16

**says** 21:19
24:16,19 25:25
28:15 33:23
35:19 39:7 40:11,
12,16,17 57:5
69:4 70:20
101:16,21 106:4
107:10 120:13
121:11 132:3,7
134:7 137:2
140:10 141:11
142:8,11 148:20
161:3 179:5
185:13 190:21

**scandal** 141:2

**scandals**
141:5

**scenario**
128:23 154:7

**scene** 21:8
22:1,3 26:16
29:4,17 32:3,4,9
36:11 44:3 49:8,
9,16 52:17 53:25
54:13 67:17 68:7
69:17 74:5 96:7,8
97:6,8 122:6
130:18 157:5
164:17,22
171:18,20 177:23
178:2,3 189:23

**schedule**
19:25 155:10

**scout** 120:6

**search** 105:6,
11,21 129:19
130:3,13,14,15
141:13,16 145:25
163:17 173:15

**second** 41:3,
23,25 79:17
100:13 106:16
152:17 154:11,20
165:21

**section** 14:5,14
20:3,21 21:2
25:14 28:21 38:1
62:6 64:11 74:18
81:9 102:24
126:20 137:3
140:23 154:6
170:8

**see** 16:25 17:3
19:13 23:24
24:17 26:3 27:1
30:16 31:25
35:24 36:4 47:6
49:25 51:12,13
52:19 56:3 65:7
68:18 69:4 70:11
73:6 75:20 76:17,
20,24 78:11,12
85:25 87:16
88:14 98:7 99:5
104:6,9,10,19,20
107:7,25 110:17
113:11 122:8
123:22 124:18,25
127:16 133:24

134:6,11 136:22
140:13 142:14
149:7 161:3
163:20 173:24
177:17 180:6
184:6,7

**seeing** 40:5

**seen** 89:12
149:10 154:16
178:5 186:11

**selected** 31:21
45:7 72:17

**sell** 86:13,19

**selling** 74:25
86:16,23 158:10,
14,17 159:17,24
171:3

**seminars**
14:15

**send** 99:3 100:5

**sent** 18:23 98:6
99:18

**sentence**
191:13

**Sergeant**
161:6 186:25

**serious** 25:15
74:4

**server** 31:15

**service** 95:1

**set** 45:25 56:14
60:21 178:18
192:8

**sets** 128:22

**seven** 23:18

**Seward** 184:24

**sex** 13:23,24
14:1 74:24 159:3,
4,6,25

**sexual** 160:22

**shed** 110:19

**sheet** 114:2

**Shelina** 81:3,4,
17,20

**Shelina's**
84:16 85:9

**Sheriff's** 167:1

**shift** 157:2

**shook** 117:3

**short** 31:15

**shorthand**
169:21,23

**shouting**
85:19

**show** 18:21
47:24 92:24 93:4
114:17 116:25
117:9,23 127:11
132:10,16,21
153:7

**showed** 155:9
176:16

**shower** 104:16

**shown** 92:22
93:5

**shows** 62:15
82:5 92:25 145:6

**side** 113:11

**sign** 55:1
130:15,24

**signature**
140:5,6 141:19
188:3 192:13

**signatures**
188:4,9,10

**signed** 27:20
127:11,13 128:7,
21 129:5 141:22
161:10 164:4,18
166:22 180:9

**significance**
98:1 110:3,8

**significant**
96:14

**signing** 141:24

**similar** 162:16

**Similarly** 8:21

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

SIMON, BARBARA
06/03/2019

**Simon** 8:4,9
18:2 21:18 24:17,
19 25:1 27:9
56:10 66:3 69:4
72:3 77:18 95:10,
25 97:1 105:5,10,
13 123:14 130:1,
2 133:14 137:2
139:15,17 141:11
144:23 155:8
156:14 179:7
184:5 185:5
186:19 191:12

**simply** 11:14
19:23 122:7
182:20

**sir** 12:19 13:20
14:13 15:1,20
16:21 17:1,12,22
19:22 20:4,16,23
22:7,13 23:3,16,
21 24:22 25:4,9,
16,23 26:22
33:13,20 34:4,6
35:7,23 36:5,12
37:5,9,12,16,23
38:25 39:3,10
40:5 41:1,7,17
43:16 44:16,20
47:21 49:19
50:16 51:3,11
52:6 55:5,20
56:23 57:1,18
58:11,21 59:9
62:1,5,9,14,20
63:3,18 64:18,19
65:4,8,11,16,22
66:13,17 69:15,
18 72:23 75:20
76:3 80:5 81:14
82:1 83:11 84:4,
19 89:5,16 93:22,
24 96:16 99:20
100:13 101:10,18
102:10 103:5
104:4,21 107:3,
20 108:15 109:9,
20 110:23 112:1,
4 113:18 115:6
116:9,18 117:8,
22 119:10,13
120:21 122:14
125:16 126:12,23
127:2,17 128:14

129:2,7 130:22
131:2,7,11 132:1,
3,7 134:1,12,16
137:19 138:22
141:1 143:3,16
145:16,23 146:8,
19 149:6,21,24
151:14 152:1,13,
24 154:16
155:22,25 156:4
159:11 161:2,15,
20 163:1,18
169:18,23 170:13
171:1,9 172:7,11,
15,17,20,25
173:18,25 174:18
175:2,13,24
176:5,22 177:7,
23 178:3,12
179:15,24 180:13
181:17,20 182:12
183:12 184:11
186:8,12 188:3
189:4 190:6

**sit** 15:14 16:22
34:16 47:1 59:3
74:1 88:16 89:3
108:17 116:15
123:21,22 128:10
147:8 183:7,13,
17

**situation** 24:25
26:10,11 99:7,12,
24

**situations**
99:6 183:4

**skull** 91:19,21
92:10,17

**sleep** 121:20

**sleeping** 74:24

**small** 131:24

**Smith** 8:1,8,10
9:17 15:2,7,13,21
16:4,6,15 17:18
18:1,7,15,21
19:1,3,5,6,16,19,
20 20:14 21:13,
15,16,17 22:8,14,
19 23:1,14 24:15
25:24 26:8 27:8,
12,16,18 28:5,14

30:1 31:6,10,12,
14 33:25 34:1,24
36:18,22,23
38:19 39:4,11,17,
20,23,25 42:3,4
43:7,10,20 44:4
45:1,4 48:6,16
49:4 50:18 51:15
52:3,7 54:3 57:6,
12 58:6,23 61:21,
22 62:23 63:25
64:9,20 65:12
66:21 67:5,12,21,
24 68:1,3 69:1,22
71:6 72:2,14
78:4,6 79:7,18,25
80:10,15,24
81:15 82:2,9,19,
25 83:5,12,24
84:7,25 85:6,7
87:3,4 88:11,22
89:24 90:2 94:8,
11,14,24 95:9,24
96:21 97:12,21
98:9,20 99:4,21
100:7,17,19
101:7 102:6,22
103:6,12,23
105:8 107:4
108:16 109:3,21
110:7,13 111:10
112:2,20 113:5,9
114:8,11,12,24
115:7,23 116:7
117:3,5,15,19,23
118:4,13,19,21,
25 119:3,14
120:1,12,22
121:5 122:4
123:2,12 125:23
126:13 127:4,18
129:3,8,22,23,25
130:9,23 131:3,
20,23 132:15
133:3,13 134:18,
23 135:10,19,25
136:8 137:1
138:2,6,20 139:3,
5,9,17,20,22
141:6 142:4,23
143:4 144:2,5,9,
14,22 145:17,24
146:3,9 147:7,19
148:3,14 149:4,
16 150:13 151:4

152:2,15,25
153:2,10 154:14,
18,25 155:7
156:9 157:22
159:8 160:11
162:2,8,13,18,24
163:5,25 167:11
168:7,9,14 169:7,
20 170:7,11,19
171:11,19,24
173:13,23
175:11,19 176:1,
12,20,24 177:1,8,
14,24 178:13,24
179:25 180:15,20
181:11 182:3,14,
24,25 183:10
184:1,14,15,19
185:3,7 186:16
187:6,14,19
188:16 189:5
190:15 191:8,14,
21 192:7

**so-called** 88:7

**solid** 93:16

**solve** 103:7

**somebody**
17:14,15 21:7

**soon** 73:13

**sorry** 11:4,16,22
12:9 13:22 17:8
19:1 26:6 27:16
29:9 36:22 37:17
38:25 43:2 48:12
51:5 55:22 58:14
67:21,24 71:5
72:16 84:21 85:5
90:23 100:12,13,
14,16,24 104:14
112:18 113:21
117:4 118:14
123:22 124:21
126:10 128:12
144:3 147:20,25
150:14 159:15
160:24 165:21,23
167:22 173:8
175:22 178:17
181:17 187:8
191:6

**sources**
174:21

**speak** 8:23
17:10 48:17
59:23 93:25
126:1 142:18
184:8 189:6

**speaking**
26:20 35:4 71:17
181:24 183:12
191:13

**Special** 13:16

**specific** 13:8
84:5 90:13

**specifically**
95:1 167:24

**speculation**
17:21 24:13 28:4,
12 29:25 36:16
38:15 39:2 82:17,
23 83:2 98:4
102:20 103:10,19
110:5 115:5,20
116:4 120:19
127:1 130:21
131:1,19 135:23
147:18 148:8
149:2,14 151:25
153:9 154:13

**splattered**
104:6,18

**spoke** 9:6 29:1
35:12 169:21

**spoken** 60:9

**spot** 131:15

**squad** 22:21,23
23:3,10,11,12,15,
16,17,19 24:25
63:19,20 65:22,
23 76:22 81:9
156:23

**squads** 22:21
23:10,11,16,18
156:22

**stab** 134:10
142:13 143:7
164:19,24 190:19
192:2

**stabbed** 152:8
181:6,9

SIMON, BARBARA
06/03/2019                                                                    Index: stabbing..tell

**stabbing** 21:4, 20 32:7 52:15 53:5 89:13 153:25 169:12

**staff** 81:9

**stains** 93:9 133:5

**stand** 69:13

**standing** 73:8

**stands** 10:7

**start** 12:15 37:1 85:8 157:3

**started** 12:18 36:25 37:7 84:16, 17 85:4,9,10,12, 24 163:8

**state** 13:16 71:9 98:21 109:16 115:11 119:20 131:14 136:9,14 143:5 146:18 190:17

**stated** 112:6 136:16 159:18 166:2 185:14

**statement** 10:7,25 11:1,3,4, 9,12 33:20 37:1 38:1 42:1 50:9 53:9 62:7,9 70:4, 8 71:13 78:11,12, 14 80:8,16 81:5 84:6,11 87:6,15 118:1 119:4,7 120:6,7,16 121:9, 11 123:5 124:3,5 126:5,8,17 127:11,13,14,17 128:6,21,22 129:2,4,6 136:17 142:5 143:8,15, 17 149:19 150:1, 20 151:1,7,11,12, 14 152:7,8,16,17, 18,21 153:16 154:2,5,9,11,17 157:21,24 158:2, 4 163:3,23 164:8 165:5,10,11 169:1,2 175:7,12,

15 177:15 180:22,24,25 181:1,2,4,5 186:23 187:1,2,5, 11,12,23,25 188:2,6,9 190:17, 24 191:12

**statements** 9:22 10:4 11:5 47:11 50:11,24 52:10 53:11,23 54:11 66:7,8,25 70:23 71:15 80:19 121:25 128:2 174:10,11, 12,16,22 176:6

**states** 137:14 155:10 185:19

**stay** 74:15

**stayed** 110:23 188:24

**step** 94:22 153:15

**sticker** 139:10

**stopped** 116:12

**story** 78:24

**strangu** 91:13

**strangulation** 91:14

**street** 38:10 85:20 161:19,21, 24 162:3,6,16,22

**strike** 159:9 176:24

**struck** 190:10

**stuff** 97:19

**subject** 33:24 42:19

**submission** 146:25

**submit** 122:21 140:15 146:15 147:2

**submitted** 46:10 140:14,20

**submitting** 122:23 140:18 147:9

**subscribed** 141:12

**subsequent** 40:17

**substantiate** 151:21

**succeeded** 151:11

**suffered** 190:9

**Sufficiently** 93:16

**suggest** 79:8 88:6,25 111:22

**summarize** 13:18

**superior** 128:15 152:22 154:10

**supervisor** 128:18,20

**support** 142:9

**suppose** 102:23

**supposed** 46:25 175:3

**sure** 45:11 57:22 58:3 61:4 86:24 144:12 161:20

**surface** 93:2

**suspect** 24:11 28:9 55:16,17 75:21 106:13 107:12 111:21 116:13

**suspected** 20:8

**suspects** 28:1

**suspicion** 110:20

**suspicions** 56:20

**suspicious** 78:8,9 160:1

**swearing** 192:1

**sworn** 78:20 81:4 141:12 142:8 182:20 185:18 186:13 190:17

**system** 40:13

_____

**T**

**Table** 69:2

**tag** 101:14,19,22 103:16 106:5,9, 15 107:6 131:10 146:14

**take** 8:15 23:22 31:12 33:19 36:1 41:4,23 46:6 47:3,12,13,19 50:4 66:19 69:23 70:16 71:20 76:21 79:12 84:6, 10 87:8 97:18 99:2 103:13,24 118:8 142:1 144:10 151:10 153:15 154:20 168:25 178:25 180:21,22 184:16

**taken** 8:5 10:7 11:17 50:9 54:11 62:15 71:23 80:16 95:5 100:2 108:6 119:22 120:7,16 126:22 129:5,13 144:18 152:9,17,21 154:5,9 155:3 157:24 174:10, 16,22 184:23 190:23

**takes** 79:17

**talk** 28:25 47:3 70:17 76:4,17 85:12 94:2 191:23

**talked** 25:1 29:5 37:9 75:5 77:4 127:23 169:25 185:13,20

**talking** 22:17 26:13 29:7,9,11 37:7 51:1 53:23 54:12 58:9,11 66:9 78:14,17 94:3 97:22 104:15,19 113:22 122:18 163:8 165:22 168:22 172:15 174:11,17 191:12

**tall** 91:8

**tank** 92:2,8,11, 25 93:2,7,9,13 96:6,13 101:22 103:16 106:11 107:19 108:6,10 109:23 110:15 111:4 114:14 115:12,14 116:1 189:23 190:11

**team** 25:11

**technician** 36:21 71:21,25 95:3,7,18,22 97:2,4 129:11,15 144:16,20 154:22 155:1,5 171:25 184:21 185:1 192:9

**technician's** 171:21

**technicians** 176:2

**telephone** 136:2

**tell** 9:18 12:6 16:10 29:15 36:13 37:3 41:14, 18 42:12 43:19 54:23,24 55:15 56:7,9 57:2,9,13 70:14 77:5,8,10, 17 87:9 91:3 99:15 108:20 109:11 110:8 114:3 130:11

SIMON, BARBARA
06/03/2019

Index: telling..treat

137:22,23 141:24
158:7,8 169:11
172:25 178:14,20

**telling** 44:13
124:8,11 133:4
145:7 172:12
182:16

**tells** 78:23
150:17

**ten** 13:6 118:10

**tend** 111:21,22
132:10 153:7

**tends** 47:24
116:24 117:9
132:20,21

**term** 116:23
117:7 145:2

**terminating**
183:21,24

**terminology**
97:14

**terms** 25:7 94:4
108:12

**test** 131:5,9,10
145:18

**tested** 131:17,
24

**testified** 26:9
44:7,19 49:17
57:20 63:6,11
66:3,5,6,23 68:21
69:6 71:12 90:5,7
93:21 94:1 96:4
114:16 120:23,24
126:19 133:17
135:2 149:25
163:5 173:14
174:19 179:1
189:18,22 191:22

**testify** 9:2
68:19 78:7
125:17 134:8
137:3,15

**testifying**
188:18

**testimony**
11:23 17:6 23:8

30:2,8 31:18 33:5
34:7,9,12 35:13
36:6,9 37:21 41:2
42:8,25 43:14
45:25 46:16 47:8
50:21 53:19 54:2
56:14 57:8 60:21
61:9 63:7,17
64:1,10,16 66:15
67:3 69:7,8,11,12
71:9 72:18,21
73:1 77:19 78:15,
21 83:10 87:16
88:20 90:8 94:5
96:3 112:17
114:21 121:3
125:22 133:1
134:24,25
136:10,15,20
138:5,7 139:2
147:4 157:23
165:15 168:10
170:2 173:11
174:24 177:12
178:11 179:23
180:12,19 185:18
186:6,14 188:19,
21,25 189:2,8,10
190:20 192:6

**Thank** 21:15
27:17 39:21 45:3
79:24 80:14 90:1
93:3 116:11
125:12 129:24
139:21 140:4
156:10 173:22
179:12 181:16
186:16 191:9
192:7

**thing** 25:17
119:1 173:4

**things** 35:7
54:7 63:10 66:7
71:14 78:7,9
94:5,21 128:4
155:20 169:2,8
172:21 182:19
184:6,9

**think** 14:6 19:16
23:17 26:9 31:8,
11 35:17 47:1
58:9,24 60:16
65:1,9 71:3,12

73:14,19 77:20
83:7 87:1 88:17
94:9,22 105:19
106:17 116:20
118:11 125:21
136:19 154:7,9
158:4 159:14
183:2 185:10
189:3,6

**thinking** 96:14
116:13

**third** 18:18
103:24 106:17,18
107:7 123:18

**Thirteenth**
13:21,24 14:13

**Thompson**
136:10 165:23
166:5

**thought** 29:9
104:19 105:17
131:17 147:24
157:17 180:16

**threatened**
158:18 181:18,
19,20

**three** 10:5 28:16
51:6,18,23 54:7
75:17 86:18,21
132:2 159:5

**thumb** 113:12
114:13,14,16
116:16

**tickets** 172:6,
10

**time** 10:18 12:22
20:3 22:21 23:13,
18 26:23 32:10,
12,15 35:15,17,
19,21 36:2,14
37:25 38:1 40:13
44:7 45:9,17
46:24 47:2,25
50:6,8 52:20 53:1
59:13 61:6,12,16,
24 70:10 71:22
72:1 74:3,15
75:2,8,20,22
80:20 84:10
87:12,24 91:4

95:4,8,23 107:14
118:8 120:5,20
124:16,17 125:15
129:16 134:15
136:1 138:14
140:14,18,21
142:1,18,24
144:17,21 150:8,
19 151:10 152:4
155:6,23 156:16,
19,25 157:12,13
159:5 160:5,7,17
161:19 164:4,7,
11,23 165:6,13,
15,25 166:8
167:3,6 168:6,25
174:18 181:10
184:22 185:2,23
188:20

**times** 86:8,10
187:25

**title** 133:16

**today** 15:15
16:22 19:12 59:3
68:18 87:13
88:16 89:3 90:6
108:17 116:15
128:10 147:8
171:14 182:8
188:19 189:15

**today's** 18:25

**toilet** 92:2,4,8,
11,25 93:2,7,9
96:6,13 101:21
103:15 106:11
107:19 108:6,10
109:22 110:14
111:4 112:7
114:14 115:12,14
116:1 145:11
189:23 190:11

**told** 9:3 24:25
25:12 29:17
33:15,17 44:8,10,
16 55:3 56:19,22
57:4,17 60:4
68:11 74:14,21
75:8 76:11 77:4,
13,22 78:19
124:1 125:5
132:23 136:19
138:8 151:20

158:20,22 171:14
172:5,9,13,14,20,
21 173:3,6
185:23 186:10

**tone** 173:20

**top** 92:3,4 93:13
96:6,13 101:16,
22 103:16,21
106:11 107:19
108:6,10 109:23
110:15 111:4
114:15 115:14
116:1 131:4
141:12 189:23
190:11

**total** 115:13,25

**totally** 136:20
159:9

**touch** 112:6

**touched**
110:22

**trace** 102:16,17

**traffic** 172:6,9

**training** 12:20
14:8,10,11,16
15:22

**transcript**
11:17 31:3,22,23
33:22 44:6,23
45:10 64:21
67:20 69:9 72:11,
17 89:22 123:9

**transcription**
31:17 34:11
37:21 42:7 46:15
53:19

**transcripts**
9:19,23 11:8,9,
14,19,22 59:4

**transferred**
141:8

**transported**
29:12

**trauma** 91:22
93:14

**treat** 182:22

**MIdeps@uslegalsupport.com**
**Ann Arbor | Detroit | Flint | Jackson**

**U. S. LEGAL SUPPORT**
**Bingham Farms/Southfield | Grand Rapids**

**Phone:  888.644.8080**
**Lansing | Mt. Clemens | Saginaw | Troy**

SIMON, BARBARA
06/03/2019

**trial** 11:23 30:17
44:19,23 45:5
46:1,16 53:20
56:15 57:21
58:15,18 60:22
64:21 68:19
71:10 72:11,17,
18 78:21 123:9,
15,17 140:19,21
165:15 166:8,21,
23

**true** 18:14 66:3
77:7,16 81:10
82:12 123:20
124:15 125:3,9,
10 134:13 143:8,
17 164:8 182:20
184:7

**truth** 126:5,17
145:7

**try** 8:23 17:11
47:22 74:11
101:5 153:13

**trying** 54:5
55:15 65:14
66:10 79:8 84:16
85:9 97:17 98:13
99:22 101:1
148:2 168:21

**Tuesday** 45:6

**turn** 48:1,20

**turned** 51:25
89:13

**turns** 83:16

**TV** 118:12,14

**twice** 148:22

**two** 10:5 63:10
76:18 86:21
96:24 99:6
101:25 102:1,4,
13 106:13 107:6
115:11 132:2
134:20 165:20
169:22

**two-and-a-
half** 115:11

**two-page**
169:12,13

**type** 49:21 60:2
70:18 86:12

**typical** 22:5
72:25

_____

**U**

**uh-huh** 19:14
26:4 42:17 87:19
112:25 128:5
139:20 170:3

**Uh-uh** 79:20

**uncertain**
49:14

**uncommon**
38:8

**underscored**
148:22

**understand**
12:10 38:17,21
64:1,10 67:6
84:10 153:11
156:25

**understandin
g** 22:9 155:14

**unidentified**
107:11,16 109:8

**unit** 97:2,4,5
98:6

**units** 24:16

**unknown**
23:25 24:1,5,6,7
27:22,23,24
98:11 99:25
100:6,8,21 101:2

**unquote** 85:19

**untrue** 164:5
165:6

**untruthful**
166:1 186:23
187:5,12

**unusable**
100:6

**unusual**
162:16

**unverified**
136:20

**updating** 14:8,
10

**usable** 100:6
102:8,9,11,15
107:11,16 109:8

**use** 78:8 121:13
139:6 145:2

**user** 177:17

**usually** 156:17
161:24,25

_____

**V**

**vague** 16:3
17:21 98:17

**various** 22:3
46:10

**vehicle** 131:6
145:19,25 176:15

**verify** 73:18
81:9 88:6 122:7,
9,22 126:5,16

**versus** 10:16
45:18

**veteran** 102:23

**victim** 32:4
53:4,5 60:3 93:13

**victim's** 91:15

**VIDEO** 36:21
71:21,25 95:3,7,
18,22 129:11,15
144:16,20 154:22
155:1,5 184:21
185:1 192:9

**videographer**
36:20

**videotaped**
192:10

**view** 32:4

**viewed** 91:8

**Vincent** 27:20
68:12,22 69:13,
16 72:6,18

168:22 171:6
185:9

**Vincent's**
185:18

**violated**
170:21

**voice** 173:20
174:2

**voluntarily**
130:24

_____

**W**

**wait** 41:9 54:5
147:23

**waiting** 54:7,8
68:18 75:25 76:1

**walk** 73:23
74:14

**Walker** 11:16,
17,18,24,25

**walking** 74:13

**wall** 104:3,7,15,
16

**walls** 101:17
146:13,16,22
147:1,10,12

**want** 17:16
19:17 31:16,20,
22 46:18 51:13
63:10 76:3 79:16
89:10 94:11,13,
16,25 99:8,10
117:1 118:8,16
146:10 158:9,25
159:5 160:3
163:13 178:25
185:8,17

**wanted** 13:10
49:13 73:24
74:14 100:1
154:10 167:19

**WARD** 85:3
144:10 166:13

**warm** 113:7

**warrant**
141:13,17 142:10
158:11 163:14
172:5,7,9

**Warren** 91:1

**wasn't** 25:18
27:2 29:7 38:12
111:15 124:13,15
152:13,24 161:15
171:9 175:24

**water** 79:19
93:1

**way** 40:1 47:15
50:19 51:22
54:18,19,24
58:12 63:20
65:16 72:22
88:24 97:25
102:1 109:22
139:23 140:13
143:20 147:14
182:22

**Wayne** 46:25
134:7 136:2
164:12,16 167:1

**we'll** 17:11
31:15 59:10
140:1

**we're** 31:8 51:1
63:1 71:22 82:12
94:22 95:3,4,18,
19 97:22 106:21
129:12 140:4
144:16,17 155:2
184:21,22 192:11

**we've** 23:23
44:5 54:7 66:4
79:9 89:12 109:5
110:1 141:10
168:22

**weapon** 24:1
109:24 111:20
112:14 117:12
132:24 153:21
178:15,21

**week** 10:3

**week-and-a-
half** 10:3

SIMON, BARBARA
06/03/2019

Index: weekend..young

**weekend** 90:18

**weeks** 12:24 86:18

**weight** 91:10

**welcome** 19:18 21:16

**went** 12:22 14:4, 15 21:8 25:11 37:11,12 46:24 49:25 55:12 69:11 73:5,6 85:16,18 95:12 119:21 121:20 134:24 136:20 164:17 171:7 189:15

**weren't** 44:10 98:13 174:9

**West** 20:8 21:20 81:2 97:2 113:13

**whereabouts** 151:13,16

**white** 24:6 27:23 93:9

**William** 140:11

**Wilson** 26:21 168:23 171:6

**window** 121:14,19 122:7 136:23

**wish** 45:9

**witness** 9:16, 22 10:4 14:25 15:5,11,20 17:7, 12,22 18:13 19:14 20:12 22:7, 13,20 23:9 24:14 25:9,12,18,23 26:1,6,17 28:13 34:20 36:17 38:16 39:3 43:2, 5,15 44:2 47:11 48:5,12,14 49:3 50:16 51:11,14 52:4,6 54:11,21, 22 55:21 57:1,24 58:2,5,21 62:19 63:18 64:18

65:11 66:17 67:8, 11 68:25 70:22 71:5,15,17 72:8 76:25 79:1,3,6, 12,14,20,24 80:8, 16,19,23 81:14 82:1,18,24 83:3, 11,22 84:4 85:5 87:2 88:10,21 89:16 94:16,19 97:11,16 98:5,18 99:1,18 100:11, 16 101:5 102:4, 21 103:4,11,20 106:22,25 107:2 108:15 109:2,20 110:6,11 111:8 112:1,18,25 114:6,9,22 115:6, 21 116:5 117:18 118:1,23 119:2, 13 120:11,20 121:4 122:3 123:1 125:15,20 126:10,12 127:2, 16 129:2 130:8, 22 131:2 132:14 133:2 134:15 135:16,24 138:18 139:4 141:4 142:2,22 143:3 144:1 145:16,23 146:2,8 147:5,24 148:9 149:3,15 150:11,23 151:1, 6 152:1,13 157:24 160:12 162:3,9,14,19 163:1,5,7 164:2 167:12 169:17 170:6,18 171:9, 16 173:8,21 175:22,24 176:11,19 177:6, 13,22 178:12,23 179:24 180:13 181:9 182:12 183:7 184:11 185:14 187:8 189:3 190:14 191:4,6 192:13

**witnesses** 10:6,8 22:4 25:7, 8,14 28:16,20,24 29:13 43:23

50:11,25 51:1,6, 7,12,20,23 52:11 53:11,23 56:22 59:14 61:1,13 66:9 69:3 70:19 76:13,16,18 79:10 119:22 161:3 174:12 176:7

**woke** 121:21

**woman** 56:8 57:2 60:10 123:5

**wondering** 51:20

**Woods** 51:23, 24 117:21 118:2 119:20 121:7 123:20 124:4 125:9 136:14 165:9

**Woods'** 126:17

**word** 11:11 78:8 86:25 132:22 141:19 143:15 148:22

**words** 97:17 156:6 180:14

**work** 12:21 13:3,15 16:7 22:15 26:22 46:23 84:16 85:9 87:13 88:8 100:3 130:5 176:13

**worked** 14:2

**working** 12:16 20:2 46:11 63:23 84:22 90:18 95:17 126:23

**worry** 148:2

**worthy** 131:17

**wouldn't** 68:12 112:3 116:6,12 132:16 150:14 182:12

**wounds** 53:3 134:10 142:13 164:19,24 190:19 192:2

**write** 54:17,19, 24 105:17 139:8 169:8 172:18,24 173:5

**writer** 28:15 185:13

**writing** 76:23 105:15 169:21

**written** 87:17 121:9 165:10,11

**wrong** 37:10 38:5,12,24

**wrote** 28:10 148:18 166:12 169:3,13,18,24 172:8,12,13,20 173:6 175:7,15 182:19

---

**Y**

**yeah** 26:25 27:16 58:15 71:20 78:4 79:7 94:10,14 97:20 100:17 101:8 103:22 118:14 173:21 177:25

**year** 125:7

**years** 10:19 13:6 14:6 50:17 91:6 108:7,8 115:11 158:22 159:25

**Yolanda** 165:22

**young** 9:7 12:23 38:9 75:9 168:20 178:5 185:24

**MIdeps@uslegalsupport.com**
**Ann Arbor | Detroit | Flint | Jackson**

**U. S. LEGAL SUPPORT**
**Bingham Farms/Southfield | Grand Rapids**

**Phone: 888.644.8080**
**Lansing | Mt. Clemens | Saginaw | Troy**