STATE OF MICHIGAN

IN THE **RECORDER'S COURT** FOR THE CITY OF DETROIT

THE PEOPLE OF THE STATE OF MICHIGAN,

vs.

Case No. **96-01138**

**LAMARR MONSON,**

                              Defendant.

                                                    **RECEIVED**

                                                    AUG 11 1997

                                         APPELLATE DEFENDER OFFICE

**JURY TRIAL**

Before the **HONORABLE GERALDINE BLEDSOE FORD**

Recorder's Court Judge

Detroit, Michigan - **Tuesday, March 4, 1997.**

**APPEARANCES:**

    **MS. MARIA MILLER**
      Assistant Prosecuting Attorney

        Appearing on behalf of the
          People of the State of Michigan.

    **MR. ROBERT MITCHELL**
      Attorney-at-Law

        Appearing on behalf of the
          Defendant Lamarr Monson.

Linda Roman Cavanagh, CSMR-1358
Official Court Reporter



RECEIVED
AUG - 8 1997
THE RECORDER'S COURT
APPELLATE DIV.
BY

*  *  **TABLE OF CONTENTS**  *  *

**WITNESSES - PROSECUTION:**                                **Page**

MARCO SCARPETTA

    Direct examination by Ms. Miller                       6
    Voir dire examination by Mr. Mitchell                  8
    Direct examination (cont.) by Ms. Miller               9
    Cross-examination by Mr. Mitchell                     24
    Redirect examination by Ms. Miller                    30


BARBARA SIMON

    Direct examination by Ms. Miller                      34
    Voir dire examination by Mr. Mitchell                 43
    Voir dire examination (cont.) by Mr. Mitchell         75
    Direct examination (cont.) by Ms. Miller              89
    Cross-examination by Mr. Mitchell                    101
    Redirect examination by Ms. Miller                   106
    Recross-examination by Mr. Mitchell                  111


SAWAIT KANZUEN

    Direct examination by Ms. Miller                      48
    Cross-examination by Mr. Mitchell                     71
    Direct examination (cont.) by Ms. Miller              73


VINCENT CROCKETT

    Direct examination by Ms. Miller                     117
    Cross-examination by Mr. Mitchell                    135
    Redirect examination by Ms. Miller                   154
    Recross-examination by Mr. Mitchell                  158


CHARLES BRAXTON

    Direct examination by Ms. Miller                     160
    Voir dire examination by Mr. Mitchell                168
    Direct examination (cont.) by Ms. Miller             182

1          At about 10:03 a.m.

2                B A R B A R A    S I M O N

3       was thereupon called as a witness herein,

4       and after being first duly sworn to tell the

5       truth, the whole truth, and nothing but the

6       truth, testified on her oath as follows:

7                    MS. MILLER:  May I proceed?

8                    THE COURT:  Please.

9                    DIRECT EXAMINATION

10  BY MS. MILLER:

11  Q.   What is your name?

12  A.   Barbara Simon.

13  Q.   And how are you employed?

14  A.   Investigator, Detroit Police Department.

15  Q.   At one time were you the officer-in-charge of the

16       case of the People versus Lamarr Monson?

17  A.   Yes.

18  Q.   When was that?  Would that have been around January

19       the 20th of 1996?

20  A.   Yes.

21  Q.   Did there come a time when there was someone else

22       assigned to this case?

23  A.   Yes.

24  Q.   When was that?

25  A.   When I left out of Squad Two, the case was signed

-34-

1          over to Investigator Kennedy.

2    Q.    Okay.  And that would be Milton Kennedy?

3    A.    Yes.

4    Q.    What does it mean to be the officer-in-charge of the

5          case?

6    A.    Do the investigation, take the evidence over to the

7          lab, prepare Investigator's Report for the

8          prosecutor.

9    Q.    Do you also review the reports that are submitted by

10         the various police agents that are working?

11   A.    Yes.

12   Q.    Okay.  Did you have contact with a person connected

13         with the murder of Christina Brown on January the

14         20th of 1996?

15   A.    Yes.

16   Q.    Okay.  And did that person -- is that person seated

17         in court today?

18   A.    Yes.

19   Q.    Where is that person seated?

20   A.    At defense table.

21   Q.    And wearing a black suit?

22   A.    Black suit.

23   Q.    Okay.  What -- what is the name that this person gave

24         you when you encountered them?

25   A.    The first name he gave me was a fake name.

```
 1   Q.   Okay.  What was the name?
 2   A.   I don't remember the name he gave.
 3   Q.   I'm going to hand you the Constitutional Rights
 4        Certificate of Notification, and --
 5                       MS. MILLER:  May I approach the
 6        witness, your Honor?
 7                       THE COURT:  Yes.
 8   BY MS. MILLER:
 9   Q.   That has been marked as People's Proposed Exhibit No.
10        38.
11                       You've had a chance to review this,
12        have you not?
13   A.   Yes.
14   Q.   Okay.  And I would like for you to review it again;
15        see if that refreshes your recollection as to the
16        name that was given to you.
17   A.   Yes, it does.
18   Q.   What was the name that was given to you by this
19        person that you've identified in the black suit?
20   A.   The first name he gave us was Marc Mason.
21   Q.   Marc?
22   A.   Marc.
23   Q.   How is that spelled?
24   A.   M-a-r-c.
25   Q.   Okay.  And M-a-s-o-n?
```

-36-

1    A.   Yes.

2    Q.   All right.  And did you later find out what that

3         person's name was?

4    A.   Yes.

5    Q.   And what is that person's name?

6    A.   Lamarr Monson.

7    Q.   Okay.  Identifying for the record, the defendant in

8         this matter.

9                   This Marc Mason was the name that was

10        given to you by the defendant when taking preliminary

11        information?

12   A.   Yes.

13   Q.   Okay.  And what time did you see the defendant, and

14        what date?

15   A.   January the 20th, 1996.  It was around 3:00 o'clock.

16   Q.   Three --

17   A.   Quarter to 3:00, 3:00 o'clock, in that area.

18   Q.   And what time of day --

19   A.   P.m. --

20   Q.   -- morning or after --

21   A.   -- p.m.

22   Q.   And where did you see him?

23   A.   At 1300 Beaubien, fifth floor, Homicide.

24   Q.   When you saw him, did he appear to be under the

25        influence of alcohol?

-37-

1   A.   No.

2   Q.   Did he appear to be under the influence of drugs?

3   A.   No.

4   Q.   Did he ask for any type of medical attention?

5   A.   No.

6   Q.   Did he ask for any food or anything like that?

7   A.   No.

8   Q.   And when you spoke with him, you had a chance to

9        observe him --

10  A.   Yes --

11  Q.   -- and his demeanor?

12  A.   Yes.

13  Q.   And was he able to answer the preliminary questions

14       that you put to him in a way that you could

15       understand?

16  A.   Yes.

17  Q.   Okay.  So when asked for his name, he gave the name

18       Marc Mason, and you proceeded from there to give him

19       constitutional rights, or something other than that?

20  A.   No.  Well, first after I found out his name -- his

21       real name was Mr. Monson, I proceeded to give him his

22       constitutional rights.

23  Q.   How did you find out that his name was Mr. Monson?

24  A.   If I'm not mistaken, I believe one of the police

25       officers that went to the scene --

-38-

```
 1                      MR. MITCHELL:  That's --
 2   A.    -- told --
 3                      MR. MITCHELL:  That's hearsay.
 4                      THE COURT:  Well, I think it's just
 5        so --
 6                      MS. MILLER:  Your Honor, I --
 7                      THE COURT:  -- it's such minutiae, so
 8        trivial, Mr. Mitchell --
 9                      MR. MITCHELL:  M'hm.
10   BY MS. MILLER:
11   Q.    You were given this information from another police
12        officer that was on the scene?
13   A.    That responded to the scene, yes.
14   Q.    Okay.  And so you found out that his name was
15        actually Lamarr Monson?
16   A.    Yes.
17   Q.    You said that you gave him constitutional rights,
18        correct?
19   A.    That's correct.
20   Q.    How did you do that?
21   A.    Used the Constitutional Rights Certification of
22        Notification form.
23   Q.    Do you do anything to determine if the defendant is
24        indeed able to read that form?
25   A.    Yes.
```

-39-

1   Q.   What did you do?

2   A.   Well, at first I asked Mr. Monson if he could read

3        and write.  He told me he could, and I had him read

4        each right out to me.

5   Q.   What rights did you have him read to you?

6   A.   First right:  I have the right to remain silent.  I

7        do not have to answer any questions put to me or make

8        any statement.

9                   Number two:  Any statement I make or

10       anything I say will be used against me in a Court of

11       Law.

12                  Number three:  I have the right

13       to have an attorney, lawyer, parenthesis,

14       present before and during the time I answer any

15       questions or make any statement.

16                  Number four:  If I cannot afford

17       an attorney, lawyer, one will be appointed for

18       me without cost by the Court prior to any

19       questioning.

20                  Number five:  I can decide at any time

21       to exercise my rights and not answer any questions or

22       make any statement.

23                  Mr. Monson read these out loud to me,

24       put his initials by each one, and signed the form.

25  BY MS. MILLER:

-40-

1  Q.   And at that time, what did he say on the form?  What
2       name was on that form?

3  A.   Marc Mason.

4  Q.   Okay.  What happened after that?

5  A.   After that, he did that, I wrote down at the bottom
6       that he could read and write, that he understood his
7       constitutional rights, and he completed the twelfth
8       grade at Central High School.

9  Q.   Okay.  At what time did you begin taking a statement
10      from him?

11 A.   7:45 p.m.

12 Q.   Okay.  There was some intervening time in there,
13      correct?

14 A.   That's correct.

15 Q.   All right.  Is there any type of delay that is
16      engendered when there is a defendant that gives a
17      false name?

18 A.   Well, what I did after I found out his name, I went
19      and checked the DPD records to see if he had a police
20      record and criminal history record on Mr. Monson.

21 Q.   Okay.  And how long did that take?

22 A.   I believe the criminal history took some time because
23      the computer was down.

24 Q.   Okay.  And so is that what caused some of the delay
25      in-between the time that you actually gave him his

-41-

1          rights and the statement was taken?

2  A.      That, and I was reading other statements that witness

3          had gave --

4  Q.      Okay.

5  A.      -- that were out at the scene.

6  Q.      Okay.  You were reading other statements that

7          witnesses had given in this case?

8  A.      Yes.

9  Q.      Why did you do that?

10 A.      Because we were doing investigation of a fatal

11         stabbing.

12 Q.      Okay.  And this is -- were you present at the crime

13         scene?

14 A.      No.

15 Q.      Okay.  And you did not see the body of the deceased

16         at the time that you questioned the defendant?

17 A.      No.

18 Q.      And you don't know what her cause of death was, do

19         you?

20 A.      No, an autopsy hadn't been done at that time.

21 Q.      Okay.  And so based upon some information that you

22         received about wounds on the body of this victim, the

23         assumption at that early date was that this victim

24         had died of a fatal stabbing?

25 A.      Yes.


                              -42-

1   Q.   Okay.  And so that's why you indicated that, correct?

2   A.   Yes.

3   Q.   Okay.  So how did you proceed?

4   A.   I took a statement from Mr. Monson.

5   Q.   Okay.  And that's after you read these statements

6        from the witnesses?

7   A.   Yes.

8   Q.   And did you proceed in the question and answer form,

9        or some other form?

10  A.   The question and answer form.

11  Q.   Can you please read the questions that you put to the

12       defendant --

13  A.   Yes.

14  Q.   -- and his answers?

15                  MR. MITCHELL:  Well, could I get an

16       opportunity to voir dire, your Honor?

17                    THE COURT:  Yes.

18                  MR. MITCHELL:  All right.

19                  **VOIR DIRE EXAMINATION**

20  BY MR. MITCHELL:

21  Q.   Now, you're -- you're a detective, are you not, Ms.

22       Simon?

23  A.   That's correct, sir.

24  Q.   All right.  And you were initially the officer-in-

25       charge of this case; is that correct?

-43-

1    A.    That's correct.

2    Q.    And you say that you had not gone to the scene; is

3          that right?

4    A.    That's correct.

5    Q.    And you began to talk to this young man sometime

6          during the day of January 20th; is that right?

7    A.    That's correct, sir.

8    Q.    All right.  Now, at the time you began to talk to

9          him, you said you gave him his constitutional rights;

10         is that right?

11   A.    Yes, I did --

12   Q.    All right.

13   A.    -- give him his constitutional rights.

14   Q.    All right.  And that was around 3:25 p.m. on that

15         day; is that right, ma'am?

16   A.    That is correct, sir.

17   Q.    All right.  And when you started to, you gave him his

18         rights at that time because you thought he was a

19         witness?

20   A.    No.

21   Q.    Did you give him his rights because you thought he

22         was a suspect?

23   A.    I gave him his rights, sir, once he gave us a false

24         name and I had information that he knew something

25         about the fatal stabbing of Christina Brown.

```
 1   Q.   Yes, ma'am.

 2                   Now -- take care of me now, Mrs. Simon.

 3                   You started this at three -- or 3:25?

 4   A.   Yes.

 5   Q.   Are you telling us now at this point in time that you

 6        had information at that point that the name Marc

 7        Mason was not the accurate name?  Are you telling us

 8        that?

 9   A.   I found out there was another name he gave the police

10        officer.

11   Q.   That's a good police answer, but that does not answer

12        my question.

13                   You've been a police officer a long

14        time, ma'am?

15                   THE COURT:  What is your question

16        again, Mr. Mitchell?

17                   MR. MITCHELL:  At the time of 3:25 p.m.

18        on Saturday, January 20th, 1996, did she have

19        information in her hand --

20                   THE COURT:  Or in her mind?

21                   MR. MITCHELL:  Better in her mind, that

22        Marc Mason was not the accurate name?  That's my

23        question.  And she --

24                   THE COURT:  What's your answer?

25                   THE WITNESS:  That the officers that
```

-45-

1        were out to the crime scene told us --

2                          THE COURT:  Had somebody told you that

3        he had another name?

4                          THE WITNESS:  Yes.

5                          THE COURT:  That's all Mr. Mitchell is

6        asking.

7                          THE WITNESS:  That's right.  Yes,

8        ma'am.

9                          MR. MITCHELL:  All right.

10   BY MR. MITCHELL:

11   Q.   Now, these people who told you, you have described it

12        as being other officers; is that correct?

13   A.   Yes, sir.

14   Q.   All right.  Now, were these other officers -- can you

15        identify these other officers, if you may?

16   A.   I don't remember their names, Mr. Mitchell.

17   Q.   All right.

18   A.   They're the responding officers that went out on

19        Boston.

20   Q.   That's good enough.  Responding officers.  That's

21        good.

22                          Now, are you trying to tell me then on

23        a basis of a false name, you've made him a suspect?

24   A.   No, I did not make him a suspect.

25   Q.   Well, why were you giving his rights?  It's --

-46-

```
 1   A.    Sir, I had got information from another witness that
 2         Mr. Monson -- I'm sorry Doctor Kanluen is there --
 3   Q.    All right.  That's all right, you proceed.  You
 4         proceed.
 5   A.    Okay.  I had got other information that Mr. Monson
 6         was Ms. Brown's boyfriend.
 7   Q.    All right.  All right.  And you had -- would that
 8         make him a suspect because that was her --
 9   A.    Well, we were doing an investigation of a fatal
10         stabbing --
11   Q.    I know.
12   A.    -- yes, sir, and we were questioning him on the fatal
13         stabbing.
14                          MS. MILLER:  Your Honor --
15   BY MR. MITCHELL:
16   Q.    I wonder now --
17                          MS. MILLER:  Your Honor --
18                          THE COURT:  Mr. Mitchell --
19                          MS. MILLER:  -- Doctor --
20                          THE COURT:  Doctor Kanluen is here?
21                          MS. MILLER:  Doctor Kanluen is
22         signalling to me, and I wanted to just get an
23         indication --
24                          THE COURT:  Mr. Mitchell, may we
25         interrupt your cross-examination so that we can get
```

-47-

```
 1        Doctor Kanluen's testimony?   Please, Mr. Mitchell.
 2                       MR. MITCHELL:  Oh, you're going to bend
 3        my -- bend my --
 4                       THE COURT:  I know, Mr. Mitchell.
 5                       MR. MITCHELL:  -- that takes me right
 6        off the crest.  But I'll accommodate the Court.
 7                       THE COURT:  Oh, thank you, Mr.
 8        Mitchell.
 9                       (Witness temporarily excused.)
10                          -   -   -
11                       At about 10:18 a.m.
12                   S A W A I T   K A N L U E N
13           was thereupon called as a witness herein,
14           and after being first duly sworn to tell the
15           truth, the whole truth, and nothing but the
16           truth, testified on his oath as follows:
17                        DIRECT EXAMINATION
18    BY MS. NILLER:
19    Q.   Good morning, doctor.  Please give your name.
20    A.   Good morning, ma'am.  I'm Doctor Sawait Kanluen,
21         ma'am.
22    Q.   How are you employed?
23    A.   I'm employed by the Wayne County Medical Examiner's
24         Office as the Chief Medical Examiner for the County
25         of Wayne.
```

-48-

1          At about 11:24 a.m.

2          B A R B A R A   S I M O N

3     having been previously called as a witness

4     herein, and sworn to tell the truth, the whole

5     truth, and nothing but the truth, testified on

6     her oath as follows:

7          VOIR DIRE EXAMINATION (cont.)

8   BY MR. MITCHELL:

9   Q.  All right.  Ms. Simon, are you ready?

10  A.  Yes, sir.

11  Q.  All right.  Now, you say at the time you started to

12      question Mr. -- Mr. Mason or Mr. Monson, that you got

13      information that you had an incorrect name; is that

14      correct?

15  A.  That's correct, sir.

16  Q.  All right.  And you said you got it from one of the

17      responding officers; is that correct?

18  A.  That's correct.

19  Q.  All right.  But you don't remember his name; is that

20      right?

21  A.  No, I don't remember the officer's name.

22  Q.  I see.  I have here two PCRs, signed and written by

23      the two responding officers, Crockett and Wilson.  I

24      want to show you these two PCRs.

25          THE COURT:  What is your purpose there?

-75-

1    MR. MITCHELL: What my purpose is for

2  showing him? I want -- she got the information from

3  one of the responding officers, your Honor.

4    THE COURT: And that can be used only

5  to refresh recollection?

6    MR. MITCHELL: Of the responding

7  officers?

8    THE COURT: For whatever purpose, it

9  can only be used to refresh recollection.

10    MR. MITCHELL: Well, that's what I'm

11  trying to do now, Judge. I'm trying to refresh her

12  recollection as to what --

13    THE COURT: I don't really think you

14  are.

15    MR. MITCHELL: Huh?

16    THE COURT: I don't really think you

17  are.

18    MR. MITCHELL: Well, as to what -- as

19  to what she said she was told at that particular

20  time.

21    THE COURT: As to what she said she was

22  told, now, will that refresh her recollection about

23  what she said she was told? I don't think so.

24    MS. MILLER: Well, I would object

25  because she --

-76-

1          MR. MITCHELL:  I --

2              MS. MILLER:  -- remembers -- I'm

3      objecting, sir.

4              She remembers what she was told.  She

5      doesn't remember the name of the person that told it

6      to her.  She may remember what they look like or

7      whatever, but that was her testimony.

8              THE COURT:  That isn't what Mr.

9      Mitchell was trying to refresh her recollection

10      about.  I know what you have in mind, Mr. Mitchell.

11      It's inadmissible, and you can't use those reports.

12  BY MR. MITCHELL:

13  Q.  Now, at the time you initially started to question

14      Mr. -- I'm going to call him Monson; I think that's a

15      little bit more simple.  At that time, you say you

16      regarded him as a suspect?  That's what you said

17      earlier; is that right?

18  A.  I told you at the time I was talking to him, I got

19      information that Mr. Monson was the boyfriend of the

20      complainant.

21  Q.  All right.  And it was during the course of that time

22      you received this information; is that correct?

23  A.  That's correct, sir.

24  Q.  You listen to me carefully now, Ms. Simon.  When I

25      say that time in the course, I'm talking like

-77-

1       sometime between 3:25 p.m. and 7:45 p.m. on Saturday,

2       January 20th, 1996. Do you understand me so far?

3   A.  Yes.

4   Q.  All right.  Now, during that time, ma'am, you were --

5       other people were being interrogated; isn't that

6       true?

7   A.  Yes, there was other witness down there.

8   Q.  That's right.  And as these witnesses were

9       interrogated, were you giving the information

10      received by the interrogator?

11  A.  Yes, and also from the witness.

12  Q.  All right.  Now, you say also from the witness.  Do

13      you refer now to Mr. Monson?

14  A.  No.

15  Q.  All right.  When you say the witness, does that have

16      any particular significance when you say the witness?

17  A.  Yes, there was other witness that were brought down

18      to Homicide also, sir.

19  Q.  We've been over that, but you said the witness.  I

20      want to know if that party --

21  A.  The witness, yes.  I remember Linda -- I don't know

22      her last name.

23  Q.  All right.  Okay.

24  A.  And a gentleman also.

25  Q.  All right.  Now, would it surprise you, Mrs. Simon,

-78-

1    to note --
2                    THE COURT:  Are you preparing to offer
3    evidence here, Mr. Mitchell?
4                    MR. MITCHELL:  Oh, no, I wouldn't do
5    that.
6    BY MR. MITCHELL:
7    Q.   You were the officer-in-charge of that case at that
8         time; is that right?
9    A.   No -- well, the case was assigned to me the next day.
10   Q.   All right.  So you would have been -- you would have
11        been in possession of the material that had been
12        developed; is that correct?
13   A.   No, sir.
14   Q.   If you're in charge of the case, naturally all of
15        the --
16                    THE COURT:  Mr. Mitchell, she said she
17   wasn't in charge until the next day.  Why don't you
18   just ask her if she -- on that day, if that's what
19   you're interested in, whether she had all the
20   information?
21                    MR. MITCHELL:  Well, I'm going to ask
22   her that too, Judge, but I was just going -- I was
23   making two questions; maybe perhaps I should just
24   make one.
25   BY MR. MITCHELL:

-79-

1   Q.   On this particular day, ma'am -- we're talking about

2        January 20th now, 7:45 p.m. -- is it not true that at

3        that time Linda Woods had not been -- had not been

4        interrogated?  Is that true?

5   A.   I can't say that, sir.

6   Q.   All right.  Well --

7                    MS. MILLER:  Your Honor, I think that

8        I'm going to place --

9   BY MR. MITCHELL:

10  Q.   -- it appears --

11                   MS. MILLER:  -- an objection.  I had

12       offered the witness for the purpose to voir dire

13       regarding voluntariness, and I'm just not sure if

14       we're getting at that, that particular issue.  This

15       seems like something for cross-examination in

16       general.

17                   MR. MITCHELL:  I don't think so, Judge,

18       and I won't keep pursuing this --

19                   THE COURT:  I'll overrule --

20                   MR. MITCHELL:  -- but I do have an item

21       here that I would like to bring forth.

22                   THE COURT:  I will overrule the

23       objection.

24                   MR. MITCHELL:  All right.

25  BY MR. MITCHELL:

-80--

1  Q.   That interrogation began at 7:45 of Linda Woods, and

2       your interrogation of this man began at 7:45.  My

3       question to you is that they began at the same time.

4       How could you have used the fruits of what you have

5       not heard to question Mr. Monson?

6  A.   Mr. Mitchell, I don't know what time Ms. Wood's

7       interrogation started, sir.

8  Q.   I'll show you.

9                  MR. MITCHELL:  Your Honor, if you don't

10      mind, I'll --

11                 THE COURT:  Is this a document that the

12      witness made?

13                 MR. MITCHELL:  Document that this

14      witness made?

15                 THE COURT:  Yes.

16                 MR. MITCHELL:  No, ma'am.  This is a

17      document -- this is a document that was made by Linda

18      Woods to a Sergeant Galop (phonetically spelled) at

19      the time, and it indicates --

20                 MS. MILLER:  Well, your Honor, I

21      believe that Mr. Mitchell is testifying now as to

22      the --

23                 THE COURT:  Well, I also think that

24      this would be a hearsay document.

25                 MR. MITCHELL:  All right.


                              -81-

1  BY MR. MITCHELL:

2  Q.   Now, for the four hours and forty minutes -- or 20

3       minutes, I'm sorry, that Mr. -- Mr. Monson was in

4       your room, I presume, to be interrogated, are you

5       telling us that it took you that long based upon --

6       well, let's say it this way.  It took you that long

7       to ascertain that Marc Mason was not Lamarr Monson;

8       are you telling us that?

9  A.   No, sir.

10 Q.   All right.  You're not telling us that at all, are

11      you?

12            Well, now, during that time that you

13      had him with you, what did you and he talk about?

14      You must have talked about something during the

15      course of four hours?

16 A.   Once again, Mr. Mitchell, within that time, I was

17      gathering information.  Your client, Mr. Monson, had

18      told me that he did not know the complainant.  We

19      found out that he was the boyfriend of the

20      complainant.

21            He was telling different things.  He

22      was -- we were checking out things on him, sir.  He

23      was saying one thing, and we was finding out it was

24      not true.

25 Q.   All right.  Now, let me find out now what he said was

-82-

1    untrue.

2            He told you his name, and you claim one

3    of the responding officers told you at that point

4    that his name was in fact Monson; is that right?

5  A.  He gave me the name of Marc Mason.  I found out his

6    name was Lamarr.

7  Q.  And a responding officer told you that, so that

8    didn't take any time to ascertain.

9            Now, the second -- the second --

10           MS. MILLER:  Well, your Honor, I'm

11   going to ask that Mr. Mitchell not characterize what

12   she said.  Her statements are what they are, and not

13   his characterizations of them.

14           MR. MITCHELL:  Well --

15           THE COURT:  Mr. Mitchell, you can ask

16   the witness when she found these particular things

17   out.

18  BY MR. MITCHELL:

19  Q.  When did you find out now, for example, the

20   boyfriend, the boyfriend angle?  When did you find

21   that out?

22  A.  Talking to Ms. Brown -- I can't give you a particular

23   time -- and the other witness that came down.  You

24   have to remember Mr. Monson told us that he did not

25   know her at all.

                        -83-

1   Q.   I see.  But Mrs. Brown, you say?

2   A.   I think he said her last name was Glenda Brown.

3   Q.   I see.

4   A.   I know it, but I remember Linda (sic).  I don't know

5        her last name; I believe you said Brown.

6   Q.   And that lady told you that they were boyfriend and

7        girlfriend, or something --

8   A.   Along with other witness, sir.  We had more than one

9        witness down here.

10  Q.   I see.  So it didn't take you long to -- well, maybe

11       it did.  It took you four hours to verify, one, that

12       he was Monson, and two, that he was a boyfriend; is

13       that correct?

14  A.   No, sir.  Other investigation was going on also.  We

15       was talking to a witness.  I was talking to your

16       client.  Things that your client was telling me was

17       not true.

18  Q.   I understand.  We've been over those.  Only two

19       things we're talking about: name and association.

20       Those are the only two things that you can point out

21       that were untrue; is that right?  Those are the only

22       two things that we're talking about; isn't that true,

23       ma'am?

24  A.   Yes.

25  Q.   All right.  Now -- now, you and he discussed these

-84-

1      two things I'm sure during this four hour period, is

2      that right, name and association; is that correct?

3 A.   Yes, sir.

4 Q.   Now, would you say, ma'am -- would you say on the

5      basis of that that that would make him a suspect? He

6      gave you a wrong name, and he's the boyfriend of the

7      girl that died, or so-called. That makes him a

8      suspect?

9 A.   It would lean toward him.

10 Q.  Now, you noticed that a young lady came there and

11     talked to you, and she gave you a false name too of

12     Paris Thompson. Do you remember that? And her name

13     was actually Cynthia Stewart. Do you remember that,

14     ma'am?

15 A.  I don't remember --

16           THE COURT: You are assuming facts

17     which are not in evidence, counsel.

18           MS. MILLER: Thank you, your Honor.

19           MR. MITCHELL: I have her statement,

20     Judge, indicating her --

21           MS. MILLER: Well, your Honor, I'm

22     going to object to his answer --

23           THE COURT: They have to be in

24     evidence.

25           MR. MITCHELL: All right.


                        -85-

1          MS. MILLER:  Thank you.

2    BY MR. MITCHELL:

3    Q.    Now, did anybody tell you that he or she saw him do

4          anything to this woman on this night?  Did anybody --

5          anybody come and tell you that at all, Ms. Simon?

6          Huh?

7    A.    No.

8    Q.    All right.

9                    MS. MILLER:  Your Honor, I'm going to

10         object to what this has to do with the

11         voluntariness --

12   BY MR. MITCHELL:

13   Q.    Now we get --

14                   MR. MITCHELL:  I'll get back to it now.

15   BY MR. MITCHELL:

16   Q.    Three o'clock in the afternoon; you take the

17         statement at 7:45, Mrs. Simon.  Now, all over the

18         world in the western culture, dinner comes in

19         somewhere during that time.

20                   Now, what I want to find out from you

21         now, what did you give him for his dinner that

22         evening?  Huh?  Do you remember what you gave him?

23   A.    I didn't give him any dinner, sir.

24   Q.    That's right.

25                   Now, did you tell him -- did you tell

                              -86-

1  him, Mrs. Simon, that he was a witness and if he gave

2  you a statement, he would be going home soon? Did

3  you tell him anything like that?

4 A. No, sir.

5 Q. You didn't tell him that at all, did you?

6 A. No, I did not.

7 Q. And you didn't tell him that he -- that you were

8  trying to extract a statement from him after four

9  hours to see if you could charge him with murder?

10  You didn't tell him that either, did you?

11 A. I told him there was an investigation going on on the

12  fatal stabbing of Christina Brown.

13 Q. Did you say murder? You never told him murder, did

14  you?

15 A. No, I did not.

16 Q. All right. Now, when you looked at him, Officer or

17  Detective Simon, did you see any injuries about

18  his -- his hands or face or arms?

19 A. No, not that I can recall, no.

20 Q. As a matter of fact, you had him take off his shirt,

21  strip to his waist, isn't that true, and looked over

22  his torso?

23 A. No, I did not.

24 Q. Now, did you -- did you make a police check on his

25  name, ma'am? On either name, Mason or Monson?

-87-

1    A.    Yes, sir.  It should be in the file, yes.

2    Q.    Indicated no prior record; is that right?

3                    MR. MITCHELL:  Your Honor, I'm going to

4          object to this line of questioning --

5                    THE COURT:  I don't quite understand --

6                    MS. MILLER:  -- and I'm going to ask

7          that that be stricken?

8                    THE COURT:  -- it either.

9                    MR. MITCHELL:  All right.

10                   THE COURT:  Is there any further

11         examination of Officer Simon?

12                   MR. MITCHELL:  Yes, ma'am.  Not much --

13         maybe none, Judge.  I'm going over my final pages

14         now.

15                   THE COURT:  Okay.

16                   (Pause.)

17   BY MR. MITCHELL:

18   Q.    When you confronted Monson that he had given you an

19         improper name, do you remember his reply to you?

20   A.    Yes, sir.

21   Q.    Did he tell you he didn't want to be involved in this

22         sort of thing, and that's why he gave the funny name?

23   A.    He said, yeah, a warrant's out for his arrest, sir;

24         that's why he gave a fake name.

25   Q.    All right.  Did he tell you those were traffic

1    warrants?

2              MS. MILLER:  Your Honor, I'm going to

3    renew my objection.

4              MR. MITCHELL:  All right.

5              THE COURT:  If she's objecting, I'll

6    sustain --

7              MR. MITCHELL:  All right.

8              THE COURT:  -- the objection.

9              MR. MITCHELL:  All right.

10             THE COURT:  And, Mr. Mitchell, I am

11   confident, has completed his examination of Officer

12   Simon.

13             MR. MITCHELL:  I am through, Judge.

14             THE COURT:  I had thought so, Mr.

15   Mitchell.

16             MR. MITCHELL:  Yes, ma'am, I am

17   through.  Thank you kindly.

18             THE COURT:  Ms. Miller?

19             MS. MILLER:  Thank you.

20             **DIRECT EXAMINATION (cont.)**

21   BY MS. MILLER:

22   Q.  You said that during the course of the time that you

23       were with Mr. Monson, the defendant in this matter,

24       there were other witnesses that were being

25       interviewed, correct?

-89-

1  A.  That's correct.

2  Q.  And they were being interviewed by other people at

3      Homicide?

4  A.  That's correct.

5  Q.  Were -- and then you were made privy of that

6      information?

7  A.  That's correct.

8  Q.  Would you speak with these people directly also?

9  A.  Yes.

10 Q.  Okay.  And were you aware of what type of apartment

11     building this was where the victim was found?

12 A.  I had been told by the responding officer that the

13     building was abandoned because it had been on fire,

14     and people were still living in the abandoned

15     building.

16 Q.  Okay.  And when these people were being spoken to,

17     based upon your observations of some of them --

18     particularly the woman by the name of Linda -- was it

19     evident to you that she had been a person that had

20     used drugs in the past?

21 A.  Yes.

22 Q.  Okay.  And so you would go back and forth acquiring

23     information, and then place that together and think

24     about and formulate what you were going to do with

25     this case?

-90-

1    A.   Yes.

2    Q.   All right.  You said that you had let the defendant

3         know that this was a fatal stabbing, and fatal means

4         dead, does it not?

5    A.   That's correct.

6    Q.   Okay.  And you told him who it was, correct?

7    A.   Yes.

8    Q.   You said that you had information that came to you

9         from a certain police officer that arrived at the

10        scene, but you don't recall that police officer's

11        name?

12   A.   Correct.

13   Q.   Is that because you don't work daily with that

14        officer?

15   A.   That's correct.

16   Q.   Did you see that officer today waiting to testify for

17        this trial?

18   A.   Yes.

19   Q.   And do you recall what type of outfit he's wearing?

20   A.   A suit, a blue-ish gray suit.

21   Q.   Okay.  And so you recognize that person; you just

22        don't know the name?

23   A.   Right.

24   Q.   And if I told you that person's name was Officer

25        Vincent Crockett, that wouldn't mean anything to you,

-91-

1  but you recognize him by face?

2  A.  Correct.

3  Q.  What information did he give you?

4  A.  He told me that Mr. Monson had gave him a fake name.

5  Then when they responded to the scene, that he had --

6  like he wanted to leave, but they wouldn't let him

7  go.  And that Mr. Monson told him that he did not

8  know the complainant; he had seen her in the

9  neighborhood.

10  Q.  And you later found out from further information

11  regarding his relationship with the victim in the

12  case?

13  A.  That's correct.

14  Q.  And who did that come from?  The woman?

15  A.  And the gentleman; I can't remember his name.

16  Q.  Okay.  So are -- I think the woman that you're

17  referring to is Linda?

18  A.  Yes.

19  Q.  And you said a gentleman.  Is this a person that was

20  associated with that apartment building or not?

21  A.  Yes.

22  Q.  All right.  Now, you began taking a statement after

23  acquiring this information at what time,

24  investigator?

25  A.  Seven forty-five p.m.

-92-

1  Q.  Did the defendant indicate to you that -- either by

2      telling you or by his demeanor that he was impaired

3      in any way because he hadn't had dinner?

4  A.  No.

5                      MR. MITCHELL:  Objection, your Honor.

6      That's --

7                      THE COURT:  What is that, Mr. Mitchell?

8                      MR. MITCHELL:  Judge, that's a --

9      that's a biological axiom.  Everybody is hungry at

10     six o'clock in the evening.  I mean, that would be

11     normal.

12                     THE COURT:  Well, assuming arguendo

13     that what you say is true, what is your objection?

14                     MR. MITCHELL:  He hadn't been fed.  A

15     hungry man may say -- may say anything, Judge; that's

16     what I hear.  But I'm saying that she used the

17     word -- did you hear the word she used?  She said --

18     I think she said impaired.

19                     Now, Lord knows, you are impaired if

20     you're starving, Judge.  That's serious impairment.

21                     THE COURT:  Okay, Mr. Mitchell.

22                     MR. MITCHELL:  All right.

23                     THE COURT:  Would you continue, please?

24                     MS. MILLER:  Thank you.

25 BY MS. MILLER:

                              -93--

1   Q.   Investigator, you were able to look at the demeanor

2        of Mr. Monson, the defendant, during the course of

3        the time that he was at the Homicide Section.  Did he

4        appear to be unable to go on with an interview

5        because he had not eaten?

6   A.   No, he talked.

7   Q.   Okay.  And did he ask you for food?

8   A.   No.  No, I didn't -- we offered him food.

9   Q.   Okay.

10   A.   I  asked him was he hungry?  Did he want any coffee,

11        pop, anything?

12   Q.   And is that something that's typical over at the

13        Homicide Section that if someone indicates that they

14        do need food, that some type of modest meal would be

15        provided for them?

16   A.   Yes, it would.

17   Q.   Okay.  And that was -- that was not done here because

18        it was not requested by the defendant?

19   A.   Correct.

20   Q.   Okay.

21              THE COURT:  Did I understand you say

22        you asked him --

23              THE WITNESS:  Asked him if he wanted

24        coffee, pop, anything to eat; he said no.

25  BY MS. MILLER:

-94-

1  Q.   Now, you said that you began asking questions, and

2       proceeded in question and answer form.  Can you

3       please just give the questions and the answers given

4       by the defendant?

5  A.   Yes.

6            "Q.   What can you tell me about the

7                  stabbing of Christina?

8            A.    I was over to the apartment last

9                  night.  It was about 11:30

10                 p.m." -- in parenthesis --

11                 "(1/19/96).  I left.  When I

12                 left, Crystal was in the

13                 apartment.  We sold drugs out of

14                 the apartment.  She had sold two

15                 bags of weeds for ten dollars

16                 each.  She had seven bags left.

17                      I left the apartment.  I

18                 came back over to the apartment

19                 about 1:00 o'clock p.m. today.

20                 I saw Linda standing outside.

21                      Linda came up to me and

22                 told me that she knocked on the

23                 apartment door, and the door was

24                 opened, cracked, and she did not

25                 get an answer.  I went in the

-95-

1    apartment. I looked in the bed.

2        Crystal was not in bed. I

3    went to the kitchen. She was

4    not in the kitchen. I went into

5    the bathroom because I saw some

6    clothes on the floor leading

7    into the bathroom.

8        I looked into the bathroom

9    and I saw her lying on the

10   floor. I called her name a

11   couple of times. I was bent

12   down next to her, over her.

13       I got up and went next

14   door. I was banging on the

15   door. I was yelling for them to

16   call 911.

17       I left out of the

18   apartment building, and I went

19   and called 911. I went back to

20   the apartment building. I went

21   into the apartment. I got a

22   blanket and put the blanket over

23   Crystal. I saw she was not

24   breathing, so I started giving

25   her CPR.

-96-

1          I stopped giving her CPR,

2      and I went outside because I

3      heard the siren, and waited for

4      the police.

5    Q.  When the police arrived, why did

6      you tell the police that you did

7      not know Crystal?

8    A.  Because I didn't want to get

9      mixed up in this because I was

10     selling drugs out of the

11     apartment, and I know I had a

12     warrant out for my arrest.

13   Q.  Mr. Monson, when I first started

14     talking to you, you told me that

15     your name was Marc Mason; is

16     that your real name?

17   A.  No.

18   Q.  Why did you give me a fake name?

19   A.  That's the name I gave the

20     police officer because I didn't

21     want them to find out I had a

22     warrant on me.

23   Q.  Was Crystal selling drugs to you

24     out of the apartment on Boston?

25   A.  Should I answer that?  Yes, she

-97-

```
1              was selling drugs for me.
2       Q.     How long had Crystal been
3              selling drugs for you?
4       A.     For about two and a half months.
5       Q.     What kind of drugs was Crystal
6              selling for you?
7       A.     Weed and crack.
8       Q.     Mr. Monson, have you ever
9              threatened Crystal?
10      A.     Yes.
11      Q.     Why did you threaten her?  What
12             did you threaten her about?
13      A.     I threatened to hit her.
14      Q.     Did you and Crystal get in an
15             argument and fight Saturday
16             morning, 1-20-96?
17      A.     No.
18      Q.     Do you carry any kind of weapon?
19      A.     No.
20      Q.     Do you own a knife?
21      A.     No.
22      Q.     Did you stab Crystal?
23      A.     No.
24      Q.     What time was it when you last
25             seen Crystal?
```

-98-

1   A.   Between 11:00 and 11:30, 1-19-

2        96.

3   Q.   What time did you go back over

4        to the apartment building?

5   A.   About 1:30 p.m. today, 1-20-96.

6   Q.   Were you over to the apartment

7        around 7:00 a.m., or 7:30 a.m.

8        this morning, 1-20-96?

9   A.   No, I was not.

10  Q.   Do you know anyone -- do anyone

11       else drive your car?

12  A.   No.

13  Q.   What kind of vehicle do you

14       drive?

15  A.   1985 black Olds.

16  Q.   Mr. Monson, you first told me

17       that Crystal was your

18       girlfriend, and after you found

19       out Crystal was 12 years old,

20       you told me that Crystal was not

21       your girlfriend; that she was

22       just a friend.  Why did you lie?

23  A.   Because I didn't want to go to

24       jail for messing around with a

25       12 year old.

-99-

```
 1          Q.   Mr. Monson, have you ever had
 2               sex with Crystal?
 3          A.   Yes.
 4          Q.   How many times have you had sex
 5               with Crystal?
 6          A.   One time.  That was three days
 7               ago.
 8          Q.   Did you and Crystal live
 9               together?
10          A.   No, we did not live together.
11               She was just selling drugs for
12               me out of the apartment.
13          Q.   Who lives in the apartment on
14               Boston?
15          A.   Nobody, we just sell drugs out
16               of there."
17               And he signed each page.
18    Q.   What happened after you took that statement?  Did you
19         leave the Homicide Section, or did you have other
20         duties connected with this case.
21    A.   No, I was -- I left.  I was working overtime.  I was
22         working days, but it ran over.
23    Q.   Did Mr. Monson have the opportunity to go over each
24         and every page of the statement that you took?
25    A.   Yes, ma'am.
```

1   Q.   And did he sign each and every page of the statement?

2   A.   Yes, he did.

3   Q.   Did he make any additions or corrections to the

4        statement?

5   A.   No, ma'am --

6   Q.   I'll refer you to the first page.

7   A.   Page five he didn't sign.

8   Q.   Okay. And what about the first page? Were there

9        additions or corrections on that page?

10   A.   Yes.

11   Q.   And what were the additions or corrections?

12   A.   The name Crystal and Chris.

13   Q.   Okay. If he had wanted to make any other additions

14        or corrections, would you have allowed him to?

15   A.   That is correct.

16   Q.   What time did you return to the Homicide Section on

17        the next day, the 21st of January of 1996?

18   A.   I was due there at 8:00, but I called in and told

19        them I was going to be late. So I didn't get there

20        till about 9:00, 9:15, I believe.

21   Q.   Okay. Thank you.

22                 MS. MILLER: I have nothing further.

23                 **CROSS-EXAMINATION**

24   BY MR. MITCHELL:

25   Q.   Detective, after you took this statement, about what

```
1        time would you say it was at that time?
2   A.   I don't recall.
3   Q.   I know you started at 7:45.  Would it have been say
4        around midnight sometime?
5   A.   No, I left before midnight.
6   Q.   I see.  Well, at the conclusion of the statement, it
7        doesn't appear to you that Mr. Monson was a suspect,
8        does it?  Was he, in that statement?
9   A.   He was a suspect, sir.
10  Q.   He was?  In that statement?
11  A.   He was a suspect.
12  Q.   I see.  Now, you know you just read the statement to
13       us; is that right?
14  A.   That's correct.
15  Q.   In the statement does he indicate to you that he
16       stabbed this young lady?
17  A.   No, he said he didn't.
18  Q.   All right.  Now, did not; that's opposite of did,
19       isn't it?
20  A.   I'm sorry?
21  Q.   Did not is the opposite of did, isn't it?
22  A.   That's correct.
23  Q.   All right.  Now, he told you he did not stab or did
24       not injure her, okay?  Now, at that time now when you
25       finished that statement sometime between 7:45 and
```

-102-

1  midnight, did you have any witness in this world who

2  told you that Mr. Monson had in fact killed Crystal?

3          MR. MILLER:  Your Honor, I'm going to

4  object to the relevance of that question.  I don't

5  think that that's relevant, okay?

6          MR. MITCHELL:  If that's not relevant,

7  what is the case about?

8          MS. MILLER:  Mr. Mitchell can yell at

9  me all he wants, but I'm placing my objection.

10          MR. MITCHELL:  I asked you very

11  simply --

12          THE COURT:  What is your question?

13          MR. MITCHELL:  My question is this:  At

14  the end of that statement which I put somewhere

15  between the beginning time, 7:45, and the outer limit

16  time is midnight -- she said she left before

17  midnight.

18          Now, I want to know at the end of that

19  statement -- obviously she has admitted that he told

20  her he did not injure the lady.  Now, what I'm asking

21  her now is simply did she have any other evidence,

22  any other statement by anybody in this world, who

23  said that he injured Crystal, Judge?  That's all I

24  want to know.

25          THE COURT:  Well, that would be hearsay

1    evidence, would it not?

2                    MR. MITCHELL:  Well, no, but does she

3        have it?  Hearsay, direct, or whatever, do you have

4        any other the evidence at that time that --

5                    THE COURT:  The objection has been

6        made, and I'm sustaining the objection.

7                    MR. MITCHELL:  You're going to sustain

8        that objection?  All right.

9    BY MR. MITCHELL:

10   Q.    Well, tell me this.  Did you talk to anybody after

11        you had talked to Mr. Monson about this case?  And

12        anybody, I mean -- I don't mean Detective Jones or

13        Inspector Smith?  I mean did you talk to any other

14        witnesses yourself regarding this case after you

15        concluded your interrogation to Mr. Monson?

16   A.    No.

17   Q.    All right.  So when you left the department that

18        night, the only evidence you had at that time was Mr.

19        Monson's statement which you've just read; isn't that

20        correct?

21   A.    I had other statements from witness, but --

22   Q.    All right.  I understand.

23   A.    -- I gave -- I left Mr. Monson's statement with all

24        the rest of the paperwork, sir.

25   Q.    I see.  But no other statement that you had, ma'am,

-104-

1   in your possession indicated in no uncertain terms

2   that Monson had injured Crystal; isn't that true,

3   ma'am?

4 A. True.

5 Q. All right.  So I go back to my question a few moments

6   ago, is that before you left the department that

7   night, the only evidence you have of this man's

8   alleged involvement was this statement; is that true,

9   ma'am?

10 A. That's correct.

11 Q. Now, my question to you now is this:  Why -- I don't

12   mean take him home with you that Saturday night, but

13   why did you leave him -- why would you leave that

14   young man in jail that night?

15 A. There was an investigation going on of a fatal

16   stabbing, sir.

17 Q. I understand.  I understand.  But you didn't have any

18   evidence --

19       THE COURT:  Mr. Mitchell --

20       MR. MITCHELL:  Well, we've been over --

21       THE COURT:  Mr. Mitchell --

22       MR. MITCHELL:  -- that part, yeah.  All

23   right, Judge.  And I won't repeat it.  It's sweet,

24   but I won't repeat it.

25       All right.  I guess that speaks for

1      itself, Judge, don't you think?

2                THE COURT:  Yes, I think so.

3                MR. MITCHELL:  I have no further

4      questions of --

5                THE COURT:  Redirect examination, Ms.

6      Miller?

7                MS. MILLER:  Yes, thank you.

8                **REDIRECT EXAMINATION**

9  BY MS. MILLER:

10  Q.    You indicated that you had spoken to a person by the

11       name of Linda, and when you spoke with that person by

12       the name of Linda, did you receive some information

13       about the time frame in which the defendant had been

14       at the apartment?

15  A.    Yes.

16  Q.    Okay.  And had she indicated when she had seen the

17       defendant at the apartment on the day of January the

18       20th of 1996?

19  A.    Yes.

20  Q.    Okay.  The defendant told you in his statement that

21       he arrived there some time in the afternoon; isn't

22       that correct?

23  A.    That's correct.

24  Q.    Had she told you something different?

25  A.    Yes.

1    Q.    And what was that?

2    A.    She had stated that Mr. Monson had been there early

3          that morning and left.

4    Q.    And do you recall when you say earlier that morning,

5          the time?

6    A.    Seven, 7:30 in the morning.

7    Q.    Okay.  And so that was in direct contradiction to

8          what the defendant was telling you about when he was

9          there?

10   A.    That's correct.

11   Q.    Okay.  Based upon your experience and training as a

12         police officer, in the span of time between 7:00 and

13         7:30 in the morning, and then this time that the

14         other witnesses see the defendant at the home, would

15         a person have time to change their clothes and

16         deposit those clothes some place else and come back

17         to the building?

18               MR. MITCHELL:  Oh, that's a lot of

19         speculation, your Honor.  I object to that.

20               THE COURT:  I thought --

21               MR. MITCHELL:  Now, that's --

22               MS. MILLER:  I'm sorry, I couldn't hear

23         you.

24               THE COURT:  I thought the question was

25         convoluted.

-107-

```
 1                    MS. MILLER:  I can break it down so
 2        that it's more clear.
 3                    THE COURT:  All right.
 4   BY MS. MILLER:
 5   Q.   How long have you been an investigator in the
 6        Homicide Section?
 7   A.   I've been at Homicide four years.
 8   Q.   Okay.  How long have you been a police officer?
 9   A.   Nineteen and a half years.
10   Q.   And when you questioned Linda Woods and she told you
11        that she had seen the defendant at 7:30 -- that's
12        correct that she said she saw him around 7:00, 7:30?
13   A.   Seven-thirty, correct.
14   Q.   And then you have the defendant telling you that he
15        was at the apartment at 1:00 o'clock or 1:30.  What
16        was significant about that to you?
17   A.   Well, Ms. Linda, like I said, said she had seen
18        him -- heard noise, and she seen him leave -- the car
19        sped off at a high rate of speed.  When I asked Mr.
20        Monson, Mr. Monson said no, he had just come over
21        there.
22   Q.   Why would that be significant to you as a police
23        officer?
24   A.   Because we have a young lady that was found in the
25        bathroom, blood all over.  And we were doing an
```

-108-

1   investigation of a -- at that time it was a critical
2   stabbing, and once she got to the hospital, she died,
3   and we changed it to a fatal stabbing.
4   Q.  Okay.  So there's blood all over the crime scene,
5       right?
6   A.  That's correct.
7   Q.  And so we've got this period of time from 7:30 to
8       8:30 to 9:30 to 10:30 to 11:30 to 12:30 to 1:30.
9       That's a long time, correct?
10  A.  That's correct.
11  Q.  Okay.  Based upon your experience and training, is
12      it -- would it have given in that span of time enough
13      time for a suspect to get rid of clothing evidence?
14  A.  Get rid of, take a bath; do whatever and come back.
15  Q.  Okay.  You had indicated that the defendant told you
16      that he placed a blanket over the victim in this
17      case?
18  A.  That's correct.
19  Q.  And this is a victim of what you thought to be at the
20      time a fatal or critical stabbing?
21  A.  That's correct.
22  Q.  And based upon the police reports that you had
23      reviewed, was it your understanding that there was a
24      large amount of blood at the scene?
25  A.  Yes.

-109-

1   Q.   Okay. The defendant told you also that he performed

2       CPR --

3   A.   That's correct.

4   Q.   -- on the victim?

5   A.   That's correct.

6   Q.   Okay. And also you were told by a police officer

7       that the defendant was at the scene and gave a false

8       name?

9   A.   Correct.

10   Q.   He also attempted to leave the area where witnesses

11       were being rounded up --

12   A.   Right.

13   Q.   -- is that right? And also, he was taken,

14       transported right from that scene down to Homicide?

15   A.   Correct.

16   Q.   Are you familiar with CPR?

17   A.   Yes.

18   Q.   And did you see any evidence that the defendant had

19       blood on his clothing from performing the CPR?

20   A.   He had nothing on this clothing.

21   Q.   Okay. All of these factors, based upon your

22       experience and training as a police officer, did all

23       of these add up to a situation where the defendant

24       became the prime suspect in this matter?

25   A.   Yes.

1   Q.   And is that why he was held?

2   A.   Yes.

3                   MS. MILLER:  I have nothing further.

4                   RECROSS-EXAMINATION

5   BY MR. MITCHELL:

6   Q.   When did you learn this from Linda Woods?  When did

7        you learn that he had come to the apartment at 7:30?

8        When did you learn this?

9   A.   Ms. Woods told us that when she was down in Homicide,

10       sir.

11  Q.   All right.  And you remember you finished talking to

12       this young man at 7:45; remember that?  We've been

13       over that a million times already.

14  A.   No, I wasn't finished talking with him at 7:45.

15  Q.   You started to talk with him at 7:45?

16  A.   Yes.

17  Q.   Again; is that right?

18  A.   Yes.

19  Q.   All right.  Now, I'm going to show you --

20                  MS. MILLER:  Your Honor, I'm going to

21       object to --

22                  MR. MITCHELL:  No, no.  You opened the

23       door now.

24                  THE COURT:  Just a minute, Ms. Miller.

25                  MS. MILLER:  Could I just object,

                            -111-

1    please?

2              THE COURT:  Ms. Miller --

3              MR. MITCHELL:  Go ahead.  Now you

4    objected, now let me proceed.

5              THE COURT:  Ms. Miller, what is your

6    objection?

7              MS. MILLER:  Okay.  My objection is is

8    that he's trying to get in a document again, it's a

9    hearsay document; it's not a document that was

10   written by the witness in this matter.  And she has

11   not shown that she needs her recollection to be

12   refreshed, so I'm not sure why he's going to try and

13   enter this document at this time.

14             MR. MITCHELL:  Because she was the

15   officer-in-charge of the case --

16             THE COURT:  I'm going to -- well, I'm

17   going to --

18             MR. MITCHELL:  -- and this is kept in

19   the normal course of records.

20             THE COURT:  -- sustain the objection,

21   Mr. Mitchell.

22             MR. MITCHELL:  I didn't hear -- I

23   didn't hear the --

24             THE COURT:  I sustain the objection.

25             MR. MITCHELL:  All right.  Well, let me

                        -112-

1   ask her this then, Judge.

2   BY MR. MITCHELL:

3   Q.   About three hours before you started your

4        conversation with Mr. Monson, a young woman named

5        Cheryl Cole was interviewed and told you that --

6                     THE COURT:  Wait a minute, Mr.

7        Mitchell.

8                     MR. MITCHELL:  Just a moment --

9   BY MR. MITCHELL:

10  Q.   Tell me this --

11                    MS. MILLER:  Your Honor, that a

12       assumes the fact --

13                    THE COURT:  That assumes facts which

14       are not in evidence.

15                    MR. MITCHELL:  All right.

16  BY MR. MITCHELL:

17  Q.   Did you ever talk to anyone who talked with a witness

18       named Cole?

19                    THE COURT:  Mr. Mitchell --

20                    MR. MITCHELL:  Huh?

21                    THE COURT:  -- the objection has been

22       sustained to that subject matter.

23                    MR. MITCHELL:  Completely?

24                    THE COURT:  Yes, as far as I'm able to

25       see.

-113-

1           MR. MITCHELL:  Okay.  All right.  Well,

2      let me -- can I rephrase it then, Judge?  Let me

3      rephrase it then.

4   BY MR. MITCHELL:

5   Q.   Did you receive any contrary information that Monson

6        was not the killer?  Did you receive any information

7        like that?

8                   THE COURT:  Now, Mr. Mitchell, that has

9      to have some admissible basis --

10                  MR. MITCHELL:  Well --

11                  THE COURT:  -- in order to -- because

12     she can say thousands of people volunteered that they

13     were the ones.

14                  MR. MITCHELL:  M'hm.  All right.  Let

15     me --

16                  THE COURT:  It has to be admissible

17     evidence.

18                  MR. MITCHELL:  All right.  Let's go it

19     this way.

20   BY MR. MITCHELL:

21   Q.   You became the officer-in-charge of the case on the

22        next day on January 21st; is that right, ma'am?

23   A.   That's correct, sir.

24   Q.   All right.  And as officer-in-charge of the case,

25        tell us what does that mean?

                           -114-

1  A.  Officer-in-charge of the case would gather all of the

2       evidence, take it over to the evidence room, would go

3       to the morgue, talk to the doctor.  We go type up the

4       Investigator's Report, go to the Prosecutor's Office,

5       interview witness.

6  Q.  When you interview witnesses, do you record what they

7       tell you?

8  A.  No, we don't record.

9  Q.  No, I mean by record, I mean do you -- you write it

10      down, do you?  Do you -- do you transfer what people

11      tell you to writing, ma'am, is what I want to know?

12  A.  Taking of a statement from a witness?

13  Q.  Yes, ma'am.

14  A.  Yes, sir.  Yes, sir.

15  Q.  And as the officer-in-charge of the case, you would

16      be in possession of all of the witness statements

17      that were pertinent to the case; isn't that correct?

18  A.  That's correct.

19  Q.  And these statements are kept obviously in the normal

20      course of your detective business; isn't that right?

21  A.  Correct.

22  Q.  Now, in the course of your collecting these

23      statements, do you remember having a statement by

24      someone named Cole?

25              THE COURT:  Mr. Mitchell --

-115-

1          MR. MITCHELL:  Still no?

2          THE COURT:  Well, that doesn't confer

3    admissible statements -- I meant admissible status on

4    the statement.

5          MR. MITCHELL:  No, it doesn't.  No,

6    okay.

7          All right.  Okay, Judge.  No further

8    questions.

9          THE COURT:  Is there any redirect

10   examination?

11         MS. MILLER:  No, your Honor, not at

12   this time.

13         THE COURT:  You may be excused.

14         (Witness excused.)

15         MS. MILLER:  Should I proceed with my

16   next witness?

17         MR. MITCHELL:  Yes, go ahead.

18         MS. MILLER:  Thank you.

19         THE COURT:  Mr. Mitchell said to go

20   ahead, Ms. Miller.

21         MS. MILLER:  I thought I saw you

22   shaking your head yes, Judge.

23         THE COURT:  No, I --

24         MS. MILLER:  No?  Okay.

25         THE COURT:  That was Mr. Mitchell.

```
 1                    MR. MITCHELL:  I thought maybe you
 2        would want to hear a short witness, Judge.  I didn't
 3        know.  Maybe I shouldn't say -- did I say anything?
 4                    THE COURT:  Is your witness going to be
 5        lengthy?
 6                    MS. MILLER:  I don't think that he will
 7        be, your Honor.  It's the police officer that arrived
 8        at the scene of the homicide.  I think we can get him
 9        in in about 20 minutes.
10                    THE COURT:  Okay.
11                    MS. MILLER:  Thank you.
12                         --   -   -
13                    At about 11:42 a.m.
14              V I N C E N T   C R O C K E T T
15            was thereupon called as a witness herein,
16            and after being first duly sworn to tell the
17            truth, the whole truth, and nothing but the
18            truth, testified on his oath as follows:
19                    MS. MILLER:  May I approach the
20        witness, your Honor?
21                    DIRECT EXAMINATION
22        BY MS. MILLER:
23        Q.   Do you have a copy of your PCR, officer?
24        A.   No, I don't.
25        Q.   What is your name?
```

-117-