DETROIT
DEPARTMENT
POLICE

**INTER-OFFICE MEMORANDUM**

Date: August 8, 1997

To: Chief of Police Isaiah McKinnon (through channels)

Subject: INVESTIGATION AND REPORT CONCERNING ALLEGATIONS OF MISCONDUCT REGARDING HOMICIDE FILE 96-279

## I. INTRODUCTION

On February 10, 1997, Chief of Police Isaiah McKinnon approved a request from Executive Deputy Chief Benny N. Napoleon, to appoint an investigative board consisting of Deputy Chief Iris Worthington, Eastern Operations Bureau, Commander Ronald Variloff, Tenth Precinct and Commander Constance Spight, Office of the Executive Deputy Chief. This board was directed to reinvestigate allegations of misconduct made by Homicide Section personnel concerning Homicide File 96-279.

On March 21, 1997, Commander Broderick Williams of the Twelfth Precinct was assigned to replace Commander Constance Spight as a member of this investigative board.

This Board was specifically directed to investigate allegations made by Police Officer Monica Childs, Badge 862, of the Homicide Section, that Inspector Joan Ghougoian had acted improperly during the investigation of Homicide File 96-279.

Those allegations are as follows:

1. That Inspector Joan Ghougoian promised two murder suspects that they would be allowed to go home in exchange for their statements.

2. That Inspector Joan Ghougoian elicited statements from the two murder suspects without advising them of their Constitutional (Miranda) rights.

3. That Inspector Joan Ghougoian directed Police Officer Monica Childs to place a time on the Constitutional Rights form that would indicate that the murder suspects were given their Miranda Rights earlier than the actual time.

4. That Inspector Joan Ghougoian directed Police Officer Monica Childs to give false testimony in court concerning the previously listed allegations.

5. That, subsequent to Police Officer Monica Childs notifying the Wayne County Prosecutor's Office regarding these allegations, Inspector Joan Ghougoian confronted Officer Childs using coarse and profane language.



Iris Worthington
Exhibit 2
6/16/21
Rptr: Cheri Popin

Chief of Police Isaiah McKinnon (through channels)  August 8, 1997
INVESTIGATION AND REPORT HOMICIDE FILE 96-279  Page 2

## II. CIRCUMSTANCES

The circumstances presented here are a summation of the events that have been documented by the Board through witness statements and written documents.

This incident began with a fatal shooting that took place on August 19, 1996, at approximately 10:00 P.M., when Scout 13-1 responded to 10211 Brush concerning a shooting. Upon arriving at that location, the officers observed James White, B/M/11, lying on the ground suffering from a fatal gunshot wound to the head. Also wounded at the scene was a Derrick Sanders, B/M/15, who suffered a gunshot wound to his right leg. Mr. Sanders was transported to Henry Ford Hospital for treatment.

Based on witness statements, that evening, a suspect, Eddie Lee James, B/M/25, was arrested at approximately 11:00 P.M. and conveyed to the Homicide Section. Eddie James remained at the Homicide Section, without being processed, until approximately 7:00 A.M., August 20, 1996. At that time Eddie Lee James was interviewed by Inspector Joan Ghougoian, Commanding Officer, Homicide Section. Inspector Ghougoian conducted the interview, in her office, with just Inspector Ghougoian and Eddie Lee James present. As a result of that interview, Inspector Ghougoian had Eddie Lee James explain to Sergeant Arlie Lovier the location where he, Eddie Lee James, had hidden a weapon used in the shooting. Inspector Ghougoian then directed Sergeant Lovier to respond to the location to recover the weapon.

At approximately 7:15 A.M., Inspector Ghougoian called Police Officer Monica Childs into her office and directed Officer Childs to take a statement from Eddie Lee James.

On the evening of August 20, 1996, Reginald Vines, B/M/31, upon hearing that he was wanted for questioning in the shooting of James White, contacted the Detroit Police Department. Reginald Vines was picked up by the Major Crime Mobile Unit and transported to the Homicide Section. Reginald Vines stated in an interview to this Board on March 24, 1997, that he was held at the Homicide Section and the Ninth Floor Cellblock, from approximately 10:30 P.M., August 20, 1996, until approximately 8:30 A.M., August 21, 1996. During the intervening period, he was interviewed by various unidentified Homicide personnel. Reginald Vines claimed that he had been "hit" in the head a "couple of times" by an unknown Homicide Investigator. This information will be turned over to the Internal Affairs Section for an independent review.

On the morning of August 21, 1996, at approximately 11:00 A.M., Reginald Vines was interviewed by Inspector Ghougoian, alone in her office. After the interview, Inspector Ghougoian turned Reginald Vines over to Officer Childs to take his statement. A statement was taken by Officer Childs from Reginald Vines and he was returned to the Ninth Floor Cellblock.

Chief of Police Isaiah McKinnon (through channels)  
INVESTIGATION AND REPORT HOMICIDE FILE 96-279

August 8, 1997  
Page 3

A preliminary examination was held on September 5, 1996. Prior to this hearing, Officer Childs told Assistant Prosecutor Curtis Smith that there were "some problems" with the case. When interviewed by the Board, Mr. Smith could not recall this specific case; however, both Mr. Smith and Officer Childs recalled that his advice was to "tell the truth." At the preliminary examination, both Reginald Vines and Eddie Lee James were bound over for trial on the charges of Murder in the First Degree and Assault with Intent to Commit Murder. The questions surrounding the confessions and possible promises made to the defendants were discussed at the preliminary examination. The Honorable Jimmylee Gray, Judge of the Thirty-Sixth District Court, determined that the questions concerning statements made by Reginald Vines and Eddie Lee James must be addressed at a Walker Hearing.

A Walker Hearing was scheduled on November 10, 1996, for Reginald Vines. However, on that date, Inspector Ghougoian was absent due to illness. The hearing was rescheduled for January 10, 1997.

Inspector Ghougoian received notification that she would be needed at the Walker Hearing scheduled for January 10, 1997. On January 8, 1997, based on the statements of several witnesses, Inspector Ghougoian entered the Squad Seven office and asked Officer Childs what she was going to testify to at the Walker Hearing. Officer Childs told Inspector Ghougoian that she was going to tell the truth. Inspector Ghougoian continued to press the matter and repeatedly asked Officer Childs, "What are you going to testify to." Inspector Ghougoian then left the office. Inspector Ghougoian stated to this Board that the reason she asked this question was to assist her in recalling her involvement in the case. Inspector Ghougoian further stated she continued to press the issue because she believed Officer Childs was being evasive and was not responding to her questions.

On January 9, 1997, Inspector Ghougoian entered the offices of Squad Seven, clapped her hands and stated, "The question of the day is, what is Monica going to testify to?" Inspector Ghougoian later called Sergeant Reginald Harvel, Badge S-627, into her office and asked Sergeant Harvel, "What was the problem with Monica?" Inspector Ghougoian also asked Sergeant Harvel if Officer Childs was upset about a recent negative counseling entry for being late. Sergeant Harvel told Inspector Ghougoian that he did not believe that was the problem. He further stated that he believed Officer Childs did not like taking statements "behind" or after the Inspector. Officer Childs was then brought into the office and reiterated that concern to Inspector Ghougoian. This was a general discussion not specifically related to Homicide File 96-279.

On the evening of January 8, 1997, Officer Childs approached Lieutenant Hilton Napoleon, Badge L-7. Officer Childs told him that Inspector Ghougoian had asked her to change her testimony at the upcoming Walker Hearing. Lieutenant Napoleon advised Officer Childs to report the incident to Commander Gerald Stewart, Major Crimes Division. Officer Childs subsequently went to Commander Stewart's office and discussed the matter with the Commander. Officer Childs also told Lieutenant William Rice, L-132, Sergeant Reginald Harvel and Police Officer Harold Mitchell, Badge 224, that Inspector Ghougoian had asked her to change her testimony.

Chief of Police Isaiah McKinnon (through channels)           August 8, 1997
INVESTIGATION AND REPORT HOMICIDE FILE 96-273           Page 4

On the morning of January 10, 1997, the day of the scheduled Walker Hearing for Reginald Vines, Assistant Prosecutor (APA) Alan Page received a voice mail message from Officer Childs asking him to call her immediately concerning the upcoming Walker Hearing. Officer Childs then told APA Page that Inspector Ghougoian had asked her to change her testimony at the Walker Hearing. APA Page contacted Chief of Operations Richard Padzieski. In discussions between APA Page and Mr. Padzieski, it was determined not to proceed with the Walker Hearing because there could be conflicting testimony by Officer Childs and Inspector Ghougoian. Mr. Padzieski then requested that Commander Stewart come to his office so that Mr. Padzieski could explain the reason the Walker Hearing was canceled.

Commander Stewart then went to the Wayne County Prosecutor's Office where he found Officer Childs, Sergeant Harvel and Inspector Ghougoian waiting in a conference room. After meeting with both APA Page and Mr. Padzieski, Commander Stewart ordered all involved police personnel to return to Headquarters and also ordered Inspector Ghougoian to report to his office.

Prior to leaving the Prosecutor's Office, Inspector Ghougoian asked APA Page the reason the hearing was not held. APA Page then related the allegations that Officer Childs had made concerning Inspector Ghougoian attempting to influence Officer Childs to change her testimony.

Inspector Ghougoian and Commander Stewart then met at the Commander's office. Inspector Ghougoian was extremely upset. And prior to leaving the Commander's office, Commander Stewart directed Inspector Ghougoian to have no further contact with Officer Childs. Commander Stewart also directed Inspector Ghougoian not to discuss this incident with Officer Childs.

Shortly after leaving Commander Stewart's office, Inspector Ghougoian went to confront Officer Childs at her desk in the Squad Seven office. As she entered the office, Sergeant Harvel was leaving. Sergeant Harvel overheard Inspector Ghougoian call Officer Childs a "lying bitch."

A verbal conflict then occurred behind closed doors in the Squad Seven office between Inspector Ghougoian and Officer Childs. Inspector Dennis Richardson, Office of the Executive Deputy Chief, and Lieutenant Napoleon were in the adjacent office and overheard the commotion. Lieutenant Napoleon stated that he had heard two distinct voices. The deeper voice, at one point, called out, "Help me, Help me," while the other high pitched voice screamed unintelligibly. Inspector Richardson knocked on the wall in an attempt to quiet the commotion. Inspector Richardson and Lieutenant Napoleon immediately left the office and while standing in the hallway observed Inspector Ghougoian exit the Squad Seven office.

A short time later, after the incident in the Squad Seven office, Commander Stewart went to the Homicide Section and directed that Officer Childs go home. He then went into Inspector Ghougoian's office and informed her that he had sent Officer Childs home.

Chief of Police Isaiah McKinnon (through channels)  August 8, 1997
INVESTIGATION AND REPORT HOMICIDE FILE 96-279  Page 2

## III. FINDINGS

The Board in conducting this investigation interviewed 45 individuals, (see Attachment A), reviewed the previous investigation and interviews conducted during the initial investigation, (see Attachment B), as well as numerous court transcripts that had a bearing on this investigation. The Board's findings as to the allegations follow.

1. That Inspector Joan Ghougoian promised two murder subjects that they would be allowed to go home in exchange for their statements.

Both Reginald Vines and Eddie Lee James claimed that Inspector Ghougoian had promised that they could go home after giving their statements. Eddie Lee James, when interviewed by Officer Childs on August 20, 1996, told her that Inspector Ghougoian had promised him he could go home after making a statement. Officer Childs told this Board that Inspector Ghougoian had admitted to her that she (Ghougoian) had told James he could go home after giving a statement, but then told Officer Childs, "But you know that he's not." Reginald Vines also told the Board that Inspector Ghougoian had promised him that he could go home after making a statement. Reginald Vines also had recounted this promise to Officer Childs on August 21, 1996, when he was interviewed by Officer Monica Childs. Inspector Ghougoian denies promising the subjects they could go home and denies making any such statement to Officer Childs.

The Board took note of the contemporaneous statements made in August, 1996, by both Eddie Lee James and Reginald Vines concerning promises made by Inspector Ghougoian that they would be allowed to go home after giving their statements to Officer Childs. Both suspects made these statements to Officer Childs before any civil litigation or law suits were initiated. When interviewed by this Board, both Eddie Lee James and Reginald Vines gave statements similar to their comments in August, 1996.

Inspector Ghougoian testified before the Board that she did not question Eddie Lee James on the morning of August 20, 1996. However, Sergeant Arlie Lovier testified before this Board that Inspector Ghougoian called him into her office, where Inspector Ghougoian told Sergeant Lovier that Eddie Lee James would provide information concerning the whereabouts of the weapon involved in the shooting. It is obvious to this Board that Inspector Ghougoian had to have questioned Eddie Lee James, in order to have known that Eddie Lee James did, in fact, know the location of the weapon. The Board questions how the information concerning the weapon could have been elicited without there being an interrogation. This casts doubts on the Inspector's version of events, therefore the Board finds that there is a question of promises being made to Eddie Lee James.

Based on the foregoing, the Board concludes that Inspector Ghougoian should be charged with promising both Eddie Lee James and Reginald Vines that they could go home after each gave a statement. This is a violation of the Police Manual, Volume III, Chapter 5, Section 2,17, "Special Consideration", which states that all requests for Special Consideration must be forwarded through channels to the appropriate Deputy Chief for approval.

2. That Inspector Joan Ghougoian elicited statements from the two murder subjects without advising them of their Constitutional (Miranda) rights.

　　Inspector Ghougoian, in her interview with this Board, stated that she did not give Eddie Lee James his Constitutional (Miranda) rights. She also stated that she understood Mr. James was under arrest for the shooting of the eleven-year-old child. Sergeant Lovier was called into the Inspector's office and told by Inspector Ghougoian that Eddie Lee James was going to tell him the location of the weapon involved in the shooting.

　　It is clear that Inspector Ghougoian knew that Mr. James was in custody as a police prisoner at the time of this interrogation and should have been given his Constitutional rights by Inspector Ghougoian.

　　In regards to Reginald Vines, Inspector Ghougoian stated she did not advise him of his Constitutional rights because he had been given his rights previously. Inspector Ghougoian stated that she did not know who had given him his Constitutional rights. A Constitutional rights form had not been completed by anyone until after the interview by Inspector Ghougoian.

　　It is clear that Inspector Joan Ghougoian did in fact fail to give either suspect his Constitutional (Miranda) rights prior to questioning in this case. This is a violation of the following:

　　a. Police Manual, Volume III, Chapter 5, Section 2.6, which states in part, "As soon as possible after the arrest of a defendant, the Constitutional Rights Certificate of Notification, D.P.D. 342B, shall be read to the defendant. A copy of the form shall be given to the suspect to read. The defendant shall be requested to sign the form."

　　b. Criminal Investigative Bureau Standard Operating Procedures, Number 37, "Interrogation Procedures - Legalities," page 4, "Custodial Interrogation," which states, "According to Miranda, custodial interrogation means, 'Questioning initiated by law enforcement officers after a person has been taken into custody, or otherwise deprived of his freedom of action in any significant way.'"

　　"This means that at the very outset, such as the time of arrest, if a person in custody is to be subjected to interrogation, he must first be informed in clear and unequivocal terms about his rights under the Fifth Amendment."

3. That Inspector Joan Ghougoian directed Police Officer Monica Childs to place a time on the Constitutional Rights Form that would indicate that the murder suspects were given their Miranda rights earlier than the actual time.

　　Officer Childs stated to this Board that Inspector Ghougoian had directed her to change the time on the Constitutional rights form that Eddie Lee James had signed, and to make herself (Childs) the arresting officer.

The Constitutional Rights Form for Eddie Lee James is dated, August 20, 1996, 7:15 A.M. Officer Childs stated that Inspector Ghougoian directed her (Childs) to change the time to reflect that the interview with Inspector Ghougoian took place after he was given his Constitutional rights. Officer Childs stated that there were no witnesses to this discussion between her and Inspector Ghougoian. Inspector Ghougoian denies making these statements.

There is insufficient evidence to substantiate charges relative to this allegation.

4. That Inspector Joan Ghougoian directed Police Officer Monica Childs to give false testimony in court concerning the statements taken from Eddie Lee James and Reginald Vines.

Officer Childs alleged, in both her testimony and in her written statement that Inspector Ghougoian had attempted to get her to change her testimony in regards to the statements taken from Eddie Lee James and Reginald Vines. On January 8, 1997, Inspector Ghougoian entered the Squad Seven office and asked Officer Childs what her testimony would be at the upcoming Walker Hearing. Seated in the office with Officer Childs were Sergeant Harvel, Police Officer Harold Mitchell, Badge 224, and Police Officer Frazier Adams, Badge 4465, all assigned to the Homicide Section, Squad Seven.

At that point Inspector Ghougoian asked Officer Childs what she would be testifying to at the upcoming Walker Hearing. Inspector Ghougoian asked this question several times. The exact conversation was not overheard by any witness. Various comments or parts of the conversation were overheard, but no one was able to put the conversation or comments in proper context.

Inspector Ghougoian stated that she repeatedly asked Officer Childs what her statement would be at the upcoming Walker Hearing. Inspector Ghougoian stated that she persisted in questioning Officer Childs because she could not recall the case. Inspector Ghougoian further stated that she was not sure why she was being called the testify at the hearing.

On January 9, 1997, Inspector Ghougoian entered the Squad Seven Office, clapped her hands and stated, "The question of the day is, what is Monica going to testify to?" While there were other personnel in the Squad Seven office, Sergeant Harvel is the only witness, other than Officer Childs, that recalls hearing the statement. Inspector Ghougoian denied clapping her hands and making "the question of the day" statement.

This Board views Inspector Ghougoian's statements and behavior on January 8 and January 9, 1997, as inappropriate and construes same as intimidating. It appears that Inspector Ghougoian was attempting to use her position of authority to influence Officer Childs' testimony.

This attempt to influence Officer Childs' testimony is a violation of the Department Rules and Regulations, General Order 72-17, Section K, Subsection 65; Conduct Unbecoming an Officer.

5. That Inspector Joan Ghougoian confronted Officer Childs using coarse and profane language.

On January 10, 1997, after meeting with Commander Stewart, Inspector Ghougoian returned to the Homicide Section and approached Officer Childs who was seated in the Squad Seven office. Inspector Ghougoian testified that at that time she was "enraged" and "very, very, upset." Commander Stewart also testified that Inspector Ghougoian was upset and highly agitated when she left his office. When Inspector Ghougoian entered the Squad Seven office, Sergeant Harvel and Officer Childs were the only people present. As Inspector Ghougoian entered the office she called Officer Childs a "lying bitch." This comment was heard by Sergeant Harvel as he was leaving the office.

It is clear that Inspector Joan Ghougoian did in fact use coarse and disrespectful language when she confronted Officer Childs in the Squad Seven office. This is a violation of the following Department rules and Regulations:

  A. Department General Order 72-42, Section II. (Offenses), Subsection 4. "Using disrespectful, coarse, profane or insolent language or gestures to any ranking officer, any citizen or any other officer either directly or indirectly, face to face, or by telephone, or to use such language on the police radio."

  B. Department General Order 72-17, Section B, Subsection 1, General, which states in part, "All members of the department will exhibit a polite, dignified and courteous manner toward all citizens as well as their fellow officers. Similarly, disrespectful, profane, abusive, demeaning, or insulting language to any citizen or officer will constitute basis for disciplinary action."

6. Other matters of misconduct that were discovered by the Board during this investigation.

  A. Willful disobedience of rules or orders.

On January 10, 1997, Commander Gerald Stewart ordered Inspector Joan Ghougoian not to have any further contact with Officer Monica Childs or discuss the matter with Officer Childs.

Based on Inspector Ghougoian's statement, after leaving Commander Stewart's office she proceeded to the Squad Seven office where she confronted Officer Child, stating, "Monica, what you said in court was a lie. . . . I won't let it rest, and I will take legal action against you". Inspector Ghougoian also stated that she was 'enraged", and that "it was just upsetting to me, and I very firmly feel I am someone who has to confront my accuser, and I have to say something. I just can't let it go."

After being ordered not to have any further contact with Officer Childs, Inspector Ghougoian's actions are a violation of General Order 72-17, Section K, Subsection 9.

B. Willfully making a false oral or written statement or report.

On April 4, 1997, after being apprised of her Garrity Rights, Inspector Joan Ghougoian did in fact make several false statements to the Board concerning this incident.

1. Inspector Ghougoian stated to this Board that she was not ordered to avoid any further contact with Officer Childs on January 10, 1997, when in fact Commander Stewart did issue that order.

2. Inspector Ghougoian stated to this Board that she did not call Officer Monica Childs a "lying bitch" on January 10, 1997, when in fact her comments were overheard by Sergeant Reginald Harvel.

3. Inspector Ghougoian stated to this Board that she did not ask Eddie Lee James any questions while he was in her office concerning the homicide committed on August 19, 1996. Inspector Ghougoian had solicited information as to the location of the weapon used in the shooting. Inspector Ghougoian then had Sergeant Arlie Lovier sit in her office while Eddie Lee James explained the location of the weapon to Sergeant Lovier.

4. Inspector Ghougoian stated to this Board that she did not enter the Squad Seven office on the morning of January 9, 1997, clap her hands and make the statement, "The question of the day is, what is Monica going to testify to?," when in fact this statement was heard by both Officer Childs and Sergeant Harvel. This matter is of serious concern to the Board in that it demonstrates Inspector Ghougoian's persistence in attempting to influence the testimony of Officer Childs.

5. Inspector Ghougoian stated to this Board on April 4, 1997, that she was not aware of any improprieties by any member of the Homicide Section. She also denied having any knowledge of any improprieties on the part of Lieutenant Rice in dealing with suspects. She further stated that had she been aware of any improprieties, "as a commanding officer, I would have to address it." At a subsequent Walker Hearing involving defendants Patrick M. Dudley and Darrian W. Tomlin (Recorder's Court Files 97-00637, 97-00638 and 97-00639) held on May 9, 1997, Inspector Ghougoian testified in Recorder's Court before the Honorable Daphne Means Curtis, that she was aware of alleged promises made by Lieutenant Rice to the defendants in January 1997.

C. Conduct unbecoming an officer.

During this investigation it became clear that Inspector Joan Ghougoian had interfered with the investigative process. Inspector Ghougoian had questioned members of the Homicide Section concerning their testimony before the previous investigative board and questioned them as to what their testimony would be before this Board. Sergeants Patrick Henahen, Reginald Harvel, Police Officer Frazier Adams and Lieutenant William Rice all stated to this Board that they had been questioned by Inspector Ghougoian concerning this investigation.

Chief of Police Isaiah McKinnon (through channels)            August 4, 1997
INVESTIGATION AND REPORT HOMICIDE FILE 96-279            Page 10

    Sergeant Patrick Henahan testified that he was called into Inspector Ghougoian's office on March 4, 1997 to discuss this ongoing investigation. While Sergeant Henahan was on furlough, he went to the Homicide Section. Sergeant Henahan testified Inspector Ghougoian "called me back in[to her office], and we sat down, and she said, 'Pat, I want you to tell me if you know of any time or you believe at any time I have done anything improper or unethical since I have been the C.O. here.'" Sergeant Henahan stated that he told Inspector Ghougoian, "I am not at all comfortable with this. . . . There is an ongoing investigation. . . . I am not privy to that investigation being completed. . . . I don't feel comfortable with it, and I don't think it is proper for you to sit here and ask me about these things, and she said, 'Oh, that thing. Well, that is all done with.'" Sergeant Henahan told this Board that Inspector Ghougoian then stated, "This is just between you and I, and you can tell me just between you and I if you think that there is anything I have done that has been improper in my duties as Inspector.'" Inspector Ghougoian testified that she, "[s]pontaneously, just as a self check" asked Sergeant Henahan his perception of how she dealt with people. When he mentioned her involvement in a case that "could be part of your (the Board's) probe . . . I didn't say anything further, nor did I look at the case." Inspector denied telling Sergeant Henahan that the investigation into this matter was over.

    Sergeant Reginald Harvel testified that approximately a week and a half prior to his March 14, 1997, appearance before this Board that he had conversations with Inspector Ghougoian wherein she informed him that his testimony before this Board should be no different than his testimony before the previous Board. Sergeant Harvel stated that the conversations between he and Inspector Ghougoian "covered the entire gambit from the [January] 8th through the 10th." He testified that they went over this incident "a half dozen times or more to get an understanding of what I was going to say or to understand how I perceived it to be or try and flavor what it was that I was supposed to say."

    Police Officer Frazier Adams testified that Inspector Ghougoian asked him on several occasions what he had heard of the January 8, 1997, discussions between Inspector Ghougoian and Officer Childs. Officer Adams reported these incidents to Commander Gerald Stewart, who directed Officer Adams not to discuss this case with anyone. Subsequent to his testimony before the previous Board, Officer Adams again was called into Inspector Ghougoian's office. Inspector Ghougoian asked Officer Adams about his testimony. Officer Adams told Inspector Ghougoian that he had been ordered by Commander Stewart not to discuss this case with anyone. Officer Adams was not questioned by Inspector Ghougoian again concerning these matters. Inspector Ghougoian denied asking Officer Adams about his testimony before the previous Board. However, Inspector Ghougoian did admit to the Board that she asked Officer Adams if he had heard her order Officer Childs to lie regarding Officer Childs' testimony. Inspector Ghougoian also admitted that Officer Adams repeated other things he heard her say to Officer Childs, but the Inspector denied that this information was prompted by her questions.

Chief of Police Isaiah McKinnon (through channels)      August 8, 1997
INVESTIGATION AND REPORT HOMICIDE FILE 96-279      Page 11

Lieutenant William Rice stated to this Board that he was called into Inspector Ghougoian's office prior to his testimony before the previous Board. Lieutenant Rice further testified that, during this same conversation, Inspector Ghougoian "reminded me of cases that she had people that was (sic) going to go into things that I may have, or allegedly had, done also." During his testimony on March 14, 1997, Lieutenant Rice told this Board that [on March 3, 1997] "she called me in and sat me down and said, 'Bill, I have heard rumors about you talking to defendants after they have been wanting an attorney, if they requested an attorney, and I heard that you too had withheld evidence, a note or something in a case,' inferring that she is going to bring all of this out if things continue." Inspector Ghougoian denied knowledge of any improprieties in the handling of cases by Lieutenant Rice.

Inspector Ghougoian denied that she had discussed this investigation with any member of the Homicide Section other than Sergeant Deborah Moon. Inspector Ghougoian also denied questioning Lieutenant William Rice concerning any allegation or rumors that he had continued to question a suspect after the suspect had asked for an attorney.

Based on the above statements the Board concludes that there is sufficient evidence to charge Inspector Joan Ghougoian did attempt to interfere with an ongoing Departmental Investigation, is being a violation of General Order 72-17, Section K, Subsection 65, Conduct Unbecoming An Officer.

## IV. ADDITIONAL INFORMATION

### A. WAYNE COUNTY PROSECUTORS OFFICE

The Board was made aware of concerns raised by members of the Wayne County Prosecutors Office that indicated that there may have been other cases involving alleged promises made to homicide suspects in order to illicit confessions. Due to the serious consequences of these allegations, the Board began the investigation of this entire incident by immediately addressing this issue.

In conducting this portion of the investigation, the Board interviewed eight (8) Assistant Prosecutors and the Chief of Operations Richard Padzieski. The Board also reviewed the transcripts of Recorder's Court hearings in the following cases:

| DEFENDANT | COURT FILE |
|---|---|
| Keith Noland Williams | 96-04758 |
| Eddie Lee James | 96-06986 |
| Reginald Vines | 96-06986 |
| Gilbert Robinson III | 96-07475 |
| Patrick Dudley | 97-00638 |
| Darrian W. Tomlin | 97-00636 |

The Board also made a specific point, under Garrity, to ask each member of the Homicide Section that was interviewed, if they were aware of any promises made to, or special considerations given to, any subject to obtain confessions.

As a result of the interviews of the prosecutors and the department personnel involved, the Board could find no substantive evidence of any misconduct or improprieties, by any member of the Homicide Section. The current court procedures allow for a Walker Hearing in cases where there is concern regarding the admissibility of a criminal defendant's confession. The court system is the appropriate forum to review the circumstances surrounding confessions. If a violation is found, the court will not allow the confession as evidence. This premise was supported when discrepancies recently came to light during the Walker Hearing on defendants Patrick Dudley and Darrian Tomlin. Based on testimony presented during this hearing, Judge Daphne Means Curtis, on May 20, 1997, suppressed the confessions made by the defendants.

It is important to note that prior to the allegations made by Officer Childs to APA Page on January 10, 1997, concerning Homicide File 96-279, the Prosecutor's Office had not notified the Detroit Police Department of any complaints nor initiated an investigation into any cases involving confessions that the Homicide Section had submitted for prosecutorial review.

B. MISCELLANEOUS INFORMATION

In the interest of being thorough, the Board notes that Inspector Ghougoian raised the allegation of a personal relationship between Police Officer Monica Childs and Lieutenant William Rice. The Board finds no need to address this matter further as it finds that the alleged relationship has no bearing on any issues in this case.

C. RECORDERS COURT FILES 97-000637, 97-000638, 97-000639

As mentioned earlier in this report, at a recent Walker Hearing that ended on Wednesday, May 21, 1997, involving defendants Patrick Dudley and Darrian Tomlin (Recorders Court Files 97-00637, 97-00638 and 97-00639), the Honorable Recorders Court Judge Daphne Means Curtis directed that the statements of both suspects be suppressed. While Inspector Ghougoian was involved in this case, no information was brought forth before this Board that would cause any Department charges concerning the confessions, other than to charge Inspector Ghougoian with making a false statement to this Board concerning alleged promises made to the defendants by Lieutenant William Rice. The decision by Judge Daphne Means Curtis was a legal ruling based on the information put forward to the court. This board did not interview all the parties involved in this case and has no basis on which to recommend other misconduct charges again Inspector Ghougoian.

V. LEGAL PROCEEDINGS

The following pending legal actions are related to the events surrounding Homicide File 96-279:

1. Police Officer Monica Childs has filed a civil lawsuit Case Number 97-705915-CZ, against the City of Detroit; that case is currently pending in the Third Circuit Court.

2. Reginald Vines has filed a civil lawsuit, Case Number 97-707119-NZ, against the City of Detroit; that case is also currently pending in the third Circuit Court. No criminal charges have been brought against Reginald Vines in regards to this incident.

3. Eddie Lee James has been convicted of Second Degree Murder in Homicide Case File Number 96-297.

## IV. RECOMMENDATIONS

A. Inspector Joan Ghougoian, Homicide Section.

The board recommends that the following charges be brought against Inspector Joan Ghougoian of the Homicide Section:

Charge I: Failure to Exhibit a Polite, Dignified and Courteous Manner Toward all Citizens as well as their Fellow Officers

Specification 1: That she, Inspector Joan Ghougoian, of the Homicide Section, did, while on duty in the Homicide Section, Squad Seven office, call Police Officer Monica Childs, Badge 862, of the Homicide Section, a "lying bitch"; THIS BEING IN VIOLATION OF GENERAL ORDER 72-17, SECTION B, SUBSECTION 1, AND GENERAL ORDER 72-42, SECTION II, SUBSECTION 4.

Charge II: Willfully Making a False Oral or Written Statement or Report

Specification 2: That she, Inspector Joan Ghougoian, of the Homicide Section, did, while on duty on April 4, 1997, during testimony before a Department Investigative Board, willfully make a false statement that she did not call Police Officer Monica Childs a "lying bitch"; THIS BEING IN VIOLATION OF GENERAL ORDER 72-17, SECTION K, SUBSECTION 7.

Specification 3: That she, Inspector Joan Ghougoian, of the Homicide Section, did, while on duty on April 4, 1997, during testimony before a Department Investigative Board, willfully make a false statement that she was not ordered by Commander Gerald Stewart to avoid contact with Police Officer Monica Childs for the remainder of the day on January 10, 1997; THIS BEING IN VIOLATION OF GENERAL ORDER 72-17, SECTION K, SUBSECTION 7.

Specification 4: That she, Inspector Joan Ghougoian, of the Homicide Section, did, while on duty on April 4, 1997, during testimony before a Department Investigative Board, willfully make a false statement that she did not solicit information from a police prisoner, Eddie Lee James, while he was in her office on August 20, 1996; THIS BEING IN VIOLATION OF GENERAL ORDER 72-17, SECTION K, SUBSECTION 7.

Chief of Police Isaiah McKinnon (through channels)  
INVESTIGATION AND REPORT HOMICIDE FILE 96-279

August 8, 1997  
Page 14

Specification 5: That she, Inspector Joan Ghougoian, of the Homicide Section, did, while on duty on April 4, 1997, during testimony before a Department Investigative Board, willfully make a false statement: that she did not enter the Homicide Section, Squad Seven office on January 9, 1997, clap her hands, and state, "The question of the day is, what is Monica going to testify to?"; THIS BEING IN VIOLATION OF GENERAL ORDER 72-17, SECTION K, SUBSECTION 7.

Specification 6: That she, Inspector Joan Ghougoian, of the Homicide Section, did, while on duty on April 4, 1997, during testimony before a Department Investigative Board, willfully make a false statement that she was unaware of any improprieties within the Homicide Section, yet she testified in Recorder's Court on May 9, 1997, that she was aware that Lieutenant William Rice allegedly had promised suspects that they could go home in exchange for their statements; THIS BEING IN VIOLATION OF GENERAL ORDER 72-17, SECTION K, SUBSECTION 7.

Charge III: Willfully Disobey a Legal Order

Specification 7: That she, Inspector Joan Ghougoian, of the Homicide Section, did, while on duty on January 10, 1997, after being directed by Commander Gerald Stewart, Major Crimes Division, not to have any further contact or discussions with Officer Childs, willfully disobey this order and immediately confronted Officer Childs in the Homicide Section; THIS BEING IN VIOLATION OF GENERAL ORDER 72-17, SECTION K, SUBSECTION 9.

Charge IV: Conduct Unbecoming An Officer

Specification 8: That she, Inspector Joan Ghougoian, of the Homicide Section, did, while on duty from January through March, 1997, did interfere with an ongoing Department investigation by questioning witnesses involved in the investigation; THIS BEING IN VIOLATION OF GENERAL ORDER 72-17, SECTION K, SUBSECTION 65.

Charge V: Neglect of Duty

Specification 9: That she, Inspector Joan Ghougoian, of the Homicide Section, did, while on duty on August 20 and 21, 1996, fail to give Eddie Lee James and Reginald Vines, suspects in a Homicide Investigation, their Constitutional Rights prior to questioning; THIS BEING IN VIOLATION OF THE POLICE MANUAL, VOL. III, CHAPTER 5, SECTION 2.6, and CRIMINAL INVESTIGATIVE BUREAU, STANDARD OPERATING PROCEDURES, NUMBER 37, "INTEROGATION PROCEDURES."

Specification 10: That she, Inspector Joan Ghougoian, of the Homicide Section, did, while on duty on August 20 and 21, 1996, promise Eddie Lee James and Reginald Vines, suspects in a Homicide Investigation, that they could go home after giving a statement; THIS BEING IN VIOLATION OF THE POLICE MANUAL, VOL. III, CHAPTER 5 SECTION 2.17, "SPECIAL CONSIDERATION."

B. Police Officer Monica Childs, Badge E62, Homicide Section.

The Board finds no evidence that Police Officer Monica Childs violated any Department rules and regulations in her handling of Homicide File 96-279. The Board therefore recommends no Departmental charges against Police Officer Monica Childs.

## VII. CONCLUSION

This Board was originally assigned to investigate a series of complaints involving Homicide File 96-279; that responsibility has been completed with actions delineated in the "Recommendation" section of this report. It should be noted that due to the continuing nature of court proceedings, new issues relative to possible improper actions by members of the Homicide Section may be brought forth in the future. As stated earlier in this report, the Board is confident that the current safeguards provided by the legal system will ensure that the rights of suspects in criminal proceedings are properly protected. There has been no information brought forth to or discovered by this board that would indicate any concerted effort to obtain confessions or statements in an improper manner.

It is recommended that this report be forwarded to the Disciplinary Administration Unit for further processing of the charges. The Board further recommends that a Department trial board consisting of a Deputy Chief and two Commanders be convened to adjudicate the charges against Inspector Joan Ghougoian.

Due to the volume of the material accumulated during the investigation, the Board has provided a list of the material under the "Attachments" section. All documents, transcripts, recordings and other material are stored at the Office of the Deputy Chief, Eastern Operations Bureau, and will be available upon request.

With the issuance of this report and the adjudication of the charges against Inspector Joan Ghougoian, this Board recommends that this matter be considered closed.

*IRIS WORTHINGTON*
Deputy Chief
Eastern Operations Bureau

BRODERICK WILLIAMS
Commander
Twelfth Precinct

RONALD VASILOFF
Commander
Tenth Precinct

Attachments

**APPROVED**

AUG 1 9 1997

EXECUTIVE DEPUTY CHIEF

## ATTACHMENTS

A. INTERVIEWS: List of Interviews Conducted (Attached)

B. ORIGINAL HOMICIDE INVESTIGATION*

C. INTERVIEW FILES*

    1. Copies of Interview Transcripts
    2. Copies of Certificate of Notification of Constitutional Rights - Departmental Investigation DPD 593
    3. Copies of Audio Tapes of Interviews

D. COURT TRANSCRIPTS*

E. MISCELLANEOUS FILES AND INFORMATION*

\* Stored at Eastern Operations Bureau

## ATTACHMENT A

### LIST OF INTERVIEWS CONDUCTED

| | DATE | NAME | LOCATION |
|---|---|---|---|
| 1. | 2/28/97 | Assistant Prosecutor Curtis Smith | Wayne County Prosecutor's Office |
| 2. | 3/4/97 | Assistant Prosecutor Richard Padziewski | Wayne County Prosecutor's Office |
| 3. | 3/5/97 | Assistant Prosecutor Laura Winegarden | Telephone |
| 4. | 3/6/97 | Assistant Prosecutor Glenn Page | Wayne County Prosecutor's Office |
| | 3/6/97 | Assistant Prosecutor Robert Agacinski | Wayne County Prosecutor's Office |
| 5. | 3/12/97 | Comdr. Gerald Stewart | Eastern Operations |
| | 3/12/97 | Assistant Prosecutors Nancy Westvold Elizabeth Walker Maria Miller | Wayne County Prosecutor's Office |
| 6. | 3/13/97 | P.O. Monica Childs | Eastern Operations |
| 7. | 3/14/97 | P.O. Harold Mitchell Sgt. Reginald Harvel Lt. William Rice | Eastern Operations |
| 8. | 3/19/97 | Sgt. Patrick Henshan Sgt. Deborah McCreary Sgt. Arlie Lovier P.O. Frazier Adams | Eastern Operations |

ATTACHMENT A (Cont'd)                                      Page 2

| DATE | | NAME | LOCATION |
|---|---|---|---|
| 9. | 3/20/97 | Eddie Lee James with Attorney Michael Sharpe | Wayne County Jail |
| | | Attorney Ray Anthony Page | Law Offices |
| 10. | 3/21/97 | Lt. Hilton Napoleon<br>Sgt. George Garrison<br>Sgt. Joann Kinney<br>P.O. Herlotha Fields | Eastern Operations |
| 11. | 3/24/97 | Inv. Thomas Roscoe<br>P.O. Dale Collins | Eastern Operations |
| | | Reginald Vines with Attorney Michael Cafferty | Law Offices |
| 12. | 3/26/97 | P.O. Arthur Wimmer<br>Inv. Bobbie Geary<br>Sgt. Vernon Humes<br>Sgt. Anthony Woodford<br>Sgt. Marvin Butler<br>Inv. Isaiah Smith | Eastern Operations |
| 13. | 3/27/97 | Inv. Donald Hughes<br>Insp. Dennis Richardson<br>Inv. James Hawthorn | Eastern Operations |
| 14. | 4/4/97 | Sgt. Deborah Monti | Eastern Operations |
| | | Insp. Joan Ghougoian with Attorney Justin Ravitz | Eastern Operations |
| 15. | 5/28/97 | Sgt. Arlie Lovier<br>Sgt. Charles Braxton | Eastern Operations |