UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LAMARR MONSON,

     Plaintiff,

v.

JOAN GHOUGOIAN, *et al.,*

     Defendants.

Case No. 18-10638
Honorable Laurie J. Michelson

---

**ORDER ON PLAINTIFF'S PARTIAL MOTION FOR SUMMARY
JUDGMENT [237] AND DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT [241]**

---

The Court heard argument on the parties' cross-motions for summary judgment on October 28, 2022. And, as explained in more detail on the record and below, the Court granted Lamarr Monson's partial motion for summary judgment (ECF No. 237) and granted in part and denied in part Defendants' motion for summary judgment (ECF No. 241).

Although the Court ruled on the two summary-judgment motions at the hearing, in the interest of completeness and to aid the parties' efforts going forward, the Court will set out the facts and then restate its ruling. As the Court noted on the record, the factual landscape post-discovery is not so different than the factual allegations in the pleadings. (*See* ECF Nos. 43, 187.)

## I. Background

Monson claims that his constitutional rights were violated when he was investigated for and convicted of the murder of 12-year-old Christina Brown in 1997.

The factual bases of his claims thus center on the investigation into her death and his eventual conviction.

But before proceeding, a brief word on the standard. When there are cross-motions for summary judgment, as there are here, the Court must consider each motion separately and take the facts in the light most favorable to the non-moving party. *See Ohio State Univ. v. Redbubble, Inc.*, 989 F.3d 435, 442 (6th Cir. 2021). But, helpfully, the cross-motions here focus on different points of the investigation into Brown's murder. Monson's summary-judgment motion focused on his arrest at the crime scene. (*See generally* ECF No. 237.) While Defendants' motion focused on claims pertaining to the investigation into Brown's death and Monson's eventual prosecution, which generally started when Monson arrived at the police station. (*See generally* ECF No. 241.) So the Court takes the facts related to Monson's arrest at the scene in the light most favorable to Defendants (to the limited extent they are disputed), but it takes the post-arrest facts in the light most favorable to Monson.

### A. 1995

In October or November of 1995, a fire broke out at an apartment building on Boston Street in Detroit. (ECF No. 269-2, PageID.19225–19227.) Rather than repair the building, the landlord told all of the tenants to move out. (*Id.*) But a few tenants stayed, including Shellena Bentley, Kenneth Brown, and Linda Woods. (*Id.*; ECF No. 241-4, PageID.12901, 12965.)

Sometime after the fire, 22-year-old Lamarr Monson began selling drugs out of Apartment 7A. (ECF No. 241-8, PageID.13315.) Monson says he only "conduct[ed]

business" there, otherwise preferring to stay with the mother of his daughter or with his parents. (*Id.* at PageID.13315, 13263, 13354.)

And around this time, Monson met 12-year-old Christina Brown and periodically saw her around the neighborhood. (ECF No. 241-8, PageID.13312–13313.) Monson believed Brown to be 17 or 18 years old. (*Id.* at PageID.13314.) Brown's childhood friend, Cynthia Stewart, recalls that she and Brown looked mature for their age and that they would frequently tell others that they were 18 or 19. (ECF No. 269-14, PageID.19792.)

### B. 1996

### 1.

Brown ran away from home in early January 1996. (ECF No. 269-13, PageID.19774.) Needing somewhere to go, she would sometimes stay in Apartment 7A because, according to Monson, "that was a convenient place for her . . . It was wintertime, it was cold; that place was warm, it had people around that she knew . . . [and at] times I would go get food for everybody." (ECF No. 241-8, PageID.13349.) While staying there, Brown occasionally sold drugs for Monson. (*Id.* at PageID.13344–13345.) But Monson says their relationship was "like brother and sister," and he denies ever having a sexual relationship with her. (*Id.* at PageID.13320.)

### 2.

On January 19, 1996, Shellena Bentley was still living in the semi-abandoned apartment building. (ECF No. 269-2, PageID.19231.) After work that day, she invited her boyfriend, Robert Lewis, over. (*Id.*) The two planned to "just lay back and get

high." (*Id.*) According to Bentley, Lewis visited Apartment 7A about three times to purchase drugs throughout the night. (*Id.* at PageID.19234.) Lewis' 1996 statement to the Detroit Police Department noted that he had purchased drugs from Brown around 10 or 11 p.m. and that Monson was not there. (ECF No. 269-6, PageID.19454.)

For his part, Monson says that he left the apartment shortly before midnight to spend the night with the mother of his daughter. (ECF No. 241-8, PageID.13357; *see also* ECF No. 269-3, PageID.19399, 19414 (testimony of Monson's daughter's mother agreeing that he spent the night with her).) He says Brown was alive when he left. (ECF No. 241-8, PageID.13357.)

**3.**

Sometime around 4 or 5 a.m. on January 20, 1996, Bentley and Lewis ran out of both drugs and money. (ECF No. 269-2, PageID.19229.) So Lewis returned to 7A to see if he could buy drugs on credit. (*Id.* at PageID.19234.) According to Bentley, when Lewis returned, he was "dripping with blood. Blood was dripping off his fingernails . . . there was blood on his jacket, blood on his boots, blood on his pants . . . [and he said,] 'I think I killed that bitch.'" (*Id.* at PageID.19234–19239, 19270.) Bentley and Lewis fled. (*Id.* at PageID.19235.)

Around 10 a.m., Monson woke up at his daughter's mother's house. (ECF No. 241-8, PageID.13351.) He left the house around noon, briefly visited his parents' home, and then headed to the apartment building on Boston. (*Id.*; ECF No. 269-3, PageID.19418 (Monson's daughter's mother agreeing that he woke up around 10 am and left her home around noon).)

4

Monson arrived at the apartment building around 1:30 or 2 p.m. (ECF No. 241-8, PageID.13372; ECF No. 241-4, PageID.12913; ECF No. 237-11, PageID.12571.) When he arrived, Lewis (who had apparently returned) and another neighbor, Linda Woods, were standing outside the building chatting. (ECF No. 241-8, PageID.13373.) Woods told Monson that she had tried to check on Brown earlier in the day and—though the door was partially open—she got no answer. (*Id.*; ECF No. 241-4, PageID.12910 (Woods' testimony); ECF No. 269-6, PageID.19450 (Lewis' statement).)

So Monson, Lewis, and Woods went to Apartment 7A to investigate. (ECF No. 241-8, PageID.13373, 13384; ECF No. 269-6, PageID.19450.) Upon their arrival, Monson immediately noticed that "everything [in the apartment] was in disarray." (ECF No. 241-8, PageID.13373.) Then he saw a badly beaten Brown "laying on the floor [of the bathroom] . . . alive, waving her hands at [him]." (*Id.* at PageID.13375.) There was blood "everywhere: walls, floor, everywhere" in the bathroom. (*Id.* at PageID.13385; *see also* ECF No. 241-12, PageID.14116–14119, 14128 (crime scene photos).) He recalled, "she was gargling blood, I told her to turn her head to the side to allow the blood to release, and I was going to get help." (ECF No. 241-8, PageID.13375.)

Hysterical, Monson asked another neighbor, Kenneth Brown (no apparent relation to Christina Brown), to call 911. (ECF No. 241-8, PageID.13376; ECF No. 241-4, PageID.12971 (Kenneth Brown's testimony).) And Monson quickly drove to his sister's house, which was nearby, to call 911. (ECF No. 241-8, PageID.13376.) Monson

returned, placed a blanket over Christina Brown, and—when he noticed she was unresponsive—started doing chest compressions. (*Id.* at PageID.13376.)

Around 2:10 p.m., Detroit Police Officers Vincent Crockett and Jerome Wilson, who are Defendants in this case, arrived on the scene. (ECF Nos. 234-8, 237-3.) Despite noting that "everyone wanted to walk out," Crockett told Monson, Woods, and Lewis to "sit on the bed" and that "everyone is going to stay here." (ECF No. 237-2, PageID.12105–12106.) In time, the trio was put in police cars and transported to the police station. (ECF No. 241-8, PageID.13394–13395; ECF Nos. 234-8, 237-3.) While Defendants are correct that Monson was not handcuffed and that there is "no evidence that officers physically forced him into the car" (ECF No. 242, PageID.14383), Monson says he was "forced" to go "against his will" (ECF No. 237-2, PageID.12116; ECF No. 241-8, PageID.13395). And several officers testified that in 1996, it was customary for police to detain and transport homicide witnesses to the police station for questioning. (ECF No. 269-23, PageID.20296 (Braxton); ECF No. 269-10, PageID.19672 (Gallant); ECF No. 269-20, PageID.20102 (Ghougoian).)

EMTs arrived at the building shortly thereafter and transported Brown to the hospital, where she was pronounced dead. (ECF No. 272-2, PageID.20933; ECF No. 241-12, PageID.14093, 14107.)

Based on the amount of blood at the scene and Brown's wounds, the police and EMTs believed that Brown had been stabbed to death. (ECF Nos. 234-8, 237-3, 272-2, 272-3.) Indeed, the crime scene was processed as a "fatal stabbing." (ECF No. 231-2, PageID.10992.) The Evidence Technician Report noted that there was blood on

6

virtually every surface in the bathroom, that the bathroom window was broken from the inside, and that there was a bent, bloody kitchen knife in the sink. (*Id.* at PageID.10992.) It also noted that, on the floor of the bedroom, "wrapped in a white Wards mattress cover is the toilet tank top which is bloody." (*Id.*) The knife, toilet-tank top, and a few other items were tagged for evidence, and a technician lifted a number of prints for identification. (*Id.* at PageID.10993–10994.)

Monson, Woods, and Lewis arrived at the police station with Officers Crockett and Wilson. The witnesses were placed in separate rooms. (ECF No. 241-8, PageID.13396.) And Monson noticed that, while he waited, the other officers "just kind of repeatedly talked as if I was the person that committed the crime." (*Id.* at PageID.13399.)

Around 3 p.m., Crockett and Wilson filled out their preliminary complaint reports. (ECF Nos. 234-8, 237-3.) Both reports indicated that Monson was a witness rather than a suspect. (ECF Nos. 234-8, 237-3.) According to Crockett's testimony during Monson's criminal trial and his deposition in this case, Robert Lewis spoke to him as he filled out his report. (ECF No. 241-13, PageID.14231, 14287; ECF No. 237-2, PageID.12120–12123.) Lewis apparently told Crockett that Monson and Brown were dating and having sex. (ECF No. 237-2, PageID.12120, 12126.) Crockett, in turn, told Investigator Barbara Simon, who is also a Defendant in this case. (ECF No. 241-13, PageID.14231, 14287; ECF No. 237-2, PageID.12120–12123.)

Around 3:30 p.m., Simon read Monson his *Miranda* rights and had him sign a "Constitutional Rights Certificate of Notification." (ECF No. 241-14, PageID.14359.)

Monson "asked to use the phone after the reading of my rights." (ECF No. 241-8, PageID.13404.) Simon apparently refused. (*See id.*)

Meanwhile, the police collected statements from the residents of the semi-abandoned apartment building (Kenneth Brown, Robert Lewis, and Linda Woods) and Brown's childhood friend, Cynthia Stewart. Monson believes that two of these statements were exculpatory and that the other two were falsified or otherwise unreliable.

First, at 4 p.m., Kenneth Brown (the neighbor who called 911) gave a statement. (ECF No. 241-9, PageID.13646.) His statement said that Monson was Brown's boyfriend, but it also said that Monson "was out all night, I seen him come in from my window just before he came and knocked on my door" following the discovery of her body. (*Id.*) At his deposition years later, Kenneth Brown said he had no actual knowledge that Monson was Brown's boyfriend, and he could not recall if he or the police officer provided that information. (ECF No. 241-9, PageID.13604.) He said, "I was mainly telling them that [Monson] wasn't there. That he was gone when that was happening, you know. And the one detective talking about I can't afford to tell them that." (*Id.* at PageID.13558.) Monson believes that statement was exculpatory because it supported his story that he was not at the building on the night of the murder. (ECF No. 269, PageID.19169.)

Next, around 4:05 p.m., Lewis gave a statement to the police that largely aligned with Monson's story. (ECF No. 269-6, PageID.19450.) He said that Monson arrived at the apartment building that afternoon, that Woods told Monson that the

door of 7A was open, and that the trio went into the apartment to investigate. (*Id.* at PageID.19451.) He noted that they found Brown, that Monson started "pumping her chest," and that the EMTs and police soon arrived on the scene. (*Id.*) His statement also said that Lewis had purchased drugs from Brown around 10 or 11 p.m. the night prior, and that Monson was not there. (*Id.*) Monson argues that this statement was exculpatory because it noted that he had "attempted to aid and comfort the injured Christina Brown when he discovered her severely injured." (ECF No. 269, PageID.19192.)

Around 5:45 p.m., the police took a statement from Cynthia Stewart (also known as Paris Thompson), Brown's 13-year-old friend. (ECF No. 269-12, PageID.19770; ECF No. 269-14, PageID.19813.) The statement—which was purportedly taken by Barbara Simon—says that Monson had threatened Brown's life about one month prior to her death, that they were "boyfriend and girlfriend," and that Monson routinely carried a knife. (ECF No. 269-12, PageID.19771–19772.) But in her deposition in this case, Stewart told a different story. She said that in 1996, two or three police officers found her, "handcuffed [her,] and put [her] in the back of the [police] car." (ECF No. 269-14, PageID.19809.) After they arrived at the station, the officers told her that Brown had been murdered, showed her a clear bag of Brown's blood-stained clothes, and kept asking her "if [she] wanted to go to jail maybe or end up like that, like [her] friend." (*Id.* at PageID.19820.) Brown took that to mean that the police would be "mad" at her and that Monson might hurt her if she did not cooperate. (*Id.* at PageID.19908.) She continued, "they told me [Brown] was

with . . . Lamarr Monson selling drugs somewhere. I did not even know [Brown and Monson] were together . . . this was all told to me by the[ police]. I did not know that stuff. We had not seen each other for so long. . . . I didn't really know nothing about nothing." (*Id.* at PageID.19820–19821.) She denied that the signature on the statement was hers. (*Id.* at PageID.19833.) And Stewart did not recall speaking to any female officers, suggesting that perhaps Simon did not take her statement. (*Id.* at PageID.19899.) (At Monson's criminal trial, Crockett identified himself as one of the officers who interrogated Stewart. (ECF No. 241-13, PageID.14297–14298; ECF No. 241-5, PageID.13154.))

Finally, around 7:45 p.m., non-party Sergeant Gallant took Woods' statement. (ECF No. 269-9, PageID.19473.) Woods said that she saw Monson's car pull up to the building around 7:30 a.m., and that the car "pulled out fast" about forty-five minutes later. (*Id.*) Woods' statement also said that Monson and Brown were dating, but it otherwise largely conformed to Monson's account of his arrival at the apartment that afternoon. (*Id.* at PageID.19473–19474.) At his deposition, Sgt. Gallant recalled that he thought Woods was lying and on drugs as he took her statement. (ECF No. 269-10, PageID.19664.)

Also around 7:45 p.m., Monson signed his First Statement to the police. (ECF No. 241-14.) But before he did so, Simon interrogated him for "hours," apparently insisting that he and Brown had had a sexual relationship. (ECF No. 241-8, PageID.13406.) Monson consistently denied it. (*Id.* at PageID.13439–13441.) In any case, according to Monson, his First Statement contained a mix of truthful and

fictitious statements. (*Id.* at PageID.13410–13442.) For example, he says the First Statement truthfully conveyed most of his statements to Simon regarding the past 24 hours, including his denial of being at the building at 7:30 a.m. and his denial of any involvement in Brown's murder. (*Id.*) But it omitted the fact that Monson had spent the night with the mother of his daughter. (*Id.*) And it included allegedly fabricated statements that Brown was his girlfriend and that he and Brown had had sex in the days preceding her death. (*Id.* at PageID.13417–13437; 13439–13442.) Monson claims that he did not realize he was endorsing the information in the First Statement when he signed it, arguing that he only did so because Simon "instructed [him] to sign [his] signature." (*Id.* at PageID.13425.) At her deposition, Simon said she took the First Statement in question-and-answer format and that she "wrote down what he told [her]." (ECF No. 237-10, PageID.12472, 12476.)

Only after signing the First Statement was Monson permitted to use the phone. (*Id.* at PageID.13442.)

At some point during the day, Monson also signed a consent form permitting the police to search his car. (ECF No. 269-10, PageID.19574–19575.) No blood was found in the car. (*Id.* at PageID.19577.)

Around 11 p.m., Monson was fingerprinted and taken to lock-up. (ECF No. 237-16, PageID.12702; ECF No. 241-8, PageID.13443.) He did not sleep that night. (ECF No. 241-8, PageID.13443, 13446.)

\* \* \*

11

To summarize the events of the day, in the early morning hours of January 20, 1996, Robert Lewis came to his girlfriend, Shellena Bentley, covered in blood and admitted that he killed Christina Brown in the semi-abandoned apartment building. Then around 1:30 or 2 p.m., Monson went to the building, met up with Lewis and another neighbor (Linda Woods), and the three discovered a severely injured Brown. Monson and yet another neighbor (Kenneth Brown) both called 911. The police arrived and conveyed Monson, Woods, Lewis, and Brown to the police station for questioning. The police took statements from each of the witnesses, but Monson says some of the statements—including his own—were at least partially fabricated. Another was exculpatory but suppressed. And, toward the end of the day, Monson signed his First Statement to police, which "admitted" to having a sexual relationship with Brown, though it denied any connection to her murder. Monson was held overnight.

### 4.

Around 5 or 5:30 the next morning, on January 21, 1996, Monson was taken to see Joan Ghougoian, then the Chief Inspector of the Detroit Police Department. (ECF No. 241-8, PageID.13443, 13446.) (Ghougoian is a Defendant in this case.) Once in her office, Monson says Ghougoian told him that she "didn't believe that I did it. . . . She told me that they had a stack of evidence against me, and she placed her hand on a stack of files on her desk." (*Id.* at PageID.13446.) But then Ghougoian extended an olive branch: "she . . . told me that she wanted to help me, but they're going to charge me with first degree murder; but if I were to do another statement,

or sign [an] information summary, as she put it, that she could have me home by that time tomorrow." (*Id.*) And then, "she continued to attempt to convince me to do a statement or sign another statement. She gave me references as to possibly the need for a self-defense scenario, and she would ramble a story about self-defense." (*Id.* at PageID.13447.) One such scenario was as follows: "she gave me a scenario of me coming home drunk or high, and getting into an argument with [Brown] to the point where she tried to stab me, and I took the knife from her, and we had a—a scuffle or whatever." (*Id.* at PageID.13448.) Then she said: "Now do you want to get charged, or do you want to go home[?] So I said, I want to go home. And she said, So you're going to sign? And I say, Yeah, I agreed to, and that's when she contacted the other officer to come in." (*Id.* at PageID.13447–13448.)

For her part, Ghougoian denies ever falsely promising any suspects that they could go home if they signed statements. (ECF No. 269-20, PageID.20011.) And in her deposition, she agreed that, in 1996, "it was unlawful for a police officer to promise a suspect they could go home if they gave a statement implicating themselves in the commission of a crime where the police officer had neither the intention nor the authority to make good on that promise." (*Id.* at PageID.20097.)

After about three hours with Ghougoian, at around 8:25 a.m., Defendant Sergeant Charles Braxton entered the room and took Monson's Second Statement, which "admitted" to stabbing Brown in self-defense. (ECF No. 241-2.) Specifically, it says that Monson "had been out drinking all night" and came home in the early morning. (ECF No. 241-2, PageID.12801.) And it says that Monson removed some

condoms from his pocket and went to the bathroom to remove a condom from his penis when Brown "charged" him with a butcher knife in a jealous rage. (*Id.*) The two struggled over the knife, and "as [Monson] was pushing her back the knife was bent in her hand and it struck her in the neck." (*Id.*) It says he left the apartment for a few hours only to return in the afternoon to call 911. (*Id.*)

Monson and Braxton dispute how the Second Statement came to be. Monson says: "I was sitting there 'sleep, half 'sleep, laying on the desk, somebody is typing, telling me to sign. Only thing on my mind is what I've been told, that I'd be going home at this time tomorrow. I'm being caught up in all this mix of stuff that I don't want to be involved in for something that I didn't do[.]" (ECF No. 241-8, PageID.13460–13461.) And he says that Braxton was "reading off of another piece of paper as he was typing in some occasions . . . [And Ghougoian] would come in and out of the room that they would confer with—even though I couldn't hear what they were saying, I know it was applying to the second statement." (*Id.* at PageId.13461.) And Monson noted the similarity between the statement Braxton typed and the self-defense scenario Ghougoian had described earlier. (ECF No. 241-8, PageID.13465 ("Q: Somebody made this up, correct? A. Yes. Part of it was the scenario that was given to me in the beginning when I talked with Ms. Ghougoian. That's why I know where—where it's from.").)

But Braxton remembers things differently. Take, for example, this exchange from his deposition: "Q: But now after 22 years, you're able to remember that [Ghougoian] was only in the room for a minute, she never looked over your shoulder,

she never proofed what you were typing; that's your testimony, correct? A: Yes." (ECF No. 269-23, PageID.20439.) And Braxton testified that he took Monson's statement in a question-and-answer format. (*Id.* at PageID.20432.)

After signing the Second Statement, Monson did not get to go home. Instead, he was returned to lock-up. (ECF No. 241-8, PageID.13474.)

At some point on the same day, the Medical Examiner's report came in. (ECF No. 241-12, PageID.14093.) Although the ME found numerous stab wounds consistent with the police department's theory, he also noted that she had suffered a severe skull fracture and ultimately concluded that Brown's death was caused by "craniocerebral injuries which were the result of a beating." (*Id.* at PageID.14093–14105, 14113–14115.) This report was made available to police "the same day." (ECF No. 241-12, PageID.14065.)

And at some point the same day, Barbara Simon became the officer-in-charge of the investigation into Brown's death. (ECF No. 237-10, PageID.12349.) As she later recalled, this required her to "put the case together. You do the lab work. . . . [Y]ou're supposed to go to the Wayne County Morgue. You have to sit in on the autopsy. I don't think I did that, though, that particular time. You prepare everything. You take it to the prosecutor. You talk to the prosecutor. You give them their package. You leave the file with them, and they will, you know, see what that person is charged with, murder 1, murder 2." (*Id.* at PageID.12349–12350.)

In accordance with her duties as the officer-in-charge, Simon sent an Investigator's Report to the prosecutor that very day. (ECF No. 237-19,

15

PageID.12726.) She recommended that the prosecutor charge Monson with first-degree murder. (*Id.*) The report notes that Brown was Monson's girlfriend and that an autopsy revealed that the "cause of death was a result of multiple stab wounds." (*Id.*) The report also included the following details: (1) that Stewart (Brown's friend) would testify that Monson had previously threatened Brown's life; (2) that Woods (the neighbor who entered the apartment with Monson and Lewis) saw Monson arrive at the building and depart 45 minutes later on the morning of the murder; (3) that Kenneth Brown (the neighbor who called 911) would testify that Monson and Brown were dating; and (4) that Braxton (the officer who took Monson's Second Statement) would testify that Monson admitted to stabbing Brown. (*Id.* at PageID.12726–12727.) The report omitted Kenneth Brown's statement that Monson was not home the morning of the murder, and it omitted Robert Lewis entirely. (ECF No. 269, PageID.19192.) At the bottom, the report said: "Statement/Confession: See Def. Monson Statement," indicating that one or both of his statements were submitted to the prosecutor. (*Id.*)

Based on the Report, the prosecutor charged Monson with first-degree premeditated homicide that day. (*Id.* at PageID.12726.) Monson was arraigned the following day, January 22, 1996. (ECF No. 241-8, PageID.13474.)

* * *

To summarize the events of February 21, 1996, the day after Brown's murder: early that morning, Ghougoian interrogated Monson and promised him that he could go home if he signed a Second Statement. He agreed to the deal, and Braxton typed

16

up the self-defense story that Ghougoian had contrived, where Monson "admitted" to stabbing Brown in self-defense during a lovers' quarrel. Monson signed it. Meanwhile, the Medical Examiner's report concluded that Brown died of craniocerebral injuries, not from being stabbed. Nonetheless, Simon submitted an Investigator's Report to the prosecutor indicating that Monson was Brown's boyfriend, that he admitted to stabbing her, and that she had died from the stab wounds. The report (according to Monson) also included fabricated information and omitted exculpatory information from various witnesses at the scene. Based on Simon's report, the prosecutor charged Monson with first-degree murder.

## 5.

On January 25, 1996, Simon received the results of the latent print examination. (ECF No. 269-24, PageID.20460.) The lab matched Monson's prints with a print found on the bathroom mirror. (*Id.*) But his prints did not match either set of useable prints recovered from the bloody toilet-tank top. (*Id.*) One set matched Brown, but the lab noted that "there is still an unidentified usable print and palmprint left." (*Id.*)

## 6.

About a week later, on February 2, 1996, Monson had his preliminary exam (i.e., his probable-cause hearing). Dr. Jeff Harkey, the pathologist who performed Brown's autopsy, testified. (ECF No. 237-11, PageID.12531.) He said the cause of death was "extensive injuries to [Brown's] brain and skull." (*Id.* at PageID.13531–13546.) He noted that, while an ordinary glass window could not have caused the

fatal blow, a "toilet tank top is a heavy enough object." (*Id.*) Braxton and Simon also testified, and Monson's First and Second Statements were read aloud and entered into the record. (*Id.* at PageID.12580, 12591–12595, 12599, 12609, 12610–12614.)

The judge found probable cause to believe Monson committed first-degree murder. (*Id.* at PageID.12628–12631.) After relaying much of the information contained in the First and Second Statements, the court concluded that "the person inflicting these injuries was Defendant Lamarr Monson and both of his statements— although there was an attempt to exculpatory[—]there's clearly no indication of anyone else. The Court believes that there is probable cause to believe that the crime of First Degree Murder has been established. There is probable cause to believe that the Defendant committed the offense." (*Id.* at PageID.12631.)

Monson was bound over for trial. (*Id.*)

## 7.

Meanwhile, more evidence came in. On February 7, 1996, Simon received tapes of the calls Monson and Kenneth Brown made to 911. (ECF No. 237-18, PageID.12712; ECF No. 269-35, PageID.20595.)

And on February 14, the forensic analysis of the knife was completed. (ECF No. 269-28, PageID.20573.) The report indicated that a "print [was] raised and a[ ]photograph [was] taken of the raised print. Evidence turned over to the Property Section. Photograph and negative turned over to latent print section." (*Id.*) The report noted that Simon was the "case officer[.]" (*Id.*)

Monson claims that this—and other—exculpatory evidence was never disclosed to him. (*See* ECF No. 269, PageID.19196, 19207.) Monson says the 911 tapes were exculpatory because, without them, the prosecutor was able to make this argument in closing at his trial: "[T]he defendant makes himself the person that's so concerned, he goes and he calls 9-1-1 . . . I went back to the apartment building, and then I got a blanket and I put it over [Brown] . . . But, no, this is a blatant fabrication. You have heard no witness come in here and say that they saw that, or any evidence consistent with that." (ECF No. 241-5, PageID.13158–13159.) And Monson says the report on the knife "has never been produced[,]" and presumably the print on the knife would have matched Lewis. (*See* ECF No. 269, PageID.19195.)

**8.**

On May 17, 1996, Monson challenged the voluntariness of the Second Statement at a *Walker* hearing. (ECF No. 241-3.) Both Braxton and Monson testified. (*Id.*) Braxton testified that he took the statement in question-and-answer format, and he denied making Monson any promises. (ECF No. 241-3, PageID.12812, 12816.)

At the *Walker* hearing, Monson agreed that the First Statement he made to Simon was "true and voluntarily given." (*Id.* at PageID.12826.) (At his deposition, Monson clarified: "My answer of yes to that question [at the hearing] was pertaining to the fact that I had no involvement in the murder of Christina Brown." (ECF No. 241-8, PageID.13326.)) But when Monson was asked if anyone had promised him anything in exchange for signing the Second Statement, he said yes. (*Id.*) He continued, Ghougoian "told me if I went with another statement, not a statement, but

19

if I went with another—she called it an information summary, I signed this, and that I would be at home by this time tomorrow, and then that I would probably get out on personal bond, but as right now I was arrested, I was held under Murder I." (*Id.* at PageID.12832.) And when asked if he supplied the information in the Second Statement to Braxton, he said: "It was already theorized to me, the words. Like he asked questions . . . its like he asked some questions, but it was like I was laying down half asleep; a little bit . . . all I heard was typing." (*Id.*) And he said, "I was given an opportunity to read [the Statement], but I didn't. I just went by thinking I could trust what was going on, and just sign." (*Id.* at PageID.12838.)

The judge denied the motion to suppress, noting: "this is a matter of credibility, so far as my decision is concerned, and I think that the testimony of Sergeant Braxton outweighed the testimony of the defendant; the officer I would consider to be credible." (*Id.* at PageID.12846.) She continued: "If you have a person who has been killed in an unnatural manner . . . and the defendant said he had something to do with it . . . that would certainly be sufficient for the People to file a charge . . . some sort of homicide." (*Id.* at PageID.12847.)

### 9.

Monson spent a year in jail awaiting trial. (*See* ECF Nos. 241-4, 241-13.)

During that time, Shellena Bentley, Robert Lewis' now-former girlfriend, called the police at least twice to tell them that they had the wrong person in jail for Brown's murder. (ECF No. 269-2, PageID.19271–19273, 19294.) The police never took Bentley's statement.

### C. 1997

### 1.

In early 1997, about a year after Brown's murder and just before Monson's trial, the Detroit Free Press ran three articles on Chief Inspector Ghougoian. (ECF No. 269-23, PageID.20324.) For example, on February 27, 1997, a front-page story indicated that Ghougoian was being sued by a homicide investigator who claimed that Ghougoian pressured her to lie under oath about an illegally-obtained confession. (*Id.* at PageID.20329.) The article said "Ghougoian got . . . two men to confess after promising they could go home after giving their statements. Ghougoian then ordered [the officer] to take statements from the suspects and testify that Ghougoian had never spoken to them. When [the officer] resisted, Ghougoian told her it was homicide protocol to keep her out of it." (*Id.*)

### 2.

Monson's three-day criminal trial began on March 3, 1997. (*See* ECF Nos. 241-4, 241-13, 241-5.)

At the start of the trial, the prosecutor sought to introduce Monson's fingerprint that was found on the bathroom mirror. (ECF No. 241-4, PageID.12858.) She said, "I had asked Barbara Simon if there had been any prints because I knew prints had been taken, and her representation was that there were no usable prints. That was true as to one form, but on another form, there is usable prints." (*Id.*) After the prosecutor said she had shared the fingerprint evidence with Monson's defense counsel that morning, the Court admitted it. (*Id.* at PageID.12861.) The report noting

21

the "unidentified, usable print" on the toilet-tank top was read into evidence the following day. (ECF No. 241-13, PageID.14333–14334.)

At trial, Stewart (Brown's friend) and Woods (the neighbor who discovered Brown with Monson and Lewis) testified. (ECF No. 241-4, PageID.12853.)

Stewart, then 14 years old, testified largely in line with her statement to police the prior year. (ECF No. 241-4, PageID.12879–12896.) When Stewart was later asked at her deposition if she testified truthfully during Monson's trial, she said she just parroted what the police told her to say. (ECF No. 269-14, PageID.19848, 19851 ("Q: Did anybody tell you what to say on the stand?" A: They did. Q: Who? A: . . . The cops. Q: Okay. Describe to me why you say that they made you say something on the stand? . . . . A: Because if I did not want to go to jail or end up like [Brown], I need to say that I seen things that I didn't . . . It was them that told me all of these things. She never said nothing to me.").)

Woods—whose 1996 statement to police indicated that she saw Monson arrive at the building at 7:30 a.m. on the day of the murder and leave in a hurry about 45 minutes later—changed her account.  (ECF No. 241-4, PageID.12896–12936.) After equivocating about whether she saw or heard Monson's car, she said she both saw and heard it. (*Id.* at PageID.12909, 12927, 12932.) But on cross-examination, she admitted that it would have been impossible to see the building's parking lot from her apartment. (*Id.* at PageID.12946.) And she admitted she had been nervous and on drugs when she gave her statement to police. (*Id.* at PageID.12947.)

Kenneth Brown (the neighbor who called 911), a medical examiner, an evidence technician, a DNA expert, Simon, Crockett, and Braxton also testified. (ECF No. 241-4, PageID.12853; ECF No. 241-13, PageID.14142.)

At the end of the second day of trial, Monson's defense counsel made an oral motion for a directed verdict, arguing that the only real evidence tying Monson to Brown's death was the Second Statement. (ECF No. 241-13, PageID.14335–14345.) The Court denied the motion the following day. (ECF No. 241-5, PageID.13071.)

Monson was convicted on March 7, 1997. (ECF No. 187, PageID.8942.)

### 3.

In August 1997, a Detroit Police Department Review Board investigation found, among other things, that Joan Ghougoian "promised two murder subjects that they would be allowed to go home in exchange for their statements" and that she "directed [an officer] to give false testimony in court concerning the statements taken from [the suspects]." (ECF No. 269-21, PageID.20150–20156.) In her deposition in this case, Ghougoian disagreed with most of the report's findings. (ECF No. 269-20, PageID.20034–20041.)

In time, Ghougoian retired from the force, and the review board case against her was dismissed. (ECF No. 269-20, PageID.20048.)

### D. Post-Conviction

Over the following years, Monson appealed his conviction and sought various forms of post-conviction relief. (ECF No. 241-8, PageID.13489–13490.) And Shellena

Bentley told the DPD that Monson was innocent and Lewis was guilty in 2005 and again in 2012. (ECF No. 269-2, PageID.19241, 19243, 19279.)

The Michigan Innocence Project became involved in Monson's case in 2012, about 16 years after Brown's death. (ECF No. 187, PageID.8935.) With its help and Bentley's assistance, the Wayne County Prosecutor's Office agreed to compare the unmatched print on the toilet-tank top to Robert Lewis'. (ECF No. 232-4, PageID.11188.) It matched. (*Id.*) And more prints were discovered on the toilet-tank top. So the DPD sent it out for reexamination, noting that "[t]he victim was killed by blunt force trauma, and there was a bloody toilet tank lid at the scene, with prints on it. Two print lifts were taken from the lid and analyzed, and one of them matched to an alternative suspect, Robert Lewis. But it is apparent from visual inspection of the tank lid that other prints are on it, including at least one that is bloody. Elimination is required." (ECF No. 269-30, PageID.20583.) These newly discovered prints also matched Lewis. (ECF No. 269-32.)

Armed with this evidence, the Clinic filed a motion for a new trial, which was granted in 2017. (ECF No. 166-9.) Later that year, the prosecutor's office dismissed the criminal case against Monson. (ECF No. 85-8, PageID.3104.)

Monson was released from prison in February 2017 after serving more than 20 years. (ECF No. 241-8, PageID.13275.)

### E. Post-Release

Less than a year later, Monson brought suit against the City of Detroit, the DPD, the Chief of Police, Barbara Simon, Joan Ghougoian, Charles Braxton, Vincent

Crockett, and Jerome Wilson, alleging that many of his constitutional rights had been violated in 1996 and 1997 and that he had been maliciously prosecuted under Michigan law. (ECF Nos. 1, 187.) In an opinion on Defendants' motion to dismiss, the Court dismissed the City, DPD, and the Chief of Police, but many of Monson's claims against the other Defendants survived. (*See* ECF No. 43.)

After extensive discovery, both parties filed summary judgment motions. (ECF Nos. 237, 241.) As explained, the Court heard argument on the parties' cross-motions for summary judgment on October 28, 2022.

## II. Order

For the reasons set forth in the oral ruling on the record, Monson's partial motion for summary judgment (ECF No. 237) is GRANTED insofar as the jury will be advised that Monson was arrested without probable cause. However, a limiting instruction will also be given that this finding is not relevant to any of the remaining claims and is being shared merely to give the jury the full factual background of Monson's prosecution.

And for the reasons set forth in the oral ruling on the record, Defendants' motion for summary judgment (ECF No. 241) is DENIED IN PART and GRANTED IN PART.

Defendants' motion on Monson's malicious-prosecution claims against Crockett, Simon, Ghougoian, and Braxton is DENIED, with certain limitations noted on the record. The motion is GRANTED as to Wilson.

Defendants' motion on Monson's *Brady* claim against Simon is also DENIED, with certain limitations noted on the record.

Defendants' motion on Monson's coerced-confession claim against Ghougoian is DENIED, but the motion against Braxton is GRANTED.

Defendants' motion on Monson's fabrication-of-evidence claims against Simon, Ghougoian, and Braxton is DENIED, except insofar as this claim relates to Stewart's statement or trial testimony. (However, as explained on the record, if Monson can provide a citation to the record showing that Stewart's 1996 statement to police was introduced at trial, the Court may reconsider this portion of the ruling.)

However, Defendants' motion on Monson's coerced-testimony claim against Crockett and Wilson is GRANTED because there is no evidence that these officers were involved in coercing Stewart's trial testimony. (However, as explained on the record, if Monson can provide a citation to the record showing that Stewart's 1996 statement to police was introduced at trial, the Court may reconsider this portion of the ruling.)

And the Court DECLINES supplemental jurisdiction over Monson's state-law malicious-prosecution claim.

In sum, with the limits noted above and on the record, the following claims remain against each Defendant: (1) a federal malicious-prosecution claim against Crockett; (2) a federal malicious-prosecution claim, a claim for violations of *Brady v. Maryland*, and a fabrication-of-evidence claim against Simon; (3) a federal malicious-prosecution claim, a coerced-confession claim, and a fabrication-of-evidence claim

against Ghougoian; and (4) a federal malicious-prosecution claim and a fabrication-of-evidence claim against Braxton. As no claims against Wilson survive, he will be DISMISSED.

SO ORDERED.

Dated: November 9, 2022

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE